**FOLEY & LARDNER LLP**
Leah M. Eisenberg, Esq.
90 Park Avenue
New York, NY 10016-1314
Tel:    (212) 682-7474
Fax:    (212) 687-2329
leisenberg@foley.com

- and -

Michael J. Small, Esq. (*pro hac vice* pending)
Emil P. Khatchatourian, Esq. (*pro hac vice* pending)
321 N. Clark Street, Suite 2800
Chicago, IL 60654-5313
Tel:    (312) 832-4500
Fax:    (312) 832-4700
msmall@foley.com
ekhatchatourian@foley.com

*Counsel for Discover Growth Fund, LLC*

**UNITED STATES BANKRUPTCY COURT FOR THE
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| Immune Pharmaceuticals, Inc., | Case No. 19-13273 (VFP) |
| Debtor. | |

**MOTION OF DISCOVER GROWTH FUND, LLC
FOR RELIEF FROM THE AUTOMATIC STAY**

Discover Growth Fund, LLC, a U.S. Virgin Islands limited liability company

("Discover"), by and through its undersigned counsel, hereby submits this motion

(this "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit 1**

(the "Proposed Order"), authorizing (i) relief from the automatic stay, and (ii) a waiver of the 14-

day stay provided by Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").  In support of this Motion, Discover submits the (i) *Statement of Amount*

*Due Pursuant to D.N.J. LBR 4001-1(a)(1)* (the "Statement of Amount Due"), a copy of which is

attached hereto as **Exhibit 2** and incorporated herein by reference, and (ii) *Declaration of John C. Kirkland in Support of Motion of Discover Growth Fund, LLC for Relief from the Automatic Stay* (the "Kirkland Declaration"), a copy of which is attached hereto as **Exhibit 3** and incorporated herein by reference.   In further support of this Motion, Discover respectfully represents the following:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference* from the United States District Court for the District of New Jersey, dated September 18, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The legal bases for the relief requested herein are sections 105, 361, and 362 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Bankruptcy Rules 4001 and 9014, and Rule 4001-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

## FACTUAL BACKGROUND

### A.      Procedural Background

3.      On February 17, 2019 (the "Petition Date"), Immune Pharmaceuticals, Inc. (the "Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 case (the "Chapter 11 Case").  The Debtor is operating its business and/or managing its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      No request for the appointment of a trustee or examiner has been made in this Chapter 11 Case, and a creditors' committee has not been appointed.

5.      The Debtor is a New Jersey-based clinical stage biopharmaceutical company specializing in the development of "novel targeted therapeutic agents" in the fields of inflammation, dermatology and oncology.

6.      Discover is the Debtor's senior secured lender, pursuant to the terms of a $5,500,000.00 face amount Senior Secured Redeemable Convertible Debenture (the "Debenture") issued to Discover on October 9, 2018 and the Securities Purchase Agreement dated October 9, 2018 (the "Agreement"), pursuant to which it was issued (the Debenture and Agreement together, the "Debt Documents").[1]  See Kirkland Declaration, ¶¶2-3.

**B.      Discover's Investment in the Debtor**

7.      The Debtor's stock is publicly traded.  It previously traded on the Nasdaq Capital Market under the trading symbol IMNP.  See Kirkland Declaration, ¶8.  On July 6, 2018, the Debtor was delisted by Nasdaq, and began trading on the OTCQB over-the-counter market under the same symbol.  See Kirkland Declaration, ¶12.

8.      On August 6, 2018, Discover was approached by the Maxim Group, a registered broker-dealer representing the Debtor, about making an additional investment.  After more than a month, a negotiated term sheet was executed between the Debtor and Discover on September 18, 2018.  See Kirkland Declaration, ¶13.

9.      In negotiating the Agreement, the Debtor's representative Gary Rabin stated: "At this time, Immune does not have enough shares of authorized common stock to cover the full conversion/exercise of the debentures and warrants.  We have approximately 135mm unreserved shares, so we propose: (i) we will issue you a TA letter for 130mm shares now and then; (ii) within 45 days of closing, we will file a PRE 14A calling a special meeting where we will ask

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Kirkland Declaration or Debt Documents, as applicable.

our shareholders to increase the number of authorized shares to a level sufficient to cover full conversion/exercise and will instruct the TA to reserve the remaining required shares." See Kirkland Declaration, ¶14.

10.    Discover had multiple discussions with the Debtor's representatives about the need for the Debtor to significantly increase its authorized shares in order to do an equity financing deal with Discover, or anyone else.  Discover also expressed considerable concern that the Debtor's stock price would continue to decline, which would result in substantially more shares needing to be reserved for Discover, particularly if the market price were to drop below a penny per share.  The parties agreed on a specific process, whereby Discover would take the initial risk of there being too few shares, but the Debtor would take the risk of having to increase its authorized shares, increasing the share reserve required for Discover, and registering all of the shares with the U.S. Securities & Exchange Commission (the "SEC").  See Kirkland Declaration, ¶15.

