UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-1(b)**

**NORRIS McLAUGHLIN, P.A.**
Morris S. Bauer
Melissa A. Pena
Catherine L. Corey
400 Crossing Boulevard, 8th Floor
P.O. Box 5933
Bridgewater, New Jersey 08807
(908) 722-0700
msbauer@norris-law.com
mapena@norris-law.com
clcorey@norris-law.com
Counsel for the Debtors/Debtors-in-Possession

| | |
|---|---|
| In re: | Chapter 11 |
| IMMUNE PHARMACEUTICALS INC., *et al.*, | Case No. 19-13273 (VFP) |
| Debtors. | Hon. Vincent F. Papalia |

**DECLARATION OF ANTHONY FIORINO IN FURTHER SUPPORT OF THE
DEBTORS' MOTION SEEKING TO (A) SELL THE CEPLENE® PRODUCT LINE
PURSUANT TO 11 U.S.C. §§ 363(b) AND (f), FREE AND CLEAR OF ALL LIENS,
CLAIMS AND INTERESTS; (B) ASSUME AND ASSIGN VARIOUS EXECUTORY
CONTRACTS PURSUANT TO 11 U.S.C. § 365(a); AND (C) OTHER RELATED RELIEF**

Anthony Fiorino, of full age, being duly sworn according to law, upon his oath, deposes

and states:

1.    I am the former President and former Interim Chief Executive Officer ("CEO") of

Immune Pharmaceuticals Inc. ("Immune Debtor"), sole Director of Immune Pharmaceuticals, Ltd.

("Ltd."), and President and sole Director of Cytovia, Inc., Maxim Pharmaceuticals, Inc., Immune

Pharmaceuticals USA Corp., and Immune Oncology Pharmaceuticals, Inc. (collectively the

"Subsidiaries" and together with Immune Debtor and Ltd., the "Debtors"). I resigned from the

positions of President and Interim CEO on March 5, 2019; notwithstanding my resignation, I

remain a member of the Board of Directors and remain involved with the Immune Debtor and the Subsidiaries. I served as President and Interim CEO of the Immune Debtor from August 28, 2018 to March 5, 2019. Prior to being the Interim CEO, I was the Chief Medical Officer and Chief Operating Officer of the Immune Debtor from August 15, 2017.

2.    As such, I have knowledge of the facts set forth herein based on my own personal knowledge and/or my review of the Immune Debtor's books and records, which are maintained in the ordinary course of its business.

3.    I submit this Declaration in further support of the Debtors' motion seeking to (A) sell the Immune Debtor's Ceplene® product line to Vector Therapeutics, Inc. (f/k/a Oxygen Therapy Inc.) (the "Buyer" or "Vector") pursuant to 11 U.S.C. §§ 363(b) and (f) free and clear of all liens, claims and interests other than certain specified liabilities (the "Assumed Ceplene Liabilities"); (B) assume and assign various executory contracts to the Buyer pursuant to 11 U.S.C. § 365(a); and (C) other related relief (the "Sale Motion") and in response to the Oppositions filed by Discover Growth Fund, LLC ("Discover") and the U.S. Trustee ("UST").

**The Sale Motion and Events Subsequent to the Filing of the Sale Motion**

4.    The Debtors filed the Sale Motion on March 15, 2019. Since the filing of the Sale Motion, two significant amendments to the APA with Vector have been made.

5.    First, upon the insistence of the Official Committee of Unsecured Creditors, Vector has agreed to increase its purchase price by $250,000, which amount will be paid to the Immune Debtor's estate by July 31, 2019.

6.    Second, the contingencies to the APA have been removed. The APA was contingent on Vector reaching an agreement with Meda Pharma SARL ("Meda") with respect to the cure amounts owed by the Immune Debtor under its Asset Purchase Agreement with Meda

2

dated June 14, 2017 (the "Meda Agreement"). Vector and Meda have reached an agreement as to the cure amount under which Meda consents to the Debtor's assumption and assignment of the Meda Agreement to Vector. Annexed hereto as Exhibit A is an Amendment to the APA (the "Amendment"). Exhibit A to the Amendment is the Assumption and Release Agreement by and between Vector and Meda (the "Assumption Agreement"). Under the Assumption Agreement, Meda has agreed to release the Debtors from any and all claims, which claims range from $5 million to $8 million.

**Discover's Allegations in its Opposition**

7.    I largely submit this Declaration to the Court as I feel compelled to correct the "record" that Discover has attempted to create in this matter. In further support of its stay relief motion and in opposition to the Motion, Discover submitted the Reply Declaration of John C. Kirkland sworn to on March 22, 2019 ("Kirkland Declaration"). In the Kirkland Declaration, John C. Kirkland ("Kirkland") repeatedly alleges that I made certain comments to him, which are simply not true.

8.    In paragraph 14 of the Kirkland Declaration, Kirkland states "Mr. Fiorino always spoke of Dr. Teper as an insider, because he was the Debtor's founder and former CEO, who had resigned from the Debtor only a few months ago." See Kirkland Declaration at ¶ 14. While Dr. Teper was a founder and former CEO of the Immune Debtor, I certainly did not "always" speak of Dr. Teper "as an insider" and I am not sure what is meant by that assertion as Dr. Teper resigned from his position as CEO of the Immune Debtor in April 2017 and as a Director of the Immune Debtor and CEO of its Cytovia subsidiary in May of 2018.

10095705v1

9.    In the Kirkland Declaration, Kirkland further states as follows:

[Mr. Fiorino] said that several of the directors—who have been recruited by Dr. Teper who founded the company—were committed to seeing that the Ceplene assets went to Dr. Teper's company. They were motivated by alleged altruism because they believed he could develop the asset to treat AML, and by personal loyalty to Dr. Teper as founder and former CEO, with whom they served together on the board of directors. Indeed, Mr. Fiorino advised me that at least one director was remaining on the board solely to ensure that Dr. Teper's interest were taken care of.

* * *

In my discussions with Mr. Fiorino, he advised that the board's desire to sell the Ceplene Assets to Dr. Teper's Newco, called Vector, was based on the desire to see to fruition the process which began in 2017 when he was on the Debtor's board of [sic] directors. Indeed, in our discussions, Mr. Fiorino referred to Dr. Teper and Vector interchangeably, as one in the same thing.

Id. at ¶¶ 15 and 19. I did not make the aforementioned statements to Kirkland. Contrary to

Kirkland's representations, the Board of Directors did not support a sale of the Ceplene Assets[1] to

Vector because of Dr. Teper's affiliation with the company. In fact, as detailed in the Declaration

of Gary Rabin[2] in support of the Motion sworn to on March 15, 2019 (the "Rabin Declaration"),

in July of 2018, the Immune Debtor received term sheets from Mediolanum Farmacutici spa

("Mediolanum")[3] and Vector to acquire the Ceplene Assets. Despite the fact that the total sale

price proposed to be paid by Vector was in excess of $1 million more than Mediolanum, the

Immune Debtor elected to proceed with a deal with Mediolanum because Mediolanum had the

necessary capital on hand to close immediately and there were concerns whether Vector had the

---

[1] The term Ceplene Assets shall have the meaning set forth in the proposed APA with Vector.

[2] Kirkland claims that I was introduced to Rabin by John Miller Fife, who he characterizes as a "toxic investor". See Kirkland Declaration at ¶ 20. I do not know anyone by the name of John Miller Fife nor had I ever heard the name referred to previously. I had informed Mr. Kirkland that I was introduced to Mr. Rabin by a former investor in the Debtor who is a highly regarded fund manager. Again, Kirkland's representation is a complete lie.

[3] In the Rabin Declaration, Mediolanum is referred to as Company A as the Immune Debtor believed that a Confidentiality Agreement prevented the Immune Debtor from disclosing Mediolanum's identity. Upon further review of the Confidentiality Agreement, the Immune Debtor determined that it is in a position to disclose the Mediolanum's identity.

4

ability to close on the sale.  Thus, there was no inclination by the Board to simply deliver the assets to Vector or Dr. Teper.

10.    Contrary to Kirkland's belief, I do not think that Dr. Teper and Vector are one in the same as it is my understanding that Dr. Teper only has a thirty (30%) percent interest in Vector.

**Efforts to Solicit and Market the Ceplene Assets**

11.    I understand that both the UST and Discover question the marketing efforts undertaken by the Immune Debtor to sell the Ceplene Assets.  I have reviewed the Rabin Declaration and I know the facts set forth therein to be true, including his recitation of the efforts undertaken by the Immune Debtor to sell the Ceplene Assets.

12.    The quest to solicit interest and a possible purchaser for the Ceplene Assets began in April 2017 when the Immune Debtor announced a corporate restructuring in which its oncology-focused subsidiary Cytovia, Inc. ("Cytovia") would be spun off to shareholders.  In a press release issued April 24, 2017, the Immune Debtor stated its Board had "authorized Dr. Daniel Teper to lead the Company's oncology business within the Company's Cytovia, Inc. subsidiary and to pursue a possible spin-off of Cytovia into a separate, stand-alone company independent from Immune. Cytovia will focus on the development and commercialization of novel immuno-oncology and hematology therapeutics, led by Ceplene®, an immunotherapy treatment in late stage development in combination with low dose interleukin 2 (IL-2) for the remission maintenance of patients with Acute Myeloid Leukemia." Annexed hereto as Exhibit B is a true and accurate copy of the April 24, 2017 press release.  Efforts to obtain financing for Cytovia to support the proposed spin-off failed, which I believe relates to limited interest in Cytovia's oncology portfolio, including Ceplene.

10095705v1

13.    Thereafter, the Immune Debtor decided to terminate the spin-off and, in May of 2018, issued a press release advising the public that it was pursuing the option to sell its oncology portfolio, including the Ceplene Assets. See Exhibit A to Rabin Declaration.

14.    The decision to sell the Ceplene Assets occurred just prior to the Biotechnology Industry Organization ("BIO") International Convention, widely viewed as one of the most important biopharmaceutical partnering conferences of the year.[4]  Immune Debtor's former CEO, Elliot Maza, held several meetings at BIO to discuss possible Ceplene partnerships.  Nonetheless, neither the conference nor the press release resulted in any offers to acquire the Ceplene Assets. While the Immune Debtor attempted to solicit offers from Clinigen, Mediolanum, Mawdsleys, Sandoz and Vector, as set forth above and detailed in the Rabin Declaration, the only offers received were from Mediolanum and Vector.  After the Mediolanum deal fell apart, the Immune Debtor proceeded to re-engage in discussions with Vector.

15.    Last fall, the Immune Debtor entered into the Option Agreement with Vector.  The terms of the Option Agreement were *publicly* disclosed.  Annexed collectively hereto as Exhibit C is a true and accurate copy of the November 27, 2018 press release and the Form 8-K.  As a result, any interested party who believed the Ceplene Assets were worth more than Vector was prepared to pay had an opportunity to buy the assets. No offers were made. The Option Agreement ultimately expired in accordance with its terms as Vector did not exercise its right to purchase the Ceplene Assets.  Prior to the Immune Debtor's bankruptcy filing, the Immune Debtor and Vector continued to discuss a proposed sale of Ceplene, which fact was publicly disclosed in SEC filings and again no interested party came forward. See Excerpt of Amendment No. 2 to Form S-1 at p.

---

[4] According to the BIO website, in 2018, 7,900 delegates representing 3,900 companies participated in the "BIO One-on-One Partnering" program.  See https://convention.bio.org/partner/.

4, a true and accurate copy of which is annexed hereto as Exhibit D. Post-petition, the Immune

Debtor continued with its sale process and negotiations with Vector.

