UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Dale E. Barney, Esq.
David N. Crapo, Esq.
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4500
Facsimile: (973) 596-0545
E-mail: dbarney@gibbonslaw.com
  dcrapo@gibbonslaw.com
*Counsel for Discover Growth Fund, LLC*

| | |
|---|---|
| **In re:** | Chapter 11 |
| | Case No. 19-13273 (VFP) |
| IMMUNE PHARMACEUTICALS, INC., *et al.*,[1] | (Jointly Administered) |
| **Debtor.** | **Hearing Date:  July 2, 2019 at 10:00 a.m. ET**<br><br>**Objection Deadline:  June 25, 2019 at 4:00 p.m. ET** |

## MOTION OF DISCOVER GROWTH FUND, LLC
## TO CONVERT PURSUANT TO 11 U.S.C. § 1112(b)

 Discover Growth Fund, LLC ("**Discover**"), the senior secured lender to the above-captioned debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 bankruptcy cases (collectively, the "**Chapter 11 Cases**"), by and through its undersigned counsel, hereby submits this motion ("**Motion**") to convert this case to Chapter 7 pursuant to

---

[1] The "**Debtor**s" in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Immune Pharmaceutical, Inc. (1431); Immune Pharmaceuticals, Ltd.; Cytovia, Inc. (7805); Immune Oncology Pharmaceuticals, Inc.; Maxim Pharmaceuticals, Inc. (9983); and Immune Pharmaceuticals USA Corp. (9630).  The lead debtor is Immune Pharmaceuticals, Inc. ("**IPI**").

2731857.1 115785-100485

11 U.S.C. § 1112(b).  In support of this Motion, Discover respectfully represents the following:

## PRELIMINARY STATEMENT

1.    Hope may spring eternal, but the only tenable exit strategy for the Debtors in this case is liquidation.   As a result of the incompetence and self-dealing of their former management, the debtors have been reduced to impotent shells.  They have but two employees between them, a chief financial officer and the recently retained president, Gary Rabin, a restructuring professional who was only retained as an employee due to certain objections of the United States Trustee.  Neither of these two gentlemen appear to be being paid for their time, as the Debtors have repeatedly stated that they have almost no funds other than the $100,000 license fee paid by Vector Therapeutics, Inc.  ("**Vector**").  Similarly, they have only two tangible assets with any *potential* value.[2]  One of those assets, however, the Ceplene® pharmaceutical product ("**Ceplene**" or "**Ceplene Assets**"), is now indisputably encumbered by a security interest in favor of Discover to whom the Debtors owe $14,848,569.00.  The Debtors have lost the license for an integral component of their other potentially valuable asset, the Bertilimumab antibody ("**Bert Assets**").  Although these jointly administered cases have been pending for more than three months, the Debtors have thus far failed in their attempts to sell either the Ceplene Assets or the Bert Assets.  The proposed sale of the Ceplene Assets was moved on extremely shortened notice, clearly with the stated intention of attempting to defeat Discover's lien rights in those assets.  However, the Debtors' attempt to deprive Discover of those lien rights has been stymied by the *repeated* inability of Vector, the potential buyer that

---

[2] As discussed below, potential claims against the Debtor's D&O insurance policies are a third potential avenue of recovery.

is headed by Daniel Teper, M.D. ("**Teper**"), both insiders of the Debtors—to fund the purchase price. Similarly, while the Debtors claim to have a stalking horse buyer for the Bert Assets, it is unclear how the Debtors will sell those assets in the absence of a license to one of its component parts. In sum, these cases present the Court with an inevitable liquidation of the Debtors' estates that can be accomplished more economically in Chapter 7. There is no conceivable need for these Debtors to go through the costly process of plan confirmation, as these cases are mere liquidations. These Chapter 11 cases are being used to deprive creditors, particularly Discover, of their rights. It is now time for the Court to convert these cases to a Chapter 7 liquidations case and direct the appointment of a disinterested fiduciary to liquidate the Debtors' assets for the benefit of creditors.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the District of New Jersey (the "**Court**") has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* (D.N.J. Sept. 18, 2012). The Motion gives rise to a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The legal basis for the relief requested herein is 11 U.S.C. § 1112(b).

## FACTUAL BACKGROUND

### A.      Procedural Background

4.      On February 17, 2019 (the "**Petition Date**"), the lead debtor, Immune Pharmaceuticals, Inc. ("**IPI**" or the "**Debtor**") and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing these Chapter 11 Cases. The Debtors are

2731857.1 115785-100485

operating their business and/or managing their properties as a debtors-in-possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code.

5.　　　No request for the appointment of a trustee or examiner has been made in these

Chapter 11 Cases.  The United States Trustee for Region 3 appointed an Official Committee of

Unsecured Creditors (the "**Committee**") effective March 14, 2019.

6.　　　IPI is a New Jersey-based clinical stage biopharmaceutical company specializing

in the development of "novel targeted therapeutic agents" in the fields of inflammation,

dermatology and oncology.

