| |
|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in compliance with D.N.J. LBR 9004-1(b)**<br><br>**NORRIS McLAUGHLIN, P.A.**<br>Morris S. Bauer<br>Melissa A. Pena<br>400 Crossing Boulevard, 8th Floor<br>P.O. Box 5933<br>Bridgewater, New Jersey 08807<br>(908) 722-0700<br>msbauer@norris-law.com<br>mapena@norris-law.com<br>Counsel for the Debtors/Debtors-in-Possession |

| | |
|---|---|
| In re: | Chapter 11 |
| IMMUNE PHARMACEUTICALS INC., *et al.*,[1] | Case No. 19-13273 (VFP) |
| Debtors. | Hon. Vincent F. Papalia |

**DECLARATION OF GARY H. RABIN IN OPPOSITION TO MOTION OF DISCOVER GROWTH FUND, LLC TO CONVERT PURSUANT TO § 1112(b)**

Gary H. Rabin, of full age, being duly sworn according to law, upon his oath, deposes and states:

1.  I am the President and Interim Chief Executive Officer of the debtor, Immune Pharmaceuticals Inc. (the "Immune Debtor") and was appointed to that position on March 6, 2019.

2.  The Immune Debtor owns all of the stock in the following debtor entities: Immune Pharmaceuticals, Ltd. ("Ltd."), Cytovia, Inc. ("Cytovia"), Maxim Pharmaceuticals, Inc. ("Maxim"), Immune Pharmaceuticals USA Corp. ("Immune USA" and collectively referred to

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Immune Pharmaceuticals, Inc. (1431); Immune Pharmaceuticals, Ltd.; Cytovia, Inc. (7805); Immune Oncology Pharmaceuticals, Inc.; Maxim Pharmaceuticals, Inc. (9983); and Immune Pharmaceuticals USA Corp. (9630).

with Ltd., Cytovia and Maxim as the "Debtor Subsidiaries" and together with the Immune Debtor the "Debtors").

3. I have over thirty years of specialized expertise in advising companies on obtaining financing, in and out of court restructurings, and M&A transactions in a variety of roles including as an investment banker, hedge fund manager, operating executive, public company CEO and crisis manager. I have significant experience in the pharmaceutical industry. I have been an investor and executive involved in the biotechnology industry since 2010. I was the Chairman and CEO of Advanced Cell Technology, a publicly traded stem cell therapy company from 2010 to 2014.

4. Prior to my appointment as Interim President and Interim Chief Executive Officer, I served as a financial advisor and consultant for the Immune Debtor.

5. I have knowledge of the facts set forth herein based on my personal knowledge and/or my review of the Debtors' books and records, which are maintained in the ordinary course of their businesses.

6. I submit this Declaration in opposition to the Motion by Discover Growth Fund, LLC ("Discover") to Convert Pursuant to 11 U.S.C. § 1112(b) (the "Conversion Motion").

7. As I understand it, the Conversion Motion is premised on Discover alleging (i) that the Chapter 11 Cases were filed in "bad faith" to "forestall Discover's foreclosure of the Collateral …"; (ii) that the Chapter 11 Cases are a "two-party dispute"; (iii) the Debtors have no cash flow, are unable to meet current expenses and have few employees at this point; and (iv) the Debtors are somehow abusing the bankruptcy process because Vector has not closed on the Ceplene Assets.

8. As this Court is aware, Discover has been aggressive since the outset of this case objecting to the Debtors' pro forma motion seeking to extend the deadline for filing Schedules of

2

Assets and Liabilities and Statement of Financial Affairs (collectively, the "Schedules") by a mere two weeks (with respect to certain Debtors, less than two weeks), filing a motion for stay relief eight (8) days after the Petition Date, serving discovery within a month of the filing which the response to the discovery resulted in the production of over 100,000 documents and objecting to any and all relief being sought by the Debtors.

9. The filing was in response to Discover's foreclosure of the Immune Debtors' assets in the Virgin Islands. The Chapter 11 Cases were filed to preserve the Immune Debtors' assets for the benefit of all creditors, not just Discover.

