UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-1(b)**

**NORRIS McLAUGHLIN, P.A.**
Morris S. Bauer
Melissa A. Pena
400 Crossing Boulevard, 8th Floor
P.O. Box 5933
Bridgewater, New Jersey 08807
(908) 722-0700
msbauer@norris-law.com
mapena@norris-law.com
Counsel for the Debtors/Debtors-in-Possession

| | |
|---|---|
| In re: | Chapter 11 |
| IMMUNE PHARMACEUTICALS INC, *et al.,* | Case No. 19-13273 (VFP) |
| Debtors.[1] | Hon. Vincent F. Papalia |

**DEBTORS' OPPOSITION TO iCO THERAPEUTICS INC.'S MOTION (I) TO COMPEL REJECTION OF THE SUBLICENSE AND (II) OBTAIN RELIEF FORM THE AUTOMATIC STAY TO ALLOW TERMINATION OF THE SUBLICENSE**

Immune Pharmaceuticals Inc., *et al.*, the within Chapter 11 debtors and debtors-in-possession (the "Debtors"), by and through their counsel, Norris McLaughlin, P.A., respectfully submit this opposition to the motion filed by iCo Therapeutics Inc. to (i) compel rejection of the sublicense, and (ii) obtain relief from the automatic stay to allow termination of the sublicense (the "Motion").

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Immune Pharmaceuticals, Inc. (1431); Immune Pharmaceuticals, Ltd.; Cytovia, Inc. (7805); Immune Oncology Pharmaceuticals, Inc.; Maxim Pharmaceuticals, Inc. (9983); and Immune Pharmaceuticals USA Corp. (9630).

**PRELIMINARY STATEMENT**

1.  In a bare bones motion, iCo asks this Court to compel Immune Pharmaceuticals, Ltd. ("Ltd.") to lose all rights and value that it has in the iCo sublicense pursuant to which iCo granted Ltd. the exclusive right to certain intellectual property to develop and commercialize bertilimumab, which is part of the Debtors' anti-eotaxin product line, undoubtedly the Debtors' most valuable asset.

2.  What is most remarkable about iCo's Motion is what iCo fails to disclose to the Court. iCo's motion involves a Product Sublicense Agreement, dated December 7, 2010, between iCo, as sublicensor, and Ltd., as sublicensee (the "Sublicense"). The story iCo tells is as follows: (i) iCo terminated the Sublicense by way of a February 15, 2019 letter (hereinafter the "Initial Alleged Notice to Terminate") prior to the Debtors' bankruptcy filings; (ii) *for no apparent reason*, it sent an amended notice to terminate on February 27, 2019 to Ltd. (the "Alleged Amended Notice to Terminate"); and (iii) the Sublicense cannot be assigned without its consent.

3.  iCo fails to advise the Court of the following:

- the Initial Alleged Notice to Terminate was ineffective because it was not given in accordance with the terms of the Sublicense as it was sent to Immune Pharmaceuticals Inc. (the "Immune Debtor") which is not a party to the Sublicense;

- on February 25, 2019, after the commencement of the bankruptcy case, the Immune Debtor notified iCo that the Initial Alleged Notice to Terminate was ineffective because it was not sent to a Ltd., which was the party to the Sublicense, in accordance with the requirements of the Sublicense;

- the notification by the Immune Debtor prompted iCo to send its Alleged Amended Notice to Terminate to Ltd., the actual sublicensee under the Sublicense; and

- the Alleged Amended Notice to Terminate was sent to Ltd. post-Petition and, thus, violated the automatic stay.

4.  Worse yet, while iCo contends that it is "black letter law" that the Sublicense cannot be assigned by Ltd. without its consent, iCo fails to disclose to the Court that the Sublicense explicitly

2

states that iCo cannot unreasonably withhold its consent to an assignment of the Sublicense. iCo's categorical statement that it will refuse to approve any assignment of the Sublicense – with zero knowledge as to the identity of the proposed assignee – is not reasonable.

5. If this were not enough, iCo attempts to mislead the Court by claiming it has been forced to file its Motion now because the Debtors recently took the position that iCo violated the automatic stay when the actual facts show that the Debtors have consistently asserted their position to iCo since the onset of the Chapter 11 cases. Since February of 2019, iCo has known that the Debtors took the position that the Initial Alleged Notice to Terminate was ineffective. In February 2019, when iCo continued to try to market and sell Ltd.'s rights under the Sublicense, the Debtors sent iCo a cease and desist letter. Since February of 2019, iCo, whose counsel has been monitoring the cases, has been aware that the Alleged Amended Notice to Terminate violated the automatic stay. This is not presented to the Court in iCo's motion as iCo "forgot" to attach all the correspondence it received from the Debtors.

