UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-1(b)**

**MORRIS S. BAUER**
**MELISSA A. PEÑA**
**NORRIS McLAUGHLIN, P.A.**
400 Crossing Boulevard, 8th Floor
P.O. Box 5933
Bridgewater, New Jersey 08807
(908) 722-0700
msbauer@norris-law.com
mapena@norris-law.com
Counsel for the Debtors/Debtors-in-Possession



**Order Filed on October 21, 2019
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

---

In re:

IMMUNE PHARMACEUTICALS INC., *et al*.,

Debtors.[1]

Chapter 11

Case No. 19-13273 (VFP)

Hon. Vincent F. Papalia

---

### ORDER (I) AUTHORIZING THE SALE OF THE DEBTORS' ANTI-EOTAXIN ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (II) APPROVING THE ASSET PURCHASE AGREEMENT, AND (III) AUTHORIZING THE DEBTOR TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND OTHER RELATED RELIEF

The relief set forth on the following page, numbered two (2) through twenty-nine (29), is

hereby **ORDERED.**

**DATED: October 21, 2019**

_____
**Honorable Vincent F. Papalia**
**United States Bankruptcy Judge**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Immune Pharmaceuticals, Inc. (1431); Immune Pharmaceuticals, Ltd.; Cytovia, Inc. (7805); Immune Oncology Pharmaceuticals, Inc.; Maxim Pharmaceuticals, Inc. (9983); and Immune Pharmaceuticals USA Corp. (9630).

Page 2 of 29
Debtor:          Immune Pharmaceuticals Inc., *et al*.
Case No.:        19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

---

This matter having been opened to the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") by Norris McLaughlin, P.A., counsel for Immune Pharmaceuticals, Inc., *et al*. (the "Debtors"), debtors/debtors-in-possession in the above captioned chapter 11 cases (the "Chapter 11 Cases"), upon the Motion of the Debtors for the entry of an Order Approving and Authorizing (I) Bid Procedures and Form of Notice in Connection with the Sale of the Debtors' Anti-Eotaxin Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (II) Stalking Horse Agreement and Stalking Horse Bid Protections, (III) the Scheduling of a Sale Hearing, (IV) Sale to the Purchaser Submitting the Highest or Best Offer, (V) Procedures for Assuming and Assigning Executory Contracts, and (VI) Other Related Relief [Doc. No. 219](the "Sale Motion")[2]; and it further appearing that on July 16, 2019, the Court entered the Order Approving and Authorizing (i) Bid Procedures and Form of Notice in Connection with the Sale of the Debtors' Anti-Eotaxin Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (ii) Stalking Horse Agreement and Stalking Horse Bid Protections, (iii) the Scheduling of a Sale Hearing, (iv) Sale to the Purchaser Submitting the Highest or Best Offer, (v) Procedures for Assuming and Assigning Executory Contracts; and (vi) Other Related Relief [Doc. No. 247](the "Bid Procedures Order"); and it further appearing that the deadlines set forth in the Bid Procedures Order having been modified as set forth in the that certain Notice of Adjournment of Dates [Doc. No. 320]; and a hearing having been conducted on the Sale Motion on October 17, 2019 (the "Sale Hearing"); and good and sufficient notice of the Sale Motion and the Sale Hearing

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

2

10517050-1

Debtor:          Immune Pharmaceuticals Inc., *et al.*
Case No.:        19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

having been provided; and the Court having considered the moving papers and the opposition thereto, if any, and the arguments of counsel, if any; and the Court having determined that good cause exists for the entry of this Order,

**IT IS HEREBY FOUND AND DETERMINED** that:

A.    **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.   To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.   To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    **Jurisdiction and Venue.**  This Court has jurisdiction to decide the Sale Motion pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b).  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these Chapter 11 Cases and the Sale Motion is proper under 28 U.S.C. §§ 1408 and 1409.

C.    **Statutory and Rule Predicates.**  The statutory and other legal predicates for the relief granted herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of the United States Bankruptcy Court, District of New Jersey (the "Local Rules").

D.    **Opportunity to Object.** A fair and reasonable opportunity to object to, and be heard with respect to, the Sale Motion has been given to all Persons entitled  to  notice  pursuant to  the  Bid  Procedures  Order,  including,  without  limitation,  the  following: (i) counsel  to

3

Debtor:            Immune Pharmaceuticals Inc., *et al.*
Case No.:          19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

___

Debtors' secured lenders, (ii) all non-Debtor counterparties to executory contracts or unexpired leases, (iii) all parties who have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002, (iv) any known bidders for the proposed auction, (v) the Office of the United States Trustee, and (vi) counsel to the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases (the "<u>Committee</u>").

E.      **<u>Final Order.</u>**  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a) and Rule 8001(a) of the Federal Rules of Bankruptcy Procedure.

F.      **<u>Stalking Horse Bid</u>**.  On July 1, 2019, Alexion Pharma International Operations Unlimited Company ("<u>Stalking Horse Bidder</u>") submitted a Qualified Bid to purchase the Anti-Eotaxin Assets (the "<u>Acquired Assets</u>") in the form of an asset purchase agreement executed by and between the Stalking Horse Bidder and the Immune Debtors and Ltd. (collectively, the "<u>Debtor Sellers</u>") dated June 28, 2019 (the "<u>Stalking Horse Agreement</u>" or the "<u>Stalking Horse Bid</u>").

G.      **<u>Winning Bid.</u>**  The highest bid for the Acquired Assets and assumption of Assumed Liabilities as defined in the Asset Purchase Agreement as defined herein (the "<u>Sale Transaction</u>") was submitted by the Stalking Horse Bidder (the "<u>Buyer</u>" or "<u>Winning Bidder</u>"), by way of a bid in the form of the Stalking Horse Agreement as annexed hereto as Exhibit "A" (the "<u>Asset Purchase Agreement</u>"), which provides for the amount of consideration as set forth in Article 4 of the Asset Purchase Agreement (the "<u>Winning Bid</u>"), and which Winning Bid is equal to the amount of consideration that was provided in the Stalking Horse Agreement.

10517050-1

Debtor:          Immune Pharmaceuticals Inc., *et al*.
Case No.:        19-13273 (VFP)
Caption of Order:**Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

H.     **<u>Sound Business Purpose – Stalking Horse Agreement</u>.**   The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of the Asset Purchase Agreement and the related Sale Transaction, and for entering into the Asset Purchase Agreement.   The Asset Purchase Agreement, and the Debtor Sellers' entry into and performance under the Asset Purchase Agreement, (i) constitutes a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties, (ii) provides value to and are beneficial to the Debtors' estates, and are in the best interests of the Debtors and their estates, creditors, and other parties in interest, and (iii) are reasonable and appropriate under the circumstances.   Business justifications for the Sale Transaction include, without limitation, the following: (i) the Winning Bid constitutes the highest or otherwise best offer received for the Acquired Assets; (ii) the Winning Bid presents the best opportunity to maximize the value of the Acquired Assets and to avoid deterioration in the value of the Acquired Assets; (iii) unless the Sale Transaction and all of the other transactions contemplated by the Asset Purchase Agreement are concluded expeditiously, as provided for pursuant to the Asset Purchase Agreement, recoveries to creditors may be materially diminished; and (iv) the value of the Debtors' estates will be maximized through the transactions effectuated pursuant to the Asset Purchase Agreement. The Debtors have demonstrated compelling circumstances for the SaleTransactions outside: (i) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code and (ii) a plan of reorganization, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to preserve and maximize the value of the Debtors' estates.

Debtor:           Immune Pharmaceuticals Inc., *et al.*
Case No.:         19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

I.     **Compliance with Bid Procedures Order.**   The Debtors and the Buyer have complied with the Bid Procedures Order and the Bid Procedures in all respects.  The Buyer was the Successful Bidder for the Acquired Assets in accordance with the Bid Procedures.

J.     **Marketing Process.**   (i) The Debtor and its advisors, including, without limitation, Armory Securities LLC ("Armory") engaged in a robust and extensive marketing and sale process, both prior to the commencement of these Chapter 11 Cases and through the post-petition sale process in accordance with the Bid Procedures Order.  Armory, the Debtors, and the Committee discussed updates on Armory's marketing of the Anti-Eotaxin Assets and interest expressed by potential bidders.  On each of the original bid deadline prior to the Notice of Adjournment extending the bid deadline, and the amended bid deadline of October 11, 2019, the Debtors received no other bids, including no bid from an entity to which the Debtors extended the bid line to October 13, 2019.  The Debtors conducted a fair and open sale process.  The sale process was non-collusive, duly noticed, and provided a full, fair, reasonable, and adequate opportunity for any entity that either expressed an interest in acquiring the Acquired Assets, or who the Debtors believed may have had an interest in acquiring the Acquired Assets, to make an offer to purchase the Acquired Assets.  The Debtors and the Buyer have negotiated and undertaken their respective roles leading to the applicable Sale Transaction and entry into the applicable Asset Purchase Agreement in a diligent, non-collusive, fair, reasonable, and good faith manner.  The sale process conducted by the Debtors pursuant to the Bid Procedures Order and the Bid Procedures resulted in the highest or otherwise best value for the Acquired Assets, was in the best interests of

6

Debtor:          Immune Pharmaceuticals Inc., *et al*.
Case No.:        19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

the Debtors, their creditors, and all parties in interest, and any other transaction would not have yielded as favorable a result.

      K.    **<u>Arm's-Length Sale; Fair Consideration</u>.** The consideration to be paid by the Buyer under the Asset Purchase Agreement was negotiated at arm's-length and constitutes fair and reasonable consideration for the Acquired Assets. The terms and conditions set forth in the Asset Purchase Agreement are fair and reasonable under these circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding the Debtors or their creditors under any applicable laws.

      L.    **<u>Good Faith</u>.** The Debtors, the Buyer and each of their respective management, boards of directors, members, officers, directors, employees, agents, and representatives, acted in good faith. The Asset Purchase Agreement, and each of the transactions contemplated therein, were negotiated, proposed, and entered into by the Debtors and the Buyer in good faith, without collusion or fraud, and from arm's-length bargaining positions. The Buyer is a "good faith purchaser" within the meaning of sections 363(m) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby in the event that this Sale Order is modified, amended, vacated, or reversed by a subsequent order of this Court or any other court on appeal. No such appeal, modification, amendment, or vacatur shall affect the validity and enforcement of the sale or the liens or priority authorized or created under the Asset Purchase Agreement or this Sale Order. Neither the Debtors nor the Buyer has engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided and/or costs and damages to be imposed under section 363(n) of the Bankruptcy Code, or that would prevent the application of section 363(m) of the

Debtor:             Immune Pharmaceuticals Inc., *et al*.
Case No.:           19-13273 (VFP)
Caption of Order:   **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All
Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement,
And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And
Unexpired Leases And Other Related Relief**

Bankruptcy Code. The Buyer has not violated section 363(n) of the Bankruptcy Code by any

action or inaction. The Debtors were free to deal with any other party interested in buying or

selling on behalf of the Debtors' estates the Acquired Assets. The Buyer has not acted in a

collusive manner with any Person and was not controlled by any agreement among bidders. The

Buyer's payment of amounts owing under the Asset Purchase Agreement is in good faith and for

valid business purposes and uses. The Buyer is not an "insider" of the Debtors, as that term is

defined in section 101 of the Bankruptcy Code, and no common identity of incorporators,

formation parties, managers, directors, or controlling stockholders or members exists between the

Buyer and the Debtors.

M. **Notice.** Proper, timely, adequate, and sufficient notice of the Sale Motion and the

Sale Hearing has been provided in accordance with sections 102(1), 105(a), and 363 of the

Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 6004, and in compliance with orders and

determinations of the Court. As evidenced by the certificates of service filed with the Court: (i)

proper, timely, adequate, and sufficient notice of the Sale Motion, the bidding process (including,

without limitation, the deadline for submitting bids and the Auction), the Sale Hearing, the Sale

Transaction, and entry of this Sale Order was provided by the Debtors; (ii) such notice was good,

sufficient, and appropriate under the circumstances and complied with the Bid Procedures Order

and other orders of the Court; and (iii) no other or further notice of the Sale Motion, the Sale

Transaction, the Bid Procedures, the Sale Hearing, or this Sale Order is required.

N. **Contract Notices**. As evidenced by the certificates of service filed with the Court,

and in accordance with the provisions of the Bid Procedures Order, the Debtors have served, prior

10517050-1

Page 9 of 29
Debtor:        Immune Pharmaceuticals Inc., *et al*.
Case No.:      19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

---

to the Sale Hearing, notices of the Debtors' potential intent to assume and assign certain leases or contracts and the proposed cure amount associated therewith (the "Contract Notices") upon each non-Debtor counterparty to such contracts or leases. The service of the Contract Notices was good, sufficient, and appropriate under the circumstances and no further notice need be given with respect to the cure costs for the assumption and assignment of the contracts or leases.  All non-Debtor parties to the contracts or leases have had a reasonable opportunity to object the proposed cure costs and the assumption and assignment of its lease or contract pursuant to the Bid Procedures Order.  Accordingly, all non-Debtor parties to the contracts or leases who did not file an objection prior to the Sale Hearing are deemed to consent to the cure costs and assumption and assignment of its lease or contract to the Buyer.  Any objection, or portion thereof, to the assumption and assignment of executory contracts and unexpired leases that was not heard at the Sale Hearing may be interposed pursuant to the procedures set forth in the Bid Procedures Order.

O.    **Satisfaction of Section 363(f) Standards.**  Except as provided for in paragraph 9 of this Sale Order, the Debtors may sell the Acquired Assets free and clear of any claim within the meaning of Section 101(5) of the Bankruptcy Code; any claim, community or other marital property interest, condition, equitable interest, right of way, encroachment, servitude, right of first refusal or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any other attribute of ownership; any interest within the meaning of Section 363(f) of the Bankruptcy Code, and all other interests, pledges, security interests, rights of setoff, restrictions or limitations on use, successor liabilities, conditions, rights of first refusal, options to purchase, obligations to allow participation,

9

10517050-1

Page 10 of 29
Debtor:        Immune Pharmaceuticals Inc., *et al*.
Case No.:      19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

---

agreements or rights, rights asserted in litigation matters, competing rights of possession, obligations to lend, matters filed of record that relate to, evidence or secure an obligation of Debtors (and all created expenses and charges) of any type under, among other things, any document, instrument, agreement, affidavit, matter filed of record, cause, or state or federal law, whether known or unknown, legal or equitable, and all liens, rights of offset, replacement liens, adequate protection liens, charges, obligations, or claims granted, allowed or directed in any order; any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising; lien (statutory or otherwise), deed of trust, right of first offer, easement, transfer restriction under any shareholder or similar agreement, mortgage, charge, option, security agreement or other encumbrance or restriction on the use or transfer of any property, hypothecation, license, preference, priority, covenant, right of recovery, orders and decrees of any court or foreign or domestic governmental entity, or any other order, to the fullest extent of the law, in each case, of any kind or nature, including, without limitation, (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any license, or other right, in favor of a third party or a seller, to use any portion of the applicable Acquired Assets, whether imposed by agreement, understanding, law, equity, or otherwise, whether derivatively, vicariously, as a transferee or successor or otherwise, and whether known or unknown, pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or

10517050-1

Debtor:              Immune Pharmaceuticals Inc., *et al.*
Case No.:            19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown, perfected or unperfected, liquidated or unliquidated, statutory or non-statutory, matured or unmatured, legal or equitable, of any kind or nature, including, without limitation, product liability claims, environmental liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes (including foreign, state and local taxes, including, without limitation, bulk sale taxes) of or against the Debtors (collectively, "Claims, Encumbrances, Interests, Liabilities and Liens"), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Those holders of any Claims, Encumbrances, Interests, Liabilities and Liens who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Sale Motion have consented or are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Upon the Closing, all Persons having Claims, Encumbrances, Interests, Liabilities and Liens of any kind or nature whatsoever against the Debtors or the Acquired Assets shall be forever barred from pursuing or asserting such Claims, Encumbrances, Interests, Liabilities and Liens against the Buyer or any of their assets, property, affiliates, successors, assigns, or the Acquired Assets.

