UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-1(b)**

**NORRIS McLAUGHLIN, P.A.**
Morris S. Bauer
Melissa A. Pena
400 Crossing Boulevard, 8th Floor
P.O. Box 5933
Bridgewater, New Jersey 08807
(908) 722-0700
msbauer@norris-law.com
mapena@norris-law.com
Counsel for the Debtors/Debtors-in-Possession

In re:

IMMUNE PHARMACEUTICALS INC, *et al.,*

Debtors.[1]

Chapter 11

Case No. 19-13273 (VFP)

Hon. Vincent F. Papalia

**DECLARATION OF GARY H. RABIN IN SUPPORT OF DEBTORS' MOTION FOR THE ENTRY OF AN ORDER APPROVING IMMUNE PHARMACEUTICALS INC.'S LIMITED USE OF SALE PROCEEDS FROM ALEXION TRANSACTION HELD IN THE UNITED STATES IN ESCROW WITH DEBTORS' COUNSEL FOR SPECIFIED PURPOSES AS SET FORTH HEREIN PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE**

Gary H. Rabin, of full age, being duly sworn according to law, upon his oath, deposes and states:

1.  I am the President and Interim Chief Executive Officer of the debtor, Immune Pharmaceuticals Inc. (the "Immune Debtor"). The Immune Debtor owns all of the stock in the following debtor entities: Immune Pharmaceuticals, Ltd. ("Ltd."), Cytovia, Inc. ("Cytovia"), Maxim Pharmaceuticals, Inc. ("Maxim"), Immune Pharmaceuticals USA Corp. ("Immune USA"

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Immune Pharmaceuticals, Inc. (1431); Immune Pharmaceuticals, Ltd.; Cytovia, Inc. (7805); Immune Oncology Pharmaceuticals, Inc.; Maxim Pharmaceuticals, Inc. (9983); and Immune Pharmaceuticals USA Corp. (9630).

and collectively referred to with Ltd., Cytovia and Maxim as the "Subsidiaries" and together with the Immune Debtor the "Debtors"). As such, I have knowledge of the facts set forth herein based on my personal knowledge and/or my review of the Debtors' books and records, which are maintained in the ordinary course of their businesses.

2. I submit this Declaration in support of the Debtors' Motion for entry of an Order Approving the Immune Debtor's Limited Use Of Sale Proceeds From Alexion Transaction Held In The United States In Escrow With Debtors Counsel For Specified Purposes As Set Forth Herein Pursuant To Section 363 Of The Bankruptcy Code and such other just relief (the "Motion").

**PRELIMINARY STATEMENT**

3. The Debtors have closed on the transaction with Alexion, as defined below, and Debtors counsel received the purchase price of $6,000,000.

4. In accordance with the MOU, as defined below, Debtors' counsel transferred $3,000,000 to the Official Receiver, who is the Israeli government entity that oversees bankruptcy proceedings in Israel.

5. Debtors' counsel continues to hold $3,000,000 (the "Escrowed Proceeds") in its attorney trust account, as defined below as the Escrowed Proceedings.

6. The Debtors have certain emergent expenses that need to be paid in the immediacy, which expenses are as follows:

   a. $385.14 relating to an inadvertent bank overdraft caused by an automatic withdrawal;

   b. $336.00 for an email and web hosting contractor;

   c. $6,187.91 for the Office of the United States Trustee (the "UST") outstanding quarterly fees relating to all Debtors; and.

    d. $25,000 to me as a partial payment toward my post-petition compensation due to significant financial obligations and hardship, which said amount includes any employer and employee tax obligations and other applicable required deductions as the case may be.

7. As discussed below, my request for payment to me is being made because unlike the other professionals in the case, I have no other alternative source of payment, no other clients nor do I work for a law firm or accounting firm that pays me a salary while the firm waits to be paid in the case.

8. Accordingly, the Debtors are requesting that $35,000 of the Escrowed Proceeds be disbursed to the Immune Debtor's debtor in possession bank account to pay the above items with the remaining balance of the $35,000 to be used to pay any accruing UST fees and other minor expenses without further order, provided that advance notice and written consent be obtained from the Committee and Discover.

