UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Dale E. Barney, Esq.
David N. Crapo, Esq.
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4500
Facsimile: (973) 596-0545
E-mail: dbarney@gibbonslaw.com
          dcrapo@gibbonslaw.com
*Counsel for Discover Growth Fund, LLC*

| | |
|---|---|
| **In re:** | Chapter 11 |
| IMMUNE PHARMACEUTICALS, INC., *et al.*,[1] | Case No. 19-13273 (VFP) |
| **Debtors.** | (Jointly Administered) |
| | **Hearing Date:** December 17, 2019 at 2:30 .m. ET  **Objection Deadline:** December 13, 2019 |

### DISCOVER GROWTH FUND, LLC'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING IMMUNE PHARMACEUTICALS, INC.'S LIMITED USE OF SALE PROCEEDS FROM ALEXION TRANSACTION HELD IN THE UNITED STATES IN ESCROW WITH DEBTORS COUNSEL FOR SPECIFIED PURPOSES PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE

Discover Growth Fund, LLC ("Discover"), the senior secured lender to the above-captioned debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 bankruptcy cases (collectively, the "Chapter 11 Cases"), by and through its undersigned counsel, hereby submits this Objection (the "Objection") to Debtors' Motion For Entry of an Order Approving Immune Pharmaceuticals, Inc.'s Limited Use of Sale Proceeds from Alexion

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Immune Pharmaceutical, Inc. (1431); Immune Pharmaceuticals, Ltd.; Cytovia, Inc. (7805); Immune Oncology Pharmaceuticals, Inc.; Maxim Pharmaceuticals, Inc. (9983); and Immune Pharmaceuticals USA Corp. (9630).

Transaction Held in the United States in Escrow with Debtors Counsel for Specified Purposes Pursuant to Section 363 of the Bankruptcy Code [Doc 354] (the "Motion"). In support of this Objection, Discover respectfully represents the following:

## PRELIMINARY STATEMENT

1.      Once again, the Debtors ask the Court to ignore Discover's valid and perfected first priority lien on cash collateral and permit the use of that cash for operating expenses without adequately protecting Discover's secured interest. For the reasons set forth herein, the Debtors' request should be denied to the extent that the Debtors seek to use cash collateral to pay Gary Rabin's salary.[2]

2.      It is undisputed that Discover provided the last $2 million in debt financing to the Debtors that allowed the Debtors to avoid shuttering their sputtering businesses in October 2018. It is indisputable that Discover has a perfected first lien on its collateral, which includes the proceeds of the recent asset sale. The adversary proceeding that disputes Discover's liens was filed as leverage, but the Debtors and the Committee are going to be put to their proofs at trial. Discover is confident that, once the facts are aired at a plenary hearing, the Court will determine that Discover's debt claim and lien are valid and enforceable.

3.      Discover has a perfected, first-priority security interest and lien on all of the assets of lead Debtor Immune Pharmaceuticals Inc. ("Immune Debtor"), including the $3 million cash proceeds of the Immune Debtor's recent sale of the Anti-Eotaxin Assets to Alexion Pharma International Operations Unlimited Company ("Alexion"). Under that certain "Grant of Security Interest Agreement in United States Patents and Trademarks (IP Security Agreement)" entered into by and between the Immune Debtor and Discover as of October 9, 2018 ("IP Security

---

[2] Discover does not object to the use of the sale proceeds to pay US Trustee fees and the other ministerial expenses sought by the Motion.

2767760.1 115785-100485

Agreement") and the other Debt Documents identified below, all of the Anti-Eotaxin Assets were

Discover's collateral.  A copy of the IP Security Agreement is attached as Exhibit A to the

Declaration of John C. Kirkland dated October 10, 2019 and filed in support of Discover's

objection to the Anti-Eotaxin Asset sale ("Kirkland Dec. III")[Doc 329-3].  See also the Court's

Order dated October 21, 2019 authorizing the sale of the Anti-Eotaxin Assets to Alexion, Doc 343

("Sale Order"), pp. 62-66 for schedule of the Anti-Eotaxin Assets sold.

4.    The Sale Order specifically provides that the sale was free and clear of claims and

liens

**with all Claims, Encumbrances, Interests, Liabilities and Liens that represent interests in property, inclusive of those of Discover Growth Fund LLC, to attach to the net proceeds of the Sale Transaction**, in the same amount and order of their priority, with the same validity (or invalidity) force, and effect that they have against the Acquired Assets immediately prior to the Sale Transaction, and subject to any rights, claims, defenses and objections, if any, the Debtors and any other interested parties may possess with respect thereto, in each case immediately before the Closing.  For the avoidance of doubt, the Acquired Assets are sold to the Buyer free and clear of any Claims, Encumbrances, Interests, Liabilities and Liens of those of Discover Growth Fund LLC. **Discover Growth Fund LLC may assert any of its Claims, Encumbrances, Interests, Liabilities and Liens against the proceeds of the Sale Transaction wherever located, deposited, escrowed or otherwise held or transferred.**

Sale Order, pp. 17-18 (Emphasis supplied).

5.    Discover has asserted and hereby again asserts that its first priority lien on the

Immune Debtor's assets attaches to the proceeds of the sale of the Anti-Eotaxin Assets to Alexion,

which constitute the "proceeds of the Sale Transaction" referenced in the Sale Order.

6.    The Motion is, in essence, a motion to use cash collateral.  While Discover's

secured claim is disputed by the Immune Debtor and the Committee by way of adversary

proceeding, that dispute is far from resolved.  Moreover, that dispute notwithstanding, Discover is

entitled to adequate protection of its secured interest in the sale proceeds, pursuant to 11 U.S.C.

§ 363(e).  As Discover already has a lien on the sale proceeds, the Immune Debtor has no other

2767760.1 115785-100485

assets with which to provide Discover a replacement lien for the $25,000 that the Immune Debtor proposes to pay to Mr. Rabin.

