UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-1(b)**

**NORRIS McLAUGHLIN, P.A.**
Morris S. Bauer
Melissa A. Pena
400 Crossing Boulevard, 8th Floor
P.O. Box 5933
Bridgewater, New Jersey 08807
(908) 722-0700
msbauer@norris-law.com
mapena@norris-law.com
Counsel for the Debtors/Debtors-in-Possession

| | |
|---|---|
| In re: | Chapter 11 |
| IMMUNE PHARMACEUTICALS INC, *et al.*, | Case No. 19-13273 (VFP) |
| Debtors.[1] | Hon. Vincent F. Papalia |

**CERTIFICATION OF MORRIS S. BAUER, ESQ. IN OPPOSITION TO DISCOVER GROWTH FUND LLC MOTION FOR STAY RELIEF AND MOTION TO CONVERT CHAPTER 11 CASES TO CHAPTER 7**

MORRIS S. BAUER, of full age, hereby certifies as follows:

1. I am an attorney at law of the State of New Jersey and am admitted to practice before this Court. I am a member of the law firm Norris McLaughlin P.A., counsel to Immune Pharmaceuticals Inc. et al., the within Chapter 11 debtors an debtors-in-possession (the "Debtors").

2. I submit this declaration in further opposition to the Motion by Discover Growth Fund, LLC ("Discover") to Convert Pursuant to 11 U.S.C. § 1112(b), Doc. No. 184, (the "Conversion Motion") and as a further supplement to the Debtors' opposition to the Motion of

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Immune Pharmaceuticals, Inc. (1431); Immune Pharmaceuticals, Ltd.; Cytovia, Inc. (7805); Immune Oncology Pharmaceuticals, Inc.; Maxim Pharmaceuticals, Inc. (9983); and Immune Pharmaceuticals USA Corp. (9630).

Discover Growth Fund, LLC for Relief from the Automatic Stay, Doc. No. 11, (the "Stay Relief Motion").

3. I have knowledge of the facts set forth herein based on my personal knowledge and/or prior certifications and declarations submitted in these Chapter 11 Cases by Gary Rabin and Anthony Fiorino, respectively, as representatives of the Debtors.

**Commencement of The Debtors' Chapter 11 Cases and Debtors' Business**

4. On February 17, 2019 (the "Petition Date"), Immune Pharmaceuticals Inc. (the "Immune Debtor") filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code.

5. Subsequent to the Petition Date, certain of the Immune Debtor's affiliates filed their own Chapter 11 bankruptcy cases. On February 22, 2019, Immune Pharmaceuticals, Ltd. ("Ltd.") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and on February 26, 2019, the remaining Subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

6. The Immune Debtor is a Delaware corporation. The Immune Debtor's principal place of business was located at 1 Bridge Plaza North, Suite 270, Fort Lee, New Jersey 07024.

7. The Immune Debtor has both common and preferred stocks outstanding. Prior to the bankruptcy filings, its common stock traded on the OTCQB, which is operated by OTC Market Groups, Inc. ("OTC"), under the symbol "IMNP". Since the bankruptcy filings, the Immune Debtor's common stock has traded on the Pink Market, which also is operated by OTC, under the symbol "IMNPQ".

8. The Debtors are clinical and approved stage biopharmaceutical companies specializing in the development of novel targeted therapeutic agents in the fields of inflammation, dermatology and oncology.

9. As of the Petition Date, the Immune Debtor's assets included the following main product lines: (i) anti-eotaxin antibodies (e.g., bertilimumab-NSO and anti-eotaxin-1-CHO, collectively, the "Anti-Eotaxin Assets"); (ii) Ceplene®; (iii) NanoCyclo®; (iv) AmiKet®; (v) Azixa/Crolibulin; and (vi) Lidopain.

**The Commencement of the Israel Stay Proceeding**

10. On March 28, 2019, Ltd. filed a motion in the District Court of Jerusalem, Israel ("Israel Court") for a "stay of proceedings" under section 350 of The Companies Act, 1999 of the State of Israel (the "Israel Stay Proceedings").

11. When the Israel Stay Proceedings were commenced, the Debtors understood that an Israel trustee would be appointed to oversee Ltd, but to also cooperate with the anticipated sale process in the Chapter 11 Cases.

