

DALE E. BARNEY
Director

Gibbons P.C.
One Gateway Center
Newark, New Jersey 07102-5310
Direct: (973) 596-4557 Fax: (973) 639-6234
dbarney@gibbonslaw.com

March 30, 2020

VIA ECF

Hon. Vincent F. Papalia, USBJ
United States Bankruptcy Court
Martin Luther King, Jr. Federal Building
50 Walnut Street, 3d Floor
Newark, NJ 07102

RE:   Immune Pharmaceuticals, Inc., Case No. 19-13273 (Jointly Administered)
      Discover Growth Fund, LLC's Motion to Convert Pursuant to 11 U.S.C. § 1112(b)

Dear Judge Papalia:

We are counsel to Discover Growth Fund, LLC ("Discover") in the captioned chapter 11 cases and with respect to the Motion of Discover Growth Fund to Convert Pursuant to 11 U.S.C. § 1112(b) [Doc 184] ("Motion"). This letter shall serve as Discover's reply to the supplemental briefs filed by the Debtors[1] and the Committee on the Motion.

The Debtors' and the Committee's supplements continue those parties' long history of invective against Discover, repeating the gross exaggerations, mischaracterizations of the Debt Documents, and misrepresentations that fill prior filings with this Court. The Debtors and the Committee are rightly concerned that the Court may indeed grant the Motion due to the lack of any progress in the Chapter 11 Cases beyond the sale of the Bert and Anti-Eotaxin assets to Alexion. That sale is long concluded and represents the only tangible accomplishment in these cases. The Debtors' and the Committee's reminiscences about that deal are not a basis for denial of the Motion.

They persist in positing the ludicrous theory that somehow, Discover's liens do not extend to the proceeds of that sale held by Norris McLaughlin P.A. Desperation exposes contradictions. The Debtors and the Committee now hope, in vain, that this Court will forget (i) that they disputed that Ltd. owned <u>any</u> of the Bert assets, and (ii) that the compromise cut with the Israeli trustee to split the proceeds, and to expatriate half of Discover's cash collateral, was an expedient that the Debtors had no choice but to accept. Your Honor characterized it as "rough justice."

---

[1] Capitalized terms used herein shall have the meaning ascribed in Discover's Supplemental Memorandum in Further Support of Motion of Discover Growth Fund, LLC for Relief from the Automatic Stay dated March 12, 2020 [Doc 374] ("<u>Discover Supp</u>.") unless otherwise defined. Discover refers to the Declaration of John C. Kirkland in Support of Discover Growth Fund, LLC's Opposition to Plaintiffs' Motion for Partial Summary Judgment Against Discover Growth Fund, LLC filed on February 12, 2020 in the Adversary as Doc 9-3 for the general factual background of this matter.

GIBBONS P.C.

March 30, 2020
Page 2

The Debtors' and the Committee's supplements plainly reveal one stark reality: they seek to keep these cases in chapter 11 to protect Norris McLaughlin P.A.'s, Porzio Bromberg & Newman, P.C.'s and the other estate professionals' bloated administrative claims. Counsel attempts to blame their accrual of upwards of $2.75 million in fees on Discover's legitimate efforts to protect its rights in the face of the Debtors' defaults under the Debt Documents. The Committee, in particular, rehashes form over substance in repeatedly referring to Discover's loan of $ 2 million to Immune as an equity investment, where a full and fair reading of the Debt Documents, and the testimony of the Debtors' own representatives, definitively demonstrates that the Debenture is debt until it is converted into stock. Only $530 was converted.[2]

The Debtors' proposed disposition of the rest of the stale and non-monetizable assets is a pipe dream. The pharma industry is overwhelmed by the Covid-19 crisis, and certainly is not poised to spend one dollar on the husks that the Debtors' remaining assets have become due to the passage of time and the incompetence of the Debtors' management.

The Debtors' and the Committee's counsel made a bet a year ago, based on the same bill of goods that Gary Rabin ("Rabin") and Tony Fiorino ("Fiorino") sold to Discover: Bert was worth $45 million and Ceplene was worth $10 million. Counsel has lost that bet. Discover protected its loan to Immune with its lien under the Debt Documents, and counsel seeks to trump that lien with the preposterous claims asserted in the Adversary Proceeding.