11.    To secure repayment of the indebtedness and its other Obligations to Discover, the Debtor granted Discover a security interest in all assets of the Debtor (other than all tangible and intangible assets associated with Ceplene unless such assets are not disposed of by March 31, 2019), including without limitation, all inventory, chattel paper, accounts, equipment, general intangibles, and all other types of Collateral, including all after-acquired property.  See Kirkland Declaration, ¶17.

12.    Discover perfected its security interest in the Collateral.  On October 9, 2018, Discover filed (a) UCC-1 Financing Statement No. 2018 6983973 with the Department of State of the State of Delaware, where the Debtor is incorporated, and (b) UCC-1 Financing Statement No. 53034144 with the Department of the Treasury of the State of New Jersey, where the Debtor

has its principal place of business.  Discover also filed a Grant of Security Interest Agreement in United States Patents and Trademarks with the United States Patent and Trademark Office. Thus, all of the Debtor's Obligations (as defined in the Agreement) under the Agreement, the Debenture, and the other Transaction Documents are fully secured by a perfected, first-position lien on the Collateral (as defined in the Agreement), which includes substantially all assets of the Debtor.  See Kirkland Declaration, ¶18.

13.    On October 9, 2018, the date the Debenture was issued, the Debtor's closing stock price was $0.08 per share.  On October 29, 2018, the Debtor filed a preliminary prospectus to increase its authorized shares of common stock from 225,000,000 to 600,000,000 shares.  On November 18, 2018, $3.9 million in convertible debentures the Debtor had issued to third parties in May 2018 became past due.  On November 21, 2018, the Debtor filed a Registration Statement to register 123,333,333 shares of common stock for issuance to Discover upon conversion of the Debenture.  On November 28, 2018, the closing price of the Debtor's stock was $0.02 per share.  On December 18, 2018, the Debtor announced it engaged Extera Partners to lead its effort to secure a partnership for bertilimumab ("Bert"), a phase 2 human anti-eotaxin-1 monoclonal antibody.  On December 19, 2018, the stockholders approved the share increase, and the Debtor increased its authorized shares to 600,000,000.  On January 15, 2019, the parties entered into a First Amendment Agreement.  The Debtor filed two amendments to the Registration Statement, but never increased the number of shares it sought to register for Discover.  The Registration Statement was never declared effective by the SEC.  On February 7, 2019, the Debtor filed a final prospectus indicating the Registration Statement had become effective automatically 20 days after filing.  On February 7, 2019, the Debtor's closing stock

price was $0.008 per share, a decline of 90% in less than four months. <u>See</u> Kirkland Declaration, ¶20.

## C.    Equity Condition Failures, Trigger Events, and Events of Default

14.    On February 8, 2019, Discover served the Debtor with a Notice of Default and Notice of Sale of Collateral ("<u>Notice of Default</u>").  Discover notified the Debtor that it was in default under the terms of the Debt Documents due to the Debtor's failure to maintain the required Reserved Amount and certain Trigger Events, including, but not limited to, (i) the Debtor's failure to repay the May Debentures when due, (ii) the Debtor's failure to register for sale under the Securities Act of 1933, as amended, all of the shares of common stock issuable in respect of the Debenture, and (iii) the failure of one or more of the equity conditions specified in the Debenture because the Debtor was not in compliance with all provisions, covenants, representations and warranties of the Transaction Documents.  In the Notice of Default, Discover declared all of the Debtor's Obligations under the Debenture, Agreement, and other Transaction Documents immediately due and payable.  <u>See</u> Kirkland Declaration, ¶22.

15.    On February 15, 2019, iCo Therapeutics Inc. ("<u>Licensor</u>") served the Debtor with a Termination of Product Sublicense Agreement ("<u>Termination</u>").  The Debtor failed to timely file a Current Report to disclose the Termination, as required by Item 1.02 of the General Instructions to Form 8-K.  <u>See</u> Kirkland Declaration, ¶23.