**The Immune Debtor's Request for an Expeditious Sale of its Assets**

16.    Discover claims that the only reason the Immune Debtor is seeking to proceed with

a sale on an expedited basis is to prevent Discover's alleged "springing lien" to attach to the

Ceplene Assets. The timing of the sale is *also* linked to the fact that the Ceplene Assets are

depreciating in value as (i) many of the patents have expired; (ii) the product is approved for sale

in Europe for the treatment of leukemia, however there is a very limited supply of Ceplene on the

shelves and the Immune Debtor incurs great regulatory risk by not having adequate supply

available; and (iii) the Immune Debtor has pharmacovigilance obligations in Europe and is

exposed to great regulatory risk as it has no funds to support pharmacovigilance activities. Without

immediate financial support, Immune Debtor is exposed to the risk of Ceplene's Market

Authorization being withdrawn, which would have a severe adverse effect on the value of the

program.

17.    It is no secret and there is nothing nefarious about the fact that the Immune Debtor

also desires to proceed with a sale to avoid the issue as to whether Discover obtains a "springing

lien." I have been advised by counsel that while there is legal basis to support a finding that

Discover's "springing lien" cannot come to fruition post-Petition, I have been further advised that

litigation on such issue may be costly to the Debtors' estate. Discover was well aware that the

Ceplene Assets would be sold and that Immune Debtor had engaged in extensive and advanced

negotiations towards such a sale before I was appointed interim CEO and during the time the

Immune Debtor discussed attempted to negotiate financing terms with Discover. This is exactly

why the Ceplene Assets were not provided as collateral under the Senior Secured Redeemable

7

10095705v1

Convertible Debenture issued to Discover and, instead, the parties agreed that Discover would not obtain a lien on the assets unless a sale did not close by March 31, 2019.

18.      Further, the Immune Debtor seeks to create value for all of its creditors, including its employees who have worked without pay to preserve the assets of the company for its creditors. Further delay in the closing of this transaction creates a risk of significantly impairing the value of the Ceplene Assets owing to regulatory risk in Europe that could result in a loss in the Market Authorization.  It is my belief that there is little other interest in acquiring the Ceplene Assets, as such theoretical bidders have had over a year to materialize, yet no interest has been forthcoming beyond what has already been described.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*/s/ Anthony Fiorino*
Anthony Fiorino

Dated:  March 28, 2019

10095705v1

# EXHIBIT A

AMENDMENT AGREEMENT

This AMENDMENT AGREEMENT (this "Agreement"), dated March 27, 2019, is entered into by and between Vector Therapeutics Inc. (f/k/a Oxygen Therapy Inc.), a Delaware corporation with its principal executive office at 85 Broad Street, 27th Floor, New York, NY 10004 (hereinafter the "Buyer"), and Immune Pharmaceuticals Inc., a Delaware corporation with its principal executive office at 1 Bridge Plaza North, Suite 270, Fort Lee, NJ 07024 (hereinafter the "Seller").

WITNESSETH:

WHEREAS, Buyer and Seller have entered into an Asset Purchase Agreement, dated March 15, 2019 (the "APA"), pursuant to which, among other things, Seller has agreed to sell to Buyer and Buyer has agreed to purchase from the Seller the Ceplene Assets and to assume certain Assumed Ceplene Liabilities (collectively, the "Ceplene Purchase") (capitalized terms used herein have the respective meanings ascribed thereto in the APA unless otherwise defined herein) ; and

WHEREAS, Buyer's obligation to consummate the Ceplene Purchase pursuant to the APA is subject to Buyer entering into the Meda Modification; and

WHEREAS, Buyer, Meda Pharma SARL and Meda AB (collectively with Meda Phama SARL, "Meda") have entered into an Assumption and Release Agreement, dated as of March 26, 2019 (the "Meda Assumption and Release Agreement"), a true and complete copy of which is attached hereto as Exhibit A; and

WHEREAS, Buyer has agreed with the Official Creditors Committee appointed in the Bankruptcy Case to pay an additional $250,000 to Seller for the Ceplene Assets on or before July 31, 2019.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, and intending to be legally bound hereby, the parties hereto agree as follows:

1.    Amendments to APA.

(a)    Section 2 of the APA is hereby amended by adding the following at the end thereof: "In addition, Buyer shall pay to Seller the additional sum of Two Hundred Fifty Thousand Dollars ($250,000) on or before July 31, 2019 by wire transfer of immediately available funds to an account specified by Seller."

(b)    Section 4 of the APA is hereby amended to read as follows:

"4.    Meda Asset Purchase Agreement.    Seller is a party to an Asset Purchase Agreement, dated June 14, 2017 (the "Meda Asset Purchase Agreement"), with Meda Pharma SARL and Meda AB (collectively with Meda Phama SARL, "Meda"), which constitutes a part of the Ceplene Assets and which will be assigned to Buyer at Closing. Buyer and Meda have

entered into an Assumption and Release Agreement, dated as of March 26, 2019 (the "Meda Assumption and Release Agreement"). From and after Closing, Buyer shall be solely responsible for any obligation created by Buyer or its affiliates under the Meda Asset Purchase Agreement as modified by the Meda Assumption and Release Agreement. Post-closing, Buyer may designate additional contracts related to the Meda Purchase Agreement which it seeks to acquire from the Seller. In the event such contracts are executory contracts, Seller shall file a motion with the Bankruptcy Court to assume and assign such contracts to Buyer. The Buyer's assumption of such agreements is subject to satisfaction of Section 365 of the Bankruptcy Code."

     (e)   Except as expressly modified hereby, the APA shall continue in full force and effect.

     2.   <u>Miscellaneous</u>. The provisions of Sections 13 through 21, inclusive, of the APA shall apply to this Agreement as if set forth herein at length.

     3.   <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same Agreement. Counterpart signature pages to this Agreement transmitted by facsimile transmission, by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing an original signature.

*[The remainder of this page is intentionally left blank.]*

-2-

IN WITNESS WHEREOF, the Parties hereto have duly executed this Amendment Agreement as of the date first written above.

IMMUNE PHARMACEUTICALS INC.:

_____

Name: Gary H. Rabin
Title: President and Interim CEO

VECTOR THEREAPEUTICS, INC.:

_____

Name: Daniel Teper
Title: Chairman and CEO

IN WITNESS WHEREOF, the Parties hereto have duly executed this Amendment Agreement as of the date first written above.

IMMUNE PHARMACEUTICALS INC.:

Name: Gary H. Rabin
Title: President and Interim CEO

VECTOR THEREAPEUTICS, INC.:

Name: Daniel Teper
Title: Chairman and CEO

Exhibit A

Meda Assumption and Release Agreement

ASSUMPTION AND RELEASE AGREEMENT

THIS ASSUMPTION AND RELEASE AGREEMENT dated as of March 26, 2019 (this "Assumption and Release Agreement"), is made effective as of the effective time specified below (the "Effective Time"), by and between (i) Vector Therapeutics Inc. (f/k/a Oxygen Therapy Inc.) ("Vector"), (ii) Meda Pharma SARL (the "Counterparty") and (iii) Meda AB ("Meda AB"). Each of Vector, the Counterparty and Meda AB are also herein sometimes referred to as a "Party" and collectively as the "Parties".

WHEREAS, on February 17, 2019 (the "Petition Date"), Immune filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), (Case No. 19-13273) (the "Bankruptcy Case");

WHEREAS, Immune and Vector have entered into an Asset Purchase Agreement dated as of March 15, 2019 (the "Asset Purchase Agreement"), a copy of which is attached hereto as Exhibit A, pursuant to which, among other things, Immune has agreed to sell and assign to Vector certain assets of Immune and its Affiliates (as defined below), and Vector has agreed to purchase such assets and assume certain liabilities, including certain obligations under the Meda Asset Purchase Agreement (as defined below), of Immune and its Affiliates;

WHEREAS, Immune and Vector have entered into an Assignment and Assumption Agreement dated as of the date hereof (the "Assignment and Assumption Agreement"), a copy of which is attached hereto as Exhibit B, pursuant to which, among other things, Immune has assigned all of its rights and interests under the Meda Asset Purchase Agreement to Vector and Vector has assumed all of Immune's obligations under the Meda Asset Purchase Agreement.

WHEREAS, the Counterparty and Immune are parties to an Asset Purchase Agreement dated June 15, 2017 (the "Meda Asset Purchase Agreement"), a copy of which is attached hereto as Exhibit C, which is an executory contract under section 365 of the Bankruptcy Code;

WHEREAS, Immune is in breach of the Meda Asset Purchase Agreement;

WHEREAS, the Counterparty's Affiliate, Meda AB, and Cytovia Inc., Immune's wholly-owned subsidiary, are parties to a Transitional Services Agreement dated June 15, 2017 (the "Transitional Services Agreement"; and the Meda Asset Purchase Agreement and the Transitional Services Agreement, collectively, the "Agreements"), a copy of which is attached hereto as Exhibit D;

WHEREAS, the Transitional Services Agreement has been terminated by Meda AB;

WHEREAS, subject to (i) entry of a final order by the Bankruptcy Court, in form and substance satisfactory to the Counterparty (the "Order"), approving: (A) the Assignment and Assumption Agreement and the transactions contemplated thereby, (B) the Asset Purchase Agreement and the transactions contemplated thereby, including this Assumption and Release Agreement, which shall be an exhibit thereto; (ii) the closing of the transactions contemplated by the Asset Purchase Agreement and the Assignment and Assumption Agreement; and (iii) there not having occurred an Event of Default (as such term is defined below) under clause (b) of Section 4 (such time, the "Effective Time"), Immune will, pursuant to section 365 of the Bankruptcy Code, assume and assign all of its right, title and interest in and

to the Meda Asset Purchase Agreement to Vector and Vector will assume all of the obligations of Immune and/or its Affiliates under the Meda Asset Purchase Agreement, as expressly modified hereby;

WHEREAS, Vector has agreed to and shall provide the Counterparty with a letter of credit or bank guarantee on or before the latest to occur of (i) fifteen (15) business days from the date of this Assumption and Release Agreement and (ii) the Effective Date, in favor of the Counterparty as beneficiary, in form and substance satisfactory to the Counterparty, which can be drawn by the Counterparty following the occurrence and during the continuance of an Event of Default under clauses (a) through (c) of Section 4 (the "APA Payment Security"); and

WHEREAS, effective as of the Effective Time and pursuant to the terms of the applicable agreements and the Order, (i) the Counterparty agrees to (A) consent to the assignment of the Meda Asset Purchase Agreement to Vector by Immune pursuant to section 365 of the Bankruptcy Code and (B) release Immune and the other Immune Release Parties (as defined below) from any and all liability under the Agreements on the terms set forth below, and (ii) Vector and the Counterparty shall deem the Meda Asset Purchase Agreement modified solely and only to the extent expressly provided for herein.

NOW, THEREFORE,

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

1.    The above recitals are incorporated into this Assumption and Release Agreement by reference and are material terms of this Assumption and Release Agreement.    Effective as of the Effective Time, the Counterparty consents to the assumption by Immune of the Meda Asset Purchase Agreement and the assignment thereof by Immune to Vector and the transfer to Vector of all of the Assets (as such term is defined in the Meda Asset Purchase Agreement) to Vector and all of the rights and obligations of Immune under the Meda Asset Purchase Agreement (as expressly modified hereby). As of the Effective Time, Vector assumes all of Immune's obligations under the Meda Asset Purchase Agreement (as expressly modified hereby) and agrees to perform all such obligations (as expressly modified hereby). From and after the Effective Time, the Counterparty shall look only to Vector for the performance of any and all obligations arising under the Meda Asset Purchase Agreement (as expressly modified hereby).