7.　　　Discover is the Debtors' senior secured lender, pursuant to the terms of a

$5,500,000.00  face  amount  Senior  Secured  Redeemable  Convertible  Debenture

(the "**Debenture**") issued to Discover on October 9, 2018 and the Securities Purchase

Agreement dated October 9, 2018 (the "**Agreement**"), pursuant to which it was issued (the

Debenture and Agreement together, the "**Debt Documents**").

8.　　　Discover respectfully refers the Court to the Declaration of  John C. Kirkland

in Support of Motion of Discover Growth Fund, LLC for Relief from the Automatic Stay

dated February 25, 2019 ("**Kirkland Dec**.")[3] [Doc 11-3] for a discussion of the terms of the

Debt Documents.  The Debenture is attached to the Kirkland Dec. as Exhibit A, and the

Agreement is attached to the Kirkland Dec. as Exhibit B.  Kirkland Dec., ¶ 3. The Kirkland

Dec. describes the terms of the Debt Documents, the genesis of the transaction between the

parties, amounts due under the Debt Documents, and the Debtor's defaults thereunder.  Those

---

[3] Capitalized terms used herein shall have the meaning ascribed in the Kirkland Dec. unless otherwise defined.

2731857.1 115785-100485

factual recitations are incorporated herein and supplemented by the Reply Declaration of John

C. Kirkland in Further Support of Discover Growth Fund, LLC's Motion for Relief from the

Automatic Stay etc. ("**Kirkland Dec. II**") filed on March 22, 2019 [Doc 77], which is

likewise incorporated herein by reference.

> **B.**      **Debtor's Defaults and Discover's Lien on the Ceplene® Assets.**

9.      Before the Petition Date the Debtor was in default in their obligations under the

Debt Documents.   As a result of the Debtor's Events of Default, Discover accelerated of all

amounts due under the Debt Documents, and, as a result, the Debtor is indebted to Discover in

the principal amount or Face Amount of $5,499,470.   Kirkland Dec., ¶¶ 21- 50.   Through

February 25, 2019, accrued interest is $670,182, for total principal and interest of $6,169,652

before additional interest.

10.      The Debenture provides a mechanism whereby Discover will immediately

receive the full amount of principal and interest due for the five-year term of the Debenture

upon the occurrence of any contractually-defined Deemed Liquidation Event.   Kirkland Dec.,

¶ 51.   Accordingly, under the "Mandatory Redemption" provision of the Debenture, Discover

is immediately entitled to be paid the "Early Redemption Price" in cash.   Debenture, Exhibit A

to Kirkland Dec., p. 4, Section I.F.   The Early Redemption Price is $14,848,569.   *See* Kirkland

Dec. II, ¶ 13.   Discover is also entitled to collect attorneys' fees and other costs of collection

from the Debtor pursuant to, *inter alia*, Sections III.G.1 and V.H of the Agreement.

11.      Section V.A of the Agreement, p. 19, under the heading "Grant of Security

Interest" provides "[t]o secure the Obligations, Company [i.e. the Debtor], *as debtor*, hereby

assigns and grants to Investor [*i.e.* Discover], *as secured party*, a continuing first-position lien

2731857.1 115785-100485

on and security interest in, all right, title and interest of the Company, whether now owned or existing or hereafter created, acquired, or arising, in and to all of the Collateral." Kirkland Dec., Exhibit B, p. 19. Emphasis supplied.

12.     "Obligations" are defined in Exhibit 1, page 3 of the Agreement, which provides that

> **"Obligations"** include the full and punctual observance and performance of all present and future duties, covenants, and responsibilities due to Investor by Company under this Agreement, the Debenture and the other Transaction Documents, including without limitation all present and future obligations and liabilities of the Company for the payment of money (extending to all principal amounts, interest, late charges, fees, and all other charges and sums, as well as all costs and expenses payable by Company).

Kirkland Dec., Exhibit B, Exhibit 1, p.3.

13.     Discover's "Collateral" is defined in Exhibit 1, page 1 of the Agreement, which provides that

> **"Collateral"** means all assets of the Company, including without limitation all personal property wherever located, both now owned and hereafter acquired, including, but not limited to, all . . . accounts, [and] deposit accounts. . ., of any kind or nature, . . . and all accessions, additions, amendments, modifications, replacements, and substitutions to, of or for the foregoing, and all proceeds, supporting obligations and products of the foregoing. . . . Notwithstanding the foregoing, the Ceplene assets (as such term is defined in the Disclosure Schedules) shall not be deemed to constitute "Collateral" unless the Company has not closed a transaction involving the sale, license, divestment or partnering of the Ceplene assets (a "Ceplene Transaction") on or before March 31, 2019 (the "Ceplene Transaction Deadline.") *For the avoidance of doubt, in the event that a Ceplene Transaction is not closed by the Ceplene Transaction Deadline, the Ceplene assets shall become and be deemed to be "Collateral" hereunder.*

Kirkland Dec., Exhibit B, Exhibit 1, p.1 (emphasis supplied.)  Accordingly, Discover holds a perfected, first-priority security interest and lien on all of IPI's assets, including the Ceplene® Assets.