10. Prior to the Petition Date, the Debtors were entertaining offers to sell its anti-eotaxin assets, including an offer from a major US-based biopharmaceutical company valued at $45 million, with an up-front payment of $12.5 million and another offer from a private equity-sponsored company for $6 million up-front and incentives up to an additional $114 million. Discover was aware of this offer and instead of paying $3 million on the note that Discover owed to the Immune Debtor to fund the Debtor's operations until the sale process could conclude with a closing, which would most likely have already occurred by this date, Discover chose to foreclose in effort to claim ownership of the anti-eotaxin assets of the Immune Debtor to reap _all_ of the upside benefits for itself.

11. Shortly after the Petition Date, the offers for the anti-eotaxin assets were reduced to a one-time cash payment of $3 million. As discussed below, the Debtors have negotiated one of these offers to in excess of $4.5 million. The Debtors anticipate that an active auction will increase the price significantly. A conversion to Chapter 7 will again further depress the value.

12. As discussed below, the Debtors have 3 other product lines, Ceplene, NanoCyclo and AmiKet. The Court is very familiar with the closing issues surrounding Ceplene. We have

now found that Discover has no lien on NanoCyclo. We have also found that Amiket may not be worthless, despite Discover's allegations that the Debtor stated this prior to the Petition.

13. Discover may be now realizing how it damaged the value of the Debtors and is using its aggressive litigation tactics to leverage as best a settlement as it can achieve for itself with the filing of the Conversion Motion.

14. As the Court is aware, the Debtors opposed Discover's stay relief motion contending that Discover's lien should be subordinated based on certain sections of the Bankruptcy Code and case law, that Discover's security interest may be flawed for it failed to properly perfect its interest in certain assets and that Discover took certain actions based on it having received insider information (if found to be a lender, some of such actions may result in lender liability), and the plain language of Discover's Securities Purchase Agreement providing for the subordination of its claims. The Committee and the Debtors have prepared a draft complaint addressing these issues, which we are prepared to file.

15. The Chapter 11 Cases are not a two-party dispute between Discover and the Immune Debtor (there are, in fact six Debtors, including five in which Discover has no direct or secured interest).

16. If this were the case, there would not be an active Committee fighting on behalf of the unsecured creditors of all of the Debtors. According to the Debtors' Schedules, the unsecured claims are in the range of $15 million, if not more.

17. Further, iCo Therapeutics Inc. ("iCo") has filed a motion to compel rejection of the Sublicense (as defined hereafter); or in the alternative to obtain relief from the automatic stay to allow the termination of the Sublicense (the "iCo Motion"). Pursuant to a December 7, 2010 Product Sublicense Agreement, iCo, as sublicensor, granted Ltd., as sublicensee, an exclusive

4

10378329-1

sublicense to certain intellectual property to enable Ltd. to develop and sell bertilimumab (the "iCo Sublicense"). iCo has asserted that the iCo Sublicense was terminated prior to the Petition Date. The Debtors dispute iCo's assertions. The Debtors do not know whether Discover will be opposing or joining in the Debtors opposition to the iCo Motion.

18. Given that iCo has begun to market the iCo sublicense, including attempting to negotiate with some of the Debtors' prospective purchasers, the Debtors have claims against iCo.

19. In addition, Ltd. filed a "stay proceeding" in Israel because Ltd. is incorporated in Israel and certain Israeli creditors ignored Ltd.'s chapter 11 case and threatened to proceed to judgment in Israel and a possible forced liquidation of Ltd. The Debtors are working with the Israeli trustee representative as part of monetizing assets and addressing claims, which includes the iCo Sublicense.

20. These Chapter 11 Cases are not a two-party dispute.

21. Discover asserts that the Debtors have no cash flow, are unable to meet current expenses, and have few employees. First, the Debtors never had many employees because they outsourced most of its operations as is standard in the biotechnology industry. Current operating and administrative costs are minimal. Second, while, the Debtors have limited revenues, there are very few biotechnology companies that have revenues or cash flow of any kind because of the long term development nature of pharmaceutical products. Other than professional fees and quarterly trustee fees, the Debtors have little to no expenses. With respect to the professionals, all appear to recognize that they will be largely paid from sale proceeds.

22. As more particularly discussed below, the Chapter 11 Cases should not be converted. The Debtors, their professionals and the Committee, who is working closely with the

5

10378329-1

Debtors, are best suited for maximizing the assets for the benefit of all creditors and should be permitted to continue with the on-going efforts of monetizing the Debtors' assets.