6. When one looks at the entire story, it is evident that iCo did not effect the termination of the Sublicense prior to the Debtors' bankruptcy filing. iCo's motion tacitly acknowledges this fact by (i) characterizing the license as an executory contract; and (ii) seeking relief from the stay to now terminate the agreement.

7. Moreover, the Motion does not set forth a basis to grant the relief that it seeks. iCo simply relies on the fact that (i) Discover Growth Fund ("DGF"), a creditor of the Immune Debtor, believes the Sublicense was terminated; and (ii) DGF thinks the case should be converted to support the relief it is seeking. Obviously, DGF's self-serving position does not determine the actual legal status of the Sublicense.

8. The Sublicense relates to the Debtors' bertilimumab assets, form a portion of the Debtors' anti-eotaxin assets (collectively the "Anti-Eotaxin Assets") which the Debtors have been engaged in negotiations to sell along for months (both pre and post-Petition). The Debtors have located a stalking horse bidder for the Anit-Eotaxin Assets, who desires to acquire Ltd.'s rights under the Sublicense as part of its purchase. Proceeding with the sale is essential to maximizing the distribution available to creditors. The Debtors anticipate filing a sale procedures motion shortly. As such and for all the reasons set forth below, the Court should permit the Debtors to proceed with a sale process and deny the Motion.

## FACTUAL BACKGROUND

9. As the factual background, the Debtors shall rely upon the Declaration of Anthony Fiorino, Declaration of Gary Rabin and the Declaration of John H. Hogoboom, Esq. and the exhibits thereto.

## ARGUMENT

### POINT I

### iCO DID NOT EFFECT THE TERMINATION OF THE SUBLICENSE PRIOR TO THE DEBTORS' BANKRUPTCY FILINGS.

10. There is no question that the Sublicense remains in effect and did not terminate prior to the Debtors' bankruptcy filings. iCo's Initial Alleged Notice to Terminate did not comply with the terms of the Sublicense as it was not sent to the party to the Sublicense. The Sublicense clearly states that it is a ". . . PRODUCT SUBLICENSE AGREEMENT . . . by and between iCo THERAPEUTICS INCORPORATED . . . and IMMUNE PHARMACUTICALS, LTD., a corporation organized and existing under the laws of the State of Israel . . ." See Rabin Dec. at Exhibit A at p. 1 (emphasis in original). Accordingly, the Initial Alleged Notice to Terminate did not effectuate a termination of the Sublicense under the terms thereof.

11.     iCo fares no better with respect to its Alleged Amended Notice to Terminate. After being advised by Debtors' counsel that the Initial Alleged Notice to Terminate had been sent to a non-party to the Sublicense, iCo sent the Alleged Amended Notice to Terminate to Ltd. on February 27, 2019 - *five days after Ltd. filed its Chapter 11 bankruptcy case* and, thus, violates the automatic stay provided for in Section 362 of the Bankruptcy Code. The Third Circuit has recognized that any action taken in violation of the automatic stay is void *ab initio*. See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1206 (3d Cir. 1991); see also In re: Hawk, 314 B.R. 312, 317 (Bankr. D.N.J. 2004).[2] Accordingly, the Alleged Amended Notice to Terminate is void as it is in direct violation of Section 362 of the Bankruptcy Code.

12.     Furthermore, there is no basis to terminate the Sublicense for the reasons set forth in the Alleged Amended Notice to Terminate. By way of the *post-Petition* Alleged Amended Notice to Terminate, iCo purported to "immediately" terminate the Sublicense as a result of an Insolvency Event (as such term is defined under the Sublicense) and, thus, it runs afoul of Section 365(e)(1) of the Bankruptcy Code.

13.     Section 365(e)(1) of the Bankruptcy Code provides as follows:

(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

---

[2] Although the termination is subject to validation through annulment of the stay pursuant to Section 362(d) of the Bankruptcy Code, iCo would need to establish that the Alleged Amended Notice to Terminate was taken without knowledge of Ltd.'s bankruptcy filing and "cause" to grant the relief otherwise existed. See In re: Sciciliano, 13. F.3d 748, 750-51 (3d. Cir. 1994). Here, iCo acknowledges that it has been monitoring the bankruptcy cases and was, thus, well aware of Ltd.'s bankruptcy filing and, as demonstrated below, there is no "cause" to lift the automatic stay nor does iCo articulate any basis to lift the stay.