P.    **Assumption and Assignment of Acquired Contracts.** The assumption and assignment of the assigned contracts or leases (the "Acquired Contracts") are integral to the Asset Purchase Agreement, may be amended, supplemented or otherwise modified prior to assumption and assignment without further order of the Court with the consent of the applicable Selling Debtors, the applicable counterparty(s) and the Buyer, are in the best interests of the Debtors and

10517050-1

Page 12 of 29
Debtor:           Immune Pharmaceuticals Inc., *et al.*
Case No.:         19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All
                  Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement,
                  And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And
                  Unexpired Leases And Other Related Relief**

their estates, do not constitute unfair discrimination, and represent the reasonable exercise of the

Debtors' sound business judgment. The iCo Sublicense may not be amended other than as set

forth in the iCo Sublicense. Specifically, the assumption and assignment of the Acquired Contracts

(i) are necessary to sell the Acquired Assets to the Buyer, (ii) limit the losses suffered by

counterparties to the Acquired Contracts, and (iii) maximize the recoveries to other creditors of

the Debtors by limiting the number and amount of claims against the Debtors' estates by avoiding

the rejection of the Acquired Contracts. With respect to each of the Acquired Contracts, the

Debtors have met the requirements of section 365(b) of the Bankruptcy Code. Further,

in compliance with the requirements of sections 365(b) and 365(f) of the Bankruptcy Code,

the Buyer has provided adequate assurance of future performance under the Acquired Contracts

to the extent that any such assurance is required and not waived by the counterparties to such

Acquired Contracts. Accordingly, the Acquired Contracts shall be assumed by the Debtors and

assigned to the Buyer as provided for in the Asset Purchase Agreement and this Sale Order, and

remain in full force and effect for the benefit of the Buyer notwithstanding any provision in the

Acquired Contracts or other restrictions prohibiting their assignment or transfer in connection with

the sale of the Acquired Assets. Each of the Acquired Contracts shall be assumed and assigned to

the Buyer free and clear of all Claims, Encumbrances, Interest, Liabilities and Liens except for

those Claims, Encumbrances, Interest, Liabilities and Liens specifically assumed by the Buyer as

set forth in the Asset Purchase Agreement.

      R.    **<u>Validity of the Transfer.</u>** As of the closing of the applicable Sale Transaction (the

"<u>Closing</u>"), the transfer of the applicable Acquired Assets to the Buyer will be a legal, valid, and

10517050-1

Debtor:        Immune Pharmaceuticals Inc., *et al.*
Case No.:      19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

effective transfer of such Acquired Assets, and will vest in such Buyer with all right, title, and interest of the Debtors in the Acquired Assets, free and clear of all Claims, Encumbrances, Interests, Liabilities and Liens, except for those Claims, Encumbrances, Interest, Liabilities and Liens specifically assumed by the Buyer as set forth in the Asset Purchase Agreement.

S.      **Authority.** Upon entry of this Order, the Debtors have the full corporate power and authority to execute, deliver, and perform their obligations under the Asset Purchase Agreement and all other documents contemplated thereby, and the entry unto the Asset Purchase Agreement and the Sale Transaction have been duly and validly authorized by the necessary corporate action of the Debtors. No consents or approvals, other than those expressly provided for herein or in the Asset Purchase Agreement, are required for the Debtors to consummate the Sale Transaction.

T.      **Acquired Assets Are Property of the Estates.** The Selling Debtors are the sole and rightful owners of the Acquired Assets, the Acquired Assets constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

U.      **Valid Contract.** The Asset Purchase Agreement (or other purchase agreement) is a valid and binding contract between the Debtors and the Buyer and shall be enforceable pursuant to its terms. From and after the closing of the Sale Transaction, the applicable Asset Purchase Agreement and the Sale Transaction, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, any chapter 7 or chapter 11 trustee appointed in these Chapter 11 Cases, and any foreign trustee appointed in any

10517050-1

Debtor:            Immune Pharmaceuticals Inc., *et al*.
Case No.:          19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

---

other jurisdiction, and shall not be subject to rejection or avoidance by the foregoing parties or any

other Person.

V.    **No Successor or Other Derivative Liability.**  The Buyer is not, nor will be, a mere

continuation, alter ego, or successor in interest, and the Buyer is not holding itself out as a mere

continuation, alter ego, or successor in interest, of the Debtors or their estates, and there is no

continuity between the Buyer and the Debtors.  The Sale Transaction does not amount to a

consolidation, merger, or *de facto* merger of the Buyer, on the one hand, and the Debtors, on the

other hand.

W.    **Waiver of Bankruptcy Rules 6004(h) and 6006(d).**  Based on the record of the

Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the sale of the Acquired

Assets must be approved and consummated promptly to preserve the value thereof.  The Sale

Transaction must be approved by the Israeli Court prior to the Closing. Time, therefore, is of the

essence in approving the Sale Transaction, effectuating the Asset Purchase Agreement and

consummating the sale of the Acquired Assets.  Therefore, the Debtors and the Buyer intend to

close the sale as soon as reasonably practicable and, in any event, on or prior to November 5, 2019.

The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound

business purpose and justification for the immediate approval and consummation of the sale of the

Acquired Assets as contemplated by the Asset Purchase Agreement.  Accordingly, there is

sufficient cause to waive the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and

6006(d).

10517050-1

Debtor:           Immune Pharmaceuticals Inc., *et al.*
Case No.:         19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All
                  Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement,
                  And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And
                  Unexpired Leases And Other Related Relief**

X.      **Legal and Factual Bases.**  The legal and factual bases set forth in the Sale Motion

and at the Sale Hearing establish just cause for the relief granted herein.

## NOW, THEREFORE, IT IS ORDERED THAT:

1.      **Sale Motion is Granted.**  The Sale Motion and the relief requested therein is

granted and approved as set forth herein. The sale of the Acquired Assets to the Buyer to the terms

and conditions set forth in the Asset Purchase Agreement is approved.

2.      **Objections.**  All objections and responses to the Sale Motion, including, without

limitation, to the Closing or the Sale Transaction have been withdrawn, waived, settled or resolved

or overruled as set forth on the record at the Sale Hearing or as set forth in this Sale Order.

3.      **Notice.**  Notice of the Sale Hearing was fair and equitable under the circumstances

and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules

2002, 6004, and 6006.

4.      **Fair Purchase Price.**  The consideration provided by the Buyer under the Asset

Purchase Agreement is fair and reasonable.

5.      **Approval of the Asset Purchase Agreement.**  The Asset Purchase Agreement and

the Sale Transaction, including, without limitation, all transactions contemplated therein or in

connection therewith, and all of the terms and conditions thereof, are hereby approved in their

entirety.  The failure to include any particular provision of the Asset Purchase Agreement

specifically in this Sale Order shall not diminish or impair the effectiveness of such provision, it

being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its

10517050-1

| | |
|---|---|
| Debtor: | Immune Pharmaceuticals Inc., *et al*. |
| Case No.: | 19-13273 (VFP) |
| Caption of Order: | **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief** |

entirety.  Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

6.     **Approval of the Winning Bid.**  The Debtors' acceptance of the Winning Bid and entry into the Asset Purchase Agreement, including, without limitation, any transaction contemplated thereby or in connection therewith, and all of the terms and conditions thereof, are hereby approved in their entirety. The Buyer's offer for the Acquired Assets, as embodied in the Asset Purchaser Price, is the highest and best offer for the correlative portion of the Acquired Assets and is hereby approved.

7.     **Consummation of the Sale Transactions.**  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors and their respective officers, employees, and agents, are authorized to execute, deliver, and perform their obligations under and comply with the terms of the Asset Purchase Agreement and to consummate the Sale Transaction.  The Debtors, their officers, employees, and agents, are authorized to execute and deliver, and authorized to perform under, consummate, and implement all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and to take all further actions as may be (i) reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer, or reducing to possession, the Acquired Assets, or (ii) necessary or appropriate to the performance of the Debtor's obligations contemplated by the Asset Purchase Agreement, all without further order of the Court.

10517050-1

Debtor:           Immune Pharmaceuticals Inc., *et al.*
Case No.:         19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All**
                  **Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement,**
                  **And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And**
                  **Unexpired Leases And Other Related Relief**

8.      **Possession**.  Except as otherwise directed by the Buyer, all Persons that are currently in possession of some or all of the applicable Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer, as of the Closing Date.

9.      **Transfer of Acquired Assets Free and Clear.**  Subject to the Closing, pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets in accordance with the terms of the Asset Purchase Agreement.  The Acquired Assets shall be transferred to the Buyer, and, upon the Closing, such transfer shall: (i) be valid, legal, binding, and effective; (ii) vest the Buyer with all right, title, and interest of the Debtors in the Acquired Assets; and (iii) be, except with respect to Assumed Liabilities, Permitted Exceptions (as defined in the Asset Purchase Agreement) and as further provided herein, free and clear of all Claims, Encumbrances, Interests, Liabilities and Liens in accordance with section 363(f) of the Bankruptcy Code or otherwise, with all Claims, Encumbrances, Interests, Liabilities and Liens that represent interests in property, inclusive of those of Discover Growth Fund LLC, to attach to the net proceeds of the Sale Transaction, in the same amount and order of their priority, with the same validity (or invalidity), force, and effect that they have against the Acquired Assets immediately prior to the Sale Transaction, and subject to any rights, claims, defenses and objections, if any, the Debtors or any other interested parties may possess with respect thereto, in each case immediately before the Closing.  For the avoidance of doubt, the Acquired Assets are sold to the Buyer free and clear of any Claims, Encumbrances, Interests, Liabilities and Liens of Discover Growth Fund LLC.  Discover Growth Fund LLC may assert any of its Claims,

10517050-1

Page 18 of 29
Debtor:          Immune Pharmaceuticals Inc., *et al*.
Case No.:        19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All
Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement,
And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And
Unexpired Leases And Other Related Relief**

---

Encumbrances, Interests, Liabilities and Liens against the proceeds of the Sale Transaction

wherever located, deposited, escrowed or otherwise held or transferred.

10.      **Payments.** In accordance with the terms of the Memorandum of Understanding

executed by Eitan Erez, the Israeli trustee in the Stay Proceedings, as defined below, the Debtors

and the Committee (the "MOU") and the conditions of the Order approving the MOU issued by

this Court, and notwithstanding anything to the contrary in the Asset Purchase Agreement, on the

Closing Date upon satisfaction of all conditions to Closing set forth in the Asset Purchase

Agreement, the Buyer shall remit a 100% of the proceeds directly to counsel to the Debtors, who

in turn will hold 50% in escrow and remit within seven (7) days receipt from the Buyer, 50% of

the proceeds directly to the Official Receiver (based upon instructions from Mr. Erez) for the "stay

proceedings under section 350 of The Companies Law 5759-1999 of the State of Israel" of Ltd.

(the "Stay Proceedings") pending before the District Court of Jerusalem, Israel ("Israeli Court"),

with such proceeds to be distributed in accordance with the MOU.

11.      Subject to and upon the Closing, except as expressly set forth in the Asset

Purchase Agreement or this Sale Order, all Persons (and their respective successors and assigns)

including, without limitation, all debt security holders, equity security holders, governmental,

tax, and regulatory authorities, lenders, employees, former employees, trade creditors, trustees,

and any other creditors holding Claims, Encumbrances, Interests, Liabilities and Liens against

the Debtor or the Acquired Assets, are hereby forever barred and estopped from asserting or

pursuing such Claims, Encumbrances, Interests, Liabilities and Liens against the Buyer, or its

respective Affiliates, successors, or assigns, their property, or the applicable Acquired Assets,

10517050-1

Page 19 of 29
Debtor:          Immune Pharmaceuticals Inc., *et al*.
Case No.:        19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

including, without limitation, taking any of the following actions with respect to any Claims, Encumbrances, Interests, Liabilities and Liens (other than Assumed Liabilities; as defined in the Asset Purchase Agreement): (i) commencing or continuing in any manner any action or other proceeding against the Buyer or its Affiliates, successors or assigns, assets, or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Buyer or its Affiliates, successors or assigns, assets, or properties; (iii) creating, perfecting, or enforcing any Liens against the Buyer or its Affiliates, successors or assigns, assets, or properties; (iv) asserting any Claims, Encumbrances, Interests, Liabilities and Liens as a setoff, right of subrogation, or recoupment of any kind against any obligation due to the Buyer or its Affiliates, successors or assigns, assets, or properties; or (v) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order or the agreements or actions contemplated or taken in respect thereof.  No such Persons shall assert or pursue against the Buyer or its Affiliates, successors, or assigns any such Claims, Encumbrances, Interests, Liabilities and Liens.

12.     Following the Closing of the Sale Transaction, no holder of any Claims, Encumbrances, Interests, Liabilities and Liens that is not an Assumed Liability and/or Permitted Exceptions as set forth in the Asset Purchase Agreement shall interfere with the Buyer's title to or use and enjoyment of the applicable Acquired Assets based on or related to any such Claims, Encumbrances, Interests, Liabilities and Liens or based on any actions or inactions the Debtors may take in these Chapter 11 Cases.