9. The MOU requires that notice of any disbursement of the Escrowed Proceeds be provided to parties in interest, including the Israeli Trustee, prior to any disbursement of the proceeds. Such notice is being proposed and will be provided.

10. The Debtors have requested consent to or at least confirmation of no objection to the use of proceeds as outlined above from the Committee, Discover and the UST. The Committee and the UST have advised that they have no objection. Discover has advised that it does not object to the use to cover expenses; however, it does object to payment of my salary.

11. The Debtors are filing the Motion for this Court to approve the use of $35,000 of the Escrowed Proceeds so that the Debtors may pay the above required and emergent obligations.

10579648-1    3

# THE CHAPTER 11 CASES, ISRAELI PROCEEDINGS AND SALE PROCESS FOR THE ANTI-EOTAXIN ASSETS

**The Debtors' Chapter 11 Cases and Debtors' Business**

12. On February 17, 2019 (the "Petition Date"), the Immune Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code.

13. Subsequent to the Petition Date, certain of the Immune Debtor's affiliates filed their own Chapter 11 bankruptcy cases. On February 22, 2019, Ltd. filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and on February 26, 2019, the remaining Subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

14. The Immune Debtor is a Delaware corporation with a principal place of business located at 1 Bridge Plaza North, Suite 270, Fort Lee, New Jersey 07024.

15. The Immune Debtor has both common and preferred stocks outstanding. Prior to the bankruptcy filings, its common stock traded on the OTCQB, which is operated by OTC Market Groups, Inc. ("OTC"), under the symbol "IMNP". Since the bankruptcy filings, the Immune Debtor's common stock has traded on the Pink Market, which also is operated by OTC, under the symbol "IMNPQ".

16. The Debtors are clinical and approved stage biopharmaceutical companies specializing in the development of novel targeted therapeutic agents in the fields of inflammation, dermatology and oncology. As of September 30, 2018, the Immune Debtor did not have any self-developed or licensed products that were approved for sale by the United States Food and Drug Administration, but does have a drug approved by the EU medical approval agency.

17. As of the Petition Date, the Immune Debtor's assets included the following main product lines: (i) anti-eotaxin antibodies (e.g., bertilimumab-NSO and Immune Debtor developed

anti-eotaxin-1-CHO, collectively, the "Anti-Eotaxin Assets"); (ii) Ceplene®; (iii) NanoCyclo®; (iv) AmiKet®; and (v) Azixa/Crolibulin.

**The Israeli Stay Proceeding**

18. On March 28, 2019, Ltd. filed a motion in the District Court of Jerusalem, Israel ("Israeli Court") for a "stay of proceedings" under section 350 of The Companies Act, 1999 of the State of Israel (the "Israeli Stay Proceedings").

19. When the Israeli Stay Proceedings were commenced, the Debtors understood that an Israeli trustee would be appointed to oversee Ltd, but to also cooperate with the anticipated sale process in the Chapter 11 Cases.

20. On or about April 2, 2019, the Israeli Court approved the Israeli Stay Proceeding and shortly thereafter appointed Baruch Hakim ("Mr. Hakim") as the Israeli Trustee.

21. As discussed below, on or about September 26, 2019, Mr. Hakim was removed as the Israeli Trustee being replaced by Eitan Erez.

**The Sale Motion Relating to the Anti-Eotaxin Assists**

22. On July 1, 2019, the Debtors filed the Motion for entry of an Order, pursuant to sections 105(a), 363(b), (f) and (m) of the United States Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002 and 6004, and D.N.J. LBR 6004, approving and authorizing, among other things: (i) bid procedures and form of notice in connection with the sale of the Debtors' anti-eotaxin antibodies, including bertilimumab assets free and clear of all liens, claims, encumbrances, and interests, (ii) stalking horse agreement and bid protections, (iii) the scheduling of a sale hearing, (iv) the sale to the purchaser submitting the highest or best offer, (v) procedures for assuming and assigning executory contracts, and (vi) other related relief (the "Sale Motion"). See Doc. No. 219.

23. On July 2, 2019, the Court conducted a hearing on the Debtors' request for an expedited hearing on the Debtors' request bidding procedures and the approval of Alexion Therapeutics, Inc. ("Alexion") as the stalking horse bidder (the "Bidding Procedures Motion").