7.    As Discover does not consent to the proposed use of its cash collateral, and the Immune Debtor has no means of providing adequate protection, the Court cannot order this proposed use of cash over Discover's objection. As such, the Motion must be denied as to the proposed payment to Mr. Rabin.

## JURISDICTION AND VENUE

8.    The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* (D.N.J. Sept. 18, 2012). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.    The legal bases for the relief requested herein are 11 U.S.C. § 363; Fed. R. Bankr. P. 6004; and Rule 9016-1 of the Local Bankruptcy Rules.

## FACTUAL BACKGROUND

### A.    Procedural Background

10.    On February 17, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned Chapter 11 Case. The other Debtors filed the balance of the Chapter 11 Cases thereafter. The Debtor is operating its business and/or managing its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.    No request for the appointment of a trustee or examiner has been made in this Chapter 11 Case. The United States Trustee for Region 3 appointed the Committee effective March 14, 2019.

4

12.    The Debtor is a New Jersey-based clinical stage biopharmaceutical company specializing in the development of "novel targeted therapeutic agents" in the fields of inflammation, dermatology and oncology.

13.    Discover is the Debtor's senior secured lender, pursuant to the terms of a $5,500,000.00 face amount Senior Secured Redeemable Convertible Debenture (the "Debenture") issued to Discover on October 9, 2018 and the Securities Purchase Agreement dated October 9, 2018 (the "Agreement"), pursuant to which it was issued (the Debenture, the Agreement and the IP Security Agreement, together with related documents, the "Debt Documents").

**B.      Pertinent Provisions of the Debt Documents**

14.    Discover respectfully refers the Court to the Declaration of John C. Kirkland in Support of Motion of Discover Growth Fund, LLC for Relief from the Automatic Stay dated February 25, 2019 ("Kirkland Dec.")[3] and filed in the Chapter 11 Cases as Doc 11-3 in support of this Objection. The Debenture is attached to the Kirkland Dec. as Exhibit A, and the Agreement is attached to the Kirkland Dec. as Exhibit B. Kirkland Dec., ¶ 3. The Kirkland Dec. describes the terms of the Debt Documents, the genesis of the transaction between the parties, amounts due under the Debt Documents, and the Debtor's defaults thereunder. Those factual recitations are incorporated herein and supplemented below and in the Declaration of John C. Kirkland in support of this Objection, dated March 22, 2019 and filed herewith ("Kirkland Dec. II").

15.    Exhibit 1 to the Agreement defines Discover's Collateral, in part, as follows: "'Collateral' means all assets of the Company, including without limitation all personal property wherever located, both now owned and hereafter acquired, including, but not limited to, all … general intangibles, … license agreements …, patents, … ***and all proceeds*** … of the foregoing….

---

[3] Capitalized terms used herein shall have the meaning ascribed in the Kirkland Dec. unless otherwise defined.

2767760.1 115785-100485

Discover's liens were perfected by the filing of UCC-1 statements in New Jersey and Delaware, where the Immune Debtor represented it had its principal place of business and was incorporated, respectively. Discover also filed the IP Security Agreement with the United States Patent and Trademark Office. Kirkland Dec., ¶ 18, Exhibits J, K and L.

16.    The IP Security Agreement lists certain of the patents and related assets that the Immune Debtor pledged to Discover to secure the debt under the Debenture. Kirkland Dec. III, Exhibit A, pp. 3-9.

17.    Section V.C(d) of the Agreement provides, in part, as follows:

Representations and Warranties. Company represents, warrants and covenants to Investor that: (a) Company has good, marketable and indefeasible title to the Collateral, except as disclosed in the Disclosure Schedules, has not made any prior sale, pledge, encumbrance, assignment or other disposition of any of the Collateral, and except as disclosed in the Disclosure Schedules, the Collateral is free from all encumbrances and rights of setoff of any kind except the lien in favor of Investor created by this Agreement; . . . and (d) Exhibit 9 [IP Security Agreement] attached hereto contains a true, complete, and current listing of all patents, trademarks, tradestyles, copyrights, and other intellectual property rights (including all registrations and applications therefor) owned by Company as of the date hereof that are registered with any governmental authority. . . .

18.    A comparison of the Intellectual Property assets sold under the Sale Order to the list of Collateral pledged under the IP Security Agreement demonstrates that all but one of the assets proposed to be sold, identified as "PC Ref No. P-F&W Ref No: 35171-40996/US – Patent Application Filed by Fenwick and West for Immune and Medimmune," ("Fenwick West Asset") Doc 343, pp. 62-66, was pledged by the Immune Debtor to Discover under the IP Security Agreement as the "Bertilimumab Patent Family." Kirkland Dec. III, Exhibit A, pp. 5-7.[4] The Fenwick West Asset was pledged as Collateral under the Agreement: "'Collateral" means all assets of the Company . . . ." The Immune Debtor pledged all of the Collateral to Discover under the foregoing representation that the Immune Debtor had good and indefeasible title to the assets.

---

[4] The IP Security Agreement lists additional Collateral.

### C.    Calculation of Discover's Claim

19.    As a result of the Debtor's Events of Default and Discover's acceleration of all amounts due under the Debt Documents, the Debtor is indebted to Discover in the principal amount or Face Amount of $5,499,470. Kirkland Dec., ¶ 39, ¶ 50. Through February 25, 2019, accrued interest is $670,182, for total principal and interest of $6,169,652 before additional interest.

20.    The Debenture provides a mechanism whereby Discover will immediately receive the full amount of principal and interest due for the five-year term of the Debenture upon the occurrence of any contractually-defined Deemed Liquidation Event. Kirkland Dec., ¶ 51. Accordingly, under the "Mandatory Redemption" provision of the Debenture, Discover is immediately entitled to be paid the "Early Redemption Price" in cash. Debenture, Exhibit A to Kirkland Dec., p. 4, Section I.F. The Early Redemption Price is $14,848,569. *See* Kirkland Dec. II, ¶ 11.