12. On or about April 2, 2019, the Israel Court approved the Israel Stay Proceeding and shortly thereafter appointed Baruch Hakim ("Mr. Hakim") as the Israel Trustee.

13. As discussed below, on or about September 26, 2019, Mr. Hakim was removed as the Israel Trustee being replaced by Eitan Erez.

**The Ceplene Sale Motion**

14. On March 15, 2019, the Debtors filed the Motion for an Order (A) authorizing the Immune Debtor to (A) sell the Ceplene® product line to Vector Therapeutics, Inc. (f/k/a Oxygen Therapy Inc.) (the "Buyer"), pursuant to 11 U.S.C. §§ 363(b) and (f), free and clear of all liens, claims and interests; (B) assume and assign various executory contracts to the Buyer pursuant to

11 U.S.C. § 365(a); and (C) other related relief (the "Motion") (the "Ceplene Sale Motion"). See Doc. No. 46.

15. Vector proposed to pay the Debtors a purchase price of $10,550,169.60, which included a cash payment of $2,500,000 and the balance in the form of the assumption of liabilities.

16. The Court scheduled an expedited hearing on the Ceplene Sale Motion for March 29, 2019. See Doc. No. 48.

17. At the Ceplene sale hearing, the Debtors and Vector's representative advised the Court that Vector did not have the funds to close, and requested that the Ceplene Sale Motion be adjourned. The Debtors and Vector also advised the Court that they would be entering into a license agreement. The Ceplene Sale Motion was adjourned to April 29, 2019, and then to May 14, 2019.

18. On March 30, 2019, the Debtors entered into a license agreement with Vector with respect to the Immune Debtor's Ceplene® product line. See Doc. No. 115. Pursuant to the license agreement, Vector paid the Debtors $100,000. The license was subsequently extended for another month. Thereafter, it was no longer extended.

19. On April 16, 2019, Discover filed its motion for a determination that (i) the Debtor's license of the Ceplene® Assets to Vector Therapeutics, Inc. ("Vector") is out of the ordinary course of the Debtor's business and is thus void *ab initio* and (ii) said assets are now subject to movant's first priority lien and security interest. See Doc. No. 143.

20. On April 23, 2019, the Debtors filed their opposition to this motion and the Debtors filed a cross-motion to approve the license. See Doc. No. 151.

21. On August 21, 2019, the Court entered an order approving the Debtors entry into the license agreement outside of the ordinary course of business *nunc pro tunc* to March 30, 2019.

The Court did not rule on Discover's remaining claims or rights to the Ceplene Assets. See Doc. No. 297.

22. In or about late July, 2019, the Debtors informed the Court that Vector would not be proceeding and that the Ceplene Sale Motion is withdrawn.

23. Subsequent to the withdrawal of the Ceplene Sale Motion, the Debtors, through Gary Rabin, remained in discussions with Dr. Daniel Teper regarding the possibility of another one of his entities acquiring Ceplene.

24. In early February 2020, subsequent to Mr. Rabin's passing, Dr. Teper informed me that he was not in a position to proceed with any purchase of Ceplene at this time.

25. As discussed in detail below, on behalf of the Debtors, I have been in discussions with three groups that have expressed an interest in purchasing Ceplene as well as other of the remaining assets of the Debtors.

**The Anti-Eotaxin Assets Sale Motion**

26. On July 1, 2019, the Debtors filed the Motion for entry of an Order, pursuant to sections 105(a), 363(b), (f) and (m) of the United States Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002 and 6004, and D.N.J. LBR 6004, approving and authorizing, among other things: (i) bid procedures and form of notice in connection with the sale of the Debtors' anti-eotaxin antibodies, including bertilimumab assets free and clear of all liens, claims, encumbrances, and interests, (ii) stalking horse agreement and bid protections, (iii) the scheduling of a sale hearing, (iv) the sale to the purchaser submitting the highest or best offer, (v) procedures for assuming and assigning executory contracts, and (vi) other related relief (the "Bert Sale Motion"). See Doc. No. 219.

27. On July 2, 2019, the Court conducted a hearing on the Debtors' request for an expedited hearing on the Debtors' request bidding procedures and the approval of Alexion Therapeutics, Inc. ("Alexion") as the stalking horse bidder (the "Bidding Procedures Motion").

28. On July 2, 2019, the Court entered an order scheduling a July 16, 2019 hearing on the Bidding Procedures Motion. See Doc. No. 222.