This is not how the bankruptcy system is intended to work. Secured creditors get paid from their collateral. Professionals get paid from retainers, carve-outs or free assets. None of those exist in these cases, so the Debtors and the Committee seek to bludgeon Discover into submission to salvage some payment on administrative claims. As such, this is indeed a two sided dispute, notwithstanding the Debtors' and the Committee's platitudes about making a distribution to unsecured creditors and confirming a plan. Neither of those is happening in these cases.

Counsel are in denial: they are in a hole and they keep digging. No plan will ever be confirmed in these cases. What will soon be $3 million in administrative expenses will never be paid. Under no circumstances is there ever going to be a dividend paid to unsecured creditors. The Debtors' "Groups A, B, C and D" are vultures hovering over a

---

[2] Even at the "Face Amount" of the Debenture, without regard to its make-whole provisions, that means that $5,499,470 in principal remains due under the Debenture, before calculation of interest. Even if only $2 million in principal is due, with interest and attorneys' fees and costs, Discover is owed more than the $2.93 million held by Debtors' counsel.

GIBBONS P.C.

March 30, 2020
Page 3

corpse in the desert, waiting to pick the rotten meat off the bones.  These cases have gone on far too long and should be converted.  The Motion should be granted.

A.    Reply to Debtors' and Committee's Supplements.

The Debtors filed their letter brief ("Debtors' Supp.") and Certification of Morris S. Bauer, Esq. etc. ("Bauer Cert.) in support [Doc 385] on March 24, 2020), which starts with the false premises that Discover's " prepetition conduct," alleged failure "to properly perfect its security interest" and Debt Documents "require mandatory subordination"[3] caused the Debtors and the Committee to file Adv. Pro. No. 19-02033 (VFP) ("Adversary").  Debtors' Supp., p. 2.  As the Debtors and the Committee both acknowledge, the Adversary was in fact filed in the face of the Motion to make it look like something was happening.  The Adversary, with its myriad falsehoods, exaggerations and irrelevant invective, was filed to give the Court the illusion that the Debtors and the Committee were doing something other than accruing administrative costs.  Alexion Pharmaceuticals, Inc. ("Alexion") arrived in the nick of time before the Motion was heard, and enabled the Debtors to demonstrate progress in at least liquidating some assets.  Nonetheless, since that now concluded asset sale, nothing else has been accomplished in these cases.

The Committee filed its Supplemental Objection of the Official Committee of Unsecured Creditors to the Motion of Discover Growth Fund, LLC to Convert Pursuant to 11 U.S.C. § 1112(b) and Statement in Support of Continuing the Debtors' Exclusivity Periods [Doc 386] on March 24, 2020 ("Committee Supp.").  The Committee Supp. continues to misrepresent Discover's status as that of an investor, not a lender, notwithstanding President and Interim CEO Rabin's testimony to the contrary.[4]:

---

[3]  The Complaint in the Adversary is replete with false statements regarding Discover's conduct.  Discover properly perfected its lien.  The Debtors' management failed to disclose that part of the Collateral, which Immune represented it owned, was owned by Immune Pharmaceuticals, Ltd.  The Debt Documents do not mandate subordination.

[4]    Q.  Okay.  And do you recall understanding at the time that by "creditors," he was including Discover in his – what he was talking about as "creditors"?

MS. PENA:  Objection to form.  You can answer.

THE WITNESS:  I mean, again, a debenture is a credit instrument.  This particular debenture was really an equity instrument, but sure.

BY MR. BARNEY:  Q:  Okay.  Well, it was a credit instrument until it converted; right?

MS: PENA:  Objection to form.  You can answer.

THE WITNESS:  Yes.

GIBBONS P.C.

March 30, 2020
Page 4

These cases are nothing more than liquidations that do not need a multitude of chapter 11 professionals to administer.  The Debtors' proposed assets sales to Groups A-D are going to be on indefinite hold, as the Debtors acknowledge.  Group A advises that its investors are in a "holding pattern."  Bauer Cert., ¶ 80.  Group B has "not made a proposal."  Bauer Cert., ¶ 73.  Group C made "only a verbal offer, which does not include a cash component."  Bauer Cert., ¶ 74.  "Group D is only at the NDA stage."  Bauer Cert., ¶ 75.  This status report is hardly encouraging.