16.    On February 17, 2019, the Debtor filed its voluntary petition under chapter 11 of the Bankruptcy Code.

17.    Events of Default are governed by Section IV.G of the Agreement, which provides as follows:

> <u>Events of Default</u>.  Company shall, at Investor's option, be in default under this Agreement upon the happening of any of the following events or conditions (each, an "Event of Default"): (a) a failure to pay any amount due under the

Debenture, this Agreement or any Transaction Document within 5 business days of the date the same is due; (b) <u>the failure by Company to perform any of its other obligations under the Debenture, this Agreement or any Transaction Document within 10 business days of notice from Investor of the same</u>; (c) <u>falsity, inaccuracy or material breach by Company of any written warranty, representation or statement made or furnished to Investor by or on behalf of Company</u>; (d) an uninsured <u>material loss</u>, theft, damage, or destruction <u>to any of the Collateral</u>, or the entry of any judgment against Company or any lien against or the making of any levy, seizure or attachment of or on the Collateral; (e) <u>the failure of Investor to have a perfected first priority security interest in the Collateral;</u> (f) any indication or evidence received by Investor that Company may have directly or indirectly been engaged in any type of activity that might reasonably be expected to result in the forfeiture of any property of Company to any governmental entity, federal, state or local; or (g) <u>the occurrence of any 3 or more Trigger Events under the Debenture</u>.

Agreement § IV.G (emphasis added).

18. The following Events of Default occurred under the Agreement prior to the filing of the Debtor's bankruptcy petition:

### i. Termination of License

19. Included in the Collateral securing the Obligations under the Debt Documents is a Product Sublicense Agreement between the Debtor and Licensor dated December 7, 2010 (the "<u>License</u>"). The License was filed with the SEC on April 9, 2014 as Exhibit 10.30 to the Debtor's Annual Report on Form 10-K, and has been incorporated by reference in every subsequent Annual Report. <u>See</u> Kirkland Declaration, ¶27. The License includes non-exclusive patent licenses for the intellectual property underlying Bert. The Debtor's website describes Bert as follows:

> Immune's lead program, bertilimumab, is a first-in-class, human monoclonal antibody that targets eotaxin-1, a chemokine that plays a role in immune responses and attracts eosinophils to the site of inflammation. By blocking eotaxin-1, bertilimumab may prevent the migration and activation of eosinophils and other cells, thus blocking an important inflammatory pathway active in a variety of allergic and immune diseases. Bertilimumab has shown promising clinical activity in bullous pemphigoid and has been studied in other conditions including allergic rhinitis and ulcerative colitis, and may have application in other diseases, including atopic dermatitis, asthma, and other diseases.

Immune Pharmaceuticals, https://www.immunepharma.com/news-events/press-releases/detail/178/immune-pharmaceuticals-engages-extera-partners-to-pursue (last visited Feb. 22, 2019).

20.     In exchange for the License, the Debtor paid the Licensor initial consideration comprised of $0.5 million in cash, 30,000 ordinary shares which were valued at $1.0 million (now worth $45.00), and 10,000 warrants which were valued at $0.2 million (now essentially worthless). See Kirkland Declaration, ¶28.

21.     In its Agreement with Discover, the Debtor represented and warranted as follows:

No Conflicts. The execution, delivery and performance of the Transaction Documents by Company, . . . and the consummation by Company of the . . . transactions contemplated thereby do not and will not . . . conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, . . . or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any material agreement . . . or other understanding to which Company . . . is a party or by which any property or asset of Company . . . is bound or affected, or . . . conflict with or violate the terms of any material agreement by which Company . . . is bound or to which any property or asset of Company . . . is bound or affected.

Agreement, § III.A.3.

22.     The Debtor also represented and warranted to Discover:

Patents and Trademarks. Company and each Subsidiary have, or have rights to use, all patents, patent applications, . . . licenses and other similar rights that are necessary or material for use in connection with their respective businesses as described in the Public Reports and which the failure to so have would have a Material Adverse Effect (collectively, "Intellectual Property Rights"). . . . To the knowledge of Company, all such Intellectual Property Rights are enforceable . . . .

Agreement, § III.B.11.

23.     In the Termination, the Licensor stated that it was terminating the License immediately, "due to Immune having subjected the intellectual property and Information covered by the [License] Agreement to be subject to one or more security interests and/or has otherwise encumbered such intellectual property and Information, in breach of the obligations under the

CAT 213 Product License Agreement between iCo and CAT, the provisions of which are applicable to Immune under the terms of the [License] Agreement." The Termination also gave notice that, "Immune is in material breach of its obligations under the [License] Agreement; to wit, (1) Immune has subjected the intellectual property covered by the [License] Agreement to one or more security interests, and/or has otherwise encumbered such intellectual property and Information, in breach of its obligations under Section 10.1(d) of the [License] Agreement." In addition, the Termination states that the Debtor "failed to establish a Joint Development Committee, as required in Section 4.2 of the [License] Agreement" and "failed to provide to iCo timely progress and other reports, as required in Sections 4.8 and 5.5." See Kirkland Declaration, ¶31.