2.    Immune, Vector and the Counterparty agree that the Counterparty is currently owed (i) Fixed Consideration (as such term is defined in the Meda Asset Purchase Agreement) under the Meda Asset Purchase Agreement of US$ 5,000,000; (ii) and Earn Out Consideration (as such term is defined in the Meda Asset Purchase Agreement) based upon future sales and licensing of Ceplene of US$ 3,000,000; and (iii) certain other payments by Immune and possibly damages for breach. It is hereby agreed that upon the Effective Time and in lieu of the consideration and cure set forth in the immediately preceding sentence, as payment in full for, and cure of, all amounts due and damages under the Meda Asset Purchase Agreement, Vector shall pay US$ 4,000,000 to Meda in two installments of US$ 2,000,000 each, the first due and payable thirty (30) days after the Effective Time, and the second due and payable on November 30, 2019 (collectively, the "Vector APA Payments"). The Vector APA Payments shall be in US dollars and wire transferred to an account, without any deduction or setoff of any kind, to be identified by the Counterparty to Vector in writing. Upon the Effective Time, except for Vector's obligation to pay the Vector APA Payments, no other amounts shall be payable to the Counterparty or its Affiliates or any Asset Seller (as such term is defined in the Meda Asset Purchase Agreement) or member of the Seller Group (as such term is defined in the Meda Asset Purchase Agreement) or their Affiliates in respect of the Meda Asset Purchase Agreement and the transactions contemplated thereby. Payment of any such other amounts to the Counterparty is hereby irrevocably waived by the Counterparty. Vector shall provide the

APA Payment Security to the Counterparty on or before the latest to occur of (i) fifteen (15) business days from the date of this Assumption and Release Agreement and (ii) the Effective Date.

3.    Immune, Vector and the Counterparty agree that Meda AB is currently owned US$ 518,000 by Cytovia Inc. under the Transitional Services Agreement. It is hereby agreed that upon the Effective Time, payment of said US$518,0000 and any other amounts that may be payable under the Transitional Services Agreement are irrevocably waived by Meda AB, the Counterparty and their respective Affiliates. The Parties confirm that the Transitional Services Agreement has terminated and that no further services are owed from Meda AB under the Transitional Services Agreement. Except for the payments contemplated by Section 2, Vector shall not be obligated to make any other payments under the Agreements or in respect of the transactions contemplated thereby. Vector agrees that as the Transitional Services Agreement has terminated Vector shall not make any claim that the Counterparty, Meda AB or any of their Affiliates have any obligation to provide or perform any services thereunder.

4.    Effective as of the Effective Time (other than clause (b) below which shall be true and correct as of this date and as condition to the Effective Time), the Counterparty and Meda AB shall be entitled to pursue all or any of their remedies pursuant to Section 5 of this Assumption and Release Agreement upon the occurrence of any of the following events (each, an "Event of Default"):

a.    Vector shall fail to pay the Vector APA Payments when due hereunder; or

b.    Any material representation or warranty made by Vector herein shall turn out to be incorrect or misleading in any material respect when made; or

c.    Vector shall fail to perform or observe any covenant or any other term of this Assumption and Release Agreement and such failure is not cured within thirty (30) days after written notice of such failure from the Counterparty or Meda AB; or

d.    Vector shall fail to provide the APA Payment Security within fifteen (15) business days from the date of this Assumption and Release Agreement.

5.    While any Event of Default exists, the Counterparty may (i) by written notice to Vector, declare the entire amount under the Vector APA Payments to be immediately due and payable without presentment, demand, protest, notice of protest or dishonor, notice of intent to accelerate the maturity thereof, notice of acceleration of the maturity thereof, or other notice of default of any kind, all of which are hereby expressly waived by Vector, (ii) with respect to Events of Default under clauses (a) through (c) above, draw down on the APA Payment Security and/or (ii) exercise any or all rights and remedies under this Assumption and Release Agreement and applicable law.

6.    Vector and the Counterparty agree that following the Effective Time, each of them shall take such actions and execute and deliver such documents and instruments as the other party may reasonably request in order to implement the terms and provisions of this Assumption and Release Agreement and the intent of the Parties evidenced hereby.

7.    Each of the Parties represent and warrant to each of the other Parties that (i) it has the legal capacity to execute, deliver and perform this Assumption Agreement and Release; (ii) it execution, delivery and performance of this Assumption Agreement and Release has been authorized in accordance with all applicable corporate power and authority; (iii) the Person executing this Assumption and Release Agreement on its behalf is authorized to do so, (iv) its execution, delivery and performance of this Assumption and Release Agreement does not violate or breach its organizational documents or any agreement or license to which it is a party or by which it is bound or subject, and (v) this Assumption and Release Agreement constitutes its legal valid and binding obligation enforceable in accordance with its terms, subject to the occurrence of the Effective Date.

8.    Release, Covenant Not to Sue and Indemnification

a.    Subject to Section 10(b), effective as of the Effective Time, each of the Counterparty and Meda AB, for itself and on behalf of its parents, subsidiaries and Affiliates and their respective past, present and future officers, directors, shareholders, partners, members, employees, trustees, agents and representatives, their respective heirs, successors, assigns and legal representatives and any Person claiming by or through any of the foregoing (collectively, "Counterparty Parties") hereby irrevocably and unconditionally releases and forever discharges Immune, its parents, subsidiaries and Affiliates and their respective past, present and future officers, directors, shareholders, partners, members, employees, trustees, agents and representatives, their respective heirs, successors, assigns and legal representatives, and any Person claiming by or through any of the foregoing (collectively, the "Immune Parties") from any and all actions, demands, settlements, indemnities, judgments, damages, causes of action and claims whatsoever, known or unknown, suspected or unsuspected (whether in law, equity, or otherwise) (collectively, "Claims"), the Counterparty Parties ever had, now have, or will have against the Immune Parties with respect to any action, event or omission occurring or arising solely under the Agreements and with respect to the transactions contemplated thereby; provided, however, Immune shall not be released from its obligations under Clause 19 (Confidentiality), which shall survive the Effective Date; provided, further, that nothing in this Section 8(a) shall act as a release of any obligations assumed by Vector under the Meda Asset Purchase Agreement (as expressly modified hereby), or of any of Vector's obligations under this Assumption and Release Agreement.

b.    Effective as of the Effective Time, Vector and its Affiliates hereby irrevocably and unconditionally do indemnify each of the Counterparty Parties and agree to hold them harmless from and against any and all Claims that Immune, any Immune Party or any other Person asserts that in any way relates to the Agreements or the transactions contemplated thereby.    This indemnity obligation of Vector and its Affiliates shall continue in perpetuity.

c.    As of the Effective Time, the Counterparty Parties covenant and agree never to file any suit, action, cause of action, or other Claim against the Immune Parties with respect to any Claims released under this Section 8.

d.    As of the date hereof and as of the Effective Time, the Counterparty, for itself and for the other Counterparty Parties, represents and warrants that none of them have assigned any Claim against the Immune Parties to be released as of the Effective Time under this Section 8 to any Person.

e.    The Counterparty, for itself and for the other Counterparty Parties, has, as of the Effective Time, received good, valuable, and sufficient consideration for making the releases contained in this Section 8.    The Counterparty, for itself and for the other Counterparty Parties, agrees that none of them will seek anything further, directly or indirectly, for themselves or any Person, including any other payment or consideration with respect to the Claims released pursuant to this Section 8.    The Counterparty, for itself and for the other Counterparty Parties, understands and agrees that the Counterparty and the other Counterparty Parties hereby expressly waive any and all rights under any and all laws or statutes, of any jurisdiction whatsoever, which may provide that a general release does not extend to Claims not known or suspected to exist at the time of executing a release which if known would have materially affected the decision to give said release. The Counterparty, for itself and for the other Counterparty Parties, acknowledges that the Counterparty and the other Counterparty Parties have consulted with independent legal counsel regarding the legal effect of the releases contained in this Section 8.

-4-

9.    As used herein:

"Affiliate" of any Person means any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. The term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"Person" means any individual, partnership, corporation, limited liability company, trust, or other entity.

10.    (a) This Assumption and Release Agreement contains the entire understanding and agreement between Vector and the Counterparty with respect to the subject matter hereof and it supersedes all prior and/or contemporaneous understandings and agreements (whether written or oral) with regard to the subject matter hereof, all of which are merged herein. For avoidance of doubt, although this Assumption and Release Agreement is being executed and delivered prior to the Effective Time, it shall only be effective, if at all, as of the Effective Time. To the extent the Effective Time does not occur on or before April 30, 2019 (as may be extended pursuant hereto, the "Termination Date"), unless the Parties agree to an extension in writing, this Assumption and Release Agreement shall be void. (b) Nothing in this Agreement shall prohibit the Counterparty or Meda AB from filing proofs of claim in Immune's bankruptcy case (or in any successor case), or, following the Termination Date, receiving distributions in such case (or in any successor case). However, in the event the Counterparty or Meda AB files a proof of claim in Immune's bankruptcy case and the Effective Time occurs, once the Order becomes a final order, the Counterparty and/or Meda AB, as applicable, shall withdraw such proof of claim.

11.    Neither this Assumption and Release Agreement nor any of the rights or obligations hereunder shall be assigned by any Party without the prior written consent of each of the other Parties. The provisions of this Assumption and Release Agreement are intended solely for the benefit of each Party and their respective successors or permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person; *provided however*, the Counterparty Parties (other than the Counterparty) shall be third party beneficiaries of the releases and indemnification set forth in Section 8.

12.    This Assumption and Release Agreement may be executed in one or more counterparts (including by fax and PDF), each of which shall be deemed an original agreement, but all of which together shall constitute one and the same instrument and shall be governed by and construed in accordance with the internal laws of the State of New York without reference to any of its choice of law principles thereof. This Assumption and Release Agreement may only be amended or modified in writing signed by the Parties hereto.

13.    Notwithstanding anything to the contrary, the Parties agree that the Bankruptcy Court shall have exclusive jurisdiction over this Assumption and Release Agreement and any disputes arising under or in connection herewith, including any breaches by Vector of its payment obligations hereunder. To the extent the Bankruptcy Court declines to assert jurisdiction over any such disputes, the Parties agree to submit such disputes to the US federal or state courts located in New York, New York. **Each Party hereby irrevocably and unconditionally waives any right such Party may have to a trial by jury in respect of any litigation relating to this Assumption and Release Agreement.**

14.    By entering into this Assumption and Release Agreement, the Counterparty and Meda AB are not waiving any of their Claims, or any Claims of their Affiliates, against Immune or any of its Affiliates, all of which are hereby reserved, subject to the occurrence of the Effective Date.

-5-

*[Signature page immediately follows]*

IN WITNESS WHEREOF, the Parties hereto have caused this Assumption and Release Agreement to be duly executed by the undersigned, thereunto duly authorized, as of the date first above written.

VECTOR THERAPEUTICS INC.