      **C.**      <u>The Debtor's Attempts to Subvert Discover's Lien on the  Ceplene® Assets</u>.

14.      On March 15, 2019, the Debtors filed the "Debtors' Motion Seeking to (a) Sell the Ceplene Product Line, Pursuant to 11 U.S.C. § 363(b) and (f), Free and Clear of All Liens, Claims and Interests; (b) Assume and Assign Various Executory Contracts Pursuant to 11 U.S.C. § 365(a); and (c) Other Related Relief" (the "**<u>Sale Motion</u>**") [Doc 46] on shortened notice.  The Sale Motion proposed to sell the Ceplene Assets to Vector, subject to higher and better offers. The Court held a hearing on the Sale Motion on March 29, 2019 (the "**<u>Sale Hearing</u>**").

15.      Discover objected to the Sale Motion on the basis, *inter alia*, that Teper and thus Vector are insiders of the Debtor and that the proposed sale is thus subject to heightened scrutiny.  [Doc 83].  The United States Trustee filed a limited objection which likewise noted the insider nature of the proposed buyer.  [Doc. 82]  The Sale Hearing was scheduled for 10:00 a.m. on March 29, a Friday.  The Sale Motion represented that Vector would be at the Sale Hearing, ready to fund and close, following the Court's approval of the sale.

16.      At the outset of the Sale Hearing, the Debtor requested that the Court continue the hearing time while the Debtor, the Committee and Vector continued to negotiate.  After some time, Discover's counsel was advised that Vector was not prepared to close the proposed sale of the Ceplene Assets.  *See* Declaration of Dale E. Barney filed in support of Discover Growth Fund, LLC's Motion for a Determination that (I) the Debtor's License of the Ceplene

2731857.1 115785-100485

Assets to Vector Therapeutics, Inc., is out of the Ordinary course of the Debtor's Business and is thus Void *Ab Initio* and (II) Said Assets Are Now Subject to Movant's First Priority Lien and Security Interest.  ("**Barney Dec. II**"), ¶ 2 [Doc. 143-1].

17.    The Court convened the Sale Hearing at approximately 1:45 p.m.  At that time, the Debtor's counsel requested a two week adjournment of the Sale Hearing, and advised that the Debtor and Vector were going to enter into a short term license ("**License**") of the Ceplene Assets from the Debtor to Vector for a license fee of $100,000 (the "**License Fee**"), and that the Debtor considered said license to be an ordinary course transaction (meaning, obviously, that the Debtor could enter into this license without Court approval.)  Barney Dec. II, ¶ 3, Exhibit A, Transcript of March 29, 2019 Sale Hearing, p 5, ll. 8-23 .

18.    Counsel to both Discover and the United States Trustee questioned how such a proposed License could be ordinary course, and counsel to the United States Trustee asked how the License could be ordinary course when the Debtor acknowledged that the proposed sale was outside of the ordinary course.  Barney Dec. II, ¶ 3, Exhibit A, Transcript of March 29, 2019 Sale Hearing, p. 7, ll. 9-25, p. 8, ll. 1-6,  p. 20, ll. 5-14.

19.    The Court directed the Debtor to renotice the sale for April 29, 2019, and to file and serve the License on or before April 3, 2019.  Barney Dec. II, ¶ 3, Exhibit A, Transcript of March 29, 2019 Sale Hearing, p. 49, ll. 2-7.

20.      Shortly before the adjourned April 29, 2019 hearing on the Sale Motion, counsel for the Debtors advised the Court and other counsel that Vector was still not prepared to close. The Court again adjourned the Sale Hearing until May 29, 2019.  Once again, Debtors' counsel advised shortly before May 29, 2019, that  Vector continues to be unable and/or

-8-

unwilling to fund the purchase price for the Ceplene Assets. *See* Declaration of Dale E. Barney,

Esq. in support of this Motion ("**Barney Dec. III**"), at ¶ 2 and Exh. A.[4]

## RELIEF REQUESTED AND REASONS THEREFOR

22.    The Debtors filed these cases in desperation to forestall Discover's foreclosure

of the Collateral following IPI's defaults under the Debenture and Agreement,  with no

reorganization purpose or possibility.  Since the Petition Date, they have failed to enunciate

even the hint of a viable exit strategy.  Other than a series of procedural efforts and the retention

of a raft of professionals, little of substance has been accomplished in the more than three month

duration of these cases.[5]  For those reasons  discussed below, cause exists to convert these cases

to Chapter 7 cases pursuant to 11 U.S.C. § 1112(b)(1) to permit the orderly liquidation of the

Debtors' bankruptcy estates by a disinterested fiduciary for the benefit of creditors.

23.    The futility of any efforts to reorganize the Debtors has been evident from the

outset of the Chapter 11 Cases.  The Debtors have no operating business or even any self-

---

[4] On April 29, 2019, the Court held a hearing on (i) Discover's Motion For A Determination That the Debtor's License of the Ceplene Assets to Vector Therapeutics is Out of the Ordinary Course of the Debtor's Business and for Related Relief [Doc 143] and (ii) the Debtors' Cross-Motion for the Entry of an Order Finding That the Immune Debtor's License Agreement of the Ceplene Assets to Vector Therapeutics, Inc. is Approved *Nunc Pro Tunc* to March 30, 2019 and  for Related Relief (together, the "Ordinary Course Motions") [Doc 151]. The Court determined that the referenced license was an out of the ordinary course transaction requiring Court approval, and granted such approval *nunc pro tunc* to March 30, 2019.