## THE CHAPTER 11 CASES

23. The factual background relating to the Debtors' commencement of these Chapter 11 Cases is set forth in the Declaration of Anthony ("Tony") Fiorino in Support of First Day Motions filed on February 27, 2019 [Doc. No. 18] and incorporated herein.

24. Additional facts pertinent in opposing the Conversion Motion are set forth in Declaration of Anthony Fiorino in Support of The Debtors' Opposition to the Motion of Discover Growth Fund, LLC for Relief from the Automatic Stay filed on March 19, 2019 [Doc. No. 67] and incorporated herein.

25. On February 17, 2019 (the "Petition Date"), the Immune Debtor filed a voluntary petition for relief under the Bankruptcy Code.

26. Subsequent to the Petition Date, certain of the Immune Debtor's affiliates filed their own Chapter 11 bankruptcy cases. On February 22, 2019, Ltd. filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and on February 26, 2019, Cytovia, Maxim, Immune USA, and Immune filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

27. The Debtors continue to operate their businesses and manage their property as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. An official Committee of Unsecured Creditors (the "Committee") has been appointed. The Committee is represented by Porzio, Bromberg & Newman, P.C. ("Porzio").

28. All of the Debtors are Delaware corporations with a principal place of business located at 1 Bridge Plaza North, Suite 270, Fort Lee, New Jersey 07024, except for Ltd., which is

an Israeli corporation with a principal place of business at Hillel Street #24, Jerusalem, Israel 94581. Ltd. maintains assets in the United States.

29. The Immune Debtor has both common and preferred stocks outstanding. Prior to the bankruptcy filings, its common stock traded on the OTCQB, which is operated by OTC Market Groups, Inc. ("OTC"), under the symbol "IMNP". Since the bankruptcy filings, the Immune Debtor's common stock has traded on the Pink Market, which also is operated by OTC, under the symbol "IMNPQ".

30. The Debtors are a clinical stage biopharmaceutical company specializing in the development of novel targeted therapeutic agents in the fields of inflammation, dermatology and oncology. As of September 30, 2018, the Debtors did not have any self-developed or licensed products that were approved for sale by the United States Food and Drug Administration.

31. On February 8, 2019, Discover delivered to the Immune Debtor a "Notice of Default and Notice of Sale of Collateral" (the "Notice"). In the Notice, Discover alleged that the Immune Debtor was in default of the terms of a securities purchase agreement dated October 9, 2018 (the "October 2018 Agreement"), and Discover purported to declare all obligations under the October 2018 Agreement to be immediately due and payable and alleged that the amount due and payable was $12.1 million. Discover provided subsequent notice to the Immune Debtor on February 14, 2019 which alleged that the amount due and payable was $14.85 million. Discover scheduled a foreclosure sale of its collateral for 10:00 a.m. on February 18, 2019, a Federal holiday, in St. Thomas, U.S. Virgin Islands.

32. Subsequent to receiving the Notice, the Immune Debtor reached out to Discover to attempt to negotiate a settlement of Discover's claims. The Immune Debtor and Discover were unable to reach a settlement.

10378329-1

33. Based on the foregoing, the Debtors made the difficult decision to seek the protections of Chapter 11 in this Court in order to prevent the sale of the Debtors' assets via the private sale of Discover, while the Debtors continue to pursue and negotiate the sale of Ceplene and the anti-eotaxin antibody with third-party purchasers.

**The Debtors Assets**

34. The Debtors' primary assets are bertilimumab and histamine dihydrochloride (Ceplene®), both of which are therapeutic agents.

35. Bertilimumab is a first-in-class, human, anti-eotaxin-1 antibody that targets eotaxin-1, a key regulator of inflammation. Phase 2 trials of bertilimumab in bullous pemphigoid, ulcerative colitis, allergic rhinitis and allergic conjunctivitis have been completed, although the ulcerative colitis trial remains blinded.

36. The Debtors' oncology portfolio includes Ceplene, which is approved in the European Union for the maintenance of remission in patients with acute myeloid leukemia in combination with interleukin-2, and two development-stage vascular disrupting agents.

37. The Debtors have also licensed a preclinical nano-encapsulated topical formation of cyclosporine-A for the treatment of atopic dermatitis and psoriasis, which is referred to as NanoCyclo.

38. In addition, the Debtor own a clinical-stage topical formulation of amitriptyline and ketamine (AmiKet) for the treatment of neuropathic pain.