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

11 U.S.C. § 365(e)(1).

14.     Even assuming, *arguendo*, that iCo could terminate the Sublicense at the time that the Alleged Amended Notice to Terminate was given, iCo did not have a legal basis to to terminate the Sublicense. It is beyond dispute that (i) the alleged defaults arose pre-Petition; and (ii) the Alleged Notice to Terminate provided that Ltd. had sixty (60) days to cure such alleged defaults and expressed iCo's intent to terminate the Sublicense if Ltd. did not cure such purported defaults. A debtor can cure pre-Petition defaults under executory contracts until the deadline for the debtor to assume or reject the contract under Section 365 of the Bankruptcy Code. See In re: Tudor Motor Lodge Associates, Ltd., 102 B.R. 936, 950 (Bankr. D.N.J. 1989) (holding that Section 108(b) of the Bankruptcy Code does not apply to curing defaults under an executory contract as Section 365 controls and, as a result, debtor may cure defaults any time prior to assumption). Thus, the alleged non-monetary defaults do not amount to a termination of the Sublicense.

15.     Moreover, even if one looks to the underlying facts surrounding the termination of the Sublicense (which is not necessary as the law forecloses iCo's argument that the Sublicense has terminated), as detailed in the correspondence from Ltd.'s Israeli counsel to iCo, attached as Exhibit B to the Declaration of Anthony Fiorino, iCo had no basis to terminate the Sublicense.

16.     Accordingly, the Sublicense remains in full force and effect, which certainly calls into question iCo's conduct of continuously seeking to market Ltd.'s rights thereunder.

## POINT II
**THERE IS NO BASIS TO COMPEL LTD. TO REJECT THE SUBLICENSE.**

17.     Tacitly acknowledging that the Sublicense has not been terminated, iCo admits in its motion that the Sublicense is an executory contract and seeks the entry of an Order to compel Ltd. to reject same.

18. In its motion, iCo conveniently fails to set forth the factors a court should consider in determining whether to compel a debtor to reject a contract despite the fact that the very case law relied upon by iCo discusses such factors. See In re: Dunes Casino Hotei, 63 B.R. 939 (D. N.J. 1986).

19. Under Section 365 of the Bankruptcy Code, the debtor has the right to assume or reject an executory contract. Section 365(d)(2) provides that a debtor in possession " . . . may assume or reject an executory contract . . . of the debtor at any time before confirmation of a plan, but the court, on the request of any party of such contract or lease, may order the [debtor in possession] to determine within a specified period of time whether to assume or reject such contract . . ." 11 U.S.C. § 365(d)(2).

20. While a party may request the entry of an order to require the debtor to assume or reject an executory contract within a specified period of time, what constitutes a reasonable time is left to the discretion of the bankruptcy court in light of the circumstances of the case. In re: G-I Holdings, 308 B.R. 196, 212 (Bankr. D.N.J. 2004). To determine what constitutes a reasonable time for a debtor to assume or reject an executory contract, the Court considers the following factors: "1) the nature of the interests at stake; 2) the balance of the hurt to the litigants; 3) the good to be achieved; 4) the safeguards afforded those litigants; and 5) whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary." In re: Dunes Casino Hotel, 63 B.R. at 949 (citation omitted).

21. The above factors weigh heavily in favor of the Debtors. As the Debtors have previously advised this Court at a recent status conference, the Debtors shortly intend to file a motion seeking the approval of an Asset Purchase Agreement with a stalking horse bidder as well bidding procedures in connection with a sale of the Anti-Eotaxin Assets and other related relief, including authority for Ltd. to assume and assign the Sublicense to the stalking horse bidder.

22. The interest at stake to the Debtors and their creditors is significant. As this Court is aware, the Anti-Eotaxin Assets are the most valuable assets of the Immune Debtor and Ltd. The sale of these assets, including Ltd's rights under the Sublicense, will enable the Debtors to distribute the proceeds to creditors, which is obviously good to be achieved by the sale. If the Sublicense is rejected, it may not be possible to effect the sale of these assets which would significantly reduce the potential distribution to creditors.