10517050-1

Debtor:        Immune Pharmaceuticals Inc., *et al*.
Case No.:      19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All
Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement,
And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And
Unexpired Leases And Other Related Relief**

13.     Subject to and upon the Closing, except as expressly set forth in the Asset Purchase

Agreement, the Buyer and its Affiliates (defined in the Asset Purchase Agreement), successors

and assigns shall have no liability for any Claims, Encumbrances, Interests, Liabilities and Liens

in, on, or against the Debtors or their assets, whether known or unknown as of the Closing Date,

now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously,

as a transferee or successor or otherwise, of any kind, nature or character whatsoever, including,

without limitation: (i) any employment or labor agreements or the termination thereof; (ii) any

pension, welfare, compensation, or other employee benefit plans, agreements, practices, or

programs, including, without limitation, any pension plan of or related to the Debtors or the

Debtors' Affiliates or predecessors or any current or future employees of any of the foregoing, or

the termination of any of the foregoing (and without limiting the generality of this clause (ii), any

Liabilities, whether for contributions required by contract, minimum required contributions

pursuant to Section 302 of the Employee Retirement Income Security Act of 1974 ("ERISA"), or

any form of withdrawal or other Liability pursuant to Title IV of ERISA or any other statutory or

contract source, such as a trust agreement; (iii) the Debtors' business operations or the cessation

thereof; (iv) any litigation involving the Debtors; (v) any employee, workers' compensation,

occupational disease or unemployment, or temporary disability related law (including, without

limitation, Claims, Encumbrances, Interests, Liabilities and Liens that might otherwise arise

pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair

Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation

Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining

Debtor:           Immune Pharmaceuticals Inc., *et al.*
Case No.:         19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All
                  Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement,
                  And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And
                  Unexpired Leases And Other Related Relief**

Notification Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age

Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990,

(i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) the Multiemployer Pension

Plan Amendments Act of 1980, (k) state and local discrimination laws, (1) state and local

unemployment compensation laws or any other similar state and local laws, (m) state workers'

compensation laws, and (n) any other state, local, or federal employee benefit laws, regulations or

rules or other state, local, or federal laws, regulations or rules relating to, wages, benefits,

employment, or termination of employment with the Debtor or its predecessors); (vi) any antitrust

laws; (vii) any product liability or similar laws, whether state or federal or otherwise; (viii) any

environmental laws, rules, or regulations, including, without limitation, under the Comprehensive

Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, or similar

state statutes; (ix) any bulk sales or similar laws; (x) any federal, state, foreign, or local tax statutes,

regulations, or ordinances, including, without limitation, the Internal Revenue Code of 1986, as

amended and the Israeli Innovation Authority; and (xi) any common law doctrine of *de facto*

merger or successor or transferee liability, successor-in-interest liability theory, or any other theory

of or related to successor liability, and the Debtors hereby waive and release the Buyer from any

such Claims, Encumbrances, Interests, Liabilities and Liens.

14.     This Sale Order (i) shall be effective as a determination that, as of the Closing, the

conveyances and transfers described herein have been effected and (ii) is and shall be binding upon

and govern the acts of all Persons, including, without limitation, all filing agents, filing officers,

title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

10517050-1

Debtor:          Immune Pharmaceuticals Inc., *et al.*

Case No.:        19-13273 (VFP)

Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

---

administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing Persons is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement and this Sale Order.

15.    Except as expressly set forth in the Asset Purchase Agreement, upon the Closing, except if any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Claims, Encumbrances, Interests, Liabilities and Liens against the Debtors or the applicable Acquired Assets shall not have delivered to the Debtors prior to the Closing of the Sale Transaction, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all interests that the Person has with respect to the Debtors or the Acquired Assets, such entity is hereby directed to deliver all such statements, instruments, and releases and, if they do not, then: (i) the Debtors are hereby authorized and directed to execute and file such statements, instruments, or releases on behalf of the Person with respect to the Acquired Assets; and (ii) Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Claims, Encumbrances, Interests, Liabilities and Liens against the Acquired Assets.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system

10517050-1

Debtor:          Immune Pharmaceuticals Inc., *et al.*
Case No.:        19-13273 (VFP)
Caption of Order:**Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

of each and every federal, state, or local government agency, department, or office is hereby directed to accept any and all documents and instruments necessary or appropriate to give effect to the Sale Transactions.

16.    **No Successor or Other Derivative Liability.**  By virtue of the sale of the Acquired Assets, the Buyer shall not be deemed to: (i) be a legal successor, or otherwise be deemed a successor to the Debtors; (ii) have, *de facto* or otherwise, merged with or into the Debtors; or (iii) be a mere continuation or substantial continuation of the Debtors or the enterprise or operations of the Debtors.

17.    **Assumption and Assignment of Certain Contracts.**  Subject to the procedures set forth in this Sale Order and the Asset Purchase Agreement, any Acquired Contract shall be deemed assumed and assigned to the Buyer, without further order of the Court.

18.    The Debtors are hereby authorized in accordance with section 365 of the Bankruptcy Code and the procedures set forth in the Bid Procedures Order and in the Asset Purchase Agreement to assume and assign the Acquired Contracts to the Buyer free and clear of all Claims, Encumbrances, Interests, Liabilities and Liens, and to execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Acquired Contracts to the Buyer as provided in the Asset Purchase Agreement.  The Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtors under the Acquired Contracts assumed and assigned in accordance with the procedures set forth in this Sale Order and the Asset Purchase Agreement and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from further liability with respect to the Acquired Contracts.  The Buyer acknowledges

23

Debtor:          Immune Pharmaceuticals Inc., *et al.*
Case No.:        19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All
Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement,
And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And
Unexpired Leases And Other Related Relief**

and agrees that, from and after Closing, subject to the terms of this Sale Order, it shall comply with

the terms of each assumed and assigned Acquired Contract from and after the Closing Date.

19.    Payment of the Cure Costs (as set forth in the Asset Purchase Agreement and in the

amount agreed to by the parties or provided in an order of this Court) shall be in full satisfaction

and cure of any and all monetary defaults under the Acquired Contracts.  Each non-Debtor party

to an Acquired Contract is forever barred and estopped from asserting against the Debtors or the

Buyer, their successors or assigns, or the property of any of them, any default existing as of the

date of the Sale Hearing if such default was not timely raised or asserted prior to or at the Sale

Hearing.  Except as expressly set forth herein, to the extent a counterparty to an Acquired Contract

failed to timely object to the Cure Costs prior to the Sale Hearing, such Cure Costs have been and

shall be deemed to be fully determined and any such counterparty shall be prohibited from

challenging, objecting to, or denying the validity and finality of the Cure Costs and/or the

assumption and assignment of the Acquired Contract at any time.

20.    Upon the Debtors' assignment of the Acquired Contracts to the Buyer, no default

shall exist under any Acquired Contracts, and no counterparty to any Acquired Contracts shall be

permitted to declare a default by any Debtor or the Buyer, or otherwise take action against the

Buyer, as a result of any Debtors' financial condition, bankruptcy, or failure to perform any of its

obligations under the relevant Acquired Contracts.  Any provision in an Acquired Contract that

prohibits or conditions the assignment or sublease of such Acquired Contract or allows the

counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or

extension, or modify any term or condition upon such assignment or sublease, constitutes an

10517050-1

Debtor:          Immune Pharmaceuticals Inc., *et al.*
Case No.:        19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

unenforceable anti-assignment provision that is void and of no force and effect, but only in connection with the assumptions and assignments authorized by this Sale Order.  The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Acquired Contract shall not be a waiver of such terms or conditions, or of the Debtors' or the Buyer's rights to enforce every term and condition of the Acquired Contract.

21.    ***Ipso Facto* Clauses Ineffective.**  The Acquired Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, including, without limitation, all obligations of the Buyer as the assignee of the Acquired Contracts, notwithstanding any provision in any such Acquired Contracts (including, without limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.  There shall be no rent accelerations, escalations, assignment fees, increases, or any other fees charged to the Buyer or the Debtor as a result of the assumption or assignment of the Acquired Contracts.

22.    **Statutory Mootness**.  The transactions contemplated by this Sale Order are undertaken by the Buyer in good faith, as that term is used in sections 363(m) of the Bankruptcy Code. The Buyer is a "good faith purchaser" within the meaning of sections 363(m) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded and, accordingly, the reversal, modification, amendment, or vacatur on appeal of the authorization provided herein (including without limitation the terms and provisions of the Asset Purchase Agreement and the Sale Transaction) shall not affect the validity and enforceability of the Asset Purchase Agreement or the Sale Transaction, the transfer of the Acquired Assets to the Buyer free and clear of Claims,

25

Page 26 of 29
Debtor:          Immune Pharmaceuticals Inc., *et al*.
Case No.:        19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All
Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement,
And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And
Unexpired Leases And Other Related Relief**

---

Encumbrances, Interests, Liabilities and Liens, or the Claims, Encumbrances, Interests, Liabilities

and Liens or priority authorized or created under the Asset Purchase Agreement, absent entry of a

Court order imposing a stay before the Closing pending such appeal.

23.    **No Avoidance of Asset Purchase Agreement.**  Neither the Debtors nor the Buyer

have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be

avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.

24.    **Waiver of Bankruptcy Rules 6004(h) and 6006(d).**  This Sale Order shall be

effective immediately upon entry pursuant to Rules 7062 and 9014, and notwithstanding the

provisions of Rule 62(a) of the Federal Rules of Civil Procedure, Bankruptcy Rules 6004(h) and

6006(d), or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after

the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen

(14) day stay provided in Rule 62(a), and/or Bankruptcy Rules 6004(h) and 6006(d) is hereby

expressly waived and shall not apply.

25.    **Binding Effect of this Sale Order.**  The terms and provisions of the Asset Purchase

Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit

of, the Debtors and the Israeli Trustee in the Stay Proceedings, including in accordance with the

MOU, their estates, and their creditors (whether known or unknown), the Buyer, and its Affiliates,

successors, and assigns, and any affected third parties, including, without limitation, all Persons

asserting Claims, Encumbrances, Interests, Liabilities and Liens (collectively, the "Bound

Parties"), notwithstanding any subsequent appointment of any trustee, examiner, or receiver under

any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall

10517050-1

Debtor:              Immune Pharmaceuticals Inc., *et al*.
Case No.:            19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary under any chapter of the Bankruptcy Code or any other law with respect to any of the Bound Parties, and all such terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary, and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner, receiver, party, entity, or other fiduciary.  The provisions of this Sale Order and the terms and provisions of the Asset Purchase Agreement, shall survive the entry of any order that may be entered confirming or consummating any chapter 11 plan of the Debtors or converting these Chapter 11 Cases to a case or cases under chapter 7, and the terms and provisions of the Asset Purchase Agreement, as well as the rights and interests granted pursuant to this Sale Order and the Asset Purchase Agreement shall continue in these or any superseding cases and shall be binding upon the Bound Parties and their respective successors and permitted assigns including, without limitation, any trustee, party, entity, or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code or any similar foreign law.  Any trustee appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code, shall be authorized and directed to (i) operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of the Asset Purchase Agreement and this Sale Order and (ii) perform under the Asset Purchase Agreement and this Sale Order without the need for further order of the Court.

26.    **Buyer a Party in Interest**.  The Buyer is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Sale Order,

10517050-1

Debtor:              Immune Pharmaceuticals Inc., *et al.*
Case No.:            19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All
Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement,
And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And
Unexpired Leases And Other Related Relief**

the Sale Transaction, and any issues related to or otherwise connected to the Sale Transaction and

the Asset Purchase Agreement.

27.    **Conflicts; Precedence.**  In the event that there is a direct conflict between the terms

of this Sale Order and the terms of the Asset Purchase Agreement, the terms of this Sale Order

shall control.  Nothing contained in any chapter 11 plan hereinafter confirmed in these Chapter 11

Cases or any order confirming such chapter 11 plan, or any other order of the Court, shall conflict

with or derogate from the provisions of the applicable Asset Purchase Agreement or the terms of

this Sale Order.

28.    **Modification of the Asset Purchase Agreements.**  The Asset Purchase Agreement

and any related agreements, documents, or other instruments, may be modified, amended, or

supplemented by the parties thereto, in a writing signed by each party, and in accordance with the

terms thereof, with the written consent of the Committee (which consent shall not be unreasonably

withheld, delayed or conditioned), without further order of the Court provided that any such

modification, amendment, or supplement does not materially change the terms of the Asset

Purchase Agreement or any related agreements, documents, or other instruments.

29.    **Retention of Jurisdiction.**  Except to the extent provided in the MOU with respect

to the distribution of the sale proceeds subsequent to receipt by the Debtors' counsel herein, this

Court shall retain exclusive jurisdiction to, among other things, (i) interpret, enforce, and

implement the terms and provisions of this Sale Order and the Asset Purchase Agreement

(including, without limitation, all amendments thereto, any waivers and consents thereunder, and

of each of the agreements executed in connection therewith) and (ii) adjudicate disputes related to

10517050-1

Page 29 of 29
Debtor:          Immune Pharmaceuticals Inc., *et al.*
Case No.:        19-13273 (VFP)
Caption of Order: **Order (I) Authorizing The Sale Of The Debtors' Anti-Eotaxin Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (II) Approving The Asset Purchase Agreement, And (III) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases And Other Related Relief**

this Sale Order and the Asset Purchase Agreement (including, without limitation, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith).

30.    **No Revocation of Permits and Licenses.**  To the extent provided by Section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred or conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the transactions contemplated by the Asset Purchase Agreement.

31.    **No Bulk Sales; No Brokers**. No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction. Other than the professionals retained by the Debtors pursuant to orders of this Court, no brokers were involved in consummating the Sale Transaction, and no brokers' commissions shall be due to any person or entity in connection with the Sale Transaction. The Buyer is not obligated to pay any fee or commission or like payment to any broker, finder, or financial advisor as a result of the consummation of the Sale Transaction. Notwithstanding the foregoing, the Debtors may be obligated to pay their financial advisor or investment banker for services rendered in connection with the sale in accordance with other orders of this Court.

10517050-1

# EXHIBIT A

ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made and entered into this 28th day of June, 2019, by and between Immune Pharmaceuticals Inc. a Delaware corporation ("Immune Inc.") and Immune Pharmaceuticals, Ltd., a corporation organized under the laws of Israel ("Immune Ltd." and, together with Immune Inc., the "Sellers" and each of the Sellers individually, a "Seller") and Alexion Pharma International Operations Unlimited Company, an Irish unlimited company ("Buyer") (the Sellers and Buyer shall each be referred to herein individually as a "Party" and collectively as the "Parties").