24. On July 2, 2019, the Court entered an order scheduling a July 16, 2019 hearing on the Bidding Procedures Motion. See Doc. No. 222.

25. On July 15, 2019, the Committee filed a Motion to Confirm the Automatic Stay and Related Relief (the "Committee Motion"). See Doc. No. 242. The Court scheduled a hearing on the Committee Motion for July 19, 2019. The Committee Motion was filed as a result of the on-going actions being taken by the Mr. Hakim, the then Israeli Trustee in the Israeli Stay Proceedings.

26. On July 16, 2019, the Court entered an order approving the Debtors' proposed bidding procedures (the "Bidding Procedures Order"). See Doc. No. 247. The Bidding Procedures Order, among other things, provided for bids to be submitted on or before September 12, 2019, the auction, if any, to be conducted on September 16, 2019 and the sale hearing approving the successful bidder to proceed on September 24, 2019.

27. Mr. Hakim sought to adjourn the July 19, 2019 hearing; however, when Mr. Hakim refused to adjourn his July 22, 2019 hearing before the Israeli Court, this Court made a preliminary ruling invoking the automatic stay. This Court further stated that it would proceed in concert with the Israeli Court in relation to the disposition of assets of both the Debtors and Ltd. The Court continued the hearing to July 31, 2019.

28. On or about July 22, 2019, the Debtors' Israeli counsel submitted the Bidding Procedures Order to the Israeli Court for its approval.

29. On July 31, 2019, the Court conducted a continued hearing on the Committee Motion. The Court entered an Order addressing the issues in the Committee Motion. See Doc. No. 287 (the "Cooperation Order"). The order included provisions that provide that this Court will have jurisdiction in the first instance with respect to the sale process and with respect to assets of Ltd the Court would proceed in conjunction with the Israeli Court. The Court's order sought to avoid inconsistencies between the Court and the Israeli Court.

30. On September 12, 2019, the Official Receiver filed a motion with the Israeli Court to appoint a co-trustee. Within an hour, Eitan Erez was appointed as the co-trustee alongside Mr. Hakim.

31. On September 16, 2019, Mr. Erez appeared at a hearing before the Israeli Court where he stated that he was prepared to adopt the Bidding Procedures Order with revised dates.

32. In a conference call before this Court with Mr. Erez' participation, conducted on September 17, 2019, the parties advised this Court that the salient dates relating to the bid solicitation process set forth in the Bidding Procedures Order were being modified to provide that bids were to be submitted on or before October 11, 2019, the auction, if any, would be conducted on October 15, 2019 and the sale hearing approving the successful bidder would proceed on October 17, 2019. See Doc. No. 320 for the Notice of the revised dates.

33. On or about September 18, 2019, Mr. Erez filed pleadings before the Israeli Court stating that he could not work with Mr. Hakim and that the Israeli Court needed to decide which of the two trustees would continue.

34. On September 26, 2019, the Israeli Court rendered its decision, which included the release of Mr. Hakim as co-trustee.

35. On October 3, 2019, the Debtors, the Committee and Mr. Erez, as the sole Israeli Trustee executed a Memorandum of Understanding ("MOU") for Mr. Erez to submit to the Israeli Court for approval.

36. On October 7, 2019, the MOU was approved by the Israeli Court.

37. On October 7, 2019, Alexion advised the Debtors that its due diligence was satisfied.

38. On October 9, 2019, Alexion posted a $600,000 deposit with Debtors' counsel.

39. On October 10, 2019, the Debtors filed a motion to obtain court approval of the MOU (the "MOU Motion"). See Doc. No. 327.

40. On October 17, 2019, the Court conducted a hearing on the Sale Motion. On October 21, 2019, the Court entered an Order approving the sale of the Anti-Eotaxin Assets to Alexion on for a purchase price of $6,000,000. See Doc. No. 343.

41. Also, on October 17, 2019, the Court conducted a hearing on the MOU Motion. On October 23, 2019, the Court entered an order approving the MOU Motion. See Doc. No. 345.