21.    While the Debtors and the Committee have initiated an adversary proceeding objecting to Discover's secured claim, Discover is unquestionably a party in interest entitled to object to the proposed sale.

## RELIEF REQUESTED AND REASONS THEREFOR

### I.    DISCOVER'S OBJECTION TO THE MOTION

22.    Discover submits that the Immune Debtor cannot provide adequate protection for the diminution in the value of Discover's cash collateral that will be occasioned by the proposed payment to Mr. Rabin. Thus, the Immune Debtor cannot satisfy the requirements of 11 U.S.C. § 363(e), so that the Motion should be denied with respect to that payment. Indeed, the Motion goes on at length regarding a debtor's obligation to propose adequate protection to a secured creditor such as Discover, but then fails to actually propose any adequate protection. *See* Memorandum of Law filed with the Motion, Doc 354-2, pp. 4-6. The reason for this failure is

7

plain: the Immune Debtor has no unencumbered assets with which to provide protection for the proposed diminution of Discover's cash collateral.

A. **Applicable Standard and Argument**

23.    As demonstrated above, Discover holds a perfected, first-priority security interest and lien on, *inter alia*, all of proceeds of the Anti-Eotaxin Asset sale. On June 19, 2019, July 16, 2019 and September 27, 2019, respectively, Discover filed an initial and two amended proofs of claim against the Immune Debtor. *See* Claims No. 37-1, 37-2 and 37-3 filed against the Immune Debtor. By doing so, Discover presented *prima facie* evidence as to the validity and amount of its secured claim against the Immune Debtor. Fed. R. Bankr. P. 3001(f). Discover's proof of claim has not been disallowed, reduced or expunged.

24.    The Immune Debtor tacitly acknowledges Discover's lien on the Anti-Eotaxin Asset sale proceeds by acknowledging that Discover is entitled to adequate protection. Doc 354-2, pp. 4-5. The Debtors contend that the lien is subject to a *bona fide* dispute. On July 1, 2019, the Debtors and the Committee filed a complaint against Discover seeking, *inter alia*, to determine the validity and extent of Discover's liens in the adversary proceeding entitled *Immune Pharmaceuticals, Inc. et al. v. Discover Growth Fund, LLC* and numbered 19-02033-VFP ("Adversary Proceeding"). Adv. Proc. No. 19-02033 Docket No. 1. Discover has answered the complaint, vigorously contesting the claims made in the Adversary Proceeding.

25.    As to the alleged subordination clause referenced in ¶ 53 of the Declaration of Gary Rabin filed in support of the Motion, Doc 354-1, and on p. 6 of the Memorandum of Law filed with the Motion, Doc 354-2, that provision, when read fairly, does not effect the subordination claimed by the Debtors. First, the Debtors' references to that provision misrepresent the provision by omission. The quoted part of that provision, which is in Section I.E.1 of the Debenture, is immediately followed by: "prior to any distribution or payment made to any other creditors or the

8

holders of any Preferred Stock or Common Stock by reason of their ownership thereof, the Holders of this Debenture [i.e. Discover] will be entitled to be paid out of the assets of the Corporation."

26.     This provision does not "specifically provide[] that [Discover's] . . . claim is subordinate to company debts" as the Immune Debtor misstates. Rather, it is at most internally inconsistent, providing both that Discover's claims will be paid before and after claims of other creditors. That inconsistency can only be resolved by looking to the entirety of the Debt Documents, taken as a whole. Provisions of contracts must be "read as a whole, without artificial emphasis on one section, with a consequent disregard for others." *Borough of Princeton v. Bd. of Chosen Freeholders of Mercer*, 333 N.J. Super. 310, 325 (App. Div. 2000), aff'd, 169 N.J. 135 (2001). "Literalism must give way to context." *Id.* Contract interpretation must take into account "the contractual scheme as a whole," *Republic Bus. Credit Corp. v. Camhe-Marcille*, 381 N.J. Super. 563, 569 (App. Div. 2005) (quoting *Newark Publishers' Ass'n v. Newark Typographical Union*, 22 N.J. 419, 426 (1956)). The Court must determine "the objects the parties were striving to attain." *Celanese Ltd. v. Essex Cnty. Imp. Auth.*, 404 N.J. Super. 514, 528 (App. Div. 2009). The District Court of the U.S. Virgin Islands is in accord. "A cardinal principle governing the construction of contracts is that the entire contract must be considered and, as between possible interpretations of ambiguous provisions, that will be chosen which best accords with the sense of the remainder of the contract. A written contract is to be construed so as to give effect to all its parts, and any construction which would render the agreement meaningless should be avoided." *Pan Am. Realty Trust v. Twenty One Kings, Inc.*, 6 V.I. 332, 343 (D.V.I. 1968)(citations omitted)(applying New York law).

27.     The Debt Documents clearly, expressly and repeatedly evidence a mutual intent to grant to Discover a first priority security interest and lien to secure repayment of the Immune

9

Debtors' obligations prior to claims of other creditors. The Debtors' interpretation requires the Court to disregard not only the contradictory language in the same provision, but also the entire security structure and priority scheme set forth in the Debt Documents. "The contractual scheme as a whole" makes clear that the parties' object was to make Discover the Immune Debtor's senior secured lender. *Republic Bus. Credit Corp. v. Camhe-Marcille*, 381 N.J. Super. at 569. The Debtors' interpretation of the provision in question renders the Debt Documents meaningless and must be eschewed. *Pan Am. Realty Trust v. Twenty One Kings, Inc.*, 6 V.I. at 343. Why would this secured creditor provide that its claims would be subordinate to other creditors when it took pains to obtain a first lien on all assets of its borrower? The answer is simple – it would not, and did not.