29. On July 15, 2019, the Committee filed a Motion to Confirm the Automatic Stay and Related Relief (the "Committee Motion"). See Doc. No. 242. The Court scheduled a hearing on the Committee Motion for July 19, 2019. The Committee Motion was filed as a result of the on-going actions being taken by the Mr. Hakim, the then Israel Trustee in the Israel Stay Proceedings.

30. On July 16, 2019, the Court entered an order approving the Debtors' proposed bidding procedures (the "Bidding Procedures Order"). See Doc. No. 247. The Bidding Procedures Order, among other things, provided for bids to be submitted on or before September 12, 2019, the auction, if any, to be conducted on September 16, 2019 and the sale hearing approving the successful bidder to proceed on September 24, 2019.

31. Mr. Hakim sought to adjourn the July 19, 2019 hearing; however, when Mr. Hakim refused to adjourn his July 22, 2019 hearing before the Israel Court, this Court made a preliminary ruling invoking the automatic stay. This Court further stated that it would proceed in concert with the Israel Court in relation to the disposition of assets of both the Debtors and Ltd. The Court continued the hearing to July 31, 2019.

32. On or about July 22, 2019, the Debtors' Israel counsel submitted the Bidding Procedures Order to the Israel Court for its approval.

33. On July 31, 2019, the Court conducted a continued hearing on the Committee Motion. The Court entered an Order addressing the issues in the Committee Motion. See Doc. No. 287 (the "Cooperation Order"). The order included provisions that provide that this Court will have jurisdiction in the first instance with respect to the sale process and with respect to assets of Ltd the Court would proceed in conjunction with the Israel Court. The Court's order sought to avoid inconsistencies between the Court and the Israel Court.

34. On September 12, 2019, the Official Receiver filed a motion with the Israel Court to appoint a co-trustee. Within an hour, Eitan Erez was appointed as the co-trustee alongside Mr. Hakim.

35. On September 16, 2019, Mr. Erez appeared at a hearing before the Israel Court where he stated that he was prepared to adopt the Bidding Procedures Order with revised dates.

36. In a conference call before this Court with Mr. Erez' participation, conducted on September 17, 2019, the parties advised this Court that the salient dates relating to the bid solicitation process set forth in the Bidding Procedures Order were being modified to provide that bids were to be submitted on or before October 11, 2019, the auction, if any, would be conducted on October 15, 2019 and the sale hearing approving the successful bidder would proceed on October 17, 2019. See Doc. No. 320 for the Notice of the revised dates.

37. On or about September 18, 2019, Mr. Erez filed pleadings before the Israel Court stating that he could not work with Mr. Hakim and that the Israel Court needed to decide which of the two trustees would continue.

38. On September 26, 2019, the Israel Court rendered its decision, which included the release of Mr. Hakim as co-trustee.

39. On October 3, 2019, the Debtors, the Committee and Mr. Erez, as the sole Israel Trustee executed a Memorandum of Understanding ("MOU") for Mr. Erez to submit to the Israel Court for approval.

40. On October 7, 2019, the MOU was approved by the Israel Court.

41. On October 7, 2019, Alexion advised the Debtors that its due diligence was satisfied.

42. On October 9, 2019, Alexion posted a $600,000 deposit with Debtors' counsel.

43. On October 10, 2019, the Debtors filed a motion to obtain court approval of the MOU (the "MOU Motion"). See Doc. No. 327.

44. On October 17, 2019, the Court conducted a hearing on the Bert Sale Motion. On October 21, 2019, the Court entered an Order approving the sale of the Anti-Eotaxin Assets to Alexion on for a purchase price of $6,000,000. See Doc. No. 343.

45. Also, on October 17, 2019, the Court conducted a hearing on the MOU Motion. On October 23, 2019, the Court entered an order approving the MOU Motion. See Doc. No. 345.

46. On November 6, 2019, the Israel Court approved the sale of the Anti-Eotaxin Assets to Alexion.

47. On November 20, 2019, the transaction with Alexion closed. On November 21, 2019, Alexion wired $5,400,000 to the attorney trust account of Debtors' counsel. Along with the $600,000 security deposit previously paid by Alexion, Debtors' counsel was then holding $6,000,000.