Discover seeks a chapter 7 trustee because the time has come, after over one year languishing in chapter 11 and the passage of months since the last meaningful development, to cut off the accrual of expenses of the multitude of professionals in the cases.  A chapter 7 trustee can liquidate the remaining assets, at far less expense than the current regime.  The Committee Supp. claims at ¶ 1 that "the Motion hurts all parties in interest, including the Debtors' administrative and unsecured creditors."  What they really mean is that the Motion is bad for the professionals – unsecured creditors are never going to see a dime.

The Debtors go on to claim that they and "the Committee believe that they can effectuate a dividend/recovery for all creditors" and "file a joint plan," Debtors' Supp., p. 2, but that claim rings hollow in the face of the monumental administrative expenses that have accrued and continue to accrue.  The Committee Supp. echoes that sentiment at ¶ 2.  Of course, other than hope, the Debtors have no framework for a plan.  The Debtors have no business, and the remaining assets continue to decline in value, evidenced by the fact that no buyer has offered real money after over a year's exposure to the market.  These cases do not need a plan, they need a chapter 7 trustee.  The Committee Supp.'s argument at ¶ 3 that the appropriate course of action is to stay in chapter 11 with visions of a plan, a creditors' trust and distributions of new stock in a "reorganized, new or merged entity" is a pipe dream.  All chapter 11 will continue to accomplish is the accrual of more and more administrative costs.

Cause for conversion is abundant.  The Debtors state that "no other party in interest" supports the Motion.  Debtors' Supp., p. 5.  That is because there are no other real parties in interest other than Discover, the Debtors' professionals and the Committee's professionals.  The Debtors have no management.  Fiorino apparently wants nothing to do with management. Bauer Cert., ¶ 66.  Unsecured creditors know that their claims are write-offs and have moved on.  The Committee Supp. claims at ¶ 4 that "[the Debtors

---

Barney Dec. I, Exhibit A., pp. 52, ll. 6-19.

GIBBONS P.C.

March 30, 2020
Page 5

have multiple assets and unsecured creditors," which is true but largely irrelevant. The assets appear to have little cash value, and unsecured creditors are out of the money.

The Committee Supp. goes on to tout the Debtors' "multiple assets" at ¶ 31, without addressing the reality that, after more than a year's exposure to the market, there appear to be no buyers willing to pay meaningful cash for any of the remaining intellectual property. If property has no meaningful cash value, can it truly be considered an asset? Discover submits that it cannot, at least under these circumstances. This also puts the lie to the Committee's position that the Debtors have more assets than the $2.93 million cash collateral that is subject to Discover's foreclosure. Committee Supp., ¶ 33.

¶ 32 of the Committee Supp. claims that the Debtors do not have a secured creditor and that Discover "should not be viewed" as such. That claim is far from established, and Discover believes that this Court views Discover as secured, at least to the extent of its minimum claim in excess of $2.9 million. Similarly, the Committee's argument that this is not a two party dispute ignores the reality that this is now a dispute between Discover and the estates' professionals, and should be viewed as essentially a two sided dispute. Committee Supp., ¶ 34. Unsecured creditors have no real stake at this point.

Since Day One, the Debtors and the Committee have admitted that these cases were filed to frustrate Discover's resort to its Collateral, Debtors' Supp., p. 5, as if there were something wrong with Discover realizing that remedy. To the contrary, Discover advanced the last round of funding to Immune, which then apparently paid most of that $2 million to subsidiaries and insiders. The fact that the Debtors and the Committee think that frustrating a secured creditor's right to realize on its Collateral (with false allegations regarding Discover's conduct to boot) is a proper purpose for chapter 11, and the accrual of upwards of $3 million in estate professional fees, demonstrates in and of itself that the bankruptcy system is being abused.

The Debtors' thus tacitly admit bad faith filing: the "cases were filed to stop Discover from taking all of the assets to the detriment of other creditors." Debtors' Supp., p. 5. The Committee Supp. claims at ¶ 35 that the timing of the chapter 11 filing does not evidence bad faith because the cases were filed "to preserve assets rightfully belonging to the estates." The Collateral rightfully belonged to Discover, not the estates. Discover had a first lien on its Collateral and had every right to resort to same. If courts stop enforcing secured creditors' lien rights as the Debtors and the Committee advocate, financing for companies like Immune will cease.