24.     Accordingly, there is an Event of Default under Section IV.G(c) of the Agreement, due to the "falsity, inaccuracy or material breach by Company of any written warranty, representation or statement made or furnished to Investor by or on behalf of Company," in that the security interest granted to Discover in the Agreement conflicted with both the License and the underlying agreement between the Licensor and CAT, in violation of the representations and warranties the Debtor made in Sections III.A.3 and III.B.11 of the Agreement. See Kirkland Declaration, ¶32.

25.     In addition, the Termination itself constitutes a further Event of Default under Section IV.G(d) of the Agreement, as a material loss of any of the Collateral. It is also a further Event of Default under Section IV.G(e) for Discover to fail to have a perfected first-priority security interest in the Collateral as a result of the Termination. See Kirkland Declaration, ¶33.

**ii.     Failure to Reserve Required Shares**

26.     From the date of Discover's first investment in the Debtor in 2015 until today, the market price of the Debtor's stock has dropped by more than 99.99%. Accordingly, to provide

9

some level of protection for Discover, the Agreement obligates the Debtor to increase its authorized shares and maintain an adequate reserve of shares for issuance upon conversion of the Debenture.  See Kirkland Declaration, ¶34.  Section IV.H of the Agreement provides as follows:

> Reservation of Shares.  Company has reserved from its duly authorized Common Stock for issuance pursuant to the Transaction Documents authorized shares of Common Stock in the amount required by the Transaction Documents, and from and after the Capital Increase Date Company will at all times maintain a reserve equal to 5 times the number of shares sufficient to immediately issue all Conversion Shares potentially issuable at such time, free from preemptive rights (the "Reserved Amount").  The Reserved Amount will, if necessary, be increased from time to time in accordance with the Company's obligations hereunder.

Agreement, § IV.H (emphasis added).

27.     As of November 28, 2018, because of the occurrence of multiple Trigger Events and the 75% decline in the Debtor's stock price from the date of the Agreement, the Debenture was convertible into over 88,000,000,000 Conversion Shares.   However, the Debtor did not seek to amend its proxy statement or obtain a larger increase, and instead on December 19, 2018 obtained approval to increase its authorized shares to only 600,000,000.   Despite the acknowledgement in the prospectus that the number of Conversion Shares issuable upon conversion of the Debenture "is significantly more shares than we are authorized to issue," the Debtor never took any action to further increase its authorized shares as required.  See Kirkland Declaration, ¶35.

28.     In addition, upon the increase in authorized shares to 600,000,000 shares, the Debtor failed to reserve all of the newly authorized shares for Discover, as required by the Transfer Agent Instructions (Agreement, Exh. 3) ("(a) immediately reserve 135,000,000 Shares for issuance to Investor, (b) immediately upon an increase in authorized shares, reserve such additional number of shares as Investor may request, (c) upon receipt of written notice, from either Company or from Investor with a copy to Company, reserve any additional Shares

requested to be reserved").  Instead, the Debtor reserved millions of shares for other debenture holders, other warrant holders, preferred stockholders, and its own employee stock option plan. See Kirkland Declaration, ¶36.

29.     Over the last three months, Discover has repeatedly notified the Debtor regarding its failure to reserve sufficient shares for Discover.  In the Notice of Default, Discover provided the Debtor with formal notice of the Debtor's failure to comply with Section IV.H of the Agreement.  The Debtor has never taken any action to perform its obligations to provide adequate reserved shares.  See Kirkland Declaration, ¶37.

30.     Accordingly, there is an Event of Default under Section IV.G(b) of the Agreement, due to the failure by the Debtor to perform its obligations within 10 business days of notice from Discover of the same.  See Kirkland Declaration, ¶38.

### iii.        Failure to Register and Issue Shares

31.     On February 12, 2019, Discover issued a Conversion Notice with respect to a conversion of $530.00 of the Debenture into 9,017,067 Conversion Shares.   The Debtor acknowledged the calculation was correct and issued the requested shares.  See Kirkland Declaration, ¶39.

32.     On February 14, 2019, the Debtor filed a Current Report on Form 8-K with the SEC, without first providing it to Discover for review, in violation of Section IV.D of the Agreement.  Discover notified the Debtor that this was an additional Default under the Agreement.  See Kirkland Declaration, ¶40.

33.     On February 15, 2019, Discover issued another Conversion Notice.  The Debtor instructed its transfer agent not to comply with the notice, and falsely advised the transfer agent that the Registration Statement was no longer effective.  See Kirkland Declaration, ¶41.