By: _____

Name:  Daniel Teper

Title:    Chairman and CEO

MEDA PHARMA SARL

By: _____

Name: Günter Camlin

Title: Class A Manager

Name: Catherine BEAUSOUR

Title: Class B Manager

[Signature Page to the Assumption and Release Agreement]

MEDA AB

By: _____

Name:    Alan Weiner

Title:    Director

## EXHIBIT A

### Asset Purchase Agreement

## EXHIBIT B

-10-

Assignment and Assumption Agreement

EXHIBIT C

Meda Asset Purchase Agreement

-11-

**EXHIBIT D**

Transitional Services Agreement

-12-

# EXHIBIT B

April 24, 2017

# Immune Pharmaceuticals Announces Corporate Restructuring

**- Inflammatory disease and dermatology business to become the focus of Immune Pharmaceuticals, Inc., with specific emphasis on bertilimumab and NanoCyclo products**

**- Oncology business to be conducted within Immune's oncology subsidiary, Cytovia, Inc., under the leadership of Dr. Daniel Teper, with plans for possible spin-off of Cytovia shares to Immune shareholders**

**- Dr. Teper to resign from position of CEO of Immune to focus exclusively on leading Cytovia's oncology research, development and commercialization efforts; will remain a member of Immune's Board of Directors**

**- Elliot Maza, JD, CPA, currently a member of the Board of Directors, named interim CEO of Immune**

**- Dr. Monica E. Luchi, Executive Vice President Global Drug Development and Chief Medical Officer, to additionally be named President, Immune Pharmaceuticals Inflammatory Disease and Dermatology Division**

NEW YORK, April 24, 2017 /PRNewswire/ -- Immune Pharmaceuticals Inc. (NASDAQ: IMNP) ("Immune" or the "Company"), a biopharmaceutical company focused on the development of targeted therapeutics for the treatment of inflammatory diseases and cancer, today announced a major corporate restructuring with the objective of prioritizing and segregating its research and development efforts on a focused set of products in inflammatory disease and dermatology and strengthening its financial position.

In line with this prioritization, the Company's Board of Directors (the "Board") has authorized Dr. Daniel Teper to lead the Company's oncology business within the Company's Cytovia, Inc. subsidiary and to pursue a possible spin-off of Cytovia into a separate, stand-alone company independent from Immune. Cytovia will focus on the development and commercialization of novel immuno-oncology and hematology therapeutics, led by Ceplene®, an immunotherapy treatment in late stage development in combination with low dose interleukin 2 (IL-2) for the remission maintenance of patients with Acute Myeloid Leukemia; Azixa and crolibulin, two phase 2 drug candidates with synergistic potential with immuno-oncology drugs; and a bispecific antibody platform to be supported by collaborative partnerships. Under the leadership of Dr. Teper, Cytovia will

aim to grow into a global specialty biopharmaceutical company through these product candidates and the acquisition of additional late stage or commercial stage oncology products. Cytovia intends to raise sufficient capital to support R&D investment through product licensing and partnership transactions, government grants and issuance of debt and equity.

A potential spin-off of Cytovia into a stand-alone company pursuing an independent path from Immune would provide several advantages:

- Allows current Immune investors to benefit from two distinct investment opportunities through proportional receipt of shares in Cytovia;
- Enables Cytovia to target new investors attracted to its specific oncology business profile and pursue distinct capital structures and capital allocation strategies; and
- Aligns Cytovia's resources with its stated goals and tailors its business strategy to best address opportunities within its target market of oncology

"The proposed restructuring strategy recognizes that our two operating divisions have evolved into distinct business and investment opportunities. The potential Cytovia spin-off will establish each division as a separate company with a focused strategy and will enable each company to enhance its business focus, better align its resources to achieve strategic priorities, target investors attracted to its unique business profile, and ultimately unlock significant value for both companies", said Dr Daniel Teper.

In connection with this restructuring, the Company's Board has accepted the resignation of Dr. Daniel Teper as CEO of Immune, effective immediately, so that he may focus his efforts exclusively on leading Cytovia. The terms of the resignation are specified in a Separation Agreement entered into by and between Dr. Teper and the Company on April 21, 2017. Dr. Teper will remain a member of the Company's Board and will focus his efforts, in conjunction with the Board, on developing and beginning execution of the plan to spin off Cytovia into an independent, stand-alone oncology business.

The Company's Board has appointed Elliot Maza, JD, CPA as interim CEO, effective immediately, to serve until a new CEO of Immune is identified. Mr. Maza has served as a member of the Board and Chairman of the Audit Committee of the Board since January 14, 2015. Mr. Maza served as a consultant to the Company from November 2014 to January 2015.  In connection with his appointment to the position of interim CEO, Mr. Maza will resign from the Audit Committee of the Board but will continue to serve as a director.

Dr. Monica E. Luchi, Executive Vice President Global Drug Development and Chief Medical Officer, will assume the title of President, Immune Pharmaceuticals Inflammatory Disease and Dermatology Division. Under the leadership of Mr. Maza and Dr. Luchi, Immune will focus its business on immuno-inflammation in general, and immuno-dermatology in particular, by developing its core asset, bertilimumab, a first in class human monoclonal antibody in phase 2 development in bullous pemphigoid and ulcerative colitis and with application for severe atopic dermatitis. Immune intends to continue to focus on the development of topical nano-cyclosporine for the treatment of atopic dermatitis and moderate psoriasis.

**About Immune Pharmaceuticals Inc.**

Immune Pharmaceuticals Inc. (NASDAQ: IMNP) applies a personalized approach to treating and developing novel, highly targeted antibody therapeutics to improve the lives of patients with inflammatory diseases and cancer. Immune's lead product candidate, bertilimumab, is in Phase II clinical development for moderate-to-severe ulcerative colitis as well as for bullous pemphigoid, an orphan autoimmune dermatological condition. Other indications being considered for development include atopic dermatitis, Crohn's disease, severe asthma and Non-Alcoholic Steato-Hepatitis (NASH), an inflammatory liver disease. Immune recently expanded its portfolio in immuno-dermatology with topical nano-formulated cyclosporine-A for the treatment of psoriasis and atopic dermatitis. Immune's oncology subsidiary, Cytovia, plans to develop Ceplene for maintenance remission in AML in combination with IL-2. Additional oncology pipeline products include Azixa® and crolibulin, Phase II clinical stage vascular disrupting agents, and novel technology platforms; bispecific antibodies and NanomAbs™. Maxim Pharmaceuticals Inc., Immune's pain and neurology subsidiary, houses AmiKet™ and AmiKet™ Nano™, pipeline products for the treatment of neuropathic pain. For more information, visit Immune's website at www.immunepharma.com, the content of which is not a part of this press release.

**Forward-Looking Statements**

This news release and any oral statements made with respect to the information contained in this news release contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. You are urged to consider statements that include the words "may," "will," "would," "could," "should," "believes," "estimates," "projects," "potential," "expects," "plans," "anticipates," "intends," "continues," "forecast," "designed," "goal" or the negative of those words or other comparable words to be uncertain and forward-looking. Such forward-looking statements include statements that express plans, anticipation, intent, contingency, goals, targets, future development and are otherwise not statements of historical fact. Forward-looking statements also include, among others, statements regarding the Board's corporate restructuring strategy, and the Company's ability to reduce expenses, capitalize on strategic alternatives, develop its assets, and generate value for shareholders. These statements are based on our current expectations and are subject to risks and uncertainties that could cause actual results or developments to be materially different from historical results or from any future results expressed or implied by such forward-looking statements. There can be no assurance that either party will ever successfully complete the anticipated corporate restructuring, or that the Company will be able to reduce expenses, capitalize on strategic alternatives, develop its assets, and generate value for shareholders. Additional factors that may cause actual results or developments to differ materially include, but are not limited to: the risks associated with the adequacy of our existing cash resources and our ability to continue as a going concern; the risks associated with our ability to continue to meet our obligations under our existing debt agreements; the risk that clinical trials for bertilimumab, Ceplene, Azixa, AmiKet, AmiKet Nano, LidoPain or NanoCyclo will not be successful; the risk that bertilimumab, AmiKet or compounds arising from our NanomAbs program will not receive regulatory approval or achieve significant commercial success; the risk that we will not be able to find a partner to help conduct the Phase III trials for AmiKet on attractive terms, on a timely basis or at all; the risk that our other product candidates that appeared promising in early research and clinical trials do not demonstrate safety and/or efficacy in larger-scale or later-stage clinical trials; the risk that we will not obtain approval to market any of

our product candidates; the risks associated with dependence upon key personnel; the risks associated with reliance on collaborative partners and others for further clinical trials, development, manufacturing and commercialization of our product candidates; the cost, delays and uncertainties associated with our scientific research, product development, clinical trials and regulatory approval process; our history of operating losses since our inception; the highly competitive nature of our business; risks associated with litigation; and risks associated with our ability to protect our intellectual property; risks associated with the contemplated transaction with NPT. These factors and other material risks are more fully discussed in our periodic reports, including our reports on Forms 8-K, 10-Q and 10-K and other filings with the U.S. Securities and Exchange Commission. You are urged to carefully review and consider the disclosures found in our filings, which are available at www.sec.gov or at www.immunepharma.com. You are cautioned not to place undue reliance on any forward-looking statements, any of which could turn out to be wrong due to inaccurate assumptions, unknown risks or uncertainties or other risk factors. We expressly disclaim any obligation to publicly update any forward-looking statements contained herein (including those relating to the corporate reorganization and exploration of strategic alternatives), whether as a result of new information, future events or otherwise, except as required by law.

To view the original version on PR Newswire, visit http://www.prnewswire.com/news-releases/immune-pharmaceuticals-announces-corporate-restructuring-300444081.html

SOURCE Immune Pharmaceuticals Inc.

# EXHIBIT C

November 27, 2018



# Immune Pharmaceuticals and Vector Therapeutics Sign Option Agreement for Worldwide Ceplene® Rights

## Immune Receives $500,000 for Option; If Exercised, Total Deal Value Could Exceed $17.5 Million

FORT LEE, N.J. and NEW YORK, Nov. 27, 2018 (GLOBE NEWSWIRE) -- Immune Pharmaceuticals, Inc. (OTCQB: IMNP) ("Immune"), a biopharmaceutical company developing novel therapeutic agents for the treatment of immunologic and inflammatory diseases,   and Vector Therapeutics, Inc. ("Vector"), a biopharmaceutical company acquiring, developing and commercializing oncology therapeutics, today announced the execution of an agreement that gives Vector an option to acquire worldwide rights to Ceplene.

Under the option agreement, Vector has paid Immune $500,000 and has gained an exclusive option to acquire worldwide Ceplene rights for total additional fixed consideration of $14.5 million, including $2.5 million at closing, $4.5 million in 2019, and $2.5 million in each of 2020, 2021 and 2022. At closing, Vector will also assume certain Ceplene-related liabilities from Immune, expected to total approximately $3.5 million. Under the option agreement, Immune and Vector will coordinate various activities critical for the maintenance of Ceplene's Market Authorization in Europe until closing of the transaction, which is anticipated in the first quarter of 2019. Vector is able to exercise the option any time until January 31, 2019, which can be extended until March 1, 2019, provided it has capital adequate to close the transaction and other closing conditions are satisfied.

Tony Fiorino, MD, PhD, Immune's interim Chief Executive Officer, stated, "We are so pleased to have signed this option agreement with Vector Therapeutics.  Given Vector's knowledge of Ceplene, we believe they are the right party to capitalize on this asset. We look forward to working with them to close this transaction and complete the transfer of Ceplene into their capable hands."

Daniel Teper, PharmD, MBA, Vector's Chairman and Chief Executive Officer, commented, "We are passionate about defeating Acute Myeloid Leukemia (AML). Preventing AML relapse – which currently affects up 80% of patients in first complete remission – is a significant medical need. We are planning to launch Ceplene, the first therapy approved for AML remission maintenance, in Europe in the first quarter 2019 and to accelerate its development toward approval in the United States, China and Japan." Dr. Teper added, "We believe that recent preclinical and clinical data for Ceplene strengthen the rationale for Ceplene in select AML patients and also form the basis for clinical development

beyond the AML indication."

Ceplene (histamine dihydrochloride) is NOX2 inhibitor that enables low dose aldesleukin (IL-2) to activate NK cells and T cells in order to prevent relapse in AML patients who have achieved first complete remission. The European Medicine Agency (EMA) confirmed the approval of Ceplene on July 27, 2018 for the maintenance of first complete remission in patients with AML following the review of additional clinical studies. In a previous international phase 3 clinical study in 320 AML patients, the combination of Ceplene and low-dose IL-2 was shown to prevent relapse of leukemia while maintaining good quality of life during treatment.