[5] Among the few substantive events thus far are the short term—and expired—License and the hearing on the Ordinary Course Motions.  As to the latter, the Debtors and the Committee have not even been able to finalize an Order as directed by the Court.  After the April 29 hearing, on May 3 and 7, 2019, Discover's counsel forwarded a proposed form of Order to Debtors' counsel and Committee counsel, respectively.  Barney Dec. III., ¶ 4.  Not until May 29, 2019, did Discover's counsel receive comments to the Order, and one of the comments, which came from Committee counsel, appeared intended to eviscerate Discover's reservation of rights regarding its lien on the Ceplene Assets, and is thus unacceptable. Barney Dec. III., ¶¶ 5-6.  Discover's counsel asked for an explanation of the language within two hours of receiving same, but has not yet received a response. Barney Dec. III., ¶ 6.

developed FDA-approved products on which such a business could be based.  *See* ¶ 32 below.

In the three months the Chapter 11 Cases have been pending, IPI has failed to sell its only

potentially valuable assets—the Bert and Ceplene Assets.  Sale of the Ceplene Assets has been

stymied by the affiliate-purchasers past and current inability to fund the purchase.  Similarly,

IPI's loss of a license to an integral component of the Bert Assets has not facilitated their sale.

Except for a one-time payment of the $100,000 License Fee, the Debtors lack any cash flow

and, in fact, have failed to generate any revenues since before 2017.  *See* ¶ 38 below.  The

Debtors' only pre-petition cash flow appears to have been the loan from Discover, the proceeds

of which were paid to insiders, former insiders and subsidiaries.  *See* ¶ 38 below.  Lacking any

cash flow, the Debtors cannot pay the employees with medical and scientific training and

knowledge to run a successful pharmaceuticals business.  Under the circumstances, the palpable

futility of any reorganization in the Chapter 11 Cases had to be obvious to the Debtors' officers

and directors as of the Petition Date, thereby precluding any determination that their Chapter

11 petitions were filed in good faith.

24.    Upon the request of a party in interest and after notice and a hearing, a

bankruptcy court *shall* convert a Chapter 11 case to a Chapter 7 case or dismiss the case,

whichever is in the best interest of creditors.  11 U.S.C. § 1112(b)(1).  The Bankruptcy Code

does not define "cause" for conversion or dismissal of a case.  Although § 1112(b)(4) contains

a non-exhaustive list of factors evidencing cause for conversion or dismissal, "the precise

parameters of 'cause' are intentionally omitted from the statute so as to afford maximum

flexibility and, among other things, to enable a bankruptcy court to dismiss a chapter 11 case

for any reason cognizable to the equity power and conscience of the court."  *In re RCM Glob.*

*Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 519 (Bankr. S.D.N.Y. 1996),

2731857.1 115785-100485

*corrected* (Sept. 18, 1996) (hereafter, "**RCM**").

25.    Numerous courts, including the Third Circuit, have held that bad faith constitutes cause for dismissal of a Chapter 11 case. *See, e.g., In re SGL Carbon Corp.,* 200 F.3d 154, 160 (3rd Cir. 1999) ("Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b)(1) unless filed in good faith"); *In re C—TC 9th Ave. P'ship*, 113 F.3d 1304, 1309-11 (2d Cir. 1997) (affirming dismissal of bankruptcy case for bad faith); ); *In re Y.J. Sons & Co.*, 212 B.R. 793, 802 (D.N.J. 1997). *See also In re Eclair Bakery Ltd.*, 255 B.R. 121, 137-38 (Bankr. S.D.N.Y. 2000) ("[b]ad faith has frequently been held to provide sufficient cause to warrant" dismissal.

26.    "The 'good faith' requirement for Chapter 11 has strong roots in equity." *SGL Ca5bon*, 200 F.3d at 161. A bad faith inquiry, therefore, "is meant to insure [sic] that the debtor actually intends to use Chapter 11 to reorganize and rehabilitate itself and not simply to cause hardship or delay to its creditors by invoking the automatic stay." *Holt v. JP Morgan Chase Bank, N.A.*, No. 17-8901, 2019 WL 192298, at *1 (S.D.N.Y. Jan. 15, 2019) (quoting *RCM*, 200 B.R. at 522); *see also In re Silberkraus*, 253 B.R. 890, 905 (Bankr. C.D. Cal. 2000), *aff'd*, 336 F.3d 864 (9th Cir. 2003). Its similarly prevents the abuse of the bankruptcy process by means of a bankruptcy filing. *Y.J. Sons & Co.*, 212 B.R. at 793 (citing *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 227 (2d Cir. 1991).