39. As the Court is aware, the Debtors have an executed asset purchase agreement with Vector for the purchase of Ceplene for cash of $2,500,000 and the assumption of certain liabilities, including unsecured claims of approximately $3.5 million that may be held by companies affiliated with Mylan and unsecured claims held by Daniel Teper and others of approximately $800,000.

40. As previously stated, the Debtors have an offer to purchase bertilumamab for in excess of $4.5 million. The Debtors are in the process of memorializing this offer in a formal stalking-horse asset purchase agreement.

41. With respect to NanoCyclo and AmiKet, Discover states in its Stay Relief Motion that the Debtors told its representative that these assets are "worthless". This is not true. The Debtors are soliciting offers for both NanoCyclo and AmiKet and hope to auction both.

**The Debtors' Liabilities**

42. Discover filed a proof of claim in the amount $14,848,569 stating that it is secured by all of "the [Immune] Debtor's personal property, including intellectual property" and asserting an interest rate of 34%. As this Court is aware and as set forth in prior submissions, the Debtors (as well as the Committee) disputes the Discover claim and its alleged security interest.

43. The Debtors' Schedules reflect unsecured claims as follows: (i) the Immune Debtor - $12,673,847.62; (ii) Ltd. - $1,006,563; (iii) Cytovia - $1,291,361; and Immune USA - $46,313.

## THE DEBTORS' SALES EFFORTS

44. Prior to the Petition Date and thereafter, the Debtors have actively solicited offers for the anti-eotaxin assets and the Ceplene assets and are negotiating with prospective purchasers. On September 17, 2018, the Immune Debtor made a public announcement in this regard regarding bertilimumab and other anti-eotaxin assets, followed by additional public statements on November 27, 2018 and December 18, 2018. Similarly, the Immune Debtor publicly disclosed its intent to find a strategic partner for Ceplene on May 17, 2018 with an additional public statement on February 7, 2019.

**The Ceplene Sale**

45. With respect to the sale of Ceplene, the Court is fully familiar with the Debtors efforts in this regard. On March 15, 2019, the Debtors filed their Motion Seeking to (a) Sell the Ceplene® Product Line Pursuant to 11 U.S.C. §§ 363(b) and (f), Free and Clear of All Liens, Claims and Interests; (b) Assume and Assign Various Executory Contracts Pursuant to 11 U.S.C. §§ 365(a); and (c) Other Related Relief (the "Ceplene Sale Motion") See Doc. No. 46.

46. The Ceplene Sale Motion sought authorization to sell the Ceplene product line to Vector and close on the transaction on or before March 31, 2019. A hearing on the Ceplene Sale Motion was scheduled for March 29, 2019. The Debtor's sought to obtain approval and close the transaction on or before March 31, 2019 to avoid an argument by Discover that its lien would attach to the sale proceeds if the closing occurred after March 31, 2019.

47. The Ceplene Sale Motion has been adjourned on numerous occasions because Vector has not provided evidence that it has the funds to close.

48. In light of the above, the Debtors are in discussions with two companies to recommence the marketing of Ceplene.

**The Sale of the Anti-Eotaxin Assets Including Bertilumamab**

49. With respect to the anti-eotaxin assets, the Debtors are negotiating with a prospective purchaser that is a major multi-billion-dollar US-based biopharmaceutical company. The Debtors and this company executed a term sheet. The proposed purchase price has increased to well in excess of $4.5 million. The formal stalking-horse asset purchase agreement is being negotiated. The sale motion pleadings have been drafted and discussed with the purchaser. The Debtors hope to file the sale motion in short order.

50. As part of soliciting purchasers for the anti-eotaxin assets, the Debtors have maintained a data room that prospective purchasers can access subject to a non-disclosure agreement ("NDA") and proceed with due diligence. Discover executed a confidentiality agreement and obtained access to the data room. Also, iCo was offered access, but did not execute an NDA. Notwithstanding, iCo's counsel briefly accessed the site.

51. No less than 4 other companies have been actively cycling through the data room. The Debtors do not know with certainty the level of interest, but do believe that the auction will have active bidding.

52. NanoCyclo is owned by Ltd and is not subject to Discover's lien. The Debtors and the Israeli trustee are in discussions with prospective companies to market NanoCyclo for sale.