23. The balancing of interest also weighs in favor of the Debtors. In lieu of entering an Order to compel Ltd. to reject the Sublicense, the Court should afford the Debtors time to proceed with the sale process for the Anti-Eotaxin Assts. As set forth above, in the absence of a sale, the Debtors' estates and their creditors will be significantly harmed. In contrast, iCo will retain its rights under the Bankruptcy Code in the event of a sale. The Sublicense cannot be assumed and assigned by Ltd. in the absence of a showing of adequate assurance of future performance by a purchaser and the curing of defaults thereunder, *if any*.

24. Although iCo complains that it has expended "significant expense and effort" to simply monitor the Debtors' bankruptcy case, other than its bare bones motion, iCo has only filed a two-page reservation of rights. In stark contrast, the proposed sale of the Ant-Eotaxin Assets is the product of months of negotiations by the Debtors, counsel for the Debtors, the Debtors' investment bankers, and the stalking horse bidder. These negotiations commenced pre-Petition and have continued subsequent to the commencement of the bankruptcy cases. In addition, the Israeli trustee and the Committee have also participated in these negotiations. Under these circumstances, the Court should deny the Motion so that the sale process can continue.

25. Notably, not only does iCo ignore the factors set forth above which are applied by the Court in determining whether to establish a deadline for a debtor to assume or reject a contract, iCo

fails to set forth any basis for the relief it seeks. Nowhere does iCo provide legal support for the notion that Ltd. should be stripped of its business judgment and compelled to reject the Sublicense. All iCo comes up with is that DGF, a creditor of Immune Debtor with a self-serving agenda of its own, has taken the position that the Sublicense has been terminated and therefore that the case should be converted to Chapter 7. DGF clearly would benefit the most from the conversion of the case and stands to gain a significant windfall at the expense of other creditors if its motion is granted. Given the "significant expense" iCo has incurred monitoring these cases, it is well aware that the Immune Debtor disputes DGF's claims and has already advised the Court and creditors of its intent to seek to subordinate DGF's interest. DGF's tactical motion to convert the case hardly constitutes a basis to require Ltd. to immediately reject the Sublicense. If the motion to convert is granted, *which the Debtors submit should not be the case*, why would the Court not want an independent trustee to review the purported termination of the Sublicense and whether the Sublicense has value to the creditor body. Apparently, iCo – who could not even bother to attach the Sublicense to its motion – does not want anyone to scratch below the surface.

26.     Lastly, iCo's argument that it alone can control the assumption and assignment of the Sublicense is completely misleading. Although iCo relies heavily on its claim that the Sublicense cannot be assigned absent its consent, iCo fails to advise the Court of the actual language in the Sublicense which provides, in pertinent part, as follows: "[t]his Agreement shall not be assignable by either Party to any Third Party without the written consent of the other Party, *such consent not to be unreasonably withheld . . .*" See Rabin Dec. at Exhibit at A (emphasis added). As further demonstrated below, this is a textbook case of unreasonably withholding consent to an assignment as iCo has made a blanket statement that it will not consent to an assignment without even knowing the identity of the potential purchaser or any information as to its ability to perform under the Sublicense.

9

# POINT III
## iCO HAS FAILED TO ESTABLISH "CAUSE" TO LIFT THE AUTOMATIC STAY TO ALLOW IT TO TERMINATE THE SUBLICENSE.

27. Section 362(d) of the Bankruptcy Code provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided for under subsection (a) . . . for cause . . ." 11 U.S.C. § 362(d)(1). "Cause" is not defined by the Bankruptcy Code and in determining whether there is "cause" to lift the automatic stay, courts apply a flexible approach examining the totality of circumstances. In re: Trump Entertainment Resorts, Inc., 526 B.R. 116, 120 (Bankr. D. Del. 2015).

28. Relying on the In re: Valley Media, Inc., 279 B.R. 105, 138 (Bankr. D. Del. 2002) decision, iCo argues, in a conclusory fashion, that it is entitled to relief from the automatic stay to terminate the Sublicense based on Ltd.'s alleged pre-Petition defaults under the Sublicense. Unfortunately for iCo, Valley Media stands for the proposition that stay relief should be granted to terminate a license only if the debtor lacks the ability, under non-bankruptcy law, to assume and assign the license. Id. at 138. Accord In re: Trump Entertainment Resorts, Inc., 526 B.R. 116 (Bankr, D. Del. 2015) (granting licensor relief from the automatic stay to terminate trademark license where license could not be assumed as non-bankruptcy law restricted the assignment); In re: Rupari Holding Corp., 573 B.R. 111 (Bankr. D. Del. 2017) (finding "cause" to lift the stay only where license restricted the ability to assign the license absent licensor's consent).