WITNESSETH

WHEREAS, the Sellers each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (as amended, the "Bankruptcy Code"), case nos.19-13273-VFP and 19-13896 (such cases referred to herein together as the "U.S. Bankruptcy Case") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), on February 17, 2019 and February 22, 2019, respectively;

WHEREAS, Immune Ltd. filed a motion for a stay of the proceedings under Section 350(b) of the Israeli Companies Law – 1999 for relief under applicable Israeli bankruptcy law, case no. 67317-03-19 (such case referred to herein as the "Israeli Bankruptcy Case" and, together with the U.S. Bankruptcy Case, the "Bankruptcy Cases") in the District Court of Jerusalem (the "Israeli Bankruptcy Court"), on or about March 19, 2019;

WHEREAS, the Sellers and their Affiliates are in the business of developing novel therapeutic agents for the treatment of immunologic and inflammatory diseases, including an anti-Eotaxin-1 program (which includes, without limitation, bertilimumab (and any derivatives, analogues, modifications, and back-up compounds thereof), a first-in-class, human monoclonal antibody that targets eotaxin-1, a chemokine that plays a role in immune responses and attracts eosinophils to the site of inflammation (the "Product Program")); and

WHEREAS, each Seller wishes to sell, transfer and assign, and Buyer wishes to purchase and acquire, the Acquired Assets and assume the Assumed Liabilities, as applicable (the "Sale") on the terms and subject to the conditions set forth in this Agreement and to be set forth in an order of the Bankruptcy Court authorizing and approving the Sale pursuant to sections 363 and 365 of the Bankruptcy Code and in an order of the Israeli Bankruptcy Court authorizing and approving the Sale pursuant to applicable Israeli bankruptcy law.

NOW THEREFORE, the Parties hereto agree as follows:

ARTICLE 1
Definitions and Interpretation

1.1    Definitions.

"Acquired Assets" means all of the properties, assets and rights owned by a Seller (or such Seller's Affiliates) of any kind and description, whether tangible or intangible, real or personally

owned, held or used in the conduct of, or which in any way, directly or indirectly, comprise or relate to, or are necessary or useful for the further research, development and commercialization of, the Product Program, including, without limitation, (a) the Acquired Contracts, (b) the Intellectual Property, (c) the Equipment, (d) the Data, Materials and Records and (e) Causes of Action, but excluding the Excluded Assets.

"Acquired Contracts" means all rights of either Seller (or any of their Affiliates) under any executory Contracts related to the Product Program, including, without limitation, those agreements set forth in Schedule 5.4, as such Schedule may be amended or supplemented from time to time at any point prior to the Closing by the Parties, in all events subject to the extent of such Sellers' or Affiliate's rights to assume and assign such contracts pursuant to section 365 of the Bankruptcy Code or, if applicable, Israeli bankruptcy law.

"Affiliate" means any Person who, directly or indirectly, controls, is controlled by or is under common control with the relevant Party.

"Agreement" is defined in the introductory paragraph of this Agreement.

"Ancillary Agreements" means the Assignment and Assumption Agreements, the Bills of Sale and the IP Assignments.

"Assignment and Assumption Agreement" means an Assignment and Assumption Agreement between Buyer and a Seller (or Affiliate of a Seller, as applicable), dated as of the Closing Date, in substantially the form of Exhibit A.

"Assumed Liabilities" means all of the following:

(a)      all obligations and Liabilities under the Acquired Contracts, but only to the extent that they arise out of or relate to the time period from and after the Closing Date; and

(b)      all Cure Costs.

"Avoidance Action" means an action brought under sections 546 to 550 of the Bankruptcy Code, but excluding any such action that relates to an Acquired Asset or Assumed Liability.

"Bankruptcy Cases" is defined in the second WHEREAS clause of this Agreement.

"Bankruptcy Code" is defined in the first WHEREAS clause of this Agreement.

"Bankruptcy Court" is defined in the first WHEREAS clause of this Agreement.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Bidding Procedures" is defined in Section 7.3(c).

"Bill of Sale" means a Bill of Sale of a Seller (or Affiliate of a Seller, as applicable), dated as of the Closing Date, in substantially the form of Exhibit B.

"Breakup Fee" is defined in Section 7.3(c).

"Business Day" means a day other than a Saturday, Sunday or legal holiday for commercial banking institutions in The Commonwealth of Massachusetts.

"Buyer" is defined in the introductory paragraph of this Agreement.

"Buyer Ancillary Agreements" is defined in Section 6.2.

"Causes of Action" means, without limitation, any and all actions, causes of action, choses in action, defenses, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims or proceedings to recover money or property and demands of any nature whatsoever, whether known or unknown, in law, equity or otherwise owned by a Seller (or an Affiliate of a Seller) that relate to the Product Program or are otherwise required to enforce to enforce Buyer's rights to ownership of, to enjoy the benefit of, and/or to collect the Acquired Assets, including any intellectual property rights in the Acquired Assets.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing" and "Closing Date" are defined in Section 11.1(a).

"Closing Payment" is defined in Section 4.2.

"Competing Transaction" means (a) any transaction by either Seller in which all or a material portion of the Acquired Assets are sold to another purchaser or (b) a plan of reorganization, or other corporate transaction which substantially prohibits or impairs the Sale contemplated by this Agreement.

"Contract" means any written contract, agreement, lease, license, commitment or other legally binding written undertaking.

"Cure Costs" is defined in Section 3.3.

"Data, Materials and Records" means, in each case to the extent used in connection with or otherwise related to, the Product Program: (a) clinical study data, (b) clinical supply and other materials (including any existing drug product and drug substance (in any form)), (c) regulatory submissions and correspondence, (d) studies, reports and similar documents and records, (e) technology transfer materials, (f) safety data, and (g) all of each Seller's (or its Affiliates') other books and records that are related to the Product Program and are owned by a Seller or its Affiliates.

"Diligence Satisfaction Notice" is defined in Section 8.3.

"Due Diligence Deadline Date" means the later of (a) the date that is thirty (30) days after the date of this Agreement, (b) the date that is ten (10) days prior to the date set by the Bankruptcy

B4956868.14

Court for the auction of the Acquired Assets (including such later auction date as may be extended by the Bankruptcy Court), and (c) such later date as the Parties may mutually agree in writing.

"Equipment" means all of the machinery and equipment, manufactured and purchased parts, goods in process and finished goods, furniture, furnishings, fixtures, construction in progress, spare parts and other tangible personal property owned by a Seller or one of its Affiliates together with all rights of a Seller or one of its Affiliates against the manufacturers and/or suppliers of such machinery and equipment, and all computer hardware and software, including all computer systems, servers, memory cards, handheld devices, and all other computer-related equipment used with respect to, or otherwise relating to, the Product Program.

"Excluded Assets" means all assets of any Seller other than the Acquired Assets, including, without limitation the following assets of each Seller: (i) such Seller's cash and debtor-in-possession operating accounts; (ii) Avoidance Actions; (iii) any asset that is specifically included on Schedule 1.1, as such Schedule may be amended or supplemented from time to time prior to the Closing by Buyer; (iv) any right of such Seller under this Agreement or any of the Ancillary Agreements; (v) any Excluded Tax Receivables; and (vi) the minute books and corporate records of each Seller.

"Excluded Liabilities" is defined in Section 3.2.

"Excluded Tax Receivables" means any receivable from a Governmental Entity in respect of a refund of Taxes with respect to the period of time prior to the Closing.

"Expense Reimbursement" is defined in Section 7.3(c).

"Final Order" means an order entered by the Bankruptcy Court as to which no appeal has been taken and the time to appeal has run, or an appeal has been taken and the underlying order was upheld and can no longer be appealed.

"Final Orders" means the Final Order and the Israeli Final Order.

"Governmental Entity" means any court, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign.

"iCo License" means that certain Product Sublicense Agreement, dated as of December 7, 2010, by and between Immune Ltd. and iCo Therapeutics, Inc., as amended.

"Immune Inc." is defined in the introductory paragraph of this Agreement.

"Immune Ltd." is defined in the introductory paragraph of this Agreement.

"Intellectual Property" means the intellectual property owned or licensed by a Seller (or one its respective Affiliates), and used in connection with or relating to the Product Program, including, without limitation, the following to the extent used in connection with or relating to the Product Program: (a) all rights and title to all patents and patent applications, and including all

4

reissues, divisions, continuations, renewals, extensions, and continuations-in-part, including, without limitation, those identified in Schedule 5.6(a); (b) all logos, trade names, trademarks, trademark registrations (including any applications), including, without limitation, those identified in Schedule 5.6(a), and all service marks; (c) Software; (d) all copyrights, and copyright registrations (including applications); (e) trade secrets, know how, designs, drawings, design plans and patterns; (f) marketing and sales files, history, literature and slide collections; (g) research library and intelligence; (h) the intellectual property used directly and exclusively in operating the Equipment; and (i) any other intellectual or industrial property and proprietary rights.

"IP Assignment" means an Intellectual Property Assignment of a Seller (or Affiliate of a Seller, as applicable), dated as of the Closing Date, in substantially the form of Exhibit C.

"Israeli Bankruptcy Case" is defined in the second WHEREAS clause of this Agreement.

"Israeli Bankruptcy Court" is defined in the second WHEREAS clause of this Agreement.

"Israeli Final Order" means an order entered by the Israeli Bankruptcy Court as to which no appeal has been taken and the time to appeal has run, or an appeal has been taken and the underlying order was upheld and can no longer be appealed.

"Israeli Sale Order" means an order of the Israeli Bankruptcy Court, in form and substance reasonably acceptable to Buyer, to be entered by the Israeli Bankruptcy Court pursuant to the Israeli Companies Law and/or the Israeli Companies Ordinance, as applicable, among other things: (a) approving this Agreement and the transactions contemplated hereby; (b) approving the sale of the Acquired Assets owned by Immune Ltd. to Buyer free and clear of any and all Liens, Claims and interests (other than Assumed Liabilities, Permitted Exceptions and Licensee IP Rights) pursuant to applicable Israeli bankruptcy law; and (c) approving the assumption and assignment to Buyer from Immune Ltd. of the Acquired Contracts to which Immune Ltd. is a party solely on the terms of such Acquired Contracts (to the extent such approval is required under applicable Israeli bankruptcy law and subject to any applicable limitations under applicable Israeli bankruptcy law).

"Law" means any federal, state, provincial, local or foreign law, statute, rule, regulation or ordinance of any Governmental Entity.

"Liability" or "Liabilities" means any liability (whether known or unknown, whether asserted or not asserted, whether absolute or contingent, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"Licensee IP Right" means the rights that a licensee of intellectual property has under section 365(n)(1) of the Bankruptcy Code or any analogous section of Israeli bankruptcy law with respect to electing certain treatment in connection with a rejected executory contract under which the debtor is a licensor of a right to intellectual property.

"Lien" means any lien, charge, mortgage, option, security interest, restriction or other encumbrance affecting title.

"Material Breach" means any breach which has a material adverse effect on the Acquired Assets or prevents a Seller from performing its obligations hereunder or prevents Buyer from receiving title to the Acquired Assets.

"Order" means any writ, judgment, decree, injunction or similar order, writ, ruling, directive or other requirement of any Governmental Entity (in each such case whether preliminary or final).

"Party" and "Parties" are defined in the introductory paragraph of this Agreement.

"Permitted Exceptions" means (a) title of a lessor under a capital or operating lease, (b) rights of any owner of Intellectual Property and any Liens affecting such rights to the extent not affecting the use by a Seller or its Affiliates of any licensed Intellectual Property, and (c) Liens which, pursuant to the Sale Order or applicable Law, will not attach to the Acquired Assets following the consummation of the Sale.

"Person" means any individual, corporation, partnership, joint venture, trust, limited liability company, business association or other entity.

"Product Program" is defined in the third WHEREAS clause of this Agreement.

"Purchase Price" is defined in Section 4.1.

"Purchased Business" means the Acquired Assets and the Assumed Liabilities.

"Purchase Price Deposit" is defined in Section 4.2.

"Sale" is defined in the fourth WHEREAS clause of this Agreement.

"Sale Motion" is defined in Section 7.3.

"Sale Order" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer, to be entered by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code, among other things: (a) approving this Agreement and the transactions contemplated hereby; (b) approving the sale of the Acquired Assets by each Seller to Buyer free and clear of any and all Liens, Claims and interests (other than Assumed Liabilities, Permitted Exceptions and Licensee IP Rights) pursuant to section 363(b) and (f) of the Bankruptcy Code; (c) approving the assumption and assignment to Buyer from each Seller of the Acquired Contracts solely on the terms of such Acquired Contracts (to the extent such approval is required under the Bankruptcy Code and subject in all events to the limitations on assuming and/or assigning executory contracts and unexpired leases under sections 365(c) and (f) of the Bankruptcy Code); (d) including a good faith finding pursuant to section 363(m) of the Bankruptcy Code; (e) approving the appointment by each Seller of Buyer as its attorney-in-fact to enforce and assigning to Buyer any rights to terminate, any Licensee IP Rights in the event that such holder of Licensee IP Rights fails to adhere to any of its obligations to Buyer arising under any such license of

intellectual property; and (f) subject to Section 13.4 hereof, retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement.

"Sale Orders" means the Sale Order and the Israeli Sale Order.

"Scheduled Monetary Defaults" is defined in Section 5.4.

"Seller" and "Sellers" are defined in the introductory paragraph of this Agreement.

"Seller Ancillary Agreements" is defined in Section 5.2.

"Software" means all software (including any accounting and finance software), firmware, source code, object code, databases, algorithms, notes, specifications, drawings, diagrams, messages, test plans, business rules, use cases, test results, customer feedback, issue or error logs and responses, labels and labeling specifications, regulatory submissions, communications with regulatory agencies, configuration tools, charts, artwork, process and work instructions, development environments, build scripts, automated test scripts, common law and statutory copyrights and copyright registrations, applications for registration, repositories of information, and the documentation thereof, and all drafts of any of the foregoing regardless of the medium in which it is fixed and all copies of any of the foregoing.

"Tax" and "Taxes" means all federal, state, provincial, local and foreign taxes, including any income, alternative or minimum, business and occupation, gross receipts, disability, unemployment compensation, social security, sales, use, ad valorem, value-added, transfer, franchise, profits, estimated, withholding, wage, payroll, employment, excise, stamp, real and personal property, environmental or other tax of any type whatsoever, together with all interest, penalties and additions with respect thereto, whether disputed or not.

"Third Party" means any Person other than a Seller, Buyer or any of their respective Affiliates.

"Transaction Taxes" is defined in Section 12.1.

"U.S. Bankruptcy Case" is defined in the first WHEREAS clause of this Agreement.

1.2    Interpretation.  Unless the context clearly otherwise requires, as used herein, the term "Agreement" means this Agreement and the Schedules and Exhibits hereto. When a reference is made in this Agreement to a Section, Schedule or Exhibit, such reference shall be to a Section, Schedule or Exhibit of this Agreement unless otherwise indicated.  The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term, and words denoting any gender shall include all genders.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  Whenever the words "included", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the phrase "without limitation."  The words "hereof", "herein" and "herewith" and words of similar import shall, unless

B4956868.14

expressly otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit, appendix and schedule references are to the articles, sections, paragraphs, exhibits, appendices and schedules of this Agreement unless expressly otherwise specified.  Unless otherwise indicated, all references to dollars refer to United States dollars.  A reference to any legislation or to any provision of any legislation shall include any amendment thereto, and any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.  The Parties acknowledge that the Parties have participated equally in the drafting and preparation of this Agreement and the Ancillary Agreements and agree that any rule of construction to the effect that ambiguities are to be construed against the drafting party shall not be applied to the construction or interpretation of this Agreement or the Ancillary Agreements.  When calculating the period of time before which, within which or following which, any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day, whether the period is calculated by days before or after a defined date.