42. On November 6, 2019, the Israeli Court approved the sale of the Anti-Eotaxin Assets to Alexion.

43. On November 20, 2019, the transaction with Alexion closed. On November 21, 2019, Alexion wired $5,400,000 to the attorney trust account of Debtors' counsel. Along with the $600,000 security deposit previously paid by Alexion, Debtors' counsel was then holding $6,000,000.

44. On November 21, 2019, in accordance with the MOU Order and in accordance with wire instructions provided by Mr. Erez and also provided by the Debtors' Israeli counsel for the

Israeli Official Receiver's bank account, Debtors' counsel remitted $3,000,000 to the Official Receiver.

45. Currently, Debtors' counsel is holding $3,000,000 of the Alexion sale proceeds in its attorney trust account.

**REQUEST FOR USE OF $35,000 OF THE ESCROWED PROCEEDS TO PAY CERTAIN EMERGENT EXPENSES OF THE DEBTORS**

46. As referenced in the Preliminary Statement set forth above, the Debtors have the following expenses that it is desirous of paying from the Escrowed Proceeds in the immediacy:

   a. $385.14 relating to an inadvertent bank overdraft caused by an automatic withdrawal;

   b. $336.00 for an email and web hosting contractor;

   c. $6,187.91 for UST outstanding quarterly fees relating to all Debtors; and.

   d. $25,000 to me as a partial payment toward my post-petition compensation, which said amount includes any employer and employee tax obligations and other applicable required deductions as the case may be.

47. With respect to items a) and b) above, these obligations need to be addressed in the immediacy. The email and web hosting remain of importance to the Debtors efforts to attempt to sell or locate a reorganization partner around their remaining assets. All vital information relating to the assets, including the data room and otherwise are maintained or accessed through the web hosting and corresponding email service. The bank overdraft needs to be addressed. The overdraft occurred as a result of an inadvertent continued automatic withdrawal by a service provider relating to the email and web hosting service.

48. With respect to item c), the Debtors are without any other source of money to pay the UST fees, except for the Escrowed Proceeds.

49. With respect to item d), my salary, as I stated previously, my personal sole source of money is my salary for my role as the interim CEO. I have not been paid any money since July 26, 2019 for my services.

50. Unlike the other professionals in the case, I am not associated with nor work for a firm that pays me a salary while such firm waits for payment of its fees, nor could I have had the time to do so. All of the legal counsel in this case, including those in Israel, could testify that I have been holding calls and email exchanges regularly from 3:30-4:30am and onward my time (Pacific Time) for the nine months I have been the Interim CEO of the Debtor.

51. At this juncture, I have significant financial commitments and hardship that include my 3 months of past due rent, health insurance coverage for myself and my three children (which has been canceled as of September 1, 2019 and after December 15, 2019 cannot be renewed for January 2020) and my son's upcoming tuition for the winter semester. As of now, my sole source of money to satisfy these commitments is my request for the $25,000 referenced in d). As of this date, I am owed $171,250 in past due salary, and the $25,000 represents only 14.6% of the amount I am due.

52. Prior to filing this Motion, I shared my issue with the Committee, Discover and the UST. The Committee and the UST were sympathetic to my request. Discover, on the other hand, only would allow the expense items to be paid, and denied my request.

53. Discover asserts that it has a lien on the Escrowed Proceeds and that the proceeds are their cash collateral. As set forth in the Debtors' and the Committee's opposition to the Discover's motion for stay relief (Doc. Nos. 67 and 68) and the Debtor and the Committee's adversary proceeding commenced against Discover (Doc. No. 218 and Adv. Pro. No. 19-02033), Discover's lien and claim is disputed. The Debtors assert, among other things, that Discover

agreed in the various agreements therewith that it would be paid only "after payment or provision for payment of debts and other liabilities of the [Immune Debtor]".

54. Based on the above, the Debtors and I are requesting that $35,000 be disbursed from the Escrowed Proceeds to the Immune Debtor's debtor in possession bank account to be used to pay the items referenced in paragraphs 6 through 8 and paragraph 46 above. The Debtors propose that the remaining balance will be used to cover future UST fees and future *di minimis* expenses under the proviso that advance notice and consent be obtained from the Committee and Discover.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ Gary H. Rabin
Gary H. Rabin
Interim CEO

Dated: December 2, 2019