28.    The Debtor's interpretation is entirely inconsistent with the multi-page Section V. of the Agreement, entitled "Security Agreement," and the IP Security Agreement which clearly evidence an intent on the part of the Immune Debtor to grant to Discover a first priority lien and security interest in all of the assets of the Immune Debtor and proceeds thereof. **In any event, this issue is not before the Court on the Motion – the issue of subordination is a central theses of the Adversary Proceeding, and can only be resolved in that context under Fed. R. Bankr. P. 7001 (2) and (8), and the inclusion of the alleged subordination language in Mr. Rabin's declaration and in the Memorandum of Law is purely gratuitous.**[5]

29.    The Debtors' and the Committee's claims disputing Discover's liens are far from resolved. This Court is not required to resolve this dispute concerning Discover's perfected liens in the context of the Motion. *In re Gaylord Grain, LLC*, 306 B.R. 624, 627 (8th Cir. B.A.P. 2004). Those claims can only be resolved through the Adversary Proceeding. *See* Fed. R. Bankr. P.

---

[5] Discover reserves all claims and defenses with respect to this issue in the Adversary Proceeding or otherwise.

2767760.1 115785-100485

7001(1), (2) and (8) of the (actions to (i) recover money or property; (ii) determine the validity, extent or priority of a lien; or (iii) subordinate a claim must be resolved via adversary proceeding). Absent an adverse ruling in the Adversary Proceeding, Discover remains a secured creditor of the Immune Debtor. *See, e.g., In re Heritage Highgate, Inc.*, 679 F.3d 132, 140 (3d Cir. 2012) (recognizing that a secured creditor's proof of claim establishes prima facie evidence of the validity and amount of the secured claim).

30.    Upon request by a secured creditor like Discover "at any time", a bankruptcy court "*shall* prohibit or condition" the sale of property of the bankruptcy estate "as is necessary to provide adequate protection of [the secured creditor's] interest" in that property. 11 U.S.C. § 363(e) (emphasis added). That requirement exists "[n]otwithstanding any other provision of this section," such as a bona fide dispute of Discover's claim such as alleged by the Immune Debtor here. 11 U.S.C. §§ 363(e) and (f)(4).[6] In connection with the sale of assets of a bankruptcy estate, the Bankruptcy Code authorizes three forms of adequate protection:

(i)    periodic payments to the extent that the proposed sale results in a decrease in the value of the secured creditor's interest in its collateral;

(ii)    additional or replacement liens; and

(iii)    such other relief that will provide the secured creditor with the indubitable equivalent of its interest in its collateral.

11 U.S.C. § 361.

31.    It cannot be disputed that the value of Discover's security interest in the Anti-Eotaxin Asset proceeds will be eroded if the proposed payment to Mr. Rabin is made. Given the posture of this case, with the Tepper/Vector group failing to close on the Ceplene transaction and

---

[6] The Motion states cryptically that "[t]he Legislative History to Section 361 'does not require the court to provide [adequate protection]'" without citation to whatever legislative history the assertion refers. *See* Memorandum of Law filed with the Motion, Doc 354-2, p. 4. However, this statement is directly contrary to the statutory mandate of 11 U.S.C. § 363(e), and should be disregarded.

2767760.1 115785-100485

the Debtors being forced to expatriate 50% of the Alexion sale proceeds to Israel, the $3 million held by the Immune Debtor may be the only asset from which to satisfy Discover's secured claim once it is allowed by this Court. The Motion proposes to use cash collateral for payment of a $25,000 administrative expense to Mr. Rabin, without adequately protecting Discover's interest, which is impermissible. In the context of DIP financing, the Third Circuit has made clear that adequate protection "should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights. … In other words, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing." *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (en banc) (internal quotations omitted). The Immune Debtor has no ability to provide Discover "with the same level of protection" of its secured interest that the $25,000 cash that is proposed to be disbursed provides.

32.    *In re Nice*, 355 B.R. 554, 563 (Bankr. N.D. Va. 2006), on which the Debtor relies in support of the Motion, underscores Discover's crucial need for adequate protection in this case. In *Nice*, the court held that "adequate protection is solely a function of preserving the value of the creditor's secured claim as of the petition date due to the debtor's continued use of the collateral." *Id.*, at 563. Here, the Debtor proposes to use $25,000 from the proceeds of the Alexion sale to pay a portion of Mr. Rabin's salary. However, the Debtor has no other funds in the estate that are not already Discover's cash collateral, and has failed to demonstrate the value of its remaining assets. Indeed, the Debtor still has been unable to close the sale of the Ceplene® assets. Discover's claim greatly exceeds the $3 million in cash the Debtor has on hand. It is indisputable that the Debtor's proposed use of the proceeds of the Alexion sale will significantly erode Discover's interest in those proceeds. Moreover, Discover fears that the Motion contains

only the first request for the payment of Mr. Rabin's salary and the beginning of the death of Discover's cash collateral by 1,000 cuts.

33.    The Debtors' reliance on 11 U.S.C. § 506(c) is misplaced.  A motion to surcharge Discover's collateral is not even before the Court, and the Debtor has not submitted the required proofs for a surcharge.  In order for a debtor to surcharge a secured creditor's collateral, the debtor must prove three elements: (i) the expense must be necessary; (ii) the amount of the expenditure must be reasonable; and (iii) the expense must benefit the secured creditor.  See 4 COLLIER ON BANKRUPTCY ¶ 506.05[9] (16th ed. 2014).  The Immune Debtor has not properly moved for this relief, and has failed to address this standard or submit competent proofs. Accordingly, the Debtor's invocation of the surcharge statute should be rejected.