48. On November 21, 2019, in accordance with the MOU Order and in accordance with wire instructions provided by Mr. Erez and also provided by the Debtors' Israel counsel for the

Israel Official Receiver's bank account, Debtors' counsel remitted $3,000,000 to the Official Receiver.

49.    Currently, Debtors' counsel is holding $3,000,000 of the Alexion sale proceeds in its attorney trust account.

**The Status of the Escrowed Proceeds**

    **The U.S. Proceeds**

50.    On December 3, 2019, the Debtors filed a motion to use a *di minimis* portion of the proceeds escrowed with Debtors' counsel for the following items:

    a. $385.14 relating to an inadvertent bank overdraft caused by an automatic withdrawal;

    b. $336.00 for an email and web hosting contractor;

    c. $6,187.91 for UST outstanding quarterly fees relating to all Debtors; and.

    d. $25,000 to Gary Rabin as a partial payment toward his post-petition compensation to address certain financial urgencies in Mr. Rabin's life; and

    e. Other items upon request.

51.    Discover strenuously opposed the payment to Mr. Rabin.

52.    Upon receipt of Discover's objection on December 13, 2019, Mr. Rabin asked me if he could call John Kirkland, Discover's representative. I advised him that he could. Mr. Rabin informed me that he attempted to contact Mr. Kirkland; however, Mr. Kirkland hung up on him and would not take his call.

53.    On December 17, 2019, the Court granted the Debtors motion authorizing the disbursement of $35,000 from the US escrowed proceeds to the Debtors' debtor-in-possession

bank account; provided, however, that the Debtors were required to remit $35,000 to Discover's counsel to be held in escrow thereby.

54. The Court's December 17, 2019 decision is set forth in an order of the Court dated January 30, 3020. See Doc. No. 366.

55. At present Debtors' counsel has $2,930,000 remaining in escrow. The Debtors' debtor-in-possession account has $8,423.51 as of January 27, 2020. Two payments of approximately $55 each have been made to the storage facility that houses the Debtors' books and records.

**Israel Proceeds**

56. As previously stated, under the MOU, $3,000,000 was disbursed to an escrow held by the Official Receiver in Israel.

57. Since receipt of this money, the Official Receiver disbursed $506,000 to the Innovation Authority. This was required by the Israel Court as part of the Innovation Authority consenting to the sale to Alexion. The Debtors, through their Israel counsel, remain in discussion with the Innovation Authority regarding a possible appeal/refund since the stated amount was not all related to the Anti-Eotaxin Assets, but also included payment of monies that may have been attributed to Ltd's development of Nanocyclo.

58. In addition, Eitan Erez, the Israel trustee, made a motion to obtain approval for the payment of approximately $51,000 for preserving and freezing materials related to the Anti-Eotaxin Assets. The Debtors disputed the payment, which was incurred by Mr. Hakim, on the basis that the materials were not needed. Also, Mr. Erez requested reimbursement of $1,089.76 associated with his trip to the US for the Bert Sale Motion.

**The Passing of Gary Rabin and Proposed Retention of Chief Restructuring Officer**

59. Subsequent to the closing on the Alexion transaction, Mr. Rabin turned his focus to the disposition of Ceplene and the disposition of the remaining product lines.

60. In late November 2019, Mr. Rabin negotiated a revised deal with Dr. Teper, which was approved by the Board. I advised Dr. Teper's counsel that the Debtors would not move forward without a cash deposit.

61. Also, in early to mid-December 2019, the details of which Mr. Rabin had not provided to me, he advised me that he was engaged with no less than two persons regarding the possible purchase of the remaining assets of the Debtors either by way of an asset purchase or a restructuring of the Debtors, including the use of the public shell.

62. During this late November to mid-December period, Mr. Rabin was significantly focused on obtaining his requested $25,000 from the use of proceeds motion. As he indicated to me, his kids were without health insurance and he needed to pay for his son's next semester of college.

63. I either spoke with Mr. Rabin or exchanged emails with him on a daily basis. At no time did he mention to me that he had any conversations with Mr. Kirkland, other than the hang up call referenced in paragraph 52 above.

64. The last email that I received from Mr. Rabin was his December 27, 2019 email response to Dale Barney's email disputing the use of proceeds proposed order. In that email, he advised Mr. Barney that Mr. Barney's client was being childish for not taking Mr. Rabin's calls.