As to the other factors addressed in the Motion establishing bad faith, the Debtors apparently have only one asset that has value- the $2.93 million cash collateral from the Alexion sale. The other assets' lack of value has been established by the market. As of

2645446.1 099998-00014

GIBBONS P.C.

March 30, 2020
Page 6

the Petition Date, the predecessor to that cash collateral, Bert, was subject to Discover's UCC foreclosure notice.  The Debtors have no cash flow and no ability to pay the expenses of these cases.  The Debtors have no employees.  All of these factors establish the Debtors' bad faith in filing these cases.  *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship),* 113 F.3d 1304, 1311 (2d Cir. 1997).  As stated in the Motion, the lack of a reasonable likelihood of reorganization combined with the diminution are cause mandating conversion.  11 U.S.C. § 1112(b)(1) and (4)(a).

Once cause for conversion is established, the burden shifts to the Debtors and the Committee to prove "unusual circumstances" and that they have "a reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time" in order to preclude conversion under 11 U.S.C. § 1112(b)(2).  The Debtors and the Committee can prove neither, and do not even attempt to do so.  Instead, the Debtors claim that if would be "unfair" to convert these cases while the specious claims in the Adversary proceeding are pending.  Debtors' Supp., p. 5.  What they do not state is to whom conversion is unfair, because they cannot credibly argue that conversion would be unfair to unsecured creditors.  The continued accrual of chapter 11 administration is what is truly unfair to unsecured creditors.  What the Debtors really mean is that conversion would be unfair to the Debtors' and the Committee's professionals.

¶¶ 37-38 of the Committee Supp. reference 11 U.S.C. § 1112(b)(2), but then make no effort to demonstrate any unusual circumstances or the prospect of timely plan confirmation, because the Committee cannot do so.  Instead, the Committee resorts to the old saw of hurling invective at Discover.  Just because the Committee drafted the overwrought Complaint in the Adversary does not mean that Discover's security interest and liens are invalid.  Discover made a loan and has a security interest which has been properly perfected.  As to the Committee's claim that Discover will "cry wolf" regarding further asset sales, there is no need for Discover to do so.  As admitted in the Bauer Cert., those sales are far from fruition and do not appear to have any significant cash value.

The Committee Supp. claims at ¶ 36 that the Debtors' operations have been "paused" to preserve assets.  That argument might have had some meaning in March 2019, but in March 2020 it is laughable.  The Debtors are out of business and defunct, not paused.  The Debtors have no management, an unpaid board of directors who are surely tired of the Chapter 11 Cases, and are attempting to hire yet another professional to give the appearance of viability.

The Debtors further claim that they and the Committee have not stood "idly by" since the Alexion closing.  Debtors' Supp., p. 5.  However, their efforts have resulted in little by way of results, and the passage of time has diminished the value of the remaining assets, as evidenced by the failure of the market to produce cash buyers.  They also

GIBBONS P.C.

March 30, 2020
Page 7

claim to be "active" in the Israeli insolvency proceedings with the false hope of recouping some part of the $3 million that was forcibly expatriated.  *Id.*  Discover has argued since the sale hearing that those funds were never coming back, and the Debtors' revelation that those proceedings will take six months or more suggest nothing more than further delay in chapter 11 and the accrual of another million in administrative costs.  The Debtors statement that "accruals of expenses are *de minimus*" other than professional fees, Debtors' Supp., p. 5, begs the question.  The professional fees accrue at a monumental rate and are a significant reason why these cases should be converted:  a chapter 7 trustee can accomplish the remaining liquidation at far less expense than the chapter 11 professionals.

In an effort to demonstrate that Debtors' counsel has a client, the Bauer Cert., ¶¶ 66-70,[5] discusses the Debtors' board of directors and the proposed CRO.  The discussion lacks any detail about anything that the board has accomplished, aside from being "informed of the on-going proceedings" such as the proposed cash-free sales of the Debtors' remaining assets discussed above.