34.     The Debtor did not amend the Registration Statement to reflect the Notice of Default, the Termination, or its filing of bankruptcy. Those appear to have been deliberate acts by the Debtor to prevent Discover from obtaining the issuance of Conversion Shares. Regardless, as a result of the Debtor's failure to comply with its obligations under the Debt Documents, Discover has not timely obtained the Conversion Shares to which it is entitled. See Kirkland Declaration, ¶42.

35.     On February 19, 2019, the Debtor's stock was delisted by the OTCQB. See Kirkland Declaration, ¶43.

### iv.      Multiple Trigger Events

36.     Under Section IV.G(g) of the Agreement, "the occurrence of any 3 or more Trigger Events under the Debenture" constitutes an Event of Default. More than 20 Trigger Events have occurred under Section I.H.1 of the Debenture. See Kirkland Declaration, ¶44.

37.     Discover did not timely receive the number of Conversion Shares stated in its February 15, 2019 Conversion Notice, and indeed never received any shares for such conversion. The Debtor failed to comply with its obligation to register enough Conversion Shares. The Debtor failed to comply with its obligation to authorize sufficient Conversion Shares. The Debtor failed to comply with its obligation to reserve sufficient Conversion Shares. The Debtor failed to comply with its obligation to deliver Conversion Shares. The Debtor failed to comply with its obligation to provide the February 14, 2019 Current Report to Discover for review prior to filing. The representations and warranties in the Agreement concerning the License and Intellectual Property were incorrect when made. Nine separate defaults occurred under nine different debentures, each in excess of $250,000. The Registration Statement has been unavailable to Discover for more than five Trading Days. The Debtor's stock was delisted from the OTCQB and now trades only on the "Pink Sheets." The Debtor's lawyer instructed the

Debtor's transfer agent not to comply with Discover's Conversion Notice, and the Debtor's agent failed to do so. The Debtor voluntarily initiated bankruptcy proceedings. See Kirkland Declaration, ¶45.

38. The Debtor was delisted from the OTCQB. The Debtor failed to timely deliver Conversion Shares to Discover pursuant to its February 15, 2019 Conversion Notice. The Debtor's counsel has stated that it failed to amend the Registration Statement and it is therefore no longer available for resale of the Conversion Shares. The Conversion Shares for the February 15, 2019 conversion notice have not been received into Discover's account and have not been cleared for trading. The Debtor has breached its representations and warranties concerning the License, and has breached the provisions of the Agreement requiring it to authorize, reserve, and register sufficient common shares for Discover. See Kirkland Declaration, ¶47.

39. Accordingly, there is an Event of Default under Section IV.G(g) of the Agreement, for "the occurrence of any 3 or more Trigger Events." See Kirkland Declaration, ¶48.

**D.   The Value of Discover's Secured Claims**

40. Discover's first-position secured lien secures all of the Debtor's Obligations under the Debenture, the Agreement, and the other Transaction Documents. See Kirkland Declaration, ¶49.

41. The current face amount of the Debenture is $5,499,470.00 plus interest at 32% per annum from October 9, 2018, as well as attorneys' fees and expenses. See Kirkland Declaration, ¶50. Additional amounts accrued and owing under the Debt Documents are set forth more particularly in the Statement of Amount Due.

42. Under Section I.D.2 of the Debenture, it constitutes a Deemed Liquidation Event if Discover does not receive the number of Conversion Shares stated in a conversion notice

within 5 trading days (Debenture § I.D.2(c)), if trading of the Common Stock is halted or suspended by the OTCQB (Debenture § I.D.2(d)), or if the Debtor sells, transfers, or licenses its assets other than Ceplene (Debenture § I.D.2(e)).    Accordingly, under the Mandatory Redemption provision of Section I.F.4 of the Debenture, Discover is immediately entitled to be paid the Early Redemption Price in cash.  The Early Redemption Price is the $5,499,470.00 face value, multiplied by the 32% annual interest rate, multiplied by the five-year term of the Debenture, which is $14,848,569.00.  See Kirkland Declaration, ¶51.

43.    Discover's monetary damages for the Debtor's breach of its obligation to authorize, reserve, register and issue Conversion Shares would be the $0.006 high trading price on February 15, 2019, less the $0.0001 price per share, multiplied by the 54,884,700,000 Conversion Shares to which Discover is entitled, which would be $324,468,730.  Suffice it to say that the amount of Discover's claims against the Debtor substantially exceeds any possible value in the estate.  See Kirkland Declaration, ¶52.