## About Immune Pharmaceuticals, Inc.

Immune Pharmaceuticals Inc. is a biopharmaceutical company developing novel therapeutic agents for the treatment of immunologic and inflammatory diseases. Immune's lead program, bertilimumab, is a first-in-class, human monoclonal antibody that targets eotaxin-1, a chemokine that plays a role in immune responses and attracts eosinophils to the site of inflammation. By blocking eotaxin-1, bertilimumab may prevent the migration and activation of eosinophils and other cells, thus blocking an important inflammatory pathway active in a variety of allergic and immune diseases. Bertilimumab has shown promising clinical activity in bullous pemphigoid and has been studied in other conditions including allergic rhinitis and ulcerative colitis, and may have application in other diseases, including atopic dermatitis, asthma, and other diseases. Immune is also developing NanoCyclo, a nano-encapsulated formulation of cyclosporin, which is in late stage preclinical development for atopic dermatitis and psoriasis. For more information, please visit www.immunepharma.com and connect with the Company on Twitter, LinkedIn, and Facebook.

## About Vector Therapeutics, Inc.

Vector Therapeutics is a biopharmaceutical company acquiring, developing and commercializing oncology therapeutics with a primary focus on leukemia. The product portfolio consists initially of drugs targeting Acute Myeloid Leukemia (AML). We aim to provide precision medicine to improve treatment outcomes by selecting patients based on the genetic features of cancer cells and by immune bio-markers. We are committed to partnering with physicians, pharmacists, caregivers and payors to ensure that every patient has access to the optimal treatment to help them defeat AML. For more information, please visit vectortherapeutics.com and connect with the company on Twitter, LinkedIn, and Facebook.

## Safe Harbor Statements Regarding Forward Looking Statements

The statements in this news release made by representatives of Immune relating to matters that are not historical facts, including without limitation, those regarding the timing of any potential sale of Ceplene, the fact that Vector's obligation to complete the purchase of Ceplene is subject to a number of conditions, including Vector's ability to have sufficient capital to complete the transaction, the negotiation of ancillary documentation for the sale and various other conditions. There can be no assurance that the sale of Ceplene will occur or as to the timing of any sale that does take place. Readers are cautioned not to

place undue reliance on these forward-looking statements, which speak only as to the date hereof. Accordingly, any forward-looking statements should be read in conjunction with the additional risks and uncertainties detailed in Immune's filings with the Securities and Exchange Commission, including those discussed in Immune's Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, and periodic reports filed on Form 8-K.

**Investor Contacts**

Immune Pharmaceuticals Inc.: Investors@immunepharma.com

Vector Therapeutics Inc.: anna.baran-djokovic@vectortherapeutics.com

SOURCE: Immune Pharmaceuticals Inc. and Vector Therapeutics Inc.



Source: Immune Pharmaceuticals, Inc.

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 8-K**

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): **November 23, 2018**

# IMMUNE PHARMACEUTICALS INC.

(Exact name of registrant as specified in its charter)

| Delaware | 001-36602 | 52-1841431 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 1 Bridge Plaza North, Suite 270, Fort Lee NJ | 07024 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(201) 464-2677**

(Former name or former address, if changed since last report) N/A

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.    ☐

**Item 8.01.**        **Other Events**

*Ceplene Option Agreement*

On November 23, 2018, Immune Pharmaceuticals Inc., a Delaware corporation (the "Company"), entered into an Option Agreement (the "Option Agreement") with Vector Therapeutics Inc. ("Vector") pursuant to which the Company granted to Vector an option to purchase the Company's Ceplene assets for an aggregate purchase price of $14.5 million, payable in installments as described below. Vector paid the Company $0.5 million for the option which expires on January 31, 2019. Vector has the one-time right to extend the expiration date of the option to March 1, 2019 by paying the Company an additional $0.1 million. The option is only exercisable by Vector if it provides to the Company a written certification that it has presently available cash resources in an amount at least equal to the purchase price. If Vector consummates one or more public or private offerings of its securities resulting in aggregate gross proceeds of not less than $8.0 million or (ii) provides to the Company comfort about Vector's ability to pay up to $7.0 million to the Company, including the payment of agreed amounts payable to the mutually agreed upon amount due to Meda Pharma SARL, the funding obligation shall be deemed to be automatically and irrevocably satisfied and the option deemed to be exercised. In the event that the option is exercised or deemed to be exercised, at the closing and subject to the satisfaction or waiver of certain conditions specified in the Option Agreement, Vector will acquire the Ceplene assets and agree to assume certain related liabilities. $2.5 million of the purchase price will be payable at closing and an additional $2.0 million will be payable on or before March 29, 2019. The remaining purchase price will be paid in four annual installments of $2.5 million on or before each December 31, commencing on or before December 31, 2019. The Company and Vector have reserved the right to evidence the right to receive the four annual installments in the form of a note convertible into freely tradable shares of Vector's common stock on such terms as the Company and Vector may agree, or by other financial instruments as mutually agreed by the Company and Vector. The Option Agreement will terminate in accordance with its terms if the closing does not occur on or prior to March 1, 2019, other than as a result of the Company's material breach. No assurance can be given that the option will be exercised or, if exercised, that the Company will receive payment of the purchase price when due.

Under the terms of a letter agreement entered into in connection with the Option Agreement, the Company and Vector have agreed to coordinate various critical activities in the maintenance of Ceplene's Market Authorization in Europe until closing of the transaction, which is anticipated in the first quarter of 2019.

**Item 9.01**        **Financial Statements and Exhibits.**

(d)  Exhibits

99.1    Press Release, dated November 27, 2018

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**IMMUNE PHARMACEUTICALS INC.**

By:   /s/ Tony Fiorino

Name: Tony Fiorino, M.D. Ph.D.

Title:  Interim Chairman, President and
       Interim Chief Executive Officer

Date: November 28, 2018



### Immune Pharmaceuticals and Vector Therapeutics Sign Option Agreement for Worldwide Ceplene® Rights

*Immune Receives $500,000 for Option; If Exercised, Total Deal Value Could Exceed $17.5 Million*

FORT LEE, NJ and NEW YORK, NY (November 27, 2018) – Immune Pharmaceuticals, Inc. (OTCQB: IMNP) ("Immune"), a biopharmaceutical company developing novel therapeutic agents for the treatment of immunologic and inflammatory diseases, and Vector Therapeutics, Inc. ("Vector"), a biopharmaceutical company acquiring, developing and commercializing oncology therapeutics, today announced the execution of an agreement that gives Vector an option to acquire worldwide rights to Ceplene.

Under the option agreement, Vector has paid Immune $500,000 and has gained an exclusive option to acquire worldwide Ceplene rights for total additional fixed consideration of $14.5 million, including $2.5 million at closing, $4.5 million in 2019, and $2.5 million in each of 2020, 2021 and 2022. At closing, Vector will also assume certain Ceplene-related liabilities from Immune, expected to total approximately $3.5 million. Under the option agreement, Immune and Vector will coordinate various activities critical for the maintenance of Ceplene's Market Authorization in Europe until closing of the transaction, which is anticipated in the first quarter of 2019. Vector is able to exercise the option any time until January 31, 2019, which can be extended until March 1, 2019, provided it has capital adequate to close the transaction and other closing conditions are satisfied.

Tony Fiorino, MD, PhD, Immune's interim Chief Executive Officer, stated "We are so pleased to have signed this option agreement with Vector Therapeutics. Given Vector's knowledge of Ceplene, we believe they are the right party to capitalize on this asset. We look forward to working with them to close this transaction and complete the transfer of Ceplene into their capable hands."

Daniel Teper, PharmD, MBA, Vector's Chairman and Chief Executive Officer, commented "We are passionate about defeating Acute Myeloid Leukemia (AML). Preventing AML relapse – which currently affects up 80% of patients in first complete remission – is a significant medical need. We are planning to launch Ceplene, the first therapy approved for AML remission maintenance, in Europe in the first quarter 2019 and to accelerate its development toward approval in the United States, China and Japan." Dr. Teper added "We believe that recent preclinical and clinical data for Ceplene strengthen the rationale for Ceplene in select AML patients and also form the basis for clinical development beyond the AML indication."

Ceplene (histamine dihydrochloride) is NOX2 inhibitor that enables low dose aldesleukin (IL-2) to activate NK cells and T cells in order to prevent relapse in AML patients who have achieved first complete remission. The European Medicine Agency (EMA) confirmed the approval of Ceplene on July 27, 2018 for the maintenance of first complete remission in patients with AML following the review of additional clinical studies. In a previous international phase 3 clinical study in 320 AML patients, the combination of Ceplene and low-dose IL-2 was shown to prevent relapse of leukemia while maintaining good quality of life during treatment.

**About Immune Pharmaceuticals, Inc.**

Immune Pharmaceuticals Inc. is a biopharmaceutical company developing novel therapeutic agents for the treatment of immunologic and inflammatory diseases. Immune's lead program, bertilimumab, is a first-in-class, human monoclonal antibody that targets eotaxin-1, a chemokine that plays a role in immune responses and attracts eosinophils to the site of inflammation. By blocking eotaxin-1, bertilimumab may prevent the migration and activation of eosinophils and other cells, thus blocking an important inflammatory pathway active in a variety of allergic and immune diseases. Bertilimumab has shown promising clinical activity in bullous pemphigoid and has been studied in other conditions including allergic rhinitis and ulcerative colitis, and may have application in other diseases, including atopic dermatitis, asthma, and other diseases. Immune is also developing NanoCyclo, a nano-encapsulated formulation of cyclosporin, which is in late stage preclinical development for atopic dermatitis and psoriasis. For more information, please visit www.immunepharma.com and connect with the Company on Twitter, LinkedIn, and Facebook.

**About Vector Therapeutics, Inc.**

Vector Therapeutics is a biopharmaceutical company acquiring, developing and commercializing oncology therapeutics with a primary focus on leukemia. The product portfolio consists initially of drugs targeting Acute Myeloid Leukemia (AML). We aim to provide precision medicine to improve treatment outcomes by selecting patients based on the genetic features of cancer cells and by immune bio-markers. We are committed to partnering with physicians, pharmacists, caregivers and payors to ensure that every patient has access to the optimal treatment to help them defeat AML. For more information, please visit vectortherapeutics.com and connect with the company on Twitter, LinkedIn, and Facebook.

**Safe Harbor Statements Regarding Forward Looking Statements**

The statements in this news release made by representatives of Immune relating to matters that are not historical facts, including without limitation, those regarding the timing of any potential sale of Ceplene, the fact that Vector's obligation to complete the purchase of Ceplene is subject to a number of conditions, including Vector's ability to have sufficient capital to complete the transaction, the negotiation of ancillary documentation for the sale and various other conditions. There can be no assurance that the sale of Ceplene will occur or as to the timing of any sale that does take place. Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as to the date hereof. Accordingly, any forward-looking statements should be read in conjunction with the additional risks and uncertainties detailed in Immune's filings with the Securities and Exchange Commission, including those discussed in Immune's Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, and periodic reports filed on Form 8-K.

**Investor Contacts**

Immune Pharmaceuticals Inc.: Investors@immunepharma.com

Vector Therapeutics Inc.: anna.baran-djokovic@vectortherapeutics.com

SOURCE: Immune Pharmaceuticals Inc. and Vector Therapeutics Inc.



Source: Immune Pharmaceuticals, Inc.