27.    The bad faith inquiry is also "is designed to ensure that the debtor actually has a potentially viable business in place to protect and rehabilitate; lacking this, the chapter 11 case has lost its *raison d'etre.* " *RCM*, 200 B.R. at 520. *See also In re 15375 Memorial Corp.*, 589 F.3d 605, 618 (3rd Cir. 2009) (to the same effect. A petition is filed in bad faith, therefore, "if it is clear that, from the date of filing, the debtor has no reasonable probability of emerging from

-11-

the bankruptcy and no realistic chance of reorganizing." *C—TC 9th Ave.*, 113 F.3d at 1310

(citing *Cohoes*, 931 F.2d  at 227 (2d Cir. 1991)); *Y.J. Sons & Co.*, 212 B.R. at 803; *accord In

re Artisanal 2015, LLC*, No. 17-12319, 2017 WL 5125545, at *8 (Bankr. S.D.N.Y. Nov. 3,

2017).

28.    The bad faith inquiry incorporates both objective (futility) and subjective (intent)

prongs.   "Once the movant has demonstrated both the objective and subjective prongs, a

rebuttable presumption of bad faith arises and the burden shifts to the debtor 'to establish good

and sufficient reasons why the relief should not be granted.'" *Artisanal 2015,* 2017 WL

5125545, at *8 (*quoting Squires Motel, LLC v. Gance*, 426 B.R. 29, 34 (N.D.N.Y. 2010)).  A

bankruptcy case must be dismissed if "both objective futility of the reorganization process and

subjective bad faith in filing the petition are found" and not rebutted. *RCM*, 200 B.R. at 520;

*see also In re Gen. Growth Props., Inc.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009) (noting that

"'a bankruptcy petition will be dismissed if both objective futility of the reorganization process

and subjective bad faith in filing the petition are found'") (quoting *In re Kingston Square

Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997)).

29.    Bad faith may be indicated by a number of factors, including whether the

debtor's filing demonstrates an intent to delay or otherwise frustrate the legitimate efforts of

creditors to pursue their rights.  *In re AMC Realty Corp.*, 270 B.R. 132, 141 (Bankr. S.D.N.Y.

2001) (citing *C–TC 9th Ave.*, 113 F.3d 1311).

30.    Courts have recognized several factors as relevant to a determination whether a

Chapter 11 petition was filed in bad faith:

> (1) the debtor has only one asset; (2) the debtor has few unsecured creditors
> whose claims are small in relation to those of the secured creditors; (3) the
> debtor's one asset is the subject of a foreclosure action as a result of arrearages
> or default on the debt; (4) the debtor's financial condition is, in essence, a two

party dispute between the debtor and secured creditors which can be resolved in a pending state foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees.

*See C–TC 9th Ave.*, 113 F.3d at 1311; *Y.J. Sons & Co.,* 212 B.R. at 802 (citing *In re Phoenix Piccadilly*, 849 F.2d 1393, 1394-95 (11th Cir. 1988)). *See also Kaplan Breslaw Asch*, 264 B.R. at 335 (case was "a two-party dispute, and the filing was timed to allow the debtor to use automatic stay to stop a foreclosure action"); *see also Holt*, 2019 WL 192298 at *2 (bad faith existed because debtor engaged in scheme to delay other litigation). A consideration of these factors compels the conclusion that the Debtors' petitions in these cases were filed in bad faith.

31.    <u>IPI's Asset Structure</u>. As to the first factor, according to its Schedule A/B Assets—Real and Personal Property filed on March 18, 2019, IPI's assets consist of (i) approximately $1,000 in cash; (ii) security deposits and pre-payments (consisting primarily of the security deposit for its leased premises and an apparent pre-payment to its accountants); (iii) office furniture; and (iv) intellectual property of unknown value; (v) a net operating loss of unknown value and; (vi) insurance policies. [Doc. 62, pp. 6-15] Notably lacking is any reference to accounts receivable or inventory. In other words, IPI's asset structure does not evidence an operating business.

32.    The bulk of IPI's scheduled assets is intellectual property that has little value. The IPI has conceded that, as of September 30, 2018, it did not have any self-developed or licensed products that were approved for sale by the United States Food & Drug Administration. *See* the Declaration of Anthony Fiorino in Support of the Debtors' Opposition to the Motion of Discover Growth Fund, LLC for Relief from the Automatic Stay ("**<u>Fiorino Dec</u>**.") ¶ 12. [Doc. 67] They have only four material assets: the Bert Assets, the Ceplene Assets, NanoCyclo and

2731857.1 115785-100485

Amiket, which belong to IPI.  Kirkland Dec. II, ¶ 53.  IPI's president, Anthony Fiorino, has

advised Discover that: (i)  NanoCyclo and AmiKet have little value; and (ii) IPI had not put

anything into developing them in some time and had no plans to do so.  *Id*., ¶ 54.

33.    In point of fact, analogous to a single-asset real estate case, the Debtor's sole

potentially income-producing assets appear to be the Ceplene and Bert Assets.  However, the

Debtors' pre-petition attempts to sell those Assets were unsuccessful.  Fiorino Dec., ¶¶ 19-27;

37-38.   As counsel for the Committee acknowledged to this Court at the Sale Hearing,

moreover, the Debtor lacks the wherewithal to effectively market either product, stating that

"there is no money to do a big marketing process."  *See* the Barney Dec. II, Exh. A, pp. 11:25—

12:2 and 12:9-10. [Doc. 143-1]  Underscoring IPI's inability to effectively market its assets, IPI

has not moved a sale of the Bert Assets in the three months since the Petition Date.  Similarly,

the only potential purchaser IPI has identified for the Ceplene Assets, Vector, is still unable to

fund its purchase of those assets, although more than two months has passed since the initial

Sale Hearing.