53. Discover's continued aggressive tactics in this case, the delays with the Ceplene Sale and the focus on the anti-eotaxin sale process (which now includes the iCo Motion) and the Debtors' thin resources have forced the Debtors to back burner its sale process for NanoCyclo.

54. Notwithstanding, the Debtors believe that there may be value in the sale of NanoCyclo that will benefit creditors, which value may not be achieved if the cases are converted to Chapter 7 because all of such assets may be owned by Ltd, which may not have sufficient resources to properly manage a sale process that will unlock value.

**Sale of AmiKet**

55. Initially, the Debtors believed that AmiKet had *di minimis* value because of the amount of money that a purchaser may have to spend to complete clinical trials and bring it to market.

56. The opioid crisis may have changed its value. AmiKet is unique because it is a pain killer that is not opioid based. This fact has peaked curiosity.

10378329-1

57. The Debtors, who have not marketed AmiKet in years, have re-set their data room for this product line.

58. The Debtors have also reached out to several companies to see if there is interest. The Debtors are in the process of interviewing a company to commence a solicitation process.

59. With respect to the data room, the Debtors have no less than two interested parties actively accessing the AmiKet data room. The Debtors expect to receive an offer for this therapeutic.

## THE DEBTORS' GOOD FAITH USE OF CHAPTER 11.

60. Contrary to Discover's assertions, the Chapter 11 was filed in good faith. The Chapter 11 was filed to benefit <u>all</u> creditors. Without the filing of the Chapter 11, Discover would have been the only beneficiary of the value of the Debtors' assets. Discover would have benefitted under such circumstances notwithstanding the fact that (i) Discover agreed in the Securities Purchase Agreement that its claims would be subordinated to other corporate liabilities, (ii) that bankruptcy law provides for subordinating its interest; and (iii) that Discover may not have properly recorded its security interest.

61. As the Court can see, the Debtors have used Chapter 11 for its proper purposes, i.e. maximize the value of assets and negotiate in good faith with its creditors. The Debtors have worked hand in hand with the Committee for the benefit of all creditors. The Debtors have discussed with the Committee the sale process and other case issues on a daily basis. The Immune Debtor has discussed the case with the Israeli Trustee for Ltd on a daily basis, including the issues of asset ownership as between the Immune Debtor and Ltd. But for Discover's aggressive litigation tactics, the Debtors have offered to Discover a willingness to accept their participation in monetizing the assets as well as assisting in addressing iCo's issues.

62. The Debtors intend to discuss with the Committee the prospects of plans for liquidation or reorganization. A plan of liquidation would be based on monetizing the Debtors assets and distributing the proceeds in accordance with the priorities established by the Bankruptcy Code. The Debtors would envision a liquidating trustee to pursue avoidance actions, if any, and any other causes of action.

63. In Discover's supplement, Discover references the Immune Debtors' pre-Petition Date disbursement of the $2 million that it paid to the Debtors. These monies as well as additional monies on hand were disbursed over a period of approximately 4 1/2 months substantially as follows: (1) Inc – (a) Payroll - $605,664 (CEO, Head of Drug Development, Head of Clinical, Controller, Office Manager and others); (b) Professional Fees - $319,141; (c) Rent/Administration - $333,133; (d) Drug Development - $397,020; (e) Accounting/Auditing/SEC fees - $275,913 (publicly traded company); (f) Insurance - $91,898; (g) Taxes $88,458; (g) Finance Costs/Fees - $58,649; (2) Ltd – (a) Drug Development - $71,497; (b) Rent/Administration - $35,098; (c) Payroll - $31,966; (d) Insurance - $13, 845; (e) Taxes - $12,881; and (3) Cytovia – (a) EMA Annual Fee – Marketing Authorization - $120,500; (b) Professional Fees - $44,049; (c) Drug Development - $24,971. The referenced payments aggregate approximately $2,525,000.

64. As for a plan of reorganization, I have recently received a few preliminary inquiries to monetize the Immune Debtor's publicly traded corporate shell. If pursued, they will necessarily require a plan of reorganization. Because of the early stage of such, I have not yet discussed this with the Committee.

65. Based on the above, the Debtors should be permitted to continue with the sale processes outlined above. A chapter 7 will only derail the process to the detriment of all creditors.

10378329-1

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ Gary H. Rabin
Gary H. Rabin
Interim CEO

Dated: June 25, 2019

14

10378329-1