29. Although iCo argues that Ltd. cannot assign the Sublicense without its consent and, as a result, there is "cause" to lift the automatic stay, iCo's argument falls flat because the Sublicense specifically provides that iCo cannot unreasonably withhold its consent. Again, the Sublicense provides as follows: "**[t]his Agreement shall not be assignable by either Party to any Third Party**

**without the written consent of the other Party,** *such consent not to be unreasonably withheld . . . .*" See Rabin Dec. at Exhibit at A (emphasis added).

30. Courts have held that a licensor cannot unreasonably withhold its consent to an assignment of a license in circumstances similar to the instant facts. In In re: Specialty Foods of Pittsburg, 91 B.R. 364 (Bank. W.D. Pa. 1988), the licensor sought relief from the automatic stay to terminate the license arguing that (i) the license agreement is not an asset of the debtor's estate because it cannot be sold or assigned through the Bankruptcy Court; and (ii) the debtor allegedly breached the license. A chapter 7 trustee sought to sell all of the debtor's assets and business relating to the product at issue in the license, including the license. Id. at 365.

31. The Specialty Foods license stated that "[w]ithout the prior written consent of Licensor, which will not be unreasonably withheld, Licensee many not sublicense any of its rights under this agreement . . . nor may Licensee assign any of its rights under this agreement to other than a company which purchases the entirety of Licensee's assets and business relating to this Exclusive License." Id. at 367 (internal citation omitted). In reading such language, the Court stated ". . . that under the terms of the [licenses, the licensor] may not withhold its consent unreasonably inasmuch as the [proposed purchaser] is purchasing all of Debtor's assets and business "relating to" the products and licenses . . . Accordingly, [licensor's] refusal to consent to this sale is neither reasonable nor of any effect." Id. at 372.

32. Similarly, in In re: Aerobox Composite Structures, LLC, 373 B.R. 135 (Bankr. D.N.M. 2007), the Court denied a licensor's motion for stay relief where the licensor argued that the debtor could not assign the license without its consent. In denying the motion, the Court stated as follows:

> The [Unsecured Creditors Committee ("UCC")] also argues that because the License Agreement contemplates assignment and requires [licensor] not to unreasonably withhold its consent, [licensor's] categorical refusal to consent cannot be considered reasonable. The UCC, therefore, contends that the Motion [for stay relief] should be denied because it constitutes a unilateral attempt by [licensor] to alter the bargained-for terms of the License Agreement. The Court agrees that the License Agreement does not prohibit assignment, and that by requiring [the licensor] not to unreasonably withhold its consent to assignment, the assignment term of the License Agreement is less restrictive than the general federal common law . . .

Id. at 142.

33.     Here, iCo's conduct is similar to the licensors in Specialty Foods and Aerobox, iCo is categorically unreasonably withholding its consent to assignment of the Sublicense. Although there can be circumstances where courts have to assess the facts to determine whether a licensor is unreasonably withholding its consent, this is not that case. iCo acknowledges that from day one of the case, it has stated that it will not consent to an assignment. This decision was made when iCo does not know (i) the identity of the proposed the assignee; (ii) the financial wherewithal of the proposed assignee; or (iii) the capability of the proposed assignee to comply with the terms of the Sublicense. Given iCo's refusal to consent to an assignment when it has no information as to the assignee, this is the epitome of unreasonably withholding consent. The Debtors expect that the ultimate purchaser of the Anti-Exotaxin Assets will be a creditworthy entity with the financial and managerial resources to continue the development of those assets.

34.     Furthermore, there is no greater evidence of iCo's unreasonableness than its own conduct. iCo well knows that a categorical refusal to consent to an assignment is unreasonable. There is no other explanation for why iCo fails to (i) disclose the assignment provision in the license to the Court; and (ii) attach the Sublicense to the Motion.

35. Under these circumstances, iCo has not established "cause" to lift the automatic stay.

          NORRIS McLAUGHLIN, P.A.
          Attorneys for Debtors/Debtors-in-Possession

Dated: June 25, 2019          By: /s/ Morris S. Bauer
                                             Morris S. Bauer
                                             Melissa A. Pena