ARTICLE 2
Purchase and Sale of Acquired Assets

2.1    Acquired Assets Subject to Agreement.  Effective as of the Closing and upon the terms and subject to the conditions of this Agreement, each Seller shall (and, where applicable, shall cause their respective Affiliates to), severally and not jointly, sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase, assume and acquire from such Seller (and, where applicable, its Affiliates), all of such Person's right, title and interest in, to and under the Acquired Assets.

2.2    Excluded Assets.  Buyer shall acquire from each Seller (and, where applicable, its Affiliates) only the Acquired Assets.  Notwithstanding anything contained in Section 2.1 hereof to the contrary, the Excluded Assets are expressly excluded from the transactions contemplated by this Agreement and do not comprise the Acquired Assets being transferred.

2.3    Assignment of Contracts; Deemed Consents.  Notwithstanding anything herein to the contrary, each Seller is only assigning, and Buyer is only acquiring, such rights and obligations under the Acquired Contracts as is permissible under section 365 of the Bankruptcy Code or the applicable Israeli bankruptcy law.   For all purposes of this Agreement (including all representations and warranties of the Sellers contained herein), each Seller shall be deemed to have obtained all required consents in respect of the assignment of any Acquired Contract if, and to the extent that, pursuant to the Sale Orders, other Bankruptcy Court Order or applicable non-bankruptcy law, each Seller is authorized to assume and assign Acquired Contracts to Buyer pursuant to section 365 of the Bankruptcy Code and Israeli bankruptcy.

ARTICLE 3
Assumption of Liabilities

3.1    Assumption of Liabilities.  On the Closing Date, Buyer shall assume, pay, perform and discharge when due the Assumed Liabilities.  Nothing in this Section 3.1 shall be deemed to

8

B4956868.14

limit any claims or defenses Buyer may have against any party other than the Sellers or their Affiliates. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any Third Party against Buyer or the Sellers or their Affiliates as compared to the rights and remedies which such Third Party would have had against a Seller or its Affiliates absent the Bankruptcy Cases had Buyer not assumed such Assumed Liabilities.

3.2    Excluded Liabilities. Buyer shall not assume or in any way be responsible for any Liability of, or incurred by or on behalf of, either Seller other than the Assumed Liabilities (all such other Liabilities being referred to herein collectively as the "Excluded Liabilities"), regardless of whether such other Liability is disclosed herein or on any Schedule hereto.

3.3    Acquired Contracts. At Closing, pursuant to section 365 of the Bankruptcy Code and applicable Israeli bankruptcy law, (except in each case with respect to any Acquired Contract that is not subject to such section), each Seller (and, where applicable, its respective Affiliates) shall assign to Buyer and Buyer shall assume from such Person, the Acquired Contracts. To the extent that any Acquired Contract is subject to an obligation to cure defaults (pursuant to section 365 of the Bankruptcy Code or applicable Israeli bankruptcy law and described in the Sale Orders or any Order of the Bankruptcy Court relating to such cure liability), Buyer shall be responsible for any such cure obligations (in the aggregate, the "Cure Costs"). At or immediately after the Closing Date, Buyer shall pay the Cure Costs unless the Bankruptcy Court or the Israeli Bankruptcy Court, as applicable, has ordered, or Buyer and the counter-party to an Acquired Contract have agreed in writing to, different treatment.

ARTICLE 4
Consideration

4.1    Consideration. The aggregate Purchase Price to be paid by Buyer to the Sellers for the Acquired Assets shall be $6,000,000 (the "Purchase Price"). As further consideration for the Acquired Assets, Buyer shall assume the Assumed Liabilities, in accordance with Section 3.1. Buyer shall allocate the Purchase Price and, to the extent applicable, Assumed Liabilities (and other costs) among the Acquired Assets and provide such allocation to the Sellers after the Closing. The Sellers shall not take any position that is inconsistent with such allocation.

4.2    Payment of Purchase Price. Upon entry of an Order in each of the Bankruptcy Cases approving procedures for sale of the Acquired Assets pursuant to sections 363 and 365 of the Bankruptcy Code and applicable Israeli bankruptcy law, and scheduling a hearing to approve the transactions contemplated by this Agreement, Buyer shall deposit into a trust account of the Seller's legal counsel (on behalf of both Immune Inc. and Immune Ltd.) a deposit of $600,000 (the "Purchase Price Deposit"). Upon full satisfaction or due waiver of each of the closing conditions set forth in ARTICLE 9 and ARTICLE 10 hereof, Buyer shall pay to Immune Inc. (on behalf of both Immune Inc. and Immune Ltd.) at the Closing the Purchase Price *less* the Purchase Price Deposit, in cash or immediately available funds by wire transfer to one or more bank accounts designated in writing by Immune Inc. (the "Closing Payment"). If this Agreement is terminated for any reason other than as a result of a Material Breach by Buyer (any such reason including, without limitation, Buyer's termination of this Agreement pursuant to Sections 11.2(f), (g), (h) or (i)), or if either Seller consummates a Competing Transaction, the Sellers shall promptly return the Purchase Price Deposit to Buyer.

9

ARTICLE 5

Representations and Warranties of the Sellers

Each Seller represents and warrants, severally and not jointly, to Buyer as follows:

5.1     <u>Organization, Standing and Power</u>.  The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, with respect to Immune Inc., and Israel, with respect to Immune Ltd.  The Seller has the corporate power to own, operate and lease its respective portion of the Acquired Assets.

5.2     <u>Authority and Status</u>.  Subject to the entry of the Sale Orders:

(a)     The Seller has the corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is or will be a party (the "<u>Seller Ancillary Agreements</u>") and to perform its obligations hereunder and thereunder and to consummate the Sale;

(b)     The execution, delivery and performance by the Seller of this Agreement and the Seller Ancillary Agreements to which it shall be a party have been duly authorized and approved by all necessary corporate actions of the Seller; and

(c)     This Agreement and the Seller Ancillary Agreements to which it shall be a party constitute or, when executed and delivered, will constitute the valid and legally binding obligations of the Seller, enforceable against it in accordance with their respective terms.

5.3     <u>Status of Assets and Leases of the Sellers</u>.  Except as disclosed in Schedule 5.3, the Sellers, collectively, have good and valid title to, or a valid and transferable leasehold interest in, all of the Acquired Assets.  At the Closing, Buyer will acquire, subject to the entry of the Sale Order, all of the Acquired Assets of the Seller, in each case free and clear of all Liens, Claims and interests other than Assumed Liabilities, Permitted Exceptions, Licensee IP Rights and the obligations of any Acquired Contract.  Except as disclosed in Schedule 5.3, the Acquired Assets are sufficient for, and constitute all of the rights, property and assets necessary for, the continued research, development and commercialization of the Product Program after the Closing in substantially the same manner as conducted prior to the Closing.

5.4     <u>Acquired Contracts</u>.  Schedule 5.4 sets forth a true and complete list of the Acquired Contracts of the Seller (true and complete copies, together with all amendments and supplements thereto, having been made available to Buyer).  Except as set forth in Schedule 5.3 or Schedule 5.4, the Seller is not in monetary default on any of the Acquired Contracts as of the date of this Agreement ("<u>Scheduled Monetary Defaults</u>").  Except as set forth in Schedule 5.3 and except for Scheduled Monetary Defaults and any defaults of a type listed in section 365(b)(2) of the Bankruptcy Code, Seller will not be in material default on any of its Acquired Contracts as of the date of Closing.

5.5     <u>Claims Litigation and Disputes</u>.  Except as set forth in Schedule 5.5, other than the Bankruptcy Proceeding, there is no Claim or litigation or investigative proceeding pending or, to the knowledge of the Seller, threatened against Seller which would affect Seller's ability to perform its obligations hereunder and under the Seller Ancillary Agreements.

10

5.6    Intellectual Property.

(a)    Schedule 5.6(a) contains a correct, current and complete list of all patents, patent applications and trademarks owned by or licensed to the Seller, specifying as to each, as applicable: the title, mark, or design; the jurisdiction by or in which it has been issued, registered or filed; the patent, registration or application serial number; the issue, registration or filing date; and the current status;

(b)    Except as set forth in Schedule 5.6(b), (i) the Seller is the owner of, or has valid rights to use, the Intellectual Property including, without limitation, the intellectual property set forth on Schedule 5.6(a), and, (ii) to the knowledge of the Seller, all of such Intellectual Property exists, is valid and enforceable, has been maintained in good standing and, to the extent subject to any registration or application with any Governmental Entity or authorized private registrar, are subsisting and in full force and effect;

(c)    Schedule 5.6(c) contains a correct, current and complete list of all agreements: (i) under which the Seller is a licensor or otherwise grants to any Person any right or interest relating to any Intellectual Property; (ii) under which the Seller is a licensee or otherwise granted any right or interest relating to the Intellectual Property of any Person; and (iii) which otherwise relate to the Seller's ownership or use of any Intellectual Property with respect to the Product Program;

(d)    Except as set forth in Schedule 5.6(d), (i) the Seller's present use of the Intellectual Property does not infringe on or violate any rights of any others in any manner and the Product Program, if it were presently sold commercially, would not infringe on or violate any rights of any others in any manner, (ii) the Seller has the right and authority to use the Intellectual Property and (iii) there are no claims, actions, demands, lawsuits, or other proceedings (including any opposition, cancellation, revocation, review, or other proceeding), whether settled, pending or threatened (including in the form of offers to obtain a license): (A) alleging any infringement, misappropriation, or other violation of the Intellectual Property of any Person by the Seller; (B) challenging the validity, enforceability, registrability, patentability, or ownership of any Intellectual Property; or (C) by the Seller or any other Person alleging any infringement, misappropriation, or other violation by any Person of any Intellectual Property;

(e)    To the Seller's knowledge, no Person has infringed, misappropriated, or otherwise violated any Intellectual Property, including, without limitation, with respect to any know-how, trade secrets or any other confidential information of the Seller, and the Seller has taken all reasonable and necessary steps to maintain and enforce the Intellectual Property and to preserve the confidentiality of all trade secrets and other confidential information, including by requiring all Persons having access thereto to execute binding, written non-disclosure agreements; and

(f)    There are no parties, except as set forth on Schedule 5.6, that might assert a Licensee IP Right to any of the Seller's Intellectual Property.

5.7    Tax Matters.  The transfer of the operations of the Purchased Business and the sale of the Acquired Assets pursuant to this Agreement are not subject to sales Tax (or any other

11

B4956868.14

Transaction Tax) in any jurisdiction.  Prior to the Closing, the Sellers shall inform Buyer if any payment to be made by Buyer pursuant to this Agreement is subject to any withholding Taxes under U.S. federal income Tax law or otherwise, and provide such certification as is required by applicable Law to establish an exemption from, or reduction of, any withholding Taxes that otherwise would be applicable.

5.8    Exclusivity of Representations.  EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE 5 (AS MODIFIED BY THE SCHEDULES HERETO), NEITHER SELLER MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR OPERATIONS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED, AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE PROVIDED IN A REPRESENTATION OR WARRANTY CONTAINED IN THIS ARTICLE 5, AND SUBJECT TO SATISFACTION OF THE CLOSING CONDITIONS, BUYER IS PURCHASING THE ACQUIRED ASSETS ON AN "AS IS, WHERE IS" BASIS. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, IN THE EVENT OF A BREACH OF ANY REPRESENTATION OR WARRANTY BY ANY SELLER, BUYER' S SOLE REMEDY, IF ANY, WITH RESPECT TO SUCH BREACH IS TERMINATION OF THIS AGREEMENT PRIOR TO CLOSING IN ACCORDANCE WITH SECTIONS 10.1 AND 11.2 OF THIS AGREEMENT OR THE RIGHTS PROVIDED IN SECTION 13.11.

ARTICLE 6
Representations and Warranties of Buyer

Buyer represents and warrants to the Sellers as follows:

6.1    Organization, Standing and Power.  Buyer is a corporation, duly organized, validly existing and in good standing under the laws of its jurisdiction.  Buyer has the requisite power and authority to conduct its business as currently conducted and as contemplated by this Agreement, and to own, lease, operate or hold the Acquired Assets and to conduct the operations of the Purchased Business.

6.2    Authority.  Buyer has all corporate power and authority necessary to execute this Agreement and the Ancillary Agreements to which it is or will be a party (the "Buyer Ancillary Agreements") and to consummate the transactions contemplated thereby and by this Agreement. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action of Buyer and the execution and performance of the Buyer Ancillary Agreements by Buyer will be authorized by all necessary corporate action prior to the Closing.  This Agreement constitutes, and upon execution each of the Buyer Ancillary Agreements will constitute, valid and binding obligations of Buyer enforceable against it in accordance with their respective terms, such enforcement subject to bankruptcy, insolvency, reorganization, moratorium, or similar laws of general application affecting creditors' rights and the application of general principles of equity.

B4956868.14

6.3     Claims, Litigation and Disputes.  There is no claim or litigation or investigative proceeding pending or, to the knowledge of Buyer, threatened against Buyer which would materially affect Buyer's ability to perform its obligations hereunder and under the Buyer Ancillary Agreements.

ARTICLE 7
Sellers' Covenants

7.1     Access and Right of Inspection; Correspondence with Third Parties.  Between the date of this Agreement and the earlier of the termination of this Agreement and the Closing Date, the Sellers shall give to Buyer and its respective officers, agents, employees, counsel, accountants and other representatives, reasonable access to the Purchased Business (including reasonable access to Dr. Anthony Fiorino consistent with his obligations to his current employer, books, records, contracts and other information related thereto) and, to the extent permitted by Law, the Sellers shall furnish to Buyer such information related to the Purchased Business as Buyer shall from time to time reasonably request for the purposes of preparing for the transition of the Purchased Business from the Sellers to Buyer. In addition, without limitation of the foregoing, each of the Sellers acknowledges that Buyer may, between the date of this Agreement and the Closing Date, contact and discuss (a) the availability of manufacturing slots for the Product Program and related matters with WuXi Biologics and its advisors and affiliates, provided that (i) a representative of one of the Sellers is involved in such communication or (ii) one of the Sellers provides prior written consent (such consent not to be unreasonably withheld, conditioned or delayed, and email consent to be sufficient), to such communication with WuXi Biologics without a representative of Immune Inc., and provided further that Immune Inc. shall be copied on all written correspondence between Buyer and WuXi Biologics and (b) the iCo License and related matters with each of iCo Therapeutics, Inc. and Cambridge Antibody Technology Ltd. (or any successor) and their respective advisors and affiliates, provided that Buyer shall coordinate with Immune Inc. with respect to any such communications with iCo Therapeutics, Inc. or Cambridge Antibody Technology Ltd. (or any successor) and provided further that Buyer shall not engage in any such communications until the Sale Motions are filed with the Bankruptcy Court.