34.    In *In re Towne, Inc.*, 536 Fed. Appx. 265 (3d Cir. 2013) (copy attached), the Third Circuit stated in unequivocal terms that. "[a]s we have explained, however, section 506(c) permits a claimant to recover expenses from secured collateral only under 'sharply limited' circumstances." *Id.* at 268, citing *In re Visual Indus., Inc.*, 57 F.3d. 321, 325(3d Cir. 1995).  The *Towne* Court quoted *In re C.S. Assocs.*, 29 F. 3d 903, 906 (3d Cir. 1994) for the proposition that "[T]o recover expenses under § 506(c), a claimant must demonstrate that (1) the expenditures are reasonable and necessary to the preservation or disposal of the property and (2) the expenditures provide a *direct* benefit to the secured creditors." *Towne*, 536 Fed. Appx. At 268 (emphasis in original.)

35.    In *Towne*, The Margolis Law Firm ("Margolis") was retained as special counsel to the debtor, a BMW dealership.  BMW Financial Services, NA, LLC ("BMW FS") was the secured lender with a first priority security interest in most of the debtor's assets and a lien on the

2767760.1 115785-100485

real estate where the dealership was located, with a secured debt of more than $9 million. *Id.* at 267.

36.    Margolis obtained an offer to purchase the collateral for $6 million, and BMW FS, which had obtained stay relief, agreed to forebear to permit the sale to close. However, BMW FS would only consent to the short sale if the debtor granted releases of what appear to have been claims to reduce BMW FS' secured claim and an administrative proceeding against the creditor in state court. The sale did not close, the Bankruptcy Court converted the case to chapter 7, and the chapter 7 trustee agreed to the releases and closed a sale of the collateral for $5.25 million. *Id.* at 267, 269.

37.    The *Towne* Court held that Margolis failed to prove a direct benefit to BMW FS, and that the primary beneficiary of Margolis' services was the debtor. *Id.* at 269. In fact, the Court cited the Bankruptcy Court's findings that Margolis sought a surcharge "for numerous services that were actually contrary to BMW FS's interests, including efforts to reduce the value of BMW FS's lien and conducting research that led to an administrative proceeding against BMW FS in state court." The Third Circuit held that "[t]hese findings are amply supported in the record and are not clearly erroneous." *Id.*

38.    Similarly, among the efforts taken by Mr. Rabin in this case is the filing of the Adversary Proceeding in which the Immune Debtor and the Committee seek to subordinate Discover's claim. That effort cannot be said to provide a benefit to Discover, much less a direct one, and is instead entirely hostile to Discover's secured position. Further, the Debtors have been unable to monetize Ceplene or any of their other assets, despite marketing efforts over many months that have caused the Debtors to incur hefty administrative expenses, including Mr.

2767760.1 115785-100485

Rabin's salary. None of those failed efforts can credibly be said to provide a direct benefit to Discover that would justify a surcharge.

39.     The Immune Debtor argues that its sale of assets to Alexion justifies the use of Discover's cash collateral to pay Mr. Rabin, but that argument pales when considered in light of the fact that the Immune Debtor, with Mr. Rabin at the helm, placed itself in a position that led to the expatriation of $3 million of the proceeds to Israel. That alienation of Discover's cash collateral has not been adequately protected, and now the Immune Debtor seeks to further diminish Discover's security with the current payment request. Mr. Rabin's efforts have provided no direct benefit to Discover and have, in many respects been contrary to Discover's interests, and the Immune Debtor cannot adequately protect Discover's interests. The current payment request must be denied.

40.     It is undisputed that Discover is entitled to adequate protection of its security interest. 11 U.S.C. §§ 361, 363(e). However, outside of the sale proceeds on which Discover already has a lien by operation of the Sale Order, the Debtors lack any other assets which are not already Discover's Collateral with which to provide a replacement lien or from which to make any payments to Discover pursuant to 11 U.S.C. §§ 361(1), to compensate Discover for the anticipated erosion to its collateral. Similarly, because Discover holds a lien on all of its assets, the Immune Debtor lacks free assets with which to provide Discover substitute collateral as provided by 11 U.S.C. § 361(2).

41.     The Debtors must, therefore, provide some other form of adequate protection to compensate Discover for the erosion of its Collateral. They must provide Discover with the indubitable equivalent of its liens. 11 U.S.C. § 361(3). Under the circumstances of this case, there is no source from which such an indubitable equivalent can come. As the Immune Debtor is

15

incapable of adequately protecting Discover's interests, the Motion must be denied as to the proposed payment to Mr. Rabin.

## MEMORANDUM OF LAW

42.    The rules and statutory provisions that constitute the basis for this Objection, the legal authorities that support the relief requested, and the factual grounds for the relief requested are all included and/or cited herein. Accordingly, Discover submits that no separate memorandum of law is necessary or required.

## NOTICE

43.    Notice of this Objection is being provided to counsel for the Debtor, the Committee and other parties in interest entitled to receive notice in connection with these Chapter 11 Cases. Discover submits that no other or further notice is required under the circumstances.

## NO PRIOR REQUEST

44.    No prior motion for the relief requested herein has been made to this or any other court.

## CONCLUSION

**WHEREFORE**, Discover respectfully requests that this Court enter an order (i) denying the Motion as to the proposed payment to Gary Rabin and (ii) granting such other further relief as is just and proper under the circumstances.