65. I sent several emails to Mr. Rabin from the period of December 27, 2019 through January 7, 2020 with no response. On January 8, 2020, Mr. Rabin's ex-wife contacted me and advised me of his passing.

66. Immediately after receiving notice of Mr. Rabin's passing, I arranged for a Board meeting to be convened, which took place on January 9, 2020. Prior to the Board meeting, Dr. Fiorino advised that he would not become the interim CEO. At that Board meeting, the Board agreed to retain Matthew Schwartz as the Chief Restructuring Officer.

67. From the period of January 9, 2020 or so to February 19, 2020, the terms for Mr. Schwartz were being discussed with Dr. Fiorino, the Committee and Mr. Schwartz. The motion to retain Mr. Schwartz was filed on February 19, 2020.

68. Mr. Schwartz has been hesitant on proceeding because of the recent Supreme Court decision that may have compromised the ability to retain a professional on a "nunc pro tunc" basis. Discover has interposed an objection to his retention. The issues with the Office of the United States Trustee have been worked out. Notwithstanding the delay, Mr. Schwartz has taken steps to obtain all of the books and records from John Clark, the former controller. Mr. Rabin used Mr. Clark to set up a storage facility for the books and records and to continue to maintain the Debtors' electronic systems.

69. Mr. Schwartz's retention motion was originally scheduled for March 17, 2020, then moved up to March 12, 2020 and then moved back to March 24, 2020. The new return date on the motion is April 1, 2020.

70. Notwithstanding the delay in Mr. Schwartz' retention, the Board remains fully informed of the on-going proceedings, including any on-going negotiations with third parties regarding the acquisition of assets.

**Current Status of Assets**

    **Debtors' Assets**

71. Since the passing of Mr. Rabin, in late January 2020, I was able to obtain from one of the Board members information relating to Mr. Rabin's on-going efforts.

72. At this time, there are three groups and possibly a fourth group expressing interest, which I will refer to as Group A, Group B, Group C and Group D.

73. As previously mentioned, Mr. Rabin was in discussions with Group B. I was provided with copies of his email exchanges with said entity. I have spoken to a representative of said entity, and received a copy of their non-disclosure agreement ("NDA"). They advised that they have familiarity with the assets; however, at this time, they have not made a proposal.

74. Group C has expressed an interest only in Ceplene, and more particularly, the histamine dihydrochloride (which as I understand to be the base product of Ceplene). We have received only a verbal offer, which does not include a cash component.

75. Group D is only at the NDA stage.

76. Group A was introduced to me by a Board member in late January 2020. Group A has retained a financial advisor and counsel. Group A is interested in all of the Debtors' remaining products.

77. Group A first met with me on February 7, 2020. They executed an NDA and were provided with access to the data room. They made a presentation on how they intended on using the products. I told them that another meeting needed to take place with Committee counsel when they completed due diligence and were in a position to make an offer.

78. I advised the Board of my meetings and calls with Group A and Group B. The Committee provided me with questions from its financial advisors for both groups.

79. On March 11, 2020, Committee counsel and I met with Group A. At that time, the coronavirus was in its infancy in this country. The meeting was productive. The discussion was the formulation of an offer with both a stock component in Newco (or possibly the use of the Immune Debtors' corporate shell) and a cash component.

80. On March 19, 2020, I spoke to a representative of Group A, who reiterated their interest in proceeding forward. He advised that his counsel was working on a formal written agreement. He also referenced that he did not see a problem with the cash component of a proposal. However, he advised that the coronavirus has their investors in a holding pattern to see how the markets are playing out. He advised that we would continue with our discussions, and that he would know something better in the near term.

81. As with the Debtors' proceeding with the sale of the Anti-Eotaxin Assets, Discover, through the Conversion Motion and the Stay Relief Motion, is again attempting to thwart the Debtors and the Committee's efforts in maximizing the assets for all creditors.

**Israel Assets**

82. Recently, the Israel trustee obtained an order converting the "stay proceedings" to a bankruptcy. As I understand it, this conversion resulted in the former employees being able to receive payment on their claims from the Israel government.

83. At this time, the Israel trustee is in the process of reviewing claims. As I understand it, the Israel trustee reviews the claims and makes the decision on the allowed amount subject to such claimant having a right to take an appeal.