The Bauer Cert., ¶¶ 88-97 and 100, goes on to discuss the "Dispute with Discover," and rehashes the ludicrous argument that Discover's lien may not attach to the $2.93 million held in Norris McLaughlin P.A.'s trust account.[6]  As discussed in Discover's letter brief dated March 19, 2020 on its stay relief motion, this argument is directly contrary to the Debtors' prior representations to the Court regarding the proceeds.  The split of the sale proceeds between Immune and Ltd. was represented to this Court by the Debtors as being a fair, if rough, approximation of the relative value of the sale assets owned by, respectively, Immune and Ltd.  Now, the Bauer Cert., ¶ 100, claims that only the Debtors' negotiation skills got the Israeli trustee to agree to give Immune half of the sale proceeds, as if it were an established fact that Ltd. owned all of the assets that were sold to Alexion.  That is simply not the case.

On page seventeen of twenty, the Bauer Cert. finally turns to the Motion.  ¶ 100 falsely claims that the Motion's true statement that the Debtors lost the iCo license was an

---

[5] The Bauer Cert. spends ten of its twenty pages repeating *ad naseum* the procedural history of these cases, apparently to give the illusion that something of import is happening now.  The Bauer Cert., ¶¶ 52 and 63, goes on to recite hearsay from Gary Rabin in an effort to dispute John Kirkland's statements in prior declarations that Rabin made significant admissions against interest during November and December 2019.  Suffice it to say that Mr. Bauer has no knowledge of those conversations, and the fact that Rabin did not mention them does not mean that they did not happen.

[6]  This specious claim has previously been articulated with the bizarre argument that "[t]he Israeli trustee argued the Anti-Eotaxin Assets were owned by Ltd. and not the Immune Debtor.  If this were the case, Discover's purported security interest would not attach to the Anti-Eotaxin Assets."  Debtors Supplemental brief on the stay relief motion, [Doc 375], p. 4.  In fact, the Israeli's trustee's argument turned out to be unavailing, so that the predicate for the Debtors' argument never occurred.

GIBBONS P.C.

March 30, 2020
Page 8

attempt to affect the value of Bert. ¶ 38 of the Committee Supp. echoes this sentiment. In fact, the Debtors had lost the iCo license, and the Motion referenced that fact in order to demonstrate the Debtors' inability to operate their businesses. The fact that iCo ultimately agreed to assign the license to Alexion does not alter iCo's termination of the license when it was held by the Debtors.

The Bauer Cert. repeats the refrain that this is not a two party dispute, and that these cases were filed to "assur[e] that all creditors can share in a recovery of the Debtors' assets. ¶ 102. This is fantasy. These cases are administratively insolvent, the Debtors' continue to incur losses in the form of extensive unpaid professional fees, and the Debtors are clearly headed for liquidation. These are grounds for conversion. See e.g., *In re Ntrl Plants & Lands Mgmt. Co., Ltd.*, 68 B.R. 394, 395 (Bankr. S.D.N.Y. 1986) (converting chapter 11 case, in part, because the debtor's proposed liquidating plan conceded that the business would be terminated and the debtor was losing $60,000 per month in chapter 11); *In re 3868-70 White Plains Rd.*, 28 B.R. 515, 518-19 (Bankr. S.D.N.Y. 1983) (dismissing chapter 11 petition on the ground that reorganization was impossible, in part, because the debtor's assets were fully collateralized, there was a continuing negative cash flow, and there was no possibility for an infusion of third party funds); *In re Kanterman*, 88 B.R. 26, 28 (S.D.N.Y. 1988) (finding no likelihood of rehabilitation when the debtor lacked independent income and was not meeting any postpetition obligations, including tax obligations).

Administrative insolvency is also grounds for conversion. While 11 U.S.C. § 1112(b)(4) does not list administrative insolvency, courts can and do consider this factor. *See In re AdBrite Corp.*, 290 B.R. 209, 217 (Bankr. S.D.N.Y. 2003). (citing *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship),* 113 F.3d 1304, 1311 (2d Cir. 1997)) ("Because the list of grounds for converting or dismissing a Chapter 11 case under § 1112(b) is illustrative, not exhaustive, the court may consider other grounds and use its equitable powers to reach an appropriate result.") Courts have converted cases due in part to administratively insolvency. *See, e.g., In re Bartmann*, No. 03- 04975, 2004 WL 1057662, at *2 (10th Cir. B.A.P. May 10, 2004). Here, even if the funds held by Debtors' counsel were free cash, which they are not, these cases are now or will soon be administratively insolvent.