## E.    The Diminishing Value of the Debtor's Assets and Lack of Adequate Protection

44.    The Debtor was a development-stage biopharmaceutical company.  It has only four material assets:  Bert, Ceplene, NanoCyclo, and AmiKet.  The Debtor's most recent Form 10-Q filing indicates that the Debtor's assets were valued at $28.6 million as of December 31, 2017 and $20.7 million as of September 30, 2018.[2]  Thus, the value of the Debtor's assets was declining even before the filing of bankruptcy.  See Kirkland Declaration, ¶53.

45.    The Debtor has described NanoCyclo and AmiKet as having little value.  The Debtor has not put anything into developing them in some time, and had no plans to do so.  See Kirkland Declaration, ¶54.

---

[2] See Form 10-Q, Nov. 14, 2018, available at
https://www.sec.gov/Archives/edgar/data/1208261/000114420418059964/tv506447_10q.htm.

46.     The Debtor has represented to Discover that Ceplene is only perceived as having any value by Daniel Tepper, the Debtor's former CEO.  Discover's understanding is that Mr. Tepper desires to acquire the Ceplene assets and liabilities from the Debtor, but he has been unable to raise the funds to do so.  Because the Debtor does not believe that Ceplene has any value, its plan was to abandon it back to the licensor in order to stop incurring further liabilities. See Kirkland Declaration, ¶55.

47.     When the License was still in effect, the Debtor represented to Discover that it believed Bert could warrant an up-front partnering payment of $10 to $15 million.  However, it advised Discover that it would take at least $3 to $5 million in cash and three to six months to bring Bert to a stage necessary to effectuate such a partnering arrangement with a larger biopharmaceutical company.  See Kirkland Declaration, ¶56.

48.     Prior to the bankruptcy filing, the Debtor repeatedly stated to Discover that it is critical that the current development path for Bert not be materially disrupted, and that if it is, that will make it much less desirable to potential partners.  Specifically, raw materials for the clinical studies must be ordered by March 2019, an engineering run is scheduled for June 2019, and a larger run in September 2019.  The Debtor also previously explained that the antibody is produced by a large contract antibody manufacturing company with very high demand, and missing the scheduled dates would likely result in the Debtor losing its manufacturing slots.  This could delay the clinical trial by a year or more.  Because the larger companies looking at Bert schedule their projects several years in advance, such a material disruption to the schedule would reduce or potentially eliminate the interest of one or more potentially interested partners.  In addition, the Debtor indicated to Discover that the most desirable potential partner was becoming

increasingly concerned about potential problems with creditors that might disrupt the rights to the technology or impede timely development.  See Kirkland Declaration, ¶57.

49.  Following the Termination, the value of Bert has been substantially reduced. Based on the limited information available, Discover would estimate its current value at approximately $1 to $1.5 million.  To the right buyer under the right conditions it could be worth more.  However, this is highly speculative, and the present conditions are far from ideal.  The only certainty is that the value of Bert is lower than it was, is decreasing daily, and may decrease dramatically if not put back on track forthwith.  See Kirkland Declaration, ¶58.

50.  As of the date hereof, Discover is not aware of any reinstatement of the License, nor is it aware of any request by the Debtor for approval of debtor-in-possession financing to fund its operations in this Chapter 11 Case.  To Discover's knowledge, the Debtor no longer has any employees, and nothing is being done to close out the current clinical trials, make preparations for the next clinical trials, or in any way preserve the value of the Bert asset or any of the other possible assets.  See Kirkland Declaration, ¶59.

51.  If a foreclosure sale is not allowed to proceed expeditiously, Discover believes that the value of its Collateral is in jeopardy.  With the passage of time, there is a material likelihood of a significant diminution in the value of the Collateral, a risk that Discover is forced to bear as the Debtor's senior secured lender.  There does not appear to be an equity cushion that would adequately protect Discover.  In the event there is any equity cushion, Discover believes that it is likely shrinking with each passing day.  See Kirkland Declaration, ¶60.

52.  In addition, the Debtor has not proposed any form of adequate protection in favor of Discover or furnished any information pertaining to adequate protection.  See Kirkland Declaration, ¶61.

53. As discussed more fully below, Discover is entitled to relief from the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code, because the Debtor cannot provide adequate protection of Discover's interest in the Collateral.

## RELIEF REQUESTED

54. By this Motion, Discover seeks entry of the Proposed Order, pursuant to sections 105, 361, and 362 of the Bankruptcy Code and Bankruptcy Rules 4001 and 9014, authorizing (a) relief from the automatic stay to permit Discover to exercise its remedies under the Debt Documents, including a public sale of the Collateral, and (b) a waiver of the 14-day stay provided by Bankruptcy Rule 4001(a)(3) in light of the continuing prejudice to Discover's interests in the Collateral and lack of adequate protection.