Released November 27, 2018

# EXHIBIT D

As filed with the Securities and Exchange Commission on January 17, 2019

Registration No. 333-228512

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

AMENDMENT NO. 2
TO
FORM S-1

REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

# IMMUNE PHARMACEUTICALS INC.

*(Exact name of registrant as specified in its charter)*

| Delaware | 2834 | 52-1841431 |
|---|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(Primary Standard Industrial Classification Code Number)* | *(I.R.S. Employer Identification No.)* |

*(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)*

**Anthony Fiorino, M.D. Ph.D.**
**President and Interim Chief Executive Officer**
**1 Bridge Plaza North, Suite 270**
**Fort Lee, NJ 07024**
**Telephone: (201) 464-2677**

*(Name, address, including zip code, and telephone number, including area code, of agent for service)*

*Copies to:*

**John D. Hogoboom, Esq.**
**Lowenstein Sandler LLP**
**1251 Avenue of the Americas**
**New York, NY 10020**
**Telephone: (212) 262-6700**

**Approximate date of commencement of proposed sale to the public:** From time to time after this Registration Statement becomes effective.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act of 1933, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act of 1933, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☒ | Smaller reporting company ☒ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided in Section 7(a)(2)(B) of the Securities Act. ☐

This registration statement shall hereafter become effective in accordance with the provisions of section 8(a) of the Securities Act of 1933.

The information in this preliminary prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is subject to completion, is not an offer to sell these securities, and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

Subject to completion, dated January 17, 2019

PRELIMINARY PROSPECTUS

# Immune Pharmaceuticals Inc.

### Up to 123,333,333 Shares of common stock

This prospectus relates to the resale or other disposition by the selling stockholder (the "Selling Stockholder") identified in this prospectus and its transferees of up to 123,333,333 shares of our common stock, par value $0.0001 per share. All of the shares of common stock registered for resale or other disposition by the Selling Stockholder are issuable upon the exercise or conversion of securities initially purchased from us in a private placement transaction. For a description of the transaction pursuant to which this resale registration statement relates, please see "Prospectus Summary—Recent Developments—October Financing."

The Selling Stockholder may, from time to time, sell, transfer or otherwise dispose of any or all of its shares of common stock or interests in shares of common stock on any stock exchange, market or trading facility on which the shares are traded or in private transactions. These dispositions may be at fixed prices, at prevailing market prices at the time of sale, at prices related to the prevailing market price, at varying prices determined at the time of sale, or at negotiated prices. We will not receive any proceeds from the sale or other disposition of these shares by the Selling Stockholder; however, we will receive the proceeds from the exercise of the warrants described herein if such warrants are exercised for cash.

We will bear all costs relating to the registration of these shares of our common stock, other than the Selling Stockholder's legal or accounting costs or commissions.

Our common stock is listed on The OTCQB Venture Market ("OTCQB") under the symbol "IMNP." The closing price of our common stock on January 16, 2019, as reported by the OTCQB, was $0.0146 per share.

**Investing in our common stock involves a high degree of risk. See the section entitled "Risk Factors" beginning on page 7 of this prospectus and elsewhere in this prospectus for a discussion of information that should be considered in connection with an investment in our common stock.**

**We may amend or supplement this prospectus from time to time by filing amendments or supplements as required. You should read the entire prospectus and any amendments or supplements carefully before you make your investment decision.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

Prospectus dated          , 2019

### TABLE OF CONTENTS

| | Page |
|---|---|
| PROSPECTUS SUMMARY | 3 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | 6 |
| RISK FACTORS | 7 |
| USE OF PROCEEDS | 38 |
| PRICE RANGE OF COMMON STOCK | 39 |
| DIVIDEND POLICY | 39 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 40 |
| BUSINESS | 50 |
| DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 64 |
| EXECUTIVE AND DIRECTOR COMPENSATION | 66 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 74 |
| SECURITY OWNERSHIP OF BENEFICIAL OWNERS AND MANAGEMENT | 73 |
| SELLING STOCKHOLDER | 75 |
| DESCRIPTION OF SECURITIES | 76 |
| PLAN OF DISTRIBUTION | 79 |
| LEGAL MATTERS | 81 |
| EXPERTS | 81 |
| WHERE YOU CAN FIND MORE INFORMATION | 81 |
| INDEX TO FINANCIAL STATEMENTS | F-1 |

### ABOUT THIS PROSPECTUS

You should read this prospectus and the information included in this prospectus before making an investment in our securities. See "Where You Can Find More Information." You should rely only on the information contained in this prospectus. We have not authorized any other person to provide you with additional or different information. If anyone provides you with different or inconsistent information, you should not rely on it. We are not making an offer to sell these securities in any jurisdiction where an offer or sale is not permitted. You should assume that the information appearing in this prospectus is accurate only as of the date on the front cover of this prospectus. Our business, financial condition, results of operations and prospects may have changed since that date. Information contained on our website is not part of this prospectus.

Ceplene®, LidoPain®, Epicept®, AmiKetTM, and AzixaTM are trademarks that we own. This prospectus contains references to our trademarks. Solely for convenience, trademarks and trade names referred to in this report, including logos, artwork and other visual displays, may appear without the ® or ™ symbols, but such references, or the lack thereof, are not intended to indicate, in any way, that we will not assert, to the fullest extent under applicable law, our rights or the rights of the applicable licensor to these trademarks and trade names. We do not intend our use or display of other companies' trade names or trademarks to imply a relationship with, or endorsement or sponsorship of us by, any other companies.

### PROSPECTUS SUMMARY

*The following summary is not intended to be complete and is qualified in its entirety by, and should be read together with, the more detailed information and financial statements and related notes thereto appearing elsewhere in this prospectus. Before you decide to invest in our securities, you should read this entire prospectus carefully, including the risk factors and the financial statements and related notes included in this prospectus. As used in this prospectus, unless the context indicates or otherwise requires, the "Company," "we," "us,", "our" or "Immune" refer to Immune Pharmaceuticals Inc., a Delaware corporation, and its subsidiaries.*

#### Overview

Immune Pharmaceuticals Inc., together with its subsidiaries (collectively, "Immune" or the "Company" or "us," "we," or "our") is a clinical stage biopharmaceutical company specializing in the development of novel targeted therapeutic agents in the fields of inflammation, dermatology and oncology.

Our lead product candidate is bertilimumab, a first-in-class, human, anti-eotaxin-1 antibody that targets eotaxin-1, a key regulator of inflammation. Phase 2 trials of bertilimumab in bullous pemphigoid ("BP"), our lead indication, as well as in allergic rhinitis and allergic conjunctivitis, have been completed, and a phase 2 clinical trial in ulcerative colitis ("UC") has completed recruiting subjects, although this trial remains blinded. We are also developing a nano-encapsulated topical formulation of cyclosporine-A, which we refer to as "NanoCyclo," for the treatment of atopic dermatitis ("AD") and psoriasis.

We also own certain rights to Ceplene, which is approved in the European Union for the maintenance of remission in patients with Acute Myeloid Leukemia ("AML") in combination with interleukin-2 (IL-2).

This prospectus contains references to our trademarks. Solely for convenience, trademarks and trade names referred to in this prospectus, including logos, artwork and other visual displays, may appear without the ® or ™ symbols, but such references, or the lack thereof, are not intended to indicate, in any way, that we will not assert, to the fullest extent under applicable law, our rights or the rights of the applicable licensor to these trademarks and trade names. We do not intend our use or display of other companies' trade names or trademarks to imply a relationship with, or endorsement or sponsorship of us by, any other companies. Each trademark, trade name or service mark of any other company appearing in this prospectus belongs to its respective holder.

3

**Recent Developments**

*Ceplene Option Agreement*

On November 23, 2018, we entered into an Option Agreement (the "Option Agreement") with Vector Therapeutics Inc. ("Vector") pursuant to which we granted to Vector an option to purchase our Ceplene assets for an aggregate purchase price of $14.5 million, payable in installments as described below. Vector paid $0.5 million for the option which expires on January 31, 2019. Vector has the one-time right to extend the expiration date of the option to March 1, 2019 by paying us an additional $0.1 million. The option is only exercisable by Vector if it provides to us a written certification that it has presently available cash resources in an amount at least equal to the purchase price. If Vector consummates one or more public or private offerings of its securities resulting in aggregate gross proceeds of not less than $8.0 million or (ii) provides to us comfort about Vector's ability to pay up to $7.0 million to us, including the payment of agreed amounts payable to the mutually agreed upon amount due to Meda Pharma SARL, the funding obligation will be deemed to be automatically and irrevocably satisfied and the option deemed to be exercised. In the event that the option is exercised or deemed to be exercised, at the closing and subject to the satisfaction or waiver of certain conditions specified in the Option Agreement, Vector will acquire the Ceplene assets and agree to assume certain related liabilities. $2.5 million of the purchase price is payable at closing and an additional $2.0 million will be payable on or before March 29, 2019. The remaining purchase price will be paid in four annual installments of $2.5 million on or before each December 31, commencing on or before December 31, 2019. We and Vector have reserved the right to evidence the right to receive the four annual installments in the form of a note convertible into freely tradable shares of Vector's common stock on such terms as we and Vector may agree, or by other financial instruments as mutually agreed by us and Vector. The Option Agreement will terminate in accordance with its terms if the closing does not occur on or prior to March 1, 2019, other than as a result of our material breach. No assurance can be given that the option will be exercised or, if exercised, that we will receive payment of the purchase price when due.

*October Financing*

On October 9, 2018, we entered into a securities purchase agreement with the Selling Stockholder, which was subsequently amended on January 15, 2019, pursuant to which we sold $5.5 million in principal amount of Senior Secured Redeemable Debentures (the "October Debentures") for $2 million in cash and a $3 million promissory note payable upon the earlier of the effectiveness of a registration statement covering the resale of the shares issuable upon conversion of the October Debentures or one year. The October Debentures originally bore compounded interest at a rate of 10% per annum, subject to adjustment as specified in the October Debentures, and mature five years from the issuance date. The October Debentures are secured by first priority security interests in all of our assets, other than all tangible and intangible assets associated with Ceplene unless such assets are not disposed of by March 31, 2019. The October Debentures are convertible into shares of our common stock at a conversion price of $0.075 per share, subject to certain adjustments, at the option of the holder thereof or, in certain circumstances, at our option. In the event of a conversion, any accrued interest and any interest make-whole amount was payable in cash or, following a "Trigger Event" in certain circumstances, shares of common stock valued on a formula basis specified in the October Debentures. At maturity, the October Debentures were automatically convertible into shares of common stock unless they were redeemed for cash at our option, in whole but not in part, at 100% of the face amount thereof plus accrued interest. Prior to maturity and subject to certain limitations, the October Debentures were redeemable in whole or in part in cash at our option at 100% of the face amount to be redeemed plus an interest make-whole payment or in whole at 125% of the face amount thereof.

We also issued Warrants (the "October Debenture Warrants") to the Selling Stockholder which are exercisable for three years from the issuance date to purchase up to 50 million shares of our common stock at an exercise price of $0.10 per share, subject to full-ratchet price protection in the event that we issue or are deemed to issue shares of common stock at a price per share less than the then-current exercise price of the October Debenture Warrants (subject to certain exceptions). In the event of certain fundamental transactions (generally involving the sale or acquisition of our company or all or substantially all of our assets), the holder of the October Debenture Warrants has the right to require us (or any successor entity) to repurchase the October Debenture Warrants at the Black-Scholes value thereof calculated pursuant to a formula specified in the October Debenture Warrants.

In the securities purchase agreement, we agreed to register the shares of common stock issuable in respect of the October Debentures and the shares issuable upon the exercise of the October Debenture Warrants.