34.    It is beyond cavil that Discover also holds a first-priority lien on and security

interest in the Bert Assets and, effective at least as of April 1, 2019, the Ceplene Assets, which

would extend to the proceeds of the sale of either of those Assets.

35.    Potential Foreclosure on the Bert and Ceplene Assets.  As of the Petition Date,

IPI was in default in its obligations to Discover under the Debt Documents.  Thus, Discover

was fully within its rights in pursuing its post-default remedies under the Debt Documents and

to seek UCC Article 9 foreclosure of the Collateral by public or private sale, notwithstanding

the Debtor's quibbling over the fact that the default notice and notice of sale was delivered on

a Monday federal holiday.  The March 31, 2019 deadline for the Debtor to sell the Ceplene

Assets before Discover's lien encompassed those assets was only seven weeks away. IPI's bankruptcy filing was thus solely an attempt to prevent (i) Discover's foreclosure of the Bert Assets and (ii) the attachment of Discover's lien to the Ceplene Assets. In other words, IPI's bankruptcy filing was analogous to bankruptcy filings by debtors seeking simply to delay or hinder a creditor's exercise of its rights in collateral.

36.     <u>Status of IPI's Bankruptcy Case as a Two-Party Dispute</u>. Notwithstanding IPI's scheduling a number of unsecured creditors in its Schedule F in this case, a review of the docket in the Chapter 11 Cases reveals that they largely constitute a two-party dispute between the Debtors, particularly IPI, and Discover. The docket is replete with filings concerning disputes over: (i) Discover's exercise of its rights under the Debt Documents [Docs. 11, 12, 14, 15, 64, 67, 68, 77 ; (ii) subpoenas issued by the Debtors and Discover against each other [Docs. 59, 63, 65, 66, 107, 108, 121 ]; (ii) the proposed sale of the Ceplene Assets to Vector—which has yet to fund the purchase price, most recently last week—to prevent the attachment of Discover's lien to those assets [Docs. 46-48, 57, 82, 83, 87, 88, 89, 91, 92, 113, 115, 162]; and (iii) IPI's attempt to license the Ceplene Assets to Vector in a desperate and cynical attempt to subvert Discover's rights in those assets. [Docs. 143, 151, 154, 157, 158] Indeed, IPI acknowledged that the Sale Motion was filed on shortened notice specifically to defeat Discover's lien rights. *See* the Declaration of Gary H. Rabin ("**<u>Rabin Dec</u>**."), *etc*. [Doc. 46-1], ¶ 34.

37.     <u>The Timing of the Bankruptcy Filing</u>. The timing of the Chapter 11 Cases evidences bad faith. As of the Petition Date, IPI was in default in its obligations to Discover. The deadline for the Debtor to sell the Ceplene Assets prior to Discover's first-priority lien extending to those assets was only seven weeks away. Under the circumstances, a bankruptcy filing was understandably tempting—and suspicious. The suspicious timing of the bankruptcy

2731857.1 115785-100485

filings is only underscored by IPI's admission that the Sale Motion was brought on shortened

notice to defeat Discover's lien rights in the Ceplene® Assets.  Rabin Dec. [Doc. 46-1], ¶ 34.

38.    <u>IPI's Cash Flow</u>.  As of the Petition Date, IPI had little more than $1,000 in its

bank accounts.  Doc. 62, p. 6.  It had no accounts receivable.  *Id.*, p. 7.  It had generated no

revenues whatsoever during 2017, 2018 or 2019.  *Id.*, p. 44.   The drought in cash flow has only

continued post-petition.  IPI's Monthly Operating Reports for February and March reflect only

about $8,000 in cash flow.  [Docs. 145, 173]  It is not surprising, therefore, that IPI's counsel

responded emphatically to a question from the Court at the March 30, 2019 Sale Hearing with

the following:

> [t]here is literally  no money in the estate.  [IPI] is not generating
> any money.  None of its growth products are out on the shelves.
> There is no money in the estate.

*See* Barney Dec. II, Exh. A, 12:19-25. [Doc. 143-1]  It is telling that IPI's counsel's response

demonstrates not only IPI's lack of cash flow, but its current and apparently permanent inability

to generate cash flow from operations.[6]

39.    IPI has recently demonstrated a tendency to misuse whatever cash it might have.

During the ninety days immediately preceding the Petition Date, IPI paid $1,929,951.64 to

"creditors."  Doc 62, pp. 45-48.  Of that amount, $1,573,923.80—or 82%—was paid to insiders,

former insiders and subsidiaries.  *Id.*, pp. 47-48.  While related parties received payment, the

providers of clinical trials and related services—the backbone of IPI's business—went unpaid.