7.2     Commercially Reasonable Efforts; Further Assurances.  Each Seller shall execute such documents and take or cause to be taken all action and do or cause to be done all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement (including, without limitation, to put Buyer in actual possession and operating control of the Acquired Assets, including to record or perfect the transfer of the Acquired Assets to Buyer, to confirm the title of the Acquired Assets in Buyer and to assist Buyer in exercising rights relating thereto), and to make all filings with, give all notices to, and obtain all consents from, all Third Parties which may be necessary or required in order to effectuate the transactions contemplated hereby. Each Seller shall use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in ARTICLE 10 of this Agreement.

7.3     Bankruptcy Actions.

(a)     As soon as practicable after the execution of this Agreement, each Seller will use best efforts to obtain the entry of the Sale Orders.

13

B4956868.14

(b)    Within two (2) Business Days of the date of the date of this Agreement, each Seller shall file with each of the Bankruptcy Court and the Israeli Bankruptcy Court a motion in form and substance acceptable to Buyer to approve the transaction contemplated hereby (the "Sale Motions"), which motions shall seek the Bankruptcy Court's and the Israeli Bankruptcy Court's respective approvals of this Agreement, each Seller's performance under this Agreement, the assumption and the assignment of the Acquired Contracts and the Assumed Liabilities, and the entry of the Sale Orders.  Contemporaneously with the filing of the Sale Motions, each Seller shall provide appropriate notice of the hearing on the Sale Motions as is required by the Bankruptcy Code and related Bankruptcy Rules and Israeli bankruptcy laws to all parties entitled to notice including, without limitation, all parties to the Acquired Contracts.

(c)    Contemporaneously with the filing of the Sale Motions, each Seller shall file with the Bankruptcy Court a motion seeking the approval of bidding procedures with respect to the Sale Motion filed therein, which bidding procedures shall have been approved by Buyer (such approval not to be unreasonably withheld, delayed or conditioned) (the "Bidding Procedures") and which shall include at a minimum (x) Bankruptcy Court approval of a break-up fee payable by Sellers to Buyer in the amount of $180,000 (the "Breakup Fee"), plus reimbursement of all reasonable expenses of Buyer incurred in connection with this transaction up to $80,000 (the "Expense Reimbursement"), in each case with priority administrative claim treatment (sharing pro rata with all priority administrative claims and expenses under Section 503(b) of the Bankruptcy Code), in the event that (1) this Agreement is terminated by Buyer pursuant to Section 11.2(c) any time after the Due Diligence Deadline Date (or the earlier delivery of a Diligence Satisfaction Notice); or (2) either Seller consummates a Competing Transaction, and (y) with respect to  the Expense Reimbursement only, payable to Buyer in the event this Agreement is terminated by Buyer pursuant to either of Sections 11.2(g), 11.2(h), or 11.2(i).  The Parties agree that Buyer would be substantially damaged in any event requiring the payment of the Breakup Fee, that the precise amount of such damage would be impossible or difficult to determine, and that the amount of the Breakup Fee represents a reasonable estimate of such damages.  Any payment of the Breakup Fee would constitute liquidated damages and not a penalty. The provisions herein as to the payment of the Breakup Fee and the Expense Reimbursement were material inducements to Buyer entering into this Agreement. Any payments of the Breakup Fee or Expense Reimbursement under this Section 7.3(c) shall be made by Sellers by wire transfer of immediately available funds to an account designated in writing by Buyer.

(d)    Each Seller will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications and supporting papers relating to the transactions contemplated by this Agreement prepared by such Seller prior to the filing thereof in the Bankruptcy Cases; provided, however, that such opportunity shall apply to any emergent matters only to the extent reasonably practicable.  All motions, applications and supporting papers prepared by such Seller and relating to the transactions contemplated by this Agreement (including forms of orders and notices to interested parties) shall be acceptable in form and substance to Buyer, in its reasonable discretion.

7.4    Conduct of Business.  Prior to the Closing, the Sellers shall use commercially reasonable efforts to preserve the value of the Acquired Assets including, without limitation, by using commercially reasonable efforts for companies in similar financial positions as the Sellers to maintain and keep their assets in good condition, keep in full force and effect any insurance

B4956868.14

coverage previously in effect, maintain in effect the Acquired Contracts (subject to the entry of an order of the Bankruptcy Court permitting the Sellers to reject any such contracts) and, with respect to the Purchased Business, maintain in accordance with good business practice their present business relationships so that such relationships shall be preserved for Buyer after the Closing.

7.5    <u>Records and Documents</u>.    From and after the Closing Date, Buyer shall grant to the Sellers and its representatives, at the Sellers' reasonable request, reasonable access during normal business hours to the records and any other documents covering any period prior to and through the Closing Date related to the Purchased Business as may be reasonably necessary for litigation, preparation of financial statements, the Bankruptcy Cases, Tax matters or other valid business purposes.

7.6    <u>Notice of Certain Events</u>.    From the date hereof until the Closing, the Sellers shall promptly notify Buyer in writing of any fact, circumstance, event or action the existence, occurrence or taking of which (a) has resulted in, or could reasonably be expected to result in, individually or in the aggregate, a Material Breach of this Agreement by either Seller, (b) has resulted in, or could reasonably be expected to result in, any representation or warranty made by either Seller hereunder not being true and correct in all material respects or (c) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in ARTICLE 10 to be satisfied.

ARTICLE 8
Covenants of Buyer

8.1    <u>Discharge of Assumed Liabilities</u>.    From and after the Closing Date, Buyer shall pay, perform and discharge the Assumed Liabilities as they become due, including, without limitation, the discharge and performance when due of each and every obligation of each Seller to be satisfied or performed after the Closing Date under the Acquired Contracts.

8.2    <u>Commercially Reasonable Efforts, Further Assurances</u>.    Buyer shall execute such documents and use commercially reasonable efforts to take or cause to be taken all action and do or cause to be done all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement, the Ancillary Agreements and the other documents and instruments to be delivered pursuant hereto. Buyer shall use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in ARTICLE 9 of this Agreement.

8.3    <u>Notice of Satisfaction of Due Diligence</u>.    Prior to or on the Due Diligence Deadline Date, Buyer shall advise Immune Inc. if its due diligence of the Product Program and Acquired Assets is completed to Buyer's satisfaction (the "<u>Diligence Satisfaction Notice</u>"). Buyer shall not be entitled to the Expense Reimbursement and/or the Breakup Fee if it terminates this Agreement pursuant to Section 11.2(f) (provided however, for the avoidance of doubt, that Buyer will be entitled to a return of the Purchase Price Deposit in the event of such a termination). Prior to delivery of the Diligence Satisfaction Notice, Buyer has the right, in its sole discretion, to terminate this Agreement on or before the Due Diligence Deadline Date by written notice to the Sellers.

B4956868.14

## ARTICLE 9
### Conditions to the Sellers' Obligations

The obligation of each Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, prior to or at the Closing, of each of the following conditions unless waived by such Seller in writing:

9.1     <u>Buyer's Representations and Warranties</u>.  Each representation and warranty made by Buyer in ARTICLE 6 hereto shall be true and correct in all material respects on and as of the Closing Date with the same effect as though each such representation or warranty had been made or given on and as of the Closing Date, other than representations and warranties made as of a specific date, which shall be true and correct in all material respects as of such specific date (disregarding, for purposes of this Section 9.1, any exception or qualification of such representations and warranties relating to materiality).

9.2     <u>Buyer's Covenants</u>.  Buyer shall have performed and complied, in all material respects, with all of the covenants set forth herein which are to be performed or complied with by it before or as of the Closing Date.

9.3     <u>Buyer's Deliveries</u>.  Buyer shall have executed and delivered to each Seller the Buyer Ancillary Agreements.

9.4     <u>No Proceedings</u>.  No action, suit or proceeding which has a reasonable likelihood of success is pending or threatened by any Governmental Entity to enjoin, restrain, prohibit or obtain substantial damages against Buyer in respect of the transfer of the Acquired Assets as contemplated by this Agreement or the Ancillary Agreements, or which would be reasonably likely to prevent or make illegal the consummation of any transactions contemplated by this Agreement.

9.5     <u>Bankruptcy Court Approvals</u>.  The Sale Order shall have been entered by the Bankruptcy Court and the Israeli Sale Order shall have been entered by the Israeli Bankruptcy Court.

## ARTICLE 10
### Conditions to Buyer's Obligations

The obligation of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, prior to or at the Closing, of each of the following conditions unless waived by Buyer in writing:

10.1     <u>Sellers' Representations and Warranties</u>.  Each representation and warranty made by a Seller in ARTICLE 5 hereof shall be true and correct in all material respects on and as of the Closing Date with the same effect as though each such representation and warranty had been made or given on and as of the Closing Date other than representations and warranties made as of a specific date, which shall be true and correct in all material respects as of such specific date (disregarding, for purposes of this Section 10.1, any exception or qualification of such representations and warranties relating to materiality).

10.2     <u>Sellers' Covenants</u>. Each Seller shall have performed and complied in all material

16

respects with all of the covenants set forth herein which are to be performed by or complied with by it before or as of the Closing Date.

10.3    Sellers' Deliveries.  Each Seller shall have executed and delivered to Buyer the Seller Ancillary Agreements.

10.4    No Proceedings.  No action, suit or proceeding which has a reasonable likelihood of success is pending or threatened by any Governmental Entity to enjoin, restrain, prohibit or obtain substantial damages against Buyer in respect of the transfer of the Acquired Assets as contemplated by this Agreement or the Ancillary Agreements, or which would be reasonably likely to prevent or make illegal the consummation of any transactions contemplated by this Agreement or the Ancillary Agreements.

10.5    Conduct of Sellers' Business.  Between the date of this Agreement and the Closing Date (a) the Sellers shall have complied with Section 7.4 in all material respects; (b) there shall have been no material adverse change or impairment in the condition of the Purchased Business; and (c) except as disclosed in the Disclosure Schedules, neither Seller shall have materially defaulted in its obligations under any Acquired Contract and there shall not have been any termination of any Acquired Contract that cannot be fully cured on a reasonably prompt basis without the required payment of material fines, fees or other compensation payable to the counterparty to such agreement.

10.6    Consulting Agreement.  Buyer and Dr. Anthony Fiorino shall have entered into a mutually agreeable consulting agreement, pursuant to which Dr. Fiorino agrees to provide to Buyer consulting services relating to the Product Program and related matters for up to (a) fifteen (15) hours per month for the first three (3) full months after the Closing Date and (b) subject to any restrictions of Dr. Fiorino's then-current employment, for up to ten (10) hours per month for the three (3) months following thereafter, and otherwise on terms and conditions customary for such agreements.

10.7    Third Party Consents.  The Sellers have obtained all necessary Third Party consents (including, without limitation, any required consents from Governmental Entities and Third Party licensor consents) to effectuate the Sale, including, without limitation, all certificates, permits, waivers and approvals.

10.8    Bankruptcy Court Approval.  (a) The Sale Order shall have been entered by the Bankruptcy Court and (i) shall be a Final Order and (ii) such order shall contain a waiver of the conditions set forth in Bankruptcy Rules 6004(h) and 6006(d) and (b) the Israeli Sale Order shall have been entered by the Israeli Bankruptcy Court and shall be an Israeli Final Order.

ARTICLE 11
Closing and Termination

11.1    Closing.

(a)    The closing (the "Closing") shall be held on the first Business Day following full satisfaction or due waiver of the last to occur of the closing conditions set forth in ARTICLE 9 and ARTICLE 10 hereof (other than those to be satisfied at the Closing), or on such

17

other date as is mutually acceptable to Buyer and the Sellers. The Closing will take place remotely on such date. The date on which the Closing occurs is referred to herein as the "Closing Date."

(b)    The Parties agree that time is of the essence in connection with the transactions contemplated hereby.

11.2    Termination. This Agreement (and the transactions contemplated hereby) may not be terminated except as follows:

(a)    Upon the mutual written consent of each Seller and Buyer;

(b)    By either Seller, if (i) Buyer is in Material Breach of this Agreement, and (ii) such breach has not been cured within 10 days following the delivery of written notice thereof to Buyer;

(c)    By Buyer, if (i) either Seller is in Material Breach of this Agreement, and (ii) such breach has not been cured within 10 days following the delivery of written notice thereof to the Sellers;

(d)    By Buyer, if the Closing has not occurred on or before October 1, 2019;

(e)    By Buyer if (i) the Bankruptcy Court does not enter an order approving the Bidding Procedures by the date that is thirty-five (35) days after the date of this Agreement, (ii) either Seller closes a Competing Transaction, or (iii) either the Bankruptcy Court and Buyer is not designated as the back-up Bidder in any auction under section 363 of the Bankruptcy Code or applicable Israeli bankruptcy law;

(f)    By Buyer, in its sole discretion, any time on or prior to the Due Diligence Deadline Date, provided that it has not previously provided a Diligence Satisfaction Notice;

(g)    By Buyer, if the U.S. Bankruptcy Case is converted to a case under chapter 7 or a trustee is appointed in the U.S. Bankruptcy Case;

(h)    By Buyer, (i) if the Bankruptcy Court issues an order in favor of iCo Therapeutics Inc. requiring Immune Ltd. to reject the iCo Therapeutics Inc. License (the "iCo License"), granting iCo relief from the automatic stay so as to permit termination of the iCo License, or finding that the iCo License is not an executory contract or that the iCo License is terminated; or (ii) if Immune Ltd. rejects the iCO License;

(i)    By Buyer, if there is an auction in the Israeli Bankruptcy Case for any of the Acquired Assets or the Israeli Bankruptcy Court enters an Order materially adverse to Buyer from the Bidding Procedures for the sale, transfer or other disposition of any of the Acquired Assets; or

(j)    By either Seller or by Buyer, if either the Bankruptcy Court or the Israeli Bankruptcy Court denies its respective Sale Motion or fails to enter the Sale Order or the Israeli Sale Order, as applicable, or if either the Sale Order or the Israeli Sale Order fails to become a Final Order or an Israeli Final Order, as applicable.

18

11.3    <u>Effect of Termination</u>.  Upon the termination of this Agreement in accordance with Section 11.2 hereof, the Parties shall be relieved of any further obligations or liability under this Agreement except for (i) confidentiality obligations contained in Section 13.10, (ii) the expense allocation provisions under Section 13.2, (iii) the provisions of Section 13.4, (iv) Sellers' obligation to return the Deposit under Section 4.2, and (v) obligations for breaches of this Agreement occurring prior to such termination.