Dated:  December 13, 2019                    Respectfully submitted,


                                             **GIBBONS P.C.**


                                             By:  _/s/ Dale E. Barney_
                                             Dale E. Barney


16

2767760.1 115785-100485

David N. Crapo
One Gateway Center
Newark, New Jersey 07102-5310
Tel:     (973) 596-7474
Fax:     (973) 639-6244
dbarney@gibbonslaw.com
dcrapo@gibbonslaw.com

*Counsel for Discover Growth Fund, LLC*



**Date and Time:** Wednesday, December 11, 2019 11:07:00 AM EST

**Job Number:** 105086185

## Document (1)

1. *In re Towne, Inc., 536 Fed. Appx. 265*
   **Client/Matter:** 099998-00031
   **Search Terms:** name(in re towne)
   **Search Type:** dynand
   **Narrowed by:**

   | **Content Type** | **Narrowed by** |
   |---|---|
   | Cases | Court: Federal > 3rd Circuit |


Positive
As of: December 11, 2019 4:07 PM Z

## *In re Towne, Inc.*

United States Court of Appeals for the Third Circuit

May 31, 2013, Argued; August 29, 2013, Opinion Filed

No. 12-3069

**Reporter**
536 Fed. Appx. 265 *; 2013 U.S. App. LEXIS 18050 **; 2013 WL 4566061

*In* re: TOWNE, INC and DMD TOWNE, LLC, Debtors,
THE MARGOLIS LAW FIRM LLC, Appellant

**Notice:** NOT PRECEDENTIAL OPINION UNDER THIRD CIRCUIT INTERNAL OPERATING PROCEDURE RULE 5.7. SUCH OPINIONS ARE NOT REGARDED AS PRECEDENTS WHICH BIND THE COURT.

PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [**1]** On Appeal from the United States District Court for the District of New Jersey. (D.C. Civil No. 2-11-cv-05435). District Judge: Honorable Katharine S. Hayden.

*Margolis Law Firm, L.L.C. v. BMW Fin. Servs, NA LLC (In re Towne, Inc.), 2012 U.S. Dist. LEXIS 87871 (D.N.J., June 25, 2012)*

## Core Terms

Collateral, expenses, Franchise, preservation, benefitted, secured creditor, claimant, releases, dispose

## Case Summary

**Overview**

HOLDINGS: [1]-A law firm that acted as special counsel in a bankruptcy case failed to meet the requirements of *11 U.S.C.S. § 506(c)* because it could not demonstrate either that its expenditures were necessary to preserve or dispose of the a car franchise and facilities, or that its efforts directly benefitted the secured creditor; [2]-The contention that the creditor was estopped from denying that it benefitted from the law firm's effort was rejected as the law firm cited no authority to indicate that such a form of estoppel had ever been recognized; [3]-The argument that the creditor violated New York law by impeding the sale of the franchise and facilities, even if true, did not provide a ground for relief under *§ 506(c)* as neither the statute nor prior case law supported the theory that a secured creditor's allegedly unlawful conduct justified relief to a claimant under *§ 506(c)*.

**Outcome**
Order affirmed.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

536 Fed. Appx. 265, *265; 2013 U.S. App. LEXIS 18050, **1

**HN1[↓]** **Standards of Review, Clear Error Review**

The United States Court of Appeals for the Third Circuit reviews the bankruptcy court's factual findings for clear error, but applies plenary review to its legal conclusions. The Third Circuit's review of the district court's decision is plenary because it sits as an appellate court in bankruptcy cases.

Bankruptcy Law > ... > Types of Claims > Secured Claims & Liens > Chargeable Expenses

**HN2[↓]** Secured Claims & Liens, Chargeable Expenses

In general, attorney fees and expenses are not chargeable against secured collateral. Instead, they ordinarily may be charged only against the surplus of the debtor's estate. However, *11 U.S.C.S. § 506(c)* of the Bankruptcy Code provides a limited exception to this rule, which allows a claimant to recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Bankruptcy Law > ... > Types of Claims > Secured Claims & Liens > Chargeable Expenses

**HN3[↓]** Secured Claims & Liens, Chargeable Expenses

*11 U.S.C.S. § 506(c)* is designed to allow a claimant who has expended funds to preserve or dispose of secured collateral to recover those funds from the secured creditor who directly benefitted from them, thus preventing a windfall to the secured creditor at the expense of the claimant. As the United States Court of Appeals for the Third Circuit has explained, however, *§ 506(c)* permits a claimant to recover expenses from the secured collateral only under sharply limited circumstances. To recover expenses under *§ 506(c)*, a claimant must demonstrate that (1) the expenditures are reasonable and necessary to the preservation or disposal of the property and (2) the expenditures provide a direct benefit to the secured creditors.

Bankruptcy Law > ... > Types of Claims > Secured Claims & Liens > Chargeable Expenses

**HN4[↓]** Secured Claims & Liens, Chargeable Expenses

The United States Court of Appeals for the Third Circuit has read *11 U.S.C.S. § 506(c)* as requiring a direct benefit to the secured creditors.

Bankruptcy Law > ... > Types of Claims > Secured Claims & Liens > Chargeable Expenses

**HN5[↓]** Secured Claims & Liens, Chargeable Expenses

Some courts consider a secured creditor's consent in analyzing a claim under *11 U.S.C.S. § 506(c)*.

**Counsel:** Seth L. Dobbs, Esq. (Argued), Martin G. Margolis, Esq., The Margolis Law Firm LLC, Roseland, NJ, Counsel for Appellant.

Anthony Sodono, III, Esq. (Argued), Trenk, DiPasquale, Della Fera & Sodono, P.C., West Orange, NJ, Counsel for Appellee Joseph Newman.

Joann Sternheimer, Esq. (Argued), Deily, Mooney & Glastetter, LLP, Albany, NY, Counsel for Appellee BMW Financial Services LLC.

**Judges:** Before: JORDAN, VANASKIE, Circuit Judges, and RAKOFF [*], Senior District Judge.

**Opinion by:** VANASKIE

# Opinion

---

[*] The Honorable Jed. S. Rakoff, United States Senior District Judge for the United States District Court for the Southern District of New York, sitting by designation.