84. The major claim in Israel is that filed by Fidelity in the approximate amount of $14,000,000. The Israel Court determined that Mr. Erez will not be reviewing the Fidelity claim because Fidelity alleged that Mr. Erez had a conflict based on they having met with him prior to

his appointment and their allegation that such meeting disqualifies him from reviewing their claim. The Israel Court appointed Doron Lange to review the Fidelity claim. As I understand it, Mr. Lange informed the Debtors' Israel counsel that he believes that he will make his decision in about 30 days.

85. The Committee has advised that they will be filing a motion to allow for US creditors of Ltd to file claims in the Israel proceeding.

86. The Debtors believe that after Mr. Erez reviews and decides on the claims against Ltd. and if the Fidelity claim is disallowed, that a fair amount of money may become available.

87. We have been advised that this process may take about six months.

**Dispute with Discover**

88. Since the outset of the Chapter 11 Cases, Discover has objected every step along the way, including (i) opposing a 7 day extension to file schedules; (ii) filing the Stay Relief Motion; (iii) filing the Conversion Motion; (iv) opposing the Ceplene transaction in a multitude of ways; (v) pursuing discovery by way of a 2004 examination and as part of its Stay Relief Motion; and (vi) opposing the MOU. Discover did side with the Debtors with respect to the sale of the Anti-Eotaxin Assets.

89. In response to the Conversion Motion, which was returnable for July 2, 2019, the Debtors and the Committee were forced to file a complaint against Discover (the "Discover Adversary Proceeding"). See Doc. No. 218 and Adversary Proceeding No. 19-02033.

90. In the Discover Adversary Proceeding, the Debtors and Committee, *inter alia*, dispute Discover's claim in its entirety, seek to subordinate same based on Section 510 of the Bankruptcy Code and seek affirmative claims against Discover based on its pre-petition conduct and course of dealings with the Debtors that lead to the filing of the Chapter 11 Cases.

91. The Court denied the Debtors and Committee's motion for summary judgment based on the counts relating to contractual subordination and the capping of the lien.

92. The Debtors and Committee's summary judgment motion based on Section 510(b) is scheduled for hearing on April 1, 2020.

93. As part of the Discover Adversary Proceeding, the Court will have to determine the extent and validity of the Discover alleged lien. The Debtors submit that Discover's lien cannot "spring" on Ceplene. The Debtors also submit that Discover does not have a lien on the Immune Debtor's shareholder interest in its subsidiaries. Discover may not have a lien on the funds that are held in the Debtors' counsel attorney trust account because Discover may not have properly perfected its interest in the Anti-Eotaxin Assets. The iCo agreement relating to the Anti-Eotaxin Assets was in the name of Ltd and certain of the patents were referenced as being owned by Ltd. The $3 million that was received pursuant to the MOU may be characterized as post-petition settlement proceeds for which Discover's lien may not attach.

94. Discover filed a complaint against the Debtors' board members as well as Dr. Teper and Mr. Rabin. One of the allegations in the complaint relates to Discover's assertion that the Debtors misrepresented their ownership interest in what Discover believed would be its collateral, including the Anti-Eotaxin Assets.

95. The parties were sent to mediation, which proved unsuccessful.

96. The Discover Adversary Proceeding is set for trial on July 22, 2020.

97. The Discover complaint against the Board members is litigation that has just commenced.

**Conversion Motion/Stay Motion**

98. The Conversion Motion was filed on June 5, 2019 and made returnable on July 1, 2019, at a time that Discover knew the Debtors were proceeding with negotiations for the sale of the Anti-Eotaxin Assets for a price in the range of $6,000,000.

99. In response to the Conversion Motion, in the Debtors' Declaration of Gary Rabin (Doc. No. 206), Mr. Rabin stated that the "Conversion Motion is premised on Discover alleging (i) that the Chapter 11 Cases were filed in "bad faith" to "forestall Discover's foreclosure of the Collateral …"; (ii) that the Chapter 11 Cases are a "two-party dispute"; (iii) the Debtors have no cash flow, are unable to meet current expenses and have few employees at this point; and (iv) the Debtors are somehow abusing the bankruptcy process because Vector has not closed on the Ceplene Assets."