The prospect of these cases ever resulting in plan confirmation or a dividend to unsecured creditors is non-existent.[7] Accordingly, Discover has demonstrated cause

---

[7] The Bauer Cert.'s claim that the value of Discover's security interest increased post-petition, ¶ 108, apparently included in an attempt to show that Discover is protected, is directly contradicted by the Fed. R. Bankr. P. 2004 testimony of Rabin. During his R. 2004 examination, Rabin, then President and interim CEO of the Debtors, directly contradicted that speculation as follows:

2645446.1 099998-00014

GIBBONS P.C.

March 30, 2020
Page 9

for conversion, and the Debtors have neither shown unusual circumstances nor the prospect of ever confirming a plan, much less within a reasonable period of time. These cases should be converted and a chapter 7 trustee appointed.

B.  Conclusion.

These Chapter 11 Cases have dragged on for far too long, resulting only in damage to Discover and the accumulation of millions of dollars of chapter 11 administrative claims that will never be paid. Aside from the Bert sale, the Debtors are incapable of monetizing any remaining assets. The Debtors have no employees, and are now trying to retain an unnecessary CRO so that Debtors' counsel will have a client and the illusion of a viable estate. The Motion should be granted before the desperate maneuvers of these Debtors results in further destruction of value, and the cases should be converted to let a chapter 7 trustee administer the remains.

The Court has given the Debtors and the Committee every opportunity and more than ample time to finish this liquidation. Rather than do so economically, the Debtors and the Committee have attempted to frustrate Discover's legitimate contract rights at every turn in the vain hope that Discover would give up and go away, and let its cash collateral be used to pay administrative claims. It should now be clear that that is not happening.

The Debtors' and Committee's professionals have incurred fees and expenses far out of proportion to the real value of the Debtors' estates, based on asset values that may have been realistic in the past, but which now have evaporated. Continuing the accrual of administrative expenses pursuing the ephemeral and desperate hope that a plan can be confirmed, money will come from somewhere, and the professionals will be saved makes no sense whatsoever. These cases are in a spiral with no prospect of confirming even a liquidating plan.

---

Q: In your view, what has happened to the value of Discover Growth Fund's collateral since the bankruptcy cases were filed?

A. Declined appreciably.

Q: Can you quantify that?

A: Yeah. We had a bid for 45 million, and now our best bid is 6-.

Barney Dec. I, Exhibit A., pp. 109, ll. 16-22.

GIBBONS P.C.

March 30, 2020
Page 10

Discover has demonstrated cause to convert the Chapter 11 Cases. They were filed in bad faith, solely to defeat and delay Discover's lien rights. The bad faith continued with the Ceplene license, which produced only $105,000, which was quickly consumed in the Debtors' failing operations. The other factors establishing bad faith have only worsened since the Motion was filed. When first faced with the Motion and before Alexion arrived on the scene, the Debtors and the Committee filed the bloated Adversary to promote the illusion of progress.

As discussed above, it is apparent that this is a two sided dispute, one that does not really involve the Debtors themselves. This is a struggle between Discover and the estate professionals. The Debtors are defunct, and have no management, employees, operations or revenue. The claim that operations have "paused" to preserve value is ludicrous. The Debtors spent Discover's $2 million in mere months and then defaulted, and then expressed shock when Discover, as was its right, refused to fund them further. What was left of the Debtors' operation was terminated shortly thereafter.

These cases were filed with the false hope that the Debtors' assets would yield tens of millions of dollars in cash that would fund a settlement with Discover, pay administrative costs and permit the Debtors to confirm a liquidating plan. The only positive event was the Alexion sale, and that closed months ago. The Debtors' and the Committee's supplements harp on that sale as justification for continuing to languish in chapter 11, but the fact remains that that accomplishment is over and done.

The much touted and would-be transactions with Groups A-D are speculative at best, are for little or no cash, and, even if they came to fruition, will yield what appears to be only stock in another microcap pharma company. These Debtors are in desperation. The time has come to end the charade of these cases and stop the administrative bleeding. Conversion is more than warranted.

As such, the Motion should be granted.

Respectfully submitted,

*s/Dale E. Barney*

Dale E. Barney
Director

Enc.
Cc:   All parties in interest (via ECF)
      Morris Bauer, Esq.
      John Mairo, Esq. (both via Email and ECF)

2645446.1 099998-00014