## BASIS FOR RELIEF

### A. Applicable Standards

55. Section 362(d) of the Bankruptcy Code provides, in pertinent part, as follows:

(d) On request of a party in interest after notice and a hearing the court shall grant relief from the stay provided under subsection (a) of the section, such as by terminating, annulling, modifying or conditioning such stay-

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an action against property under section (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d).

56. "In seeking relief from the automatic stay, the moving party has the burden of proof on the issue of the debtor's equity in the collateral, with the debtor having the burden of

proof on all other issues, including adequate protection." In re Tudor Motor Lodge Assocs. Ltd.

P'ship, 102 B.R. 936, 952 (Bankr. D.N.J. 1989) (citing 11 U.S.C. § 362(g)).

57.    For the reasons set forth below, Discover submits that it is entitled to relief from

the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code.

**B.    Discover Is Entitled to Relief from Stay "For Cause" Under Section 362(d)(1)
Because the Debtor Has Not and Cannot Provide Adequate Protection to Discover.**

58.    Discover is entitled to relief from the automatic stay "for cause" in order to

exercise its rights under the Debt Documents.  To make "a *prima facie* case for cause due to a

lack of adequate protection, a movant must initially demonstrate that it holds a claim, secured by

a valid, perfected lien upon estate property and that a decline in the value of its collateral is either

occurring or is threatened, against which the creditor is precluded from protecting its interests

due to the existence of the automatic stay."  In re Kowalsky, 235 B.R. 590, 595 (Bankr. E.D.

Tex. 1999) (footnote omitted).  While the Bankruptcy Code does not define adequate protection,

it provides three examples of what may qualify to protect a secured creditor:

> (1) requiring the trustee to make a cash payment or periodic cash payments to
> such entity, to the extent that the stay under section 362 of this title, use, sale, or
> lease under section 363 of this title, or any grant of a lien under section 364 of this
> title results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that
> such stay, use, sale, lease, or grant results in a decrease in the value of such
> entity's interest in such property; or
>
> (3) granting such other relief, other than entitling such entity to compensation
> allowable under section 503(b)(1) of this title as an administrative expense, as
> will result in the realization by such entity of the indubitable equivalent of such
> entity's interest in such property.

11 U.S.C. § 361.

59.    "Many courts have focused on the presence or absence of an equity cushion in

determining whether a secured creditor has adequate protection of his collateral.  An equity

cushion has been defined as 'the surplus of value remaining after the amount of indebtedness is subtracted from the fair market value of the collateral.'" In re Cardell, 88 B.R. 627, 632 (Bankr. D.N.J. 1988) (internal citations and quotations omitted).

60.     Here, cause exists to lift the stay because (a) the Debt Documents entitle Discover to foreclose and sell the Collateral; (b) the Debt Documents establish Discover's valid, perfected lien on the Collateral; and (c) the Debtor has provided no evidence that shows the Collateral is indeed worth more than the debt that encumbers it.

61.     On the Petition Date, the Debtor merely filed a voluntary petition and no other "first day" filings.  As of the date hereof, the Debtor has not sought approval of any debtor-in-possession financing to fund its operations in this Chapter 11 Case.

62.     The Notice of Default notified the Debtor that it was in default under the terms of the Debt Documents due to the Debtor's failure to maintain the required Reserved Amount and certain Trigger Events, including, but not limited to, (i) the Debtor's failure to repay the May Debentures when due, (ii) the Debtor's failure to register for sale under the Securities Act of 1933, as amended, all of the shares of common stock issuable in respect of the Debenture, and (iii) the failure of one or more of the equity conditions specified in the Debenture because the Debtor was not in compliance with all provisions, covenants, representations and warranties of the Transaction Documents.  In the Notice of Default, Discover declared all of the Debtor's Obligations under the Debenture, Agreement, and other Transaction Documents immediately due and payable.

63.     Crucially, cause also exists to lift the stay because the License, which includes non-exclusive patent licenses for the intellectual property underlying Bert, was terminated prior to the Petition Date, on February 15, 2019.  The Termination was an Event of Default under the

Agreement, in that the security interest granted to Discover in the Agreement conflicted with both the License and the underlying agreement between the Licensor and CAT, in violation of the representations and warranties the Debtor made in the Agreement.  In addition, the Termination itself constitutes a further Event of Default under the Agreement, as a material loss of any of the Collateral.  It is also a further Event of Default under the Agreement for Discover to fail to have a perfected first-priority security interest in the Collateral as a result of the Termination.

64.    Moreover, Discover's monetary damages for the Debtor's multiple breaches of its obligation to authorize, reserve, register and issue Conversion Shares would be hundreds of millions of dollars.  See Kirkland Declaration, ¶50.  Thus, the amount of Discover's claims against the Debtor substantially exceeds any possible value of the estate.