On May 18, 2018, we issued $2.8 million in aggregate principal amount of our Original Issue Discount Convertible Debentures (the "May Debentures"). Pursuant to Waiver Amendment and Exchange Agreements entered into with certain holders of the May Debentures in connection with the sale of the October Debentures, the aggregate face amount of the May Debentures was increased to $3.9 million. By their terms, the May Debentures matured and became due and payable on November 18, 2018. We did not repay the May Debentures on the maturity date.

Our failure to repay the May Debentures when due resulted in a "Trigger Event" under the October Debentures. As a result of the Trigger Event, we no longer have the right to redeem the October Debentures prior to their maturity, the interest rate on the October Debentures has increased to 20% and interest is now payable in shares of our common stock valued at 80.0% of the average of the 3 lowest sale prices during the relevant measurement period, less $0.02 per share of Common Stock, but in no event less than the par value of our common stock. As of January 4, 2019, a total of 2,745,251,141 shares of common stock would be issuable in respect of the October Debentures and the October Debenture Warrants, which is significantly more shares than we are authorized to issue.

The Selling Stockholder is not obligated to fund the remaining $3.0 million of its investment in the October Debentures until the earlier of the date on which all of the shares of common stock issuable in respect of the October Debentures and the October Debenture Warrants are registered and the first anniversary of the issuance of the October Debentures. Because we are not able to

register all of the shares required under the securities purchase agreement, the Selling Stockholder has advised us that it believes we are in default of our obligations under the October Debentures and that it does not intend to fund its remaining $3 million investment in the October Debentures. We are negotiating with the Selling Stockholder regarding terms under which it would be willing to fund its remaining investment. However, no agreement has been reached as of the date hereof and we cannot assure you that we will reach any agreement with the Selling Stockholder or as to the terms of any such agreement. If the Selling Stockholder does not fund a substantial portion of its remaining $3 million investment, we may be required to find alternative sources of financing. If we are unable to do so, we may need to cease operations and file for protection under applicable bankruptcy law.

**Corporate Information**

Immune (formerly EpiCept) was incorporated in Delaware in March 1993. Immune Ltd., incorporated in Israel in July 2010, entered into a definitive merger agreement with EpiCept in November 2012, which was completed on August 25, 2013. Our principal executive offices are located at 1 Bridge Plaza North, Suite 270, Fort Lee, NJ 07024. Our telephone number is (201) 464-2677, and our website address is www.immunepharma.com. The information contained in, or accessible through, the Company's website does not constitute a part this this Registration Statement on Form S-1.

4

Case 19-13273-VFP    Doc 92-1    Filed 03/28/19    Entered 03/28/19 13:48:02    Desc
Declaration of Anthony Fiorino (with Exhibits A - D) in Further Support of the    Page 48 of 54

### The Offering

| | |
|---|---|
| Common stock covered hereby (1): | 123,333,333 shares. |
| Common stock outstanding | 133,700,690 shares as of January 11, 2019. |
| Use of proceeds: | We will not receive any proceeds from the sale of the common stock by the Selling Stockholder; however, we will receive the proceeds from any cash exercise of the October Warrants. |
| Risk factors: | Investing in our common stock involves a high degree of risk. See the section entitled "Risk Factors" beginning on page 7 of this prospectus and elsewhere in this prospectus for a discussion of information that should be considered in connection with an investment in our common stock. |
| OTCQB symbol | IMNP |

(1) All share numbers contained in this prospectus give effect to a 1-for-20 reverse split of our common stock effected on April 13, 2017.

5

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

The statements contained in this prospectus that are not purely historical are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Such forward-looking statements include statements regarding our expectations, hopes, beliefs or intentions regarding the future, including but not limited to statements regarding our market, strategy, competition, development plans (including acquisitions and expansion), financing, revenues, operations, and compliance with applicable laws. Forward-looking statements involve certain risks and uncertainties, and actual results may differ materially from those discussed in any such statement. Factors that could cause actual results to differ materially from such forward-looking statements include the risks described in greater detail in the following paragraphs. All forward-looking statements in this document are made as of the date hereof, based on information available to us as of the date hereof, and we assume no obligation to update any forward-looking statement. Market data used throughout this prospectus is based on published third party reports or the good faith estimates of management, which estimates are based upon their review of internal surveys, independent industry publications and other publicly available information. Although we believe that such sources are reliable, we do not guarantee the accuracy or completeness of this information, and we have not independently verified such information.

Forward-looking statements contained herein involve known and unknown risks, uncertainties and other important factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. These factors include, among others:

- our need for additional capital to pursue the clinical development of our product candidates;
- the effects of our lack of capital on our ability to pursue clinical development of our product candidates;
- our inability to continue as a going concern if we are unable to raise substantial additional capital;
- our inability to obtain funding of the additional $3 million investment by the Selling Stockholder in our October Debentures;
- our ability to continue to meet our obligations under our existing debt agreements;
- risks associated with our ability to raise additional funds sufficient to meet our working capital requirements;
- our history of operating losses since our inception;
- success in retaining or recruiting, or changes required in, our officers, key employees or directors;
- our ability to find partners for our products on attractive terms, on a timely basis, or at all;
- our ability to obtain approval to market and commercialize any of our product candidates;
- our reliance on collaborative partners and others for further clinical trials, development, manufacturing and commercialization of our product candidates;
- our ability to complete our planned clinical trials (or initiate other trials) in accordance with our estimated timelines due to delays;
- the cost, delays and uncertainties associated with our scientific research, product development, clinical trials and regulatory approval process;
- the cost, delays and uncertainties associated with our scientific research, product development, clinical trials and regulatory approval process;
- risks associated with our ability to protect our intellectual property;
- risks associated with litigation;
- our dependence upon key personnel;
- our expectations regarding government and third-party payor coverage and reimbursement; and
- the highly competitive nature of our business.

6

## RISK FACTORS

*Investing in our securities involves a high degree of risk. Prospective investors should carefully consider the risks described below, together with all of the other information included in this prospectus, before purchasing shares of our common stock. There are numerous and varied risks as set forth below that may prevent us from achieving our goals, and the risks we describe are not the only ones facing us. If any of these risks actually occur, or if any risks or uncertainties not presently known to us or that we currently deem immaterial impair our business or operations, then our business, financial condition or results of operations may be materially adversely affected. In such cases, the trading price of our common stock could decline and investors could lose all or part of their investment.*

**Risks related to our financial position and need for additional capital**

*We have limited liquidity.*

As of September 30, 2018, our cash and cash equivalents balance was $0.1 million, which we believe will not be sufficient to fund our anticipated level of operations for at least the next 12 months, and our working capital deficit was $14.5 million. Our cash used in operations was $11.6 million and $12.3 million for the fiscal years ended December 31, 2017 and 2016, respectively and $8.3 million for the nine months ended September 30, 2018.

We have financed our operations to date through private placements and public offerings of common and preferred stock and convertible debt securities and borrowings under secured loans. Our revenue to date has been immaterial and consisted of royalties on licensed patents and sales of Ceplene used in clinical trials.

Our ability to continue operations depends on our ability to access the capital markets, license our technology to third parties and obtain regulatory approval to market our drugs. We expect to finance our cash needs from additional equity or debt financing, or strategic alliances on products until we can achieve profitability and positive cash flows from operating activities, if ever.

*We have incurred operating losses since our inception. We expect to incur operating losses for the foreseeable future and may never achieve or maintain profitability.*

Since our inception in July 2010, we have incurred significant losses and expect to continue to operate at a net loss in the foreseeable future. Our net loss was $13.2 million and $14.7 million for nine months ended September 30, 2018 and 2017, and our accumulated deficit as of September 30, 2018 was $126.8 million. Our cash used in operations was $8.3 million and $5.2 million for the nine months ended September 30, 2018 and 2017, respectively. We have devoted substantially all of our financial resources and efforts on the development of bertilimumab, our phase 2 drug candidate for the treatment of inflammatory diseases, and our other drug candidates. We are still in the early stages of development of our product candidates. We expect to continue to incur significant expenses and operating losses for the foreseeable future. Our net losses may fluctuate significantly from quarter to quarter and year to year. We anticipate that our expenses will increase substantially as we continue the research and development of our product candidates.

We have limited capital resources and operations since inception have been funded with the proceeds from equity and debt financings and license fee arrangements. As of September 30, 2018, we had $0.1 million in cash and cash equivalents. We intend to finance our need for working capital from additional equity or debt financing, the sale of its Ceplene assets and a collaboration or other agreement with respect to bertilimumab. We cannot assure you that we will be able to obtain sufficient funding to continue our operations. Any financing, sale of assets or collaboration agreement may be on terms that are not favorable to us and may not be available on any terms. If we fail to raise additional capital or obtain substantial cash inflows from potential partners within the next six months, we may be forced to curtail or cease operations.

To become and remain profitable, we must, either alone or with partners, succeed in developing and eventually commercializing products that generate significant revenue. This will require us to be successful in a range of challenging activities, including completing preclinical testing and clinical trials of our product candidates, discovering additional product candidates, obtaining regulatory approval for these product candidates and manufacturing, marketing and selling any products for which we may obtain regulatory approval, and establishing and managing our collaborations at various stages of each candidate's development. We are only in the preliminary stages of most of these activities. We may never succeed in these activities and, even if we do, may never generate revenues that are significant enough to achieve profitability.

Other than Ceplene, none of the Company's drug candidates has received FDA or foreign regulatory marketing approval. In order to grant marketing approval, the FDA or foreign regulatory agencies must conclude that clinical data establish the safety and efficacy of the Company's drug candidates. Furthermore, the Company's strategy includes entering into collaborations with third parties to participate in the development and commercialization of its products. In the event that third parties have control over the preclinical development or clinical trial process for a product candidate, the estimated completion date would largely be under control of that third party rather than under the Company's control. The Company cannot forecast with any degree of certainty which of its drug candidates will be subject to future collaborations or how such arrangements would affect its development plan or capital requirements.

Because of the numerous risks and uncertainties associated with pharmaceutical product development, we are unable to accurately predict the timing or amount of increased expenses or when, or if, we will be able to achieve profitability. If we are required by the FDA or EMA to perform studies in addition to those currently expected, or if there are any delays in completing our clinical trials or the development of any of our product candidates, our expenses could increase and revenue could be further delayed.

Even if we do achieve profitability, we may not be able to sustain or increase profitability on a quarterly or annual basis. Our failure to become and remain profitable would depress the value of our company and could impair our ability to raise capital, expand our business, maintain our research and development efforts, diversify our product offerings or even continue our operations. A decline in the value of our Company could also cause you to lose part or all of your investment.

***The estimates and judgments we make, or the assumptions on which we rely, in preparing our consolidated financial statements could prove inaccurate.***

Our consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these consolidated financial statements requires us to make estimates and judgments that affect the reported amounts of our assets, liabilities, revenues and expenses, the amounts of charges accrued by us and related disclosure of contingent assets and liabilities. Such estimates and judgments include revenue recognition, inventory, valuation of stock-based awards, research and development expenses and income tax. We base our estimates on historical experience, facts and circumstances known to us and on various other assumptions that we believe to be reasonable under the circumstances. We cannot provide assurances, however, that our estimates, or the assumptions underlying them, will not change over time or otherwise prove inaccurate. If this is the case, we may be required to restate our consolidated financial statements, which could, in turn, subject us to securities class action litigation. Defending against such potential litigation relating to a restatement of our consolidated financial statements would be expensive and would require significant attention and resources of our management. Moreover, our insurance to cover our obligations with respect to the ultimate resolution of any such litigation may be inadequate. As a result of these factors, any such potential litigation could have a material adverse effect on our financial results and cause our stock price to decline, which could in turn subject us to securities class action litigation.