*Id.*, pp. 19-39.  IPI's payment of almost $2 million to "creditors" on the eve of its bankruptcy

---

[6] The $100,000 License Fee is not evidence of current cash flow.  It was a one-time payment by Vector, which is still unable to fund a purchase price that was due by March 31, 2019.  Additionally, the belated payment of the License Fee on April 3, 2019 did not prevent Discover's lien from attaching to the Ceplene Assets.

2731857.1 115785-100485

filing despite having not generated revenues for two years also raises the question of the source of the funds utilized for those payments.  The answer can only be that IPI utilized the funds Discover advanced pursuant to the Debt Documents to make those payments, 82% of which went to related parties.

40.    IPI's long-running lack of cash-flow and its inability to properly use cash demonstrates the subjective bad faith, an inability to reorganize and the urgent need for the appointment of a fiduciary to take charge of its assets and affairs for the benefit of creditors.

41.    <u>Meeting Current Expenses</u>.    IPI's counsel admits that IPI is not currently generating any revenues, and IPI's Statement of Financial Affairs demonstrates that it has not generated revenues in more than two years.  IPI's Monthly Operating Reports indicate that, even now, it essentially has no cash flow.  Apparently, IPI has dissipated the advances it received from Discover primarily on payments to related parties.  The $100,000 License Payment was a one-time payment.  Consequently, IPI is unable to meet any current expenses it might incur.

42.    <u>Debtor's Employees</u>.  Finally, it appears that IPI's only employees at this point is its recently retained president, restructuring professional Gary Rabin, and its chief financial officer.  Notably lacking are the employees with the medical or scientific experience and expertise necessary for a successful reorganization of IPI.

43.    <u>Abuse of the Bankruptcy Process</u>.  Bankruptcy courts are courts of equity. *Pepper v. Litton*, 308 U.S. 295, 304 (1939).  Those seeking equity must do equity.  *In re Kaplan Breslaw Asch, LLC*, 264 B.R. 309, 334 (Bankr. S.D.N.Y. 2000).  They must come to the court with clean hands.  *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945).  These equitable principles require a debtor seeking to reorganize

-17-

under Chapter 11 to do so for a legitimate business purpose.  IPI's bad faith in seeking

bankruptcy relief is exemplified by its use of the process to transfer Ceplene Assets to Vector,

whose principal is, at minimum, a former insider of the Debtors, ***and who now appears to be***

***attempting to renegotiate the deal.***

44.    Vector's co-founder, Chairman and Chief Executive Officer,  Teper,[7]  is also

the Founder and former Chairman and Chief Executive Officer of IPI.  *Id.*  Teper resigned as

CEO of IPI pursuant to a Separation Agreement which provides that the Debtor, "will

cooperate in good faith to assist Dr. Teper in developing Cytovia or a company to be formed

by Dr. Teper ('NewCo')" to exploit the Ceplene® Assets, and "to develop and begin

execution of a plan to establish an independent oncology business, either through Cytovia or

NewCo, which may involve the transfer by [IPI] of some or all of its [Ceplene] oncology

assets to Cytovia or NewCo."  *See* Debtor's 2017 Annual Report, p. 69.[8]  *See also* Reply

Declaration of John C. Kirkland in Further Support of Discover Growth Fund, LLC's Motion

for Relief from the Automatic Stay *etc*. ("Kirkland Dec. II") filed on March 22, 2019 as Doc

77, ¶¶ 15-19.

45.    Teper resigned from IPI's Board only a year ago and set up Vector three months

later in August 2018.  Consequently, Vector's sole purpose appears to be the conduit for

stripping IPI of one of its few potentially valuable assets.  This attempt by IPI's former principal

to circumvent the equitable principles underlying the bankruptcy process is all the more galling

because Vector is unable or unwilling to pay the full contract price for the Ceplene Assets.  This

---

[7] https://www.linkedin.com/in/danielteper/.  *See* Declaration of Dale E. Barney filed on March 25, 2019 as Doc
83-1 ("Barney Dec. I"), ¶ 2 and Exhibit A.

[8] https://www.sec.gov/Archives/edgar/data/1208261/000114420418018699/tv489491_10k.htm.  *See* Barney Dec.
I, ¶3 and Exhibit B.   Discover respectfully requests that the Court take judicial notice of these public filings
pursuant to Fed. R. Evid. 201.

appears to be an attempt to retrade the deal at a lower price, to the detriment of creditors. Indeed, the Debtors' counsel acknowledged as late as May 29, 2019 Vector's inability to pay for the Ceplene Assets. *See* Barney Dec. III, ¶ 2 and Exh. A.

46.    IPI licensed the Ceplene Assets to Vector, albeit for only thirty days from the initial Sale Hearing on March 29, 2019. The License both provided Vector with exclusive rights to engage third parties to manufacture and market Ceplene and related products and, at the same time and in a contradictory fashion, expired in thirty days upon which all rights terminate. *See* the Declaration of Gary H. Rabin Regarding License Agreement, Exh. A. [Doc. 115]. The License has now expired and Vector appears to be using delay to attempt to retrade. As such, it is now clear that, notwithstanding the fact that the transaction yielded the License Fee, the transaction was a bad faith and ineffective stop-gap measure following a failed § 363 sale to prevent the attachment of Discover's lien to the Ceplene Assets.[9]

47.    Moreover, Vector's apparent attempts to renegotiate the purchase price for the Ceplene Assets by repeated delays and refusals to close is an abuse of the process by an insider of the Debtors that exposes a conflict of interest for the Debtors and their directors and officers. That conflict is particularly acute for what could be IPI's most valuable asset, its $5 million director and officer's errors and omissions insurance policy. Clearly, a disinterested fiduciary like a Chapter 7 trustee must be the part tasked with evaluating potential claims against IPI's current and former officers and directors and determining whether to file claims against that policy.