ARTICLE 12<br>Tax Matters

12.1    <u>Transaction Taxes</u>.  The Sellers shall bear and be responsible for paying any recording charges, sales, use, stamp, transfer, deed, documentary, registration, business and occupation and other similar Taxes (including related penalties (civil or criminal), additions to Tax and interest) imposed by any Governmental Entity with respect to the transfer of the operations of the Purchased Business and any Acquired Assets to Buyer ("<u>Transaction Taxes</u>"), regardless of whether the Tax authority seeks to collect such Taxes from either Seller or from Buyer; further, Buyer shall reasonably cooperate with each Seller in taking all reasonable steps and make all filings or submissions appropriate under applicable Transaction Tax laws and regulations reasonably requested by the Sellers in order to cause such transfer to qualify for one or more exemptions from such Transaction Taxes including, without limitation, any sales Taxes.  Each Party shall give prompt written notice to the other Party of any proposed adjustment or assessment of any Transaction Taxes with respect to the transactions contemplated hereby and in the Ancillary Agreements.  In any proceedings, whether formal or informal, both Parties shall be permitted to participate in the defense of such proceeding with respect to such Transaction Taxes, and shall take all actions and execute all documents reasonably required to allow such participation.  Buyer shall not be responsible for income, franchise or any other Taxes of either Seller, if any, arising from the transactions contemplated hereby.

12.2    <u>Withholding Tax</u>.  Buyer shall be entitled to withhold from any payment under this Agreement any Tax required by applicable Law to be withheld from the payment.  The Sellers shall promptly reimburse Buyer for any such amount of Tax that Buyer does not withhold from any such payment.

ARTICLE 13<br>Miscellaneous

13.1    <u>No Survival</u>.  The representations and warranties of each Seller contained in ARTICLE 5 shall not survive the Closing, neither Seller shall have any liability to Buyer for any breach thereof (whether prior to or after the Closing) and the sole consequence (if any) of any breach thereof prior to the Closing shall be the failure of the condition set forth in Section 10.1 (subject to the provisions of Section 10.1).  The representations and warranties of Buyer contained in ARTICLE 6 shall not survive the Closing, Buyer shall have no liability to either Seller for any breach thereof (whether prior to or after the Closing) and the sole consequence (if any) of any breach thereof prior to the Closing shall be the failure of the condition set forth in Section 9.1 (subject to the provisions of Section 9.1).  None of the covenants of Buyer or of either Seller contained in this Agreement (except for such items as are expressly required to be performed after

19

the Closing) shall survive the Closing hereunder, and no party hereto shall be liable to any other party hereto after the Closing for any breach of such covenants.

13.2    Expenses.  Except as otherwise expressly provided for elsewhere in this Agreement, each Party hereto shall pay its own expenses and costs relating to the negotiation, execution and performance of this Agreement.

13.3    Governing Law.  This Agreement shall be governed by the laws of the State of Delaware regardless of the laws that might otherwise govern under applicable conflicts of law principles.

13.4    Disputes; Bankruptcy Court Jurisdiction.

(a)    Without limiting any Party's right to appeal any order of the Bankruptcy Court or the Israeli Bankruptcy Court, (i) the Israeli Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, in each case to the extent related to the Israeli Bankruptcy Case, (ii) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, in each case to the extent related to the U.S. Bankruptcy Case, and (iii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court or the Israeli Bankruptcy Court, as applicable, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and the Israeli Bankruptcy Court, as applicable, and shall receive notices at such locations as indicated in Section 13.5; provided, however, that if the Bankruptcy Case has closed or if the Bankruptcy Court declines to exercise jurisdiction, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the U.S. federal and state courts of competent jurisdiction located within the State of Delaware, and any appellate court from any such court, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the Parties hereto hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 13.5.

(c)    EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS AGREEMENT OR ANY PROVISION HEREOF.

13.5    Notices.  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given when personally delivered, delivered by overnight courier or transmitted by facsimile or by email, or five (5) days after mailed, certified

or registered mail, with postage prepaid addressed as follows (or to such other person or address as the Party to receive such notice may have designated from time to time by notice in writing pursuant hereto):

If to either Seller:

> c/o Immune Pharmaceuticals, Inc.
> 1 Bridge Plaza South
> Suite 270
> Fort Lee, NJ  07024
> Attn: Gary Rabin
> Email: gary.rabin@immunepharma.com

> with a copy to:

> John Hogoboom, Esq.
> Lowenstein Sandler LLP
> 1251 Avenue of the Americas
> New York, NY 10020
> Attn:  Jack Hogoboom
> Email:  jhogoboom@lowenstein.com

> Morris S. Bauer or Melissa A. Pena
> Norris McLaughlin, P.A.
> 400 Crossing Boulevard
> 8th Floor
> P.O. Box 5933
> Bridgewater, NJ 08807-5933
> Phone: (908) 722-0700
> Fax: (908) 722-0755
> Email:  msbauer@norris-law.com
>             or: mapena@norris-law.com

If to Buyer:

> Alexion Pharma International Operations Unlimited Company
> c/o Alexion Pharmaceuticals, Inc.
> 121 Seaport Boulevard
> Boston, Massachusetts 02210
> Attn: General Counsel
> Email: ellen.chiniara@alexion.com

> with a copy to:

> Foley Hoag LLP
> 155 Seaport Boulevard
> Boston, MA 02210

B4956868.14

Attn:  Mark A. Haddad, Esq., and Kenneth S. Leonetti, Esq.
Email Addresses:  mhaddad@foleyhoag.com and kleonetti@foleyhoag.com

13.6    <u>Counterparts, Facsimile or PDF Signatures; Third Party Beneficiaries</u>.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  Counterpart signatures to the Agreement delivered and received by facsimile or "pdf" shall be acceptable and binding on the Party(ies) transmitting the same.  No provision of this Agreement is intended to (i) confer upon any Person other than the Parties hereto and their successors and permitted assigns, any rights or remedies hereunder (except to the extent provided under section 365(n) of the Bankruptcy Code), (ii) relieve or discharge the obligation or liability of any third party or (iii) give any third party any right of subrogation or action against Seller or Buyer.

13.7    <u>Entire Agreement</u>.    This Agreement and the Ancillary Agreements embody the entire agreement and understanding between the Sellers and Buyer with respect to the subject matter hereof and supersede all prior agreements and understandings related to the subject matter hereof.  There are no representations, warranties, covenants, promises or agreements on the part of a Party to the other hereto which are not explicitly set forth herein.

13.8    <u>Modifications</u>.    Any modification, amendment or waiver of or with respect to any provision of this Agreement or any agreement, instrument or document delivered pursuant hereto shall not be effective unless it shall be in writing and signed by an authorized representative of each Seller and of Buyer and shall designate specifically the terms and provisions so modified.

13.9    <u>Assignment and Binding Effect</u>.    This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns (including any liquidating trustee, or similar representative for either Seller or the estate of either Seller appointed in connection with either of the Bankruptcy Cases), but (except as provided for in this Section 13.9) neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by Buyer or by either Seller without the prior written consent of the other; provided, however, that Buyer may assign any of its rights, interests or obligations hereunder to any Affiliate of Buyer or in connection with the sale of all or substantially all of its business to which this Agreement relates (whether by sale, merger, reorganization, consolidation or otherwise), provided that, such assignee shall be required to assume all of the rights and obligations of Buyer hereunder.

13.10    <u>Public Announcements; Confidentiality</u>.    Prior to Closing, the Parties will consult with each other before issuing or prior to the issuance by any Affiliate of, and will provide each other the opportunity to review and comment upon, any press release or other public statements (or relevant portions thereof) relating to the transactions contemplated by this Agreement and shall not issue, and shall ensure that their respective Affiliates shall not issue, any such press release or make any such public statement prior to such consultation, except as may be required by applicable Law, court process or by obligations pursuant to any listing agreement with any national securities exchange or contractual obligation to make public filings with the Securities and Exchange Commission.  Each Party also agrees that it will not, directly or indirectly, except to the extent required by Law or Order (provided prior timely notice has been provided to the other Party to permit such Party to limit such disclosure or to seek appropriate protective orders), make use of or divulge, or permit any of its agents, employees or Affiliates to make use of or divulge, any terms

22

or conditions of this Agreement or the Ancillary Agreements prior to the time that the Bankruptcy Cases are filed. The obligations contained in this Section 13.10 are in addition to and independent of the obligations contained in the Confidential Disclosure Agreement, dated as of December 9, 2018, by and between Buyer and Immune Inc., which shall remain in full force and effect. Notwithstanding anything herein to the contrary, Buyer acknowledges that the Sellers will have certain obligations in the Bankruptcy Cases to discuss or disclose matters relating to this Agreement and the Ancillary Agreements (including the specific terms therein), and compliance with such obligations shall not be prohibited nor limited by this Section 13.10.

13.11    <u>Right to Specific Performance</u>.  The Parties acknowledge that the unique nature of the transactions contemplated by this Agreement may render money damages an inadequate remedy for the breach by either Party of its obligations under this Agreement. Each Party agrees that in the event of such breach, (i) the non-breaching Party may, upon proper action instituted by it, be entitled to seek a decree of specific performance of this Agreement, and (ii) such rights are cumulative and in addition to any other remedy to which the Parties may be entitled at law or equity.

13.12    <u>Severability</u>.    Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

*****

23

B4956868.14

IN WITNESS WHEREOF, the Parties, acting through their duly authorized representatives, have executed this Agreement as of the date first above written.

SELLERS:

IMMUNE PHARMACEUTICALS INC.

By: _____

Name: _____

Title: _____

IMMUNE PHARMACEUTICALS, LTD.

By: _____

Name: _____

Title: _____

*--Signature Page to Asset Purchase Agreement--*

BUYER:

ALEXION PHARMA INTERNATIONAL
OPERATIONS UNLIMITED COMPANY

By: _____

Name: SHANE DOYCE

Title: Director

*--Signature Page to Asset Purchase Agreement--*

INDEX OF SCHEDULES

Schedule 1.1          Excluded Assets
Schedule 5.4          Acquired Contracts
Schedule 5.6          Intellectual Property

LIST OF EXHIBITS

Exhibit A          Assignment and Assumption Agreement
Exhibit B          Bill of Sale
Exhibit C          IP Assignment

## IMMUNE PHARMACEUTICALS INC. AND
## IMMUNE PHARMACEUTICALS, LTD.

DISCLOSURE SCHEDULES
to
ASSET PURCHASE AGREEMENT
Dated June 28, 2019

These Disclosure Schedules are made and given in connection with that certain Asset Purchase Agreement (the "Agreement") by and between Immune Pharmaceuticals Inc., a Delaware corporation ("Immune Inc."), Immune Pharmaceuticals, Ltd., a corporation organized under the laws of Israel ("Immune Ltd." and, together with Immune Inc., the "Sellers" and each of the Sellers individually, a "Seller"), and Alexion Pharma International Operations Unlimited Company, an Irish unlimited company ("Buyer").  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Agreement.

These Disclosure Schedules are arranged in sections and subsections corresponding to the numbered section and lettered subsections of the Agreement, and the information, exceptions and disclosures in each such section and subsection of these Disclosure Schedules apply only to the correspondingly numbered section and lettered subsection of the Agreement; provided that the information, exceptions and disclosures contained in any section or subsection of these Disclosure Schedules shall be deemed to be incorporated by reference to each other section or subsection herein if the applicability of such information, exception or disclosure to such other section or subsection herein is reasonably apparent on its face.

No reference to or disclosure of any item or other matter in these Disclosure Schedules that is listed as an exception to a representation and warranty of the Agreement shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in these Disclosure Schedules.  The information set forth in these Disclosure Schedules is disclosed solely for purposes of the Agreement, and no information set forth herein shall be deemed to be an admission by any party hereto to any third party of any matter whatsoever, including of any violation of law or breach of any agreement.

These Disclosure Schedules are an integral part of the Agreement, are incorporated therein by reference and are not intended to be an independent document.  The description of the terms and provisions of any plans, contracts, agreements or documents identified herein are qualified, in their entirety, by the actual terms and provisions of such plans, contracts, agreements or documents.

B4956868.14

**Schedule 1.1**
**Excluded Assets**

All assets and properties of any Seller except those that comprise or relate to, or are necessary or useful for the further research, development and commercialization of, the Product Program, including, without limitation, the following:

1.      The Sellers' Ceplene, Nanocyclo, Amiket, and Cytovia assets and all permits, licenses and contracts related to such assets, in each case solely to the extent that such assets do not relate to, and are not required for the use of, the Acquired Assets.

2.      All office furniture, computers and telephone equipment and all laboratory facilities and equipment located in both Israel (in storage) and New Jersey (whether in the Ft. Lee office space or in storage).

B4956868.14

**Schedule 5.3**
**Status of the Assets and Leases of the Sellers**

1.  iCo Therapeutics Incorporated ("iCo") has sent a termination notice for the Product Sublicense Agreement.

2.  As disclosed in Immune Inc.'s public SEC filings, Discover Growth Fund holds a secured interest in all assets of Immune Inc.

**Schedule 5.4**
**Acquired Contracts**

| Contract | Cure Costs |
|---|---|
| The "Biologics Master Services Agreement" between Immune Pharmaceuticals, Inc. and WuXi Biologics (Hong Kong) Limited dated June 27, 2018. | $555,190 |
| The "Product Sublicense Agreement" between Immune Pharmaceuticals Ltd. and iCo Therapeutics Incorporated dated December 7, 2010, as amended on March 31, 2011. | $0 |
| The "Proposal – Clinical Trial Services – Bertilimumab for the Treatment of Bullous Pemphigoid" between Immune Pharmaceuticals Inc. and Target Health Inc. dated June 1, 2014. | $192,050 |

**Schedule 5.5**
**Claims Litigation and Disputes**

1.      iCo Therapeutics Incorporated ("iCo") has sent a termination notice for the Product Sublicense Agreement.  In addition, they have filed with the U.S. Bankruptcy Court a motion to reject the Sublicense and to obtain relief from the stay in order to allow the termination of the Sublicense.