536 Fed. Appx. 265, *265; 2013 U.S. App. LEXIS 18050, **1

**[*267]** VANASKIE, *Circuit Judge.*

The Margolis Law Firm LLC ("Margolis" or "The Margolis Law Firm") appeals from the District Court's denial of its motion to collect fees and expenses for its service as special counsel in the underlying bankruptcy case. Although such fees and expenses are ordinarily chargeable only against the surplus of a debtor's estate, Margolis seeks to collect them from proceeds of the sale of a **[**2]** secured creditor's collateral pursuant to *section 506(c) of the Bankruptcy Code*. Because we agree with the District Court that Margolis does not meet the requirements of *section 506(c)*, we will affirm.

I.

We write primarily for the parties to this action. Moreover, the District Court has ably provided the relevant background. See *In re Towne, Inc., Civ. No. 11-5435 (KSH), 2012 U.S. Dist. LEXIS 87871, 2012 WL 2401981 (D.N.J. June 25, 2012)*. Accordingly, we set forth only those facts necessary to our analysis.

This appeal arises out of bankruptcy proceedings instituted by two related debtors: Towne, Inc. ("Towne"), which owned a franchised BMW motor vehicle dealership in Oyster Bay, New York, and DMD Towne, LLC ("DMD"), which owned the real property upon which Towne's dealership was located. Towne and DMD (collectively, "Debtors") each filed voluntary petitions for bankruptcy under Chapter 11 of the Bankruptcy Code. The Bankruptcy Court consolidated the cases and appointed The Margolis Law Firm as special counsel.

BMW Financial Services, NA, LLC ("BMW FS") held a perfected first priority security interest in most of Towne's assets ("the Franchise"), and also held a perfected first priority lien on DMD's property ("the **[**3]** Property"). Together, Debtors owed BMW FS $9,006,951.67.

On April 1, 2009, Margolis notified the Bankruptcy Court that it had received an offer to purchase the Franchise and Property (collectively, "the Collateral") for six million dollars. Given that offer, BMW FS - which in the meantime had successfully obtained relief in the Bankruptcy Court from the bankruptcy stay so that it could take possession of the Collateral - agreed not to pursue immediate liquidation to give Debtors the opportunity to complete the sale. Because the offer was for less money than the amount of BMW FS's lien, however, BMW FS refused to consent to the sale unless Debtors signed certain releases. When Debtors refused to sign the releases, BMW FS, in turn, refused to

consent to the sale, and the offer was withdrawn.

Several months passed without a successful sale of the Collateral. Thus, the Bankruptcy Court converted the case to Chapter 7 and appointed a trustee. Margolis then withdrew from the case. The Chapter 7 trustee executed releases on the Debtor's behalf, and the Collateral was subsequently sold to affiliates of Len Stoler, Inc. ("LSI") for $5,525,000.00.

**[*268]** The Bankruptcy Court later approved fees in the **[**4]** amount of $84,585.11 in fees and $3,626.90 in expenses for Margolis' services as special counsel. Margolis filed a motion arguing it was entitled under *11 U.S.C. § 506(c)* to collect these fees out of the proceeds of the sale of the Collateral. The Bankruptcy Court denied the motion, finding that Margolis did not meet the requirements of *§ 506(c)*. The District Court affirmed, and Margolis filed this appeal.

II.

The Bankruptcy Court had jurisdiction under *28 U.S.C. § 157*. The District Court had jurisdiction under *28 U.S.C. §§ 158(a)* and *1334*, and we have jurisdiction under *28 U.S.C. §§ 158(d)* and *1291*. **HN1[↑]** We review the Bankruptcy Court's factual findings for clear error, but apply plenary review to its legal conclusions. *In re Visual Indus., Inc., 57 F.3d 321, 324 (3d Cir. 1995)*. Our review of the District Court's decision is plenary "because [it] sits as an appellate court in bankruptcy cases." *Id.*

Margolis seeks to collect fees and expenses out of the proceeds of the sale of the Collateral. **HN2[↑]** In general, such fees and expenses are not chargeable against secured collateral. *Visual Indus., 57 F.3d at 324.* Instead, they ordinarily may be charged only against the surplus of the debtor's estate. **[**5]** *Id.* However, *section 506(c) of the Bankruptcy Code* provides a limited exception to this rule, which allows a claimant to "recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim . . . ." *11 U.S.C. § 506(c).*

**HN3[↑]** *Section 506(c)* is designed to allow a claimant who has expended funds to preserve or dispose of secured collateral to recover those funds from the secured creditor who directly benefitted from them, thus "prevent[ing] a windfall to the secured creditor at the expense of the claimant." *Visual Indus., 57 F.3d at 325* (citing *IRS v. Boatmen's First Nat'l Bank of Kan. City, 5 F.3d 1157, 1159 (8th Cir. 1993))*. As we have explained,

536 Fed. Appx. 265, *268; 2013 U.S. App. LEXIS 18050, **5

however, *section 506(c)* permits a claimant to recover expenses from the secured collateral only under "sharply limited" circumstances. *Id.* "[T]o recover expenses under *§ 506(c)*, a claimant must demonstrate that (1) the expenditures are reasonable and necessary to the preservation or disposal of the property and (2) the expenditures provide a *direct* benefit to the secured creditors." *In re C.S. Assocs., 29 F.3d 903, 906 (3d Cir. 1994)*.

Margolis **[\*\*6]** asserts three theories for relief under *section 506(c)*. First Margolis argues that the costs and expenses of its legal services "were reasonable and necessary to the preservation and disposition" of the Collateral (Appellant's Br. 12); second, Margolis asserts that BMW FS is estopped from denying that it benefitted from Margolis's services; and finally, Margolis argues that it should be able to recover its fees and expenses under *section 506(c)* because its efforts to sell the Collateral were thwarted only when BMW FS sought releases from Debtors in violation of New York law. We will discuss each theory in turn.

A.