100. Also, in support of the Conversion Motion, Discover stated that prior to the Petition Date, the "Debtors lost the license for an integral component of their potentially valuable asset, the Bertilumumab antibody." In short, Discover again attempted to affect the value of the asset in hopes that Discover could take possession of the asset for itself through the Stay Relief Motion. As shown by the closing of the transaction with Alexion, through the Debtors' efforts, iCo agreed to the assignment of the license to Alexion. Notably, the iCo license, which Discover references as an integral component to the value of the Anti-Eotaxin Assets, was with Ltd and Discover did not have a lien on the assets of Ltd nor the iCo license.

101. To date, Discover has not supplemented the Conversion Motion.

102. As stated in the Rabin Declaration in opposition to the Conversion Motion, this case is not a two-party dispute as described by Discover. This case is about assuring that all creditors can share in a recovery on the Debtors' assets. Discover's pre-petition actions would

have resulted in Discover taking all assets and leaving nothing for the creditors. Clearly, the filing was not in "bad faith", but rather filed in "good faith" intending to preserve value for all creditors.

103. As stated in the complaint, while knowing of the existence of on-going negotiations for the purchase of the Anti-Eotaxin Assets for more than $12 million, "Mr. Kirkland made … offers to Immune to have the Debtors' assets transferred to Discover Growth for no new consideration, other than offering Mr. Fiorino and certain other Immune employees jobs at the new company."

104. At the time of the Conversion Motion, iCo Therapeutics, Inc. filed a motion to compel rejection of its agreement. iCo further took the position that its agreement was terminated pre-petition. iCo's agreement related to the disposition of the Anti-Eotaxin Assets. As previously stated, the iCo issues were resolved with sale of the Anti-Eotaxin Assets.

105. Since the commencement of the Chapter 11 Cases, due to Discover's numerous objections throughout the case, and the difficulties that have transpired with the proceedings in Israel, the administrative costs by way of professional fees have escalated to the range of approximately $2.75 million. Other administrative claims are *di minimus*, mostly comprised of fees owing to the United States Trustee, storage costs, board member fees and unpaid wages for Dr. Fiorino and Mr. Clark.

106. As a result, this case is not a two-party dispute, it is now the holders of administrative claims (predominantly the professionals), the unsecured creditors (which are over a hundred in number), the on-going Israel proceedings (which both the Debtors and Committee have been active participants) and Discover, whose liens are disputed and whose claims are subject to subordination.

107. During the course of the Chapter 11 Cases, the Debtors not only preserved the value of the assets, but have increased their value. Although there were pre-petition discussions regarding the sale and value of the Anti-Eotaxin Assets, immediately subsequent to the filing of the Chapter 11 Cases, the initial offer was for $3,000,000.

108. In Jeffrey Davis' certification in support of the Bert Sale Motion (Doc. No. 339), Mr. Davis states in paragraph 5k and 5l that the initial post-petition offers started at $3.0 million and $4.0 million respectively. Through the Debtors' efforts the resulting successful purchase price was increased to $6.0 million. Assuming Discover held a valid security interest in the Anti-Eotaxin Assets, the value of its interest actually increased post-petition.

109. Discover may argue that the Debtors only received $3.0 million. However, there remained the issue as of the Petition Date as to whether the Immune Debtor owned any of the Anti-Eotaxin Assets. Through the Debtors' efforts, the Debtors were able to negotiate with the Israel trustee such that 50% of the purchase price were to be governed for distribution by this Court. There still remains the issue as to whether any of Discover's purported security interest attaches to the money held in the US (or as a matter of fact any money that may be received from Israel).

110. At this juncture, the resolution of this case consists of (i) the disposition of the Discover litigation, including a determination of (a) whether Discover's claim should be subordinated; (b) the extent of Discover's lien, if any; (c) if settled, how much is paid to Discover; (ii) the disposition of the remaining assets; (iii) conclusion of the Israel proceeding with hope that money is distributed to the Immune Debtor; and (iv) formulation of a liquidating plan unless one of the asset purchasers is inclined to make a proposal using the corporate shell. The Debtors and the Committee are in the best position to administer this process to a conclusion. Discover would rather this not be the case because it harbors hopes that a chapter 7 trustee will capitulate to its

demands for all of the money to the detriment of the holders of administrative claims (the professionals) and the unsecured creditors.

    I certify that the foregoing statements made by me are true. I am aware that if any such statements are willfully false, I am subject to punishment.

                                                          /s/ Morris S. Bauer  
                                                           MORRIS S. BAUER

Dated: March 24, 2020