65.    The Debtor no longer has any employees, and nothing is being done by the Debtor to close out current clinical trials, make preparations for the next clinical trials, or in any way preserve the value of the Bert asset.

66.    In the absence of a viable funding source to fund the Debtor's operations during this Chapter 11 Case, the value of the Debtor's assets will remain in jeopardy.  With the passage of time, there is a material likelihood of a significant diminution in the value of the Collateral, a risk that Discover is forced to bear as the Debtor's senior secured lender.  There does not appear to be an equity cushion that would adequately protect Discover. In the event there is an equity cushion, it is likely shrinking with each passing day.

67.    In addition, the Debtor has not proposed any form of adequate protection in favor of Discover or furnished any information pertaining to adequate protection.  See Kirkland Declaration, ¶59.

68.     Nevertheless, the Debtor appears to be unable to provide Discover with adequate protection.  First, the Debtor cannot make periodic cash payments from anything other than Discover's existing cash collateral, which is already subject to Discover's prepetition security interest and therefore cannot be used for adequate protection purposes.  Second, the Debtor's unencumbered assets (if any), on which the Debtor would provide Discover with a replacement lien, are of an undetermined value, and themselves are likely declining in value.  Third, the License that granted the Debtor the rights to develop and commercialize pharmaceuticals containing a critical antibody underlying the Bert asset was terminated just prior to the Petition Date, severely limiting the Debtor's ability to monetize the Collateral.

69.     Any equity cushion, which is unlikely to exist as of the date hereof, is shrinking each day there is no financing proposed to fund the Debtor's operations in this Chapter 11 Case. Accordingly, Discover is entitled to relief from the automatic stay pursuant to Section 362(d)(1) of the Bankruptcy Code.  See Hartman v. Wells Fargo Bank, N.A. (In re Hartman), 2016 U.S. Dist. LEXIS 40470, at *___ (D.N.J. Mar. 28, 2016) (affirming bankruptcy court's grant of stay relief as the debtor could not provide adequate protection to the secured creditor).

70.     Because Discover has stated a *prima facie* case entitling it to relief under section 362(d)(1) of the Bankruptcy Code, the burden shifts to the Debtor to demonstrate that Discover is adequately protected.  See Tudor Motor Lodge Assocs. Ltd. P'ship, 102 B.R. at 952.

71.     Based on the foregoing, Discover respectfully submits that there is cause for this Court to lift the automatic stay to allow Discover to exercise its rights and remedies under the Debt Documents.

## C.     Waiver of Bankruptcy Rule 4001(a)(3)

72.     Pursuant to Bankruptcy Rule 4001(a)(3), "[a]n order granting a motion for relief from an automatic stay made in accordance with [Bankruptcy] Rule 4001(a)(1) is stayed until the

expiration of 14 days after the entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 4001(a)(3).  Discover submits that cause exists to waive the 14-day stay provided by Bankruptcy Rule 4001(a)(3).  Removing the 14-day stay is an appropriate remedy to allow Discover to immediately exercise its legal rights and remedies against the Collateral in order to prevent, among other things, diminution of Discover's interests in the Collateral.

## MEMORANDUM OF LAW

73.     The rules and statutory provisions that constitute the basis for this Motion, the legal authorities that support the relief requested, and the factual grounds for the relief are all included and/or cited herein.  Accordingly, Discover submits that no separate memorandum of law is necessary or required.

## NOTICE

74.     Notice of this Motion is being provided to counsel for the Debtor and other parties in interest entitled to receive notice in connection with this Chapter 11 Case.  Discover submits that no other or further notice is required under the circumstances.

## NO PRIOR REQUEST

75.     No prior motion for the relief requested herein has been made to this or any other court.

## CONCLUSION

**WHEREFORE**, Discover respectfully requests that this Court enter the Proposed Order, granting the relief requested herein and such other further relief as is just and proper under the circumstances.

Dated:  February 25, 2019

Respectfully submitted,

**FOLEY & LARDNER LLP**

*/s/ Leah M. Eisenberg*
Leah M. Eisenberg, Esq.
90 Park Avenue
New York, NY 10016-1314
Tel:    (212) 682-7474
Fax:    (212) 687-2329
leisenberg@foley.com

- and -

Michael J. Small, Esq. (*pro hac vice* pending)
Emil P. Khatchatourian, Esq. (*pro hac vice* pending)
321 N. Clark Street, Suite 2800
Chicago, IL 60654-5313
Tel:    (312) 832-4500
Fax:    (312) 832-4700
msmall@foley.com
ekhatchatourian@foley.com

*Counsel for Discover Growth Fund, LLC*