***We will require substantial additional funding, which may not be available to us on acceptable terms, or at all. If we fail to raise the necessary additional capital, we will be unable to complete the development and commercialization of our product candidates or continue our development programs.***

Our operations have consumed substantial amounts of cash since our inception in 2010. We will require additional capital for the further development and commercialization of our product candidates and to fund our other operating expenses and capital expenditures.

We cannot be certain that additional funding will be available on acceptable terms or at all. If we are unable to raise additional capital in sufficient amounts or on terms acceptable to us we may need to significantly delay, scale back or discontinue the development or commercialization of one or more of our product candidates. We may need to seek collaborators for one or more of our current or future product candidates at an earlier stage than otherwise would be desirable or on terms that are less favorable than might otherwise be available. Any of these events could significantly harm our business, financial condition and results of operations.

We expect that a large percentage of our future research and development expenses will be incurred in support of current and future preclinical and clinical development programs. These expenditures are subject to numerous uncertainties in timing and cost to completion. We test our product candidates in numerous preclinical studies for toxicology, safety and efficacy. We then conduct early stage clinical trials for each drug candidate. As we obtain results from clinical trials, we may elect to discontinue or delay clinical trials for certain product candidates or programs in order to focus resources on more promising product candidates or programs. Completion of clinical trials may take several years but the length of time generally varies according to the type, complexity, novelty and intended use of a drug candidate. The cost of clinical trials may vary significantly over the life of a project as a result of differences arising during clinical development.

In order to carry out our business plan and implement our strategy, we will need to obtain additional financing and may choose to raise additional funds through public or private equity or debt financing, licensing arrangements, strategic collaborations, asset sales, government grants, or other arrangements. We cannot be sure that any additional funding will be available on terms favorable to us, or at all. Furthermore, any additional equity or equity-related financing may be dilutive to our stockholders, and debt or equity financing, if available, may subject us to restrictive covenants and significant interest costs. We may be required to relinquish our rights to certain of our product candidates or marketing territories if we obtain funding through licensing arrangements or strategic collaborations.

In addition, certain investors may be unwilling to invest in our securities if we are unable to maintain the listing of our common stock on a United States national securities exchange. Our inability to raise capital when needed would harm our business, financial condition and results of operations, and could cause our stock price to decline or require that we wind down our operations altogether.

***The report of the Independent Registered Public Accounting Firm on our financial statements for the year ended December 31, 2017 includes an explanatory paragraph that expresses substantial doubt about our ability to continue as a going concern.***

The Independent Registered Public Accounting Firm's Report issued in connection with our audited financial statements for the year ended December 31, 2017 states that there is "substantial doubt about our ability to continue as a going concern". Our ability to continue as a going concern is dependent on a combination of several factors, including, our ability to raise capital by issuing debt or equity securities to investors, license or sell our product candidates to other pharmaceutical companies, and generate revenues from successfully developed products. If we are not able to continue our business as a going concern, we may be forced to liquidate our assets for an amount less than the value at which those assets are carried on our financial statements, and it is likely that investors will lose part or all of their investment.

***We may be exposed to market risk and interest rate risk that may adversely impact our financial position, results of operations or cash flows.***

We may be exposed to market risk, i.e. the risk of loss related to changes in market prices, including foreign exchange rates, of financial instruments that may adversely impact our financial position, results of operations or cash flows. In addition, our investments may be exposed to market risk due to fluctuation in interest rates, which may affect its interest income and the fair market value of investments, if any. At present, our investments consist primarily of cash and cash equivalents. We may invest in investment-grade marketable securities with maturities of up to three years, including commercial paper, money market funds, and government/non-government debt securities. The primary objective of our investment activities is to preserve principal while maximizing the income that we receive from our investments without significantly increasing risk of loss.

9

*We are exposed to fluctuations in currency exchange rates, which could have an adverse effect on us.*

Our foreign currency exposures give rise to market risk associated with exchange rate movements of the United States dollar, our functional and reporting currency, mainly against the New Israeli Shekel, ("NIS"), the Euro and the British pound sterling. A significant portion of our expenses are denominated in United States dollars (with certain expenses payable to Israeli personnel, including sub-contractors and consultants, in the NIS). Our United States dollar expenses consist principally of payments made to personnel in the United States, including sub-contractors and consultants for preclinical studies, clinical trials and other research and development activities. We anticipate that the bulk of our expenses will continue to be denominated in United States dollars and the NIS. If the United States dollar fluctuates significantly against the NIS, the Euro or the British pound sterling it may have a negative impact on our results of operations.

To date, we have not engaged in hedging transactions. In the future, we may enter into currency hedging transactions to decrease the risk of financial exposure from fluctuations in the exchange rates of our principal operating currencies. These measures, however, may not adequately protect us from the material adverse effects of such fluctuations. Exchange rate fluctuations resulting in a devaluation of the NIS, the Euro or the British pound sterling compared with the United States dollar could have a material adverse impact on our results of operations and share price.

*We are in default under our agreement for the acquisition of the European rights to Ceplene. If not cured, we bear significant risk to our business plan regarding Ceplene, including the loss of such rights.*

Under an asset purchase agreement between Immune and Meda Pharma SARL ("Meda"), we were obligated to make a payment to Meda of $1,500,000 (the "First Initial Consideration") no later than December 15, 2017. Under that agreement, we had a 30-day grace period to make the payment or work out a payment plan with Meda. On January 31, 2018, Meda delivered to us a default notice under the asset purchase agreement, demanding payment of the First Initial Consideration no later than February 15, 2018. We have yet to make this payment. Accordingly, Meda could terminate the asset purchase agreement, and cause the loss by us of certain Ceplene-related assets without consideration to us and cancel our further obligations under the agreement. If such action were to occur, we would need to either work out a license with Meda or renegotiate terms of a purchase of the European Ceplene rights from Meda. There can be no guarantee that that we would be able to work out such a deal. Loss of the Ceplene related assets would materially impair our ability to execute our business plan with respect to our oncology related assets and have a negative effect on our financial condition.

*Our failure to repay our May Debentures when due may have a material adverse effect on our financial condition.*

On May 18, 2018, we issued $2.8 million in aggregate principal amount of our Original Issue Discount Convertible Debentures (the "May Debentures"). Pursuant to Waiver Amendment and Exchange Agreements entered into with certain holders of the May Debentures in connection with the sale of the October Debentures, the aggregate face amount of the May Debentures was increased to $3.9 million. By their terms, the May Debentures matured and became due and payable on November 18, 2018. We did not repay the May Debentures on the maturity date.

Our failure to repay the May Debentures when due constitutes a "Trigger Event" under the October Debentures. As a result, we no longer have the right to redeem the October Debentures prior to their maturity, the interest rate on the October Debentures has increased to 20% and interest will become payable in shares of common stock valued at 80.0% of the average of the 3 lowest sale prices during the relevant measurement period, less $0.02 per share of Common Stock, but in no event less than the par value of our common stock.

On December 13, 2018, Hudson Bay Master Fund Ltd. ("Hudson Bay") filed an action against us in the United States District Court for the Southern District of New York for payment of all amounts due on the $437,500 May Debentures issued to Hudson Bay. Although we have discussed a resolution of Hudson Bay's claim, no assurance can be given that such claim can be resolved on terms favorable to us, if at all.

Because we are not able to register all of the shares required under the securities purchase agreement relating to the October Debentures, the Selling Stockholder has advised us that it believes we are in default of our obligations under the October Debentures and that it does not intend to fund its remaining $3 million investment in the October Debentures. We are negotiating with the Selling Stockholder regarding the terms under which it would be willing to fund its remaining investment. However, no agreement has been reached as of the date hereof and we cannot assure you that we will reach any agreement with the Selling Stockholder or as to the terms of any such agreement. If the Selling Stockholder does not fund a substantial portion of its remaining $3 million investment, we may be required to find alternative sources of financing. If we are unable to do so, we may be required to cease operations and file for protection under applicable bankruptcy law.

These events may have a material and adverse effect on our financial condition.

10

***Our level of indebtedness could adversely affect our business, financial condition and results of operations and our ability to meet our payment obligations under such indebtedness.***

As of September 30, 2018, we had approximately $8.3 million of indebtedness, net of debt discount and issuance costs, outstanding. This level of debt could have significant consequences on our future operations, including:

- increasing our vulnerability to adverse economic and industry conditions;

- making it more difficult for us to meet our payment and other obligations under our existing indebtedness;

- making it more difficult to obtain any necessary future financing for working capital, capital expenditures, debt service requirements or other purposes;

- requiring the dedication of a substantial portion of any cash flow from operations to service our indebtedness, thereby reducing the amount of cash flow available for other purposes, including capital expenditures;

- placing us at a possible competitive disadvantage with competitors that are less leveraged than us or have better access to capital than we have; and

- limiting our flexibility in planning for, or reacting to, changes in our business and the markets in which we compete.

Any of the above-listed factors could have an adverse effect on our business, financial condition and results of operations and our ability to meet our payment obligations under our convertible notes.

Our ability to meet our payment and other obligations under our indebtedness depends on our ability to generate significant cash flow in the future. This, to some extent, is subject to general economic, financial, competitive, legislative and regulatory factors as well as other factors that are beyond our control. We cannot assure you that our business will generate cash flow from operations, or that future borrowings will be available to us, in an amount sufficient to enable us to meet our payment obligations under the convertible notes and to fund other liquidity needs. If we are not able to generate sufficient cash flow to service our debt obligations, we may need to refinance or restructure our debt, sell assets, reduce or delay capital investments, or seek to raise additional capital. If we are unable to implement one or more of these alternatives, we may not be able to meet our payment obligations under our existing indebtedness.

As described above, we did not repay the May Debentures when due. Our failure to repay the May Debentures when due constitutes a "Trigger Event" under the October Debentures. As a result, we no longer have the right to redeem the October Debentures prior to their maturity, the interest rate on the October Debentures has increased to 20% and interest will become payable in shares of common stock valued at 80.0% of the average of the 3 lowest sale prices during the relevant measurement period, less $0.02 per share of Common Stock, but in no event less than the par value of our common stock.

On December 13, 2018, Hudson Bay filed an action against us in the United States District Court for the Southern District of New York for payment of all amounts due on the $437,500 May Debentures issued to Hudson Bay. Although we have discussed a resolution of Hudson Bay's claim, no assurance can be given that such claim can be resolved on terms favorable to us, if at all.

***Servicing our indebtedness requires a significant amount of cash or common stock, and we may not have sufficient cash flow from our business to service our debt.***

We will be required to pay accrued interest on our indebtedness in cash or, in certain circumstances, shares of our common stock. Our ability to make scheduled payments of interest depends on our future performance, which is subject to economic, financial, competitive and other factors beyond our control. Our business may not generate cash flow from operations in the future sufficient to service our debt in cash and make necessary capital expenditures.

If we are unable to generate sufficient cash flow to satisfy payment obligations under our existing indebtedness, we may be required to adopt one or more alternatives, such as selling assets or obtaining additional equity capital on terms that may be onerous or highly dilutive. We may not be able to engage in any of these activities or engage in these activities on desirable terms, which could result in a default on our debt obligations.

We are subject to a number of restrictive covenants, which may restrict our business and financing activities. Such restrictions may affect, and in many respects limit or prohibit, among other things, our ability to:

- incur additional indebtedness for borrowed money (except permitted indebtedness);

- grant liens (except permitted liens);

- repurchase shares of common stock or common stock equivalents (subject to certain limited exceptions);

- repay or repurchase outstanding indebtedness (subject to certain limited exceptions);

- pay cash dividends or distributions on our equity securities; or

- enter into certain related party transactions.