48.    Finally, it bears noting that the Bankruptcy Code expressly provides that a "substantial continuing loss to or diminution of the estate and *the absence of a reasonable*

___
[9] It bears noting that the term of the License was initially 14 days. Barney Dec. II, Exh. A, pp. 5:7-23.

2731857.1 115785-100485

*likelihood of reorganization*" is 'cause' mandating the conversion or dismissal of a Chapter 11 bankruptcy case. 11 U.S.C. § 1112(b)(1) and (4)(A) (emphasis added).  Teper's continued inability or unwillingness to fund the purchase price for the Ceplene Assets only underscores the Debtors' inability to rehabilitate in these Chapter 11 Cases.  It also demonstrates the conflicts of interest between the Debtors' current and former management and their creditors that can only hobble any attempts by the Debtors to reorganize on their own.  Those conflicts will inevitably generate delays that can only result in loss or diminution to the Debtors' demonstrably fragile bankruptcy estates.  To avoid such a loss or diminution, Discover respectfully submits that the appointment of a disinterested fiduciary to expeditiously administer the Debtors' estates is an absolute imperative.

49.    <u>Conclusion</u>.  Under the circumstances Discover has amply proven both prongs of the bad faith test.  As to the objective prong, the facts discussed above demonstrate the impossibility of a successful reorganization in the Chapter 11 Cases. Those facts, moreover, which are corroborated by the Debtors' admissions, demonstrate the real purpose of the Chapter 11 Cases—subverting Discover's rights and interests, particularly its rights in the Ceplene Assets.  These facts establish the Debtors' subjective bad faith.  *See, e.g.*, *15735 Memorial Corp*, 589 F.3d at 625-26 (debtors' subjective bad faith evidenced by their use of bankruptcy as a tactic (in this case a litigation tactic) to disadvantage a creditor knowing that their cases would be dismissed).

50.    Discover acknowledges that a debtor's bad faith is generally asserted as cause for dismissing a Chapter 11 case.  The Third Circuit has stated that, where bad faith is evidenced by the abusive nature of a bankruptcy filing, dismissal is the appropriate remedy under 11 U.S.C. § 1112(b)(2).  *SGL Carbon*, 200 F.3d at 159, n. 8.  However, the Third

-20-

Circuit has also recognized that, when bad faith is evidenced by the debtor's bad acts, the appointment of a fiduciary may be appropriate. *Id*. Here, as demonstrated above, IPI's bankruptcy filing constitutes an abuse of the bankruptcy process and is accompanied by IPI's bad acts, most notably, its misuse of substantial funds on the eve of its filing. Additionally, the Bert and Ceplene Assets could possibly be liquidated to the benefit of IPI's creditors. However, the foregoing analysis demonstrates the urgent need for the appointment of a disinterested fiduciary to effectuate such a liquidation. Extension of the Debtors' exclusivity in the Chapter 11 Cases would not meet that need. Rather the conversion of this case to Chapter 7 and the appointment of a liquidating trustee would best serve the interests of creditors in this case.[10]

## MEMORANDUM OF LAW

51.     The rules and statutory provisions that constitute the basis for this Motion, the legal authorities that support the relief requested, and the factual grounds for the relief requested are all included and/or cited herein. Accordingly, Discover submits that no separate memorandum of law is necessary or required.

## NOTICE

52.     Notice of this Motion is being provided to counsel for the Debtor and other parties in interest entitled to receive notice in these Chapter 11 Cases under Bankruptcy Rule 2002.

---

[10] Discover submits that the palpable impossibility of a viable reorganization of IPI militates against appointing a Chapter 11 trustee. The Debtors' minimal assets and almost complete lack of business operations similarly leaves little, if anything, for an examiner to investigate.

2731857.1 115785-100485

**<u>NO PRIOR REQUEST</u>**

53.    No prior motion for the relief requested herein has been made to this or any other court.

**WHEREFORE**, Discover respectfully requests that this Court enter an order converting the Chapter 11 Cases to cases under Chapter 7 and directing the appointment of a Chapter 7 Trustee to liquidate the Debtors' estates for the benefit of creditors.

Dated: June 4, 2019
      Newark, New Jersey

GIBBONS P.C.

By:    _/s/_ Dale E. Barney _____.
      Dale E. Barney, Esq.
      David N. Crapo, Esq.
      One Gateway Center
      Newark, NJ 07102-5310
      Tel.  973-596-4500
      Fax.  973-596-
      E-mail: dbarney@gibbonslaw.com
            dcrapo@gibbonslaw.com

*Counsel for Discover Growth Fund, LLC*

2731857.1 115785-100485