2.      Discover Growth Fund, LLC has filed a motion to convert the U.S. Bankruptcy Case into a Chapter 7 case.

**Schedule 5.6**
**Intellectual Property**

5.6 (a):  List of patents and applications

# BERTILIMUMAB PATENT FAMILY

PATENTS AND PATENT APPLICATIONS FILED UNDER IMMUNE PHARMA LTD
(OWNER)

| PC Ref. No. | Title | Application No. | Filing Date |
|---|---|---|---|
| P-76963-AU | USE OF ANTI-EOTAXIN ANTIBODIES FOR TREATING INFLAMMATORY BOWEL DISEASE | 2014229137 (ACTIVE[1]) (FILE DIVISION INSTEAD OF RESPONSE ON OR BEFORE JAN 23, 2019 | March 13, 2014 |
| P-76963-CA | As above | 2,923,905 (ACTIVE) | March 13, 2014 |
| P-76963-CN | As above | 201480028187.4 (ACTIVE – RESPONSE DUE JAN 10, 2019) | March 13, 2014 |
| P-76963-EP | As above | EP14763599.9(ACTIVE – RESPONSE DUE NOV 8, 2018, NOT FILING RESPONSE UNTIL NOTICE RECEIVED IN 2019) | March 13, 2014 |
| P-76963-IL | As above | 242521 (ACTIVE) | March 13, 2014 |
| P-76963-NZ | As above | 714361 (ACTIVE – Request for Examination on or before January 2019, absolute deadline March 13, 2019) | March 13, 2014 |
| P-76963-US1 | As above | 13/864,387(ACTIVE, RCE filed Nov 19, 2018) | March 13, 2014 |
| P-76963-US2 | As above | 15/347,847(ACTIVE, 6-MTH DEADLINE JAN 9, 2019) | November 10, 2016 |

---

[1] ACTIVE:  Applications still undergoing examination

| P-575761-USP | USE OF ANTI-EOTAXIN ANTIBODIES FOR TREATING BULLOUS PEMPHIGOID | US Provisional Application 62/636,170 | February 28, 2018 (TO FILE PCT on or before Feb 28,2019) |

PATENTS AND PATENT APPLICATIONS LICENSED FROM MEDIMMUNE LTD

| PC Ref. No. | Title | Patent/Application No. | Filing Date |
|---|---|---|---|
| P-75623-US | HUMAN ANTIBODIES AGAINST EOTAXIN | 6946546 (ISSUED 09/20/2005) | FILED March 2, 2001 EXPIRES MARCH 2, 2021 PLUS 31 DAYS PTA, NOT INCLUDING PATENT EXTENSION AND TERMINAL DISCLAIMER |
| P-75623-US1 | METHODS OF OBTAINING A SPECIFIC BINDING MEMBER THAT BINDS EOTAXIN | 7323311 (ISSUED 01/29/2008) | FILED January 9, 2003 EXPIRES MARCH 2, 2021 PLUS 534 DAYS PTA, NOT INCLUDING PATENT EXTENSION AND TERMINAL DISCLAIMER |
| P-75623-US2 | As above | 8067564 (ISSUED 11/29/2011) | FILED December 17, 2007 EXPIRES MARCH 2, 2021 PLUS 432 DAYS PTA, NOT INCLUDING PATENT EXTENSION AND TERMINAL DISCLAIMER |
| P-75623-US4 | As above | 9284589 (ISSUED 03/15/2016) | FILED March 24, 2014 EXPIRES MARCH 2, 2021 PLUS 38 DAYS PTA, NOT INCLUDING PATENT EXTENSION AND TERMINAL DISCLAIMER |
| P-75623-US5 | As above | App. No. 15/014,945 PENDING | FILED February 3, 2016 |

| PC Ref. No. | Title | | |
|---|---|---|---|
| | | | ADVISORY ACTION MAILED NOV 05,2018. |
| P-75623-CA | HUMAN ANTIBODIES AGAINST EOTAXIN AND THEIR USE | 2401342 | March 2, 2001 |
| P-75623-FR | As above | 1259615 (EP Validation) | March 2, 2001 |
| P-75623-DE | As above | 1259615 (EP Validation) (60136527.5) | March 2, 2001 |
| P-75623-IE | As above | 1259615 (EP Validation) | March 2, 2001 |
| P-75623-IL | As above | 151499 | March 2, 2001 |
| P-75623-CH | As above | 1259615 (EP Validation) | March 2, 2001 |
| P-75623-GB | As above | 1259615 (EP Validation) (2361704) | March 2, 2001 |
| P-75623-EP | As above | 1259615 | March 2, 2001 |

PATENTS AND PATENT APPLICATIONS LICENSED FROM CAMBRIDGE ANTIBODY TECHNOLOGY LIMITED

| PC Ref. No. | Title | Patent No. | Filing Date |
|---|---|---|---|
| P-75623-AU | HUMAN ANTIBODIES AGAINST EOTAXIN AND THEIR USE | 778392 | March 2, 2001 |
| P-75623-BR | As above | 0108923 A | March 2, 2001 |
| P-75623-JP | As above | 5198704 | March 2, 2001 |
| P-75623-NZ | As above | 521182 | March 2, 2001 |
| P-75623-SG | As above | 91497 | March 2, 2001 |

PATENTS AND PATENT APPLICATIONS LICENSED FROM HADASIT MEDICAL RESEARCH SERVICE AND DEVELOPMENT LTD.

| PC Ref. No. | Title | Application No. | Filing Date |
|---|---|---|---|
| P-80259-PC | ANTI-EOTAXIN FOR IMMUNOPROTECTION AND HEPATOPROTECTION | PCT/IL2017/050637 DID NOT ENTER NATIONAL PHASE, IMMUNE RETURNED APPLICATION TO HADASIT | June 6, 2017 NES due on Dec 6, 2018.  TO BE ABANDON PER OPHRA'S INSTRUCTION. |

PATENTS AND PATENT APPLICATIONS NOT ASSIGNED -LICENSED (THE
ASSIGNMENT ON RECORD ARE THE INVENTORS, NO ASSIGNMENT TO
MEDIMMUNE

| PC Ref. No. | Title | Patent No. | Filing Date |
|---|---|---|---|
| P-75623-US3 | METHODS OF OBTAINING A SPECIFIC BINDING MEMBER THAT BINDS EOTAXIN | 8715961 (ISSUED 05/06/2014) | FILED October 19, 2011 EXPIRES MARCH 2, 2021 PLUS 82 DAYS PTA, NOT INCLUDING PATENT EXTENSION AND TERMINAL DISCLAIMER |

PATENT APPLICATION FILED BY FENWICK AND WEST FOR IMMUNE AND
MEDIMMUNE

| PC Ref. No. | Title | Patent No. | Filing Date |
|---|---|---|---|
| P-F&W Ref No: 35171-40996/US | ANTI-EOTAXIN AGENTS FOR TREATMENT OF ASTHMA | 62/745,907 | October 15, 2018 |

5.6 (b): iCo Therapeutics Incorporated ("iCo") has sent a termination notice for the Product
Sublicense Agreement.

5.6 (c): (1) The "Biologics Master Services Agreement" between Immune Pharmaceuticals, Inc.
and WuXi Biologics (Hong Kong) Limited dated June 27, 2018 and (2) The "Product Sublicense
Agreement" between Immune Pharmaceuticals Ltd. and iCo Therapeutics Incorporated dated
December 7, 2010, as amended on March 31, 2011.

5.6 (d):  iCo Therapeutics Incorporated ("iCo") has sent a termination notice for the Product
Sublicense Agreement.

B4956868.14

EXHIBIT A
TO ASSET PURCHASE AGREEMENT

<u>ASSIGNMENT AND ASSUMPTION AGREEMENT</u>

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Agreement") is entered into as of this _____ day of _____, 2019 by and between [Immune Pharmaceuticals, Inc. / Immune Pharmaceuticals Ltd.], a [_____] ("Assignor"), and Alexion Pharma International Operations Unlimited Company, an Irish unlimited company ("Assignee").

WITNESSETH:

WHEREAS, pursuant to that certain Asset Purchase Agreement dated as of June [__], 2019, by and between Assignor and Assignee (the "Asset Purchase Agreement"); all capitalized terms used herein but not otherwise defined having the meanings ascribed to such terms in the Asset Purchase Agreement), Assignor agreed to assign to Assignee all of Assignor's right, title, and interest in, to, and under the Acquired Assets, which included the Acquired Contracts.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Assignor does hereby sell, assign, transfer, and convey to Assignee all of Assignor's right, title, and interest in, to, and under and all obligations under the Acquired Contracts.

Assignor also hereby appoints Assignee its attorney-in-fact to enforce, and assigns to Assignee any rights to terminate, any Licensee IP Rights in the event that such holder of Licensee IP Rights fails to adhere to any of its obligations to Assignor arising under any such license of intellectual property.

Assignee hereby assumes and agrees to perform all of the obligations of Assignor under the Acquired Contracts accruing from and after the date hereof and to indemnify and hold harmless Assignor from and against liabilities or obligations under the Acquired Contracts solely with respect to events occurring or liabilities accruing from and after the date hereof.

This Assignment and Assumption Agreement is subject in all respects to the terms of the Asset Purchase Agreement, and nothing contained in this Agreement shall be deemed to supersede, restrict, expand, modify, or alter in any respect any of the terms, conditions or provisions of the Asset Purchase Agreement.

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

* * * * *

B4956868.14

Executed and delivered the day and year first above written.

ASSIGNOR:


By:_____
Name:_____
Title:_____


ASSIGNEE:


By:_____
Name:_____
Title:_____

EXHIBIT B
TO ASSET PURCHASE AGREEMENT

BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS:

[Immune Pharmaceuticals, Inc. / Immune Pharmaceuticals Ltd.], a [_____] ("Assignor"), for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, does hereby sell, transfer, assign, and convey to Alexion Pharma International Operations Unlimited Company, an Irish unlimited company ("Assignee"), the Acquired Assets as defined in that certain Asset Purchase Agreement dated as of June [__], 2019, by and between Assignor and Assignee (the "Asset Purchase Agreement"), to have and to hold the same, unto the Assignee, its successors and assigns, forever.

This Bill of Sale is subject in all respects to the terms of the Asset Purchase Agreement, and nothing contained in this Bill of Sale shall be deemed to supersede, restrict, expand, modify, or alter in any respect any of the terms, conditions or provisions of the Asset Purchase Agreement.

EXECUTED AND DELIVERED as of this ___ day of _____, 2019.

ASSIGNOR:

By:_____
Name:_____
Title:_____

B4956868.14

EXHIBIT C

TO ASSET PURCHASE AGREEMENT

IP ASSIGNMENT

This Intellectual Property Assignment Agreement (this "*Assignment*") is effective as of [_____], 2019, and is made and entered into between [Immune Pharmaceuticals, Inc. / Immune Pharmaceuticals Ltd.] ("*Assignor*"), and Alexion Pharma International Operations Unlimited Company, an Irish unlimited company ("*Assignee*"), pursuant to the Asset Purchase Agreement dated as of June [__], 2019 (the "*Purchase Agreement*"), by and among the Assignor and Assignee. Capitalized terms used in this Assignment without definition shall have the respective meanings given to them in the Purchase Agreement. Assignor and Assignee agree as follows:

3. **Assignment.** For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby assigns, transfers and contributes to Assignee, any and all of its right, title and interest in and to all Intellectual Property owned by Assignor and held or used in the conduct of, or which in any way, directly or indirectly, comprise or relate to, or are necessary or useful for the further research, development and commercialization of, the Product Program, including (without limitation) the Intellectual Property described in Schedule 5.6 to the Purchase Agreement, as well as all goodwill appurtenant thereto, all rights therein provided by international conventions and treaties, all rights of priority and renewals, and all rights to sue and recover damages for past, present and future infringement, dilution, misappropriation or other violation thereof, whether such rights are registered or not, and all rights of priority therein, and the right to recover for damages and profits and all other remedies for past infringements thereof, and any and all appurtenant goodwill associated therewith, but excluding any Excluded Assets.

4. **Additional Actions.** Upon and at any time after the Closing, at Assignee's request, Assignor shall, without further consideration, execute and deliver to Assignor such other instruments and documents, and take such other actions as Assignor may reasonably deem necessary or desirable to effect, evidence, record and perfect the transfer and assignment contemplated by this Assignment.

5. **Miscellaneous**. This Assignment is subject in all respects to the terms of the Purchase Agreement, and nothing contained in this Assignment shall be deemed to supersede, restrict, expand, modify, or alter in any respect any of the terms, conditions or provisions of the Purchase Agreement. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Signature page follows]*

B4956868.14

Executed and delivered the day and year first above written.

ASSIGNOR:


By:_____
Name:_____
Title:_____


ASSIGNEE:


By:_____
Name:_____
Title:_____

September 25, 2019

**Via Email**
c/o Immune Pharmaceuticals, Inc.
1 Bridge Plaza South
Suite 270
Fort Lee, NJ  07024
Attn: Gary Rabin
Email: gary.rabin@immunepharma.com

Re: <u>Agreement re Rescission of Diligence Satisfaction Notice</u>

Dear Mr. Rabin:

      Reference is made to that certain that certain Asset Purchase Agreement, dated as of June 28, 2019 (the "<u>Purchase Agreement</u>" ), by and among Immune Pharmaceuticals Inc., a Delaware corporation ("<u>Immune Inc.</u>") and Immune Pharmaceuticals, Ltd., a corporation organized under the laws of Israel ("<u>Immune Ltd.</u>" and, together with Immune Inc., the "<u>Sellers</u>") and Alexion Pharma International Operations Unlimited Company, an Irish unlimited company (the "<u>Buyer</u>"). Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Purchase Agreement.

      Reference is also made to that Diligence Satisfaction Notice delivered by the Buyer's legal counsel to the Sellers' legal counsel via email on September 6, 2019 (the "<u>Prior Satisfaction Notice</u>"). In connection with, and as consideration for, the Buyer's agreement to the extension of certain bidding deadlines in connection with the transactions contemplated by the Purchase Agreement, the Sellers and the Buyer each hereby acknowledge and agree that the Prior Satisfaction Notice is hereby rescinded and is null and void, with no further force or effect.

      The Sellers and the Buyer also hereby each acknowledge and agree that Section 11.2(d) of the Purchase Agreement shall be amended and restated in its entirety to read as follows: "By Buyer, if the Closing has not occurred on or before November 5, 2019;".

[Signature Page Follows]

B5042418.1

Sincerely,

**ALEXION PHARMA INTERNATIONAL OPERATIONS UNLIMITED COMPANY**

By: _____

Name: Shane Doyle

Title: Director

Acknowledged and Agreed:

**IMMUNE PHARMACEUTICALS INC.**

By: _____

Name: _____

Title: _____

**IMMUNE PHARMACEUTICALS, LTD.**

By: _____

Name: _____

Title: _____

Sincerely,

**ALEXION    PHARMA    INTERNATIONAL
OPERATIONS UNLIMITED COMPANY**

By: _____

Name: Shane Doyle

Title: Director

Acknowledged and Agreed:

**IMMUNE PHARMACEUTICALS INC.**

By: _____

Name: _____

Title: _____

**IMMUNE PHARMACEUTICALS, LTD.**

By: _____

Name: _____

Title: _____

[Signature Page to Icarus Side Letter Agreement]