At the outset, we reject Margolis's argument that the proper inquiry under *section 506(c)* is "whether [a secured creditor] benefitted *or could reasonably* have been expected to benefit from Special Counsel's efforts." (Appellant's Br. 18.) In support of this standard, Margolis cites to a 1980 decision from the Eastern District of Pennsylvania Bankruptcy Court. *See In re Hotel Assocs., 6 B.R. 108, 112 [\*269] (Bankr. E.D. Pa. 1980)*. We have not adopted the standard articulated in *Hotel Associates*. Rather, *HN4*[⬆] we have read *section 506(c)* as requiring "a *direct* **[\*\*7]** benefit to the secured creditors." *C.S. Assocs., 29 F.3d at 906*.

Applying this standard, Margolis fails to meet the requirements of *section 506(c)* because it cannot demonstrate either that its expenditures were necessary to preserve or dispose of the Collateral, or that its efforts directly benefitted BMW FS. Although Margolis points to several services it undertook, including "exposing the Franchise and the Debtors' single purpose Facilities for sale," "soliciting prospective bids" for the Collateral, and "consummating purchase agreements," (Appellant's Br. 18), these efforts did not result in an actual sale. Instead, BMW FS, along with the Chapter 7 trustee, sold the Collateral to LSI after the case had been converted from Chapter 11 to Chapter 7 and Margolis had already withdrawn. As the District Court noted, an affidavit submitted by Eliot Wagonheim, an attorney who

represented LSI in negotiations for the purchase of the Collateral, supports the Bankruptcy Court's conclusion that Margolis was not responsible for LSI's interest in, or eventual purchase of, the Collateral. *See Towne, 2012 U.S. Dist. LEXIS 87871, 2012 WL 2401981 at \*7*. We therefore agree that Margolis fails to prove that its efforts were necessary **[\*\*8]** to the preservation or disposition of the Collateral.

Margolis also fails to demonstrate that it provided a direct benefit to BMW FS. Margolis argues that its efforts prevented termination of the Franchise, and that this benefitted BMW FS by preserving the value of the Collateral. The Bankruptcy Court dismissed this assertion as "purely speculative," noting that BMW of North America, LLC ("the Franchisor") did not terminate the franchise after the case was converted to Chapter 7 and Margolis had withdrawn. (A. 7.) The District Court agreed, concluding that Margolis failed to prove that the franchise would have been terminated without its efforts. *Towne, 2012 U.S. Dist. LEXIS 87871, 2012 WL 2401981, at \*7*.

Furthermore, the Bankruptcy Court concluded that "the primary benefit of [Margolis's] legal services was to the Debtors . . . rather than to preservation of the collateral of BMW FS." (A. 8.) In making this finding, the Bankruptcy Court observed that Margolis seeks reimbursement for numerous services that were actually contrary to BMW FS's interests, including efforts to reduce the value of BMW FS's lien and conducting research that led to an administrative proceeding against BMW FS in state court. These findings are **[\*\*9]** amply supported in the record and are not clearly erroneous.

We also reject Margolis's alternative argument that BMW FS consented to be surcharged for Margolis's efforts. Although *HN5*[⬆] some courts have considered a secured creditor's consent in analyzing a claim under *section 506(c)*, *see, e.g., In re Flagstaff Foodserv. Corp., 739 F.2d 73, 77 (2d Cir. 1984)*, Margolis has shown no more than BMW FS's limited cooperation with its initial efforts to effectuate a sale of the Collateral. BMW FS's limited cooperation does not demonstrate consent to be charged for all of Margolis's efforts. *Id.* ("'[Consent] is not to be inferred merely because a secured creditor cooperates with the debtor.'") (quoting *In re S & S Indus., Inc., 30 B.R. 395, 398 (Bankr. E.D. Mich. 1983)*).

Accordingly, and for substantially the same reasons as the District Court, we conclude that Margolis did not

536 Fed. Appx. 265, *269; 2013 U.S. App. LEXIS 18050, **9

demonstrate that the fees and expenses for which it seeks compensation were "reasonable, necessary costs and expenses of preserving, or disposing of, [the collateral]," *11 U.S.C. § 506(c)*, **[\*270]** or that its expenditures provided a direct benefit to BMW FS.

B.

Margolis next asserts that BMW FS is estopped from denying that it benefitted **[\*\*10]** from Margolis's services because BMW FS "secretly collaborated with [Franchisor] and Debtor's trustee for the purpose of achieving various unlawful objectives." (Appellant's Br. 23.) Specifically, Margolis contends that BMW FS, Franchisor, and LSI conducted a "comfortable, concealed relationship," which resulted in "favoritism" that led to the sale of the Collateral to LSI. (Id. 23, 24.) Margolis asserts that this concealed collaboration led it to perform extensive work in vain.

We need not address the merit of these claims because, as the District Court explained, Margolis "cites no case, statute, or other authority to indicate that such a form of estoppel has ever been recognized." *2012 U.S. Dist. LEXIS 87871, 2012 WL 2401981, at \*9*. We therefore reject Margolis's contention that BMW FS is estopped from denying that it benefitted from the efforts of the Margolis Law Firm.

C.

Finally, Margolis argues that BMW FS "impeded the sale of the franchise and facilities in order to secure releases . . . in direct contravention of the New York Franchised Motor Vehicle Dealer Act." (Appellant's Br. 28.) Like the District Court, we express no view on the merits of this argument because the question of whether or not BMW FS **[\*\*11]** sought releases from Debtors in violation of New York law is not relevant to our analysis under *section 506(c)*. Margolis cannot identify language in *section 506(c)* or prior cases of ours supporting its theory that a secured creditor's allegedly unlawful conduct justifies relief to a claimant under *section 506(c)*. Thus, we conclude that Margolis's argument that BMW FS violated New York law, even if true, would not provide a ground for relief under *section 506(c)*.

III.

For the foregoing reasons, we will affirm the order of the District Court.

End of Document