## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>IMMUNE PHARMACEUTICALS INC.,<br>*et al.*,<br><br>Debtors. | Case No. 19-13273 (VFP)<br><br>Chapter 7<br><br>Jointly Administered<br><br>Hearing Date: Dec. 7, 2021 at 10:00 AM |

## BRIEF IN SUPPORT OF CHAPTER 7 TRUSTEE'S MOTION FOR APPROVAL OF SETTLEMENT AND MUTUAL RELEASE AGREEMENT

**RABINOWITZ, LUBETKIN & TULLY, LLC**
293 Eisenhower Parkway, Suite 100
Livingston, NJ 07039
(973) 597-9100
Attorneys for Jeffrey A. Lester, Chapter 7 Trustee

Of Counsel:
JONATHAN I. RABINOWITZ

On the Brief:
JONATHAN I. RABINOWITZ
HENRY M. KARWOWSKI

## PRELIMINARY STATEMENT

Jeffrey A. Lester, Chapter 7 Trustee (the "Trustee") for the bankruptcy estates of Immune Pharmaceuticals, Inc. ("Immune") and related debtors (collectively, the "Debtors"), hereby submits pursuant to Bankruptcy Rule 9019 and Local Bankruptcy Rule 9019-3 this Memorandum of Law in support of his Motion for an order approving a certain Settlement and Mutual Release Agreement (the "Settlement Agreement") between and among the Trustee on behalf of the Debtors' bankruptcy estates; Discover Growth Fund, LLC ("Discover"), a creditor of Immune; certain directors and officers of Immune; and Argonaut Insurance Company (the "Insurer"), the issuer of a certain insurance policy in favor of the directors and officers.

As set forth in detail below, the Settlement Agreement resolves multiple lawsuits and claims.  And for the reasons set forth, the risks inherent in litigation against Discover and the directors and officers; the complexity, expense, inconvenience, and delay associated with such litigation; and the paramount interest of creditors each and collectively support approval of the Settlement Agreement.

Accordingly, the Trustee respectfully requests that this Court approve the Settlement Agreement.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

**Background.**

Immune is a publicly traded biopharmaceutical company that specialized in the development of therapeutic agents in the fields of inflammation, dermatology, and oncology.  Decl. of Anthony Fiorino in Support of Debtor's First-Day Motions (ECF 18) ("Fiorino Decl.") ¶ 14. The remaining Debtors are wholly owned subsidiaries of Immune.  Id. ¶¶ 6-7.

At certain times relevant hereto, Anthony Fiorino, M.D. ("Fiorino"), Daniel Teper ("Teper"), and Gary H. Rabin ("Rabin") served as officers of Immune.  Am. Compl. (Adv. Pro.

1

No. 21-01230 ECF 8) Exh. A ¶¶ 6-11.  Also, at certain times relevant hereto, Fiorino, Teper, Daniel

Kazado ("Kazado"), John Neczesny ("Neczesny"), Jeffrey Paley, M.D. ("Paley"), and Elliot Maza

("Maza") (collectively, excluding Rabin, who is now deceased, and Maza, who is the subject of a

separate settlement agreement, the "Former Directors and Officers") served as directors of

Immune.  Ibid.  Certain Former Directors and Officers reside outside of New Jersey, including

Kazado, a resident of Israel.  Ibid.

The Debtors' assets included "Bertilimumab," or commonly referred to as "Bert,"

described as "a first-in class, human, abti-eotaxin-1 antibody that targets eotaxin-1, a key regulator

of inflammation"; and "Ceplene," used for "the maintenance of remission in patients with Acute

Myeloid Leukemia in combination with interleukin-2 and two vascular disrupting agents."  Fiorino

Decl. (ECF 18) ¶¶ 16-17.

None of Immune's products were ever approved by the United States Food and Drug

Administration for sale in the United States, and upon information and belief, Immune never

actually generated revenue from the sale of approved products.  Id. ¶ 14.  Instead, upon information

and belief, Immune financed its operations through a series of investment vehicles.  Am. Compl.

(Adv. Pro. No. 21-01230 ECF 8) Exh. C ¶ 22.

For instance, in July 2015, Discover Growth Fund ("Discover Cayman"), a Cayman Islands

limited liability company and a related entity of Discover, invested $9 million in Immune pursuant

to two separate Stock Purchase Agreements.  Decl. of John C. Kirkland in Support of Motion for

Relief from Automatic Stay (ECF 11-3) ("Kirkland Decl.") ¶ 9, Exhs. C-D.  In September 2016,

Discover Cayman invested an additional $2 million in Immune pursuant to a Stock Purchase

Agreement.  Id. ¶ 11, Exh. E.

Subsequently, on or about May 18, 2018, Immune issued to certain institutional investors debentures in the total aggregate amount of $2.8 million, later increased to the amount of $3.9 million (the "May Debentures"). Id. ¶ 21. Pursuant to the terms, Immune was required to repay the full amount owed under the May Debentures with interest no later than November 18, 2019. Ibid.

The Trustee alleges that during this period, Immune entered the "zone of insolvency" and that the Former Directors and Officers owed a heightened duty of care to the Debtors' creditors. Am. Compl. (Adv. Pro. No. 21-01230 ECF 8) Exh. C ¶ 65.

**Immune Issues October 2018 Debenture to Discover.**

Later in 2018, Immune, in need of additional working capital after the issuance of the May Debentures, commenced negotiations with Discover, a U.S. Virgin Islands limited liability company, for an investment in the company. Kirkland Decl. (ECF 11-3) ¶ 13. Discover maintains that it was not willing to enter into an equity investment in Immune, but was willing to enter into a secured, convertible debt investment in Immune. Decl. of John C. Kirkland in Opposition to Motion for Partial Summary Judgment (Adv. Pro. No. 19-02033 ECF 9-3) ¶ 18.

On or about October 9, 2018, Immune and Discover entered into that certain Securities Purchase Agreement (the "Securities Agreement") pursuant to the terms of which Discover purchased a debenture convertible into common stock (the "Debenture") in exchange for $2 million in cash and a $3 million "Promissory Note" (the "2018 Transaction"). Kirkland Decl. (ECF 11-3) ¶ 3, Exh. B. On the same date, Immune issued the Debenture. Id. Exh. A.

Pursuant to its terms, the Debenture accorded Discover the right, among others, to convert the Debenture into shares of common stock. Id. Exh. B.

Pursuant to its terms, the Promissory Note was payable upon the earlier of (i) the date of effectiveness of a registration statement covering the resale of the shares issuable upon conversion of the Debenture; or (ii) one year.  Id. Exh. B at Exh. 8.

Pursuant to the terms of the Securities Agreement, Immune granted in favor of Discover a first lien on and security interest in all assets, including inventory, accounts, equipment, chattel paper, general intangibles, and other types of "Collateral."  Id. ¶ 17.  The Ceplene assets were excluded from the collateral, unless such assets, which Immune at the time was negotiating to sell, were not disposed of by March 31, 2019 in a "Ceplene Transaction" as described in the Securities Agreement.  Ibid.  Also, the Bert assets or a portion thereof may have been owned not by Immune, but by Immune Pharmaceuticals, Ltd. ("Ltd."), a subsidiary of Immune.  Am. Compl. (Adv. Pro. 21-01230 ECF 8) Exh. C ¶ 59.  During the subsequent bankruptcy cases, a material question would arise as to whether these Bert assets are included as part of Discover's collateral under the Securities Agreement.

**Discover Declares Default Under the Securities Agreement.**

On February 8, 2019, Discover issued a "Notice of Default and Notice of Sale of Collateral" pursuant to which Discover alleged as an event of default Immune's failure to maintain the required number of shares issuable to Discover under the Debenture, as well as the occurrence of certain "Trigger Events," including (i) Immune's failure to repay the May Debentures when due; (ii) Immune's failure to authorize, reserve, and deliver sufficient shares issuable to Discover; and (iii) the failure of certain "equity conditions" specified in the Debenture.  Kirkland Decl. (ECF 11-3) ¶¶ 14, 39, 62, Exh. N.

At all relevant times, Immune disputed the alleged default under the Debenture.  Decl. of Anthony Fiorino in Opposition to Motion for Relief from Automatic Stay (ECF 67) ¶¶ 46-48, 54-55, 61-79.

As a result of the alleged default, Discover scheduled a foreclosure sale of Immune's assets. Fiorino Decl. (ECF 18) ¶ 25.

On February 12, 2019, shortly before Immune's bankruptcy filing, Discover effected the conversion of the amount of $530.00 of the Debenture into 9,017,067 Conversion Shares of Immune.  Kirkland Decl. (ECF 11-3) ¶ 39.

**The Debtors File Bankruptcy Petitions.**

On February 17, 2019, Immune filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.  Petition (ECF 1).  Each of the remaining Debtors, which are subsidiaries of Immune, filed its own petition soon thereafter.  Fiorino Decl. (ECF 18) ¶¶ 6-7. Ltd., one such subsidiary, is also the subject of an insolvency proceeding in Israel.  Order Approving Memorandum of Understanding (ECF 345) Exh. A at 2.

On February 25, 2019, Discover filed a Motion for Relief from the Automatic Stay to enforce its alleged security interest in certain of Immune's assets, including the Bert and Ceplene assets.  Motion (ECF 11).  The Debtor opposed the Motion.  See, e.g., Decl. of Anthony Fiorino in Opposition to Motion for Relief from Automatic Stay (ECF 67); Obj. to Motion (ECF 68).

On June 12, 2019, Discover filed a Proof of Claim, which was subsequently amended, in the amount of $14,848,569 plus additional interest and costs of collection including attorneys' fees.  Proof of Claim No. 37-1 (Claims Register ECF 37-1).  Discover asserts that it has a lien on all assets of Immune and that its claim amounts to, as of June 30, 2020, $15,874,977.38.  Proof of Claim No. 37-4 (Claims Register ECF 37-4).

**The Bankruptcy Court Approves Sales of the Debtors' Assets.**

Early in the bankruptcy cases, Vector Therapeutics, Inc. ("Vector"), a company allegedly controlled by Teper, on the one hand, and Immune, on the other hand, entered into an Asset Purchase Agreement whereby Vector would purchase the Ceplene assets from Immune for the

sum of $2.25 million and the assumption of certain liabilities.  Am. Compl. (Adv. Pro. No. 21-01230 ECF 8) Exh. A ¶ 120.  At a hearing on March 29, 2019, Vector informed this Court that it did not have the funds to close the purchase, but that it would shortly.  Id. ¶ 121.

Instead, on or about March 30, 2019, subject to approval of this Court, Vector and Immune entered into a 30 day licensing agreement for the Ceplene assets for the sum of $100,000, with a right to renewal.  Order (ECF 297) Exh. A.

On April 16, 2019, Discover filed a "Motion for a Determination that (I) the Debtor's License of the Ceplene Assets to Vector Therapeutics, Inc. Is Out of the Ordinary Course of the Debtor's Business and Is Thus Void Ab Initio and (II) Said Assets Are Now Subject to Movant's Priority Lien and Security Interest."  Motion (ECF 143).

On April 23, 2019, the Debtors filed in response a Notice of Debtors' (A) Opposition to Discover's Motion and (B) Cross-Motion to Approve the License Agreement with Vector Therapeutics, Inc. Nunc Pro Tunc to March 30, 2019.  Notice (ECF 151).

On August 21, 2019, this Court entered an Order (I) Granting in Part Discover Growth Fund, LLC's Motion Finding the Immune Debtor's License Agreement of the Ceplene Assets to Vector Therapeutics, Inc. Is a Transaction Out of the Ordinary Course of the Immune Debtor's Business and (II) Granting in Part Debtors' Cross-Motion Finding that the License Agreement Is Approved Nunc Pro Tunc to March 30, 2019.  Order (ECF 297).  Immune and Vector did not close the purchase of the Ceplene assets thereafter.

On October 28, 2020, this Court ultimately approved the sale of the Ceplene assets and other assets of the Debtors' estates for the sum of $190,000.  Order (ECF 578).

On October 21, 2019, this Court entered an Order approving the sale of the Bert assets for the sum of $6 million.  Order (ECF 343).  Pursuant to a Memorandum of Understanding, Immune

and the Official Committee of Unsecured Creditors (the "Committee") on the one hand, and the

Israeli trustee for Ltd., on the other hand, who claimed that some portion of the Bert assets was in

fact a Ltd. asset, agreed that (i) Immune's counsel would hold 50% of the sale proceeds in trust

and that such proceeds can be disbursed only upon authorization of this Court; and (ii) the Israeli

trustee would hold the remaining 50% of the sale proceeds in trust and that such proceeds can be

disbursed only upon authorization from the Israeli court.   Order Approving Memorandum of

Understanding (ECF 345) Exh. A.

**The Debtors and the Committee File Complaint Against Discover.**

On July 1, 2019, the Debtors and the Committee filed against Discover an Adversary

Complaint challenging the amount and classification of the claim asserted by Immune under the

Securities Agreement and the Debenture (the "DGF Adversary Proceeding").  Compl. (Adv. Pro.

No. 19-02033 ECF 1).

In the Eighth Count of the Complaint, the Debtors and the Committee sought the

subordination of Discover's claim to the same priority as that of claims of holders of common stock

pursuant to Bankruptcy Code section 510(b), on the basis that the claim is for damages arising from

the purchase of a "security," that is, the Debenture.  Id. ¶¶ 188-99.

On August 2, 2019, Discover filed an Answer to the Adversary Complaint.  Answer (Adv.

Pro. No. 19-02033 ECF 4).

On February 27, 2020, the Debtors and the Committee filed a Motion for Partial Summary

as to the Eighth Count of the Adversary Complaint.  Motion (Adv. Pro. No. 19-02033 ECF 13).

On March 17, 2020, Discover filed opposition to the Motion.  Brief in Opposition (Adv. Pro.

No. 19-02033 ECF 22).

On April 1, 2020, this Court denied the Motion.  Apr. 1, 2020 Tr. (Adv. Pro. No. 19-02033

ECF 32).  Although this Court acknowledged that the Debtors' estates may hold a viable claim,

this Court rejected the movants' interpretation of section 510(b) in their Motion.  For instance, this Court observed: "I don't think this is in any way the type of transaction that automatically gets subordinated.  I just don't, I just don't see it – I don't see it." Id. at 40:18-20.  See also id. at 15:25-16:5 ("510(b) doesn't mean just because it's within the definition of security . . . . That's not . . . the proper analysis."), 41:17-19 ("I'm just not prepared to hold that a convertible debenture that's secured is automatically subordinated under 510.").

On March 27, 2020, Discover filed a Motion for Withdrawal of the Reference and for Jury Trial in the DGF Adversary Proceeding.  Motion (Adv. Pro. No. 19-02033 ECF 25).  The parties have since fully briefed the Motion before the District Court.  See D.N.J. Civ. Action No. 20-033750.

**Bankruptcy Court Converts Case and Appoints Trustee;
the Trustee Appeals from Denial of Reconsideration.**

On April 2, 2020, this Court converted the Debtors' bankruptcy cases to cases under chapter 7.  Order (ECF 400).  On April 3, 2020, the United States Trustee appointed the Trustee as Chapter 7 Trustee.  Notice of Appointment (ECF 401).

On May 4, 2020, the Trustee filed a Motion to substitute for the Debtors and the Committee as Plaintiff in the DGF Adversary Proceeding.  Motion (Adv. Pro. No. 19-02033 ECF 39).

On the same date, the Trustee filed a Motion for Reconsideration of the Order Denying Partial Summary Judgment in the DGF Adversary Proceeding.  Motion (Adv. Pro. No. 19-02033 ECF 40).

On May 26, 2020, Discover filed opposition to the Trustee's Motion.  Brief in Opposition (Adv. Pro. No. 19-02033 ECF 42).

On June 23, 2020, this Court denied the Trustee's Motion and denied Discover's Motion for Relief from the Automatic Stay pending resolution of the DGF Adversary Proceeding.  June 23, 2020 Tr. (Adv. Pro. No. 19-02033 ECF 50).

In reaching its decision on reconsideration, this Court noted that the language of section 510(b) is not clear and that courts are divided in their application of the statute.  Id. at 20:19-24 ("[J]ust like there's the NAL case, there's other cases – the Mobil case – and what was the other one in Delaware, you know, that go the other way.  And all, you know, the plain meaning, about five appellate courts have said there is no plain meaning in this statute.  It's difficult to understand."), 29:25-30:1-2 ("I just can't overlook that, you know, the vast majority of this [Debenture] was never converted, that there are cases that go in every direction on this . . . .").

Moreover, although this Court acknowledged that the Trustee may eventually succeed on the claim, this Court rejected the Trustee's interpretation of section 510(b).  Id. at 48:23-49:7 (holding that "[the] rationale . . . that the subordination of this claim as giving rise to damages under 510(b) could lead to the untenable result that any claim produced out of the corporate bond or debenture is automatically subordinated [to] the claims of other unsecured creditors given the [definition] of security . . . . I do not believe Congress intended this result").

**The Trustee and Discover File Appeals;**
**the Trustee Files Amended Complaint Against Discover.**

On June 29, 2020, this Court entered an Order Substituting Trustee for Debtors and Committee as Plaintiff Pursuant to F.R.B.P. 7025.  Order (Adv. Pro. No. 19-02033 ECF 48).

On July 24, 2020, the Trustee filed a Notice of Appeal from this Court's Order denying the Trustee's Motion for Reconsideration and a Motion for Leave to Appeal.  Notice of Appeal (Adv. Pro. No. 19-02033 ECF 54); Motion (Adv. Pro. No. 19-02033 ECF 55).  The parties have since fully briefed the appeal.  See D.N.J. Civ. Action No. 20-09469.

On September 1, 2020, Discover filed a Notice of Appeal from this Court's Order Denying Discover's Motion for Relief from the Automatic Stay.  Notice of Appeal (ECF 552).  The parties have since fully briefed the appeal.  See D.N.J. Civ. Action No. 20-12247.

On October 26, 2020, the Trustee filed an Amended Adversary Complaint in the DGF Adversary Proceeding; the Trustee deleted certain allegations made in the original Complaint filed by the Debtors and the Committee.  Am. Compl. (Adv. Pro. No. 19-02033 ECF 75).

On November 16, 2020, Discover filed an Answer in which Discover denies the Trustee's allegations and raises the affirmative defense of failure to state a claim, among other defenses. Answer (Adv. Pro. No. 19-02033 ECF 76).

## Discover Files Complaint Against the Former Directors and Officers.

On January 9, 2020, Discover filed a Complaint against the Former Directors and Officers and the Rabin estate (the "Discover Action").  Compl. (Civ. Action 2:20-CV-351 ECF 1).  On February 14, 2020, Discover filed a Corrected Amended Complaint.  Am. Compl. (Adv. Pro. No. 21-01230 ECF 8) Exh. A ¶¶ 6-16.

In the Corrected Amended Complaint, Discover alleges various "Equity Condition Failures, Trigger Events, and Events of Default," including the following: (i) the termination by iCo Therapeutics Inc. ("iCo") of a Product Sublicense Agreement providing for the use by Immune of patent licenses for certain intellectual property; iCo maintained that Immune had improperly subjected the intellectual property to Discover's purported security interest; Discover alleged in turn that the termination had effected a breach of certain representations and warranties made by Immune, acting through the Former Directors and Officers, and defaults under the Securities Agreement; (ii) Immune's failure to reserve the required amount of shares issuable to Discover under the Securities Agreement; (iii) Immune's failure to register and issue certain conversion shares pursuant to a "Conversion Notice" issued by Discover; (iv) "multiple" Trigger Events and the failure of "Equity Conditions" associated with Immune's failure to reserve and deliver shares to Discover under the Debenture; and (v) Immune's pledge of property purportedly owned not by

Immune, but by Ltd.  Id. Exh. A ¶¶ 28-50, 58-74.  Also, Discover alleges that based upon available financial information, Immune was insolvent and suffered severely impaired cash flow before and after its petition filing.  Id. Exh. A ¶ 69.

On the basis of these allegations, among others, Discover asserts claims for common law fraud, fraud in the inducement, negligent misrepresentation, breach of fiduciary duty, and securities fraud.  Id. ¶¶ Exh. A 92-141.

On April 8, 2020, the Former Directors and Officers filed a Motion to Dismiss the Corrected Amended Complaint.  Motion (Civ. Action 2:20-CV-00351 ECF 10).  Discover opposed the Motion.  Brief in Opposition (D.N.J. Civ. Action 2:20-CV-00351 ECF 14).

On April 9, 2020, the Former Directors and Officers filed in this Court a Motion for Entry of Order Authorizing Payment and/or Advancement of Defense Costs Under Immune Pharmaceuticals Inc.'s Directors and Officers Insurance Policy.  Motion (ECF 420).  The Former Directors and Officers, as beneficiaries under a certain "Public Company Directors & Officers Insurance Policy" numbered ML 7602075-01 and purchased by Immune and issued by the Insurer (the "Policy"), alleged that they had incurred, and that they would continue to incur, costs in the defense of the action brought by Discover.  Id. at 2.  On June 18, 2020, this Court entered an Order granting the Motion.  Order (ECF 513).

On January 25, 2021, the District Court denied the Motion to Dismiss the Corrected Amended Complaint, except for a securities fraud claim that was dismissed.  Discover Growth Fund, LLC v. Fiorino, 2021 U.S. Dist. LEXIS 13082, at *23 (D.N.J. Jan. 25, 2021).  Am. Compl. (Adv. Pro. No. 21-01230 ECF 8) Exh. B.

Thereafter, the Former Directors and Officers and the Rabin estate filed Answers denying Discover's allegations.  Answers (Civ. Action 2:20-CV-351 ECF 30, 33, 37).

**Directors and Officers File Proofs of Claim Against the Immune Estate.**

On July 7, 2020, Neczesny filed a Proof of Claim in the amount of $105,000, with the amount of $13,650 claimed as priority.  Proof of Claim No. 158 (Claims Register ECF 158-1).

On the same date, Paley filed a Proof of Claim in the amount of $105,000, with the amount of $13,650 claimed as priority.  Proof of Claim No. 159 (Claims Register ECF 159-1).

On the same date, Fiorino filed a Proof of Claim in the amount of $641,736.16, with the amount of $13,650 claimed as priority.  Proof of Claim No. 161 (Claims Register ECF 161-1).

**The Trustee Files First Complaint for Declaratory Relief Against Discover.**

On June 22, 2020, the Trustee filed a Complaint for Declaratory Judgment and for Other Relief against Discover.  Compl. (Adv. Pro. 20-01371 ECF 1).  The Trustee alleged that pursuant to the Securities Agreement, Immune granted to Discover a security interest in certain defined "Collateral"; and that Discover, in filing a UCC-1 financing statement, attempted to perfect its security interest in the collateral.  Id. ¶¶ 9-13.  He alleged further that the Debtors' estates have certain causes of action against the Debtors' Former Directors and Officers (the "Breach of Fiduciary Duty Claims"); that these causes of action are commercial tort claims within the meaning of Uniform Commercial Code ("U.C.C.") section 9-102(a)(13); and that the broad definition of "Collateral" in the Securities Agreement does not satisfy the specificity requirements of U.C.C. sections 9-203(b) and 9-108(e) for the attachment of such claims.  Id. ¶¶ 14-19.  Accordingly, the Trustee sought judgment determining that Discover had failed to attach and as a result under U.C.C. section 9-308(a) also perfect a security interest in the Breach of Fiduciary Duty Claims; and avoiding any security interest for the benefit of the Debtors' estates under Bankruptcy Code section 544(a)(1) and U.C.C. section 9-317(a)(2).  Id. at 4-6.

On July 22, 2020, Discover filed a Motion to Dismiss Plaintiff's Complaint for Declaratory Judgment and for Other Related Relief.  Motion (Adv. Pro. No. 20-01371 ECF 4).  Discover cited

ripeness, standing, lack of subject matter jurisdiction, and justiciability as grounds for dismissal. Ibid.

On August 11, 2020, the Trustee filed opposition to the Motion. Brief in Opposition (Adv. Pro. No. 20-01371 ECF 6).

On September 4, 2020, this Court entered an Order Denying Motion to Dismiss Without Prejudice. Order (Adv. Pro. No. 20-01371 ECF 10). The Order directed the Trustee to file an amended complaint with attached as an exhibit a form of proposed complaint "setting forth the claims against Directors and Officers that the Plaintiff believes constitute the commercial tort claims alleged in paragraphs 14, 17, and 21 of the Complaint." Ibid.

On October 19, 2020, the Trustee, rather than file a copy of a proposed complaint as an exhibit, filed a Notice of Voluntary Dismissal Without Prejudice Pursuant to Bankruptcy Rule 7041 and Federal Rule 41(a)(1)(A)(I) because he was in the process of continuing to conduct pre-litigation discovery concerning the Breach of Fiduciary Duty Claims. Notice (Adv. Pro. No. 20-01371 ECF 13); Certif. of Jonathan I. Rabinowitz, Esq. (Adv. Pro. No. 21-01230 ECF 11-1) ¶ 4.

**The Trustee Files Second Complaint for Declaratory Relief Against Discover.**

On April 2, 2021, the Trustee, in order to preserve the statute of limitations for any avoidance claims against Discover, filed a second Complaint for Declaratory Judgment and for Other Relief against Discover (the "DGF Lien Adversary Proceeding"). Compl. (Adv. Pro. No. 21-01230 ECF 1). In this second action, the Trustee asserts the same factual allegations as those raised in the first action for declaratory relief. Id. ¶¶ 5-20. He raises the following claims: (i) the definition of "Collateral" in the Securities Agreement did not sufficiently specify the Breach of Fiduciary Duty Claims; (ii) Discover's purported security interest did not attach to the Breach of Fiduciary Duty Claims; (iii) Discover's purported security interest in the Breach of Fiduciary Duty Claims never attached, and hence, Discover failed to perfect a security interest in the Breach of

Fiduciary Duty Claims as well; (iv) as a hypothetical lien creditor under section 544(a)(1), the Trustee has the power to avoid any unperfected security interest in the Breach of Fiduciary Duty Claims; and (v) the avoided security interest in the Breach of Fiduciary Duty Claims will be preserved for the Debtors' estate under Bankruptcy Code section 551.  Id. ¶¶ 16-34.

Based on these claims, the Trustee seeks judgment (i) determining that Discover failed to adequately describe the Breach of Fiduciary Duty Claims in the Securities Agreement; (ii) determining that Discover's purported security interest did not attach to the Breach of Fiduciary Duty Claims; (iii) determining that Discover failed to perfect a security interest in the Breach of Fiduciary Duty Claims; (iv) avoiding any unperfected security interest in the Breach of Fiduciary Duty Claims; and (v) preserving any avoided security interest in the Breach of Fiduciary Duty Claims for the benefit of the Debtors' estates.  Id. at 6-7.

On April 9, 2021, Discover filed a Motion to Dismiss Complaint in the DGF Lien Adversary Proceeding.  Motion (Adv. Pro. 21-01230 ECF 4).  Discover cited standing, ripeness, and justiciability as grounds for dismissal.  Ibid.

On April 23, 2021, the Trustee filed in the DGF Lien Adversary Proceeding an Amended Complaint in which the Trustee added a new Count VI, in which the Trustee seeks the disallowance of any secured claim alleged by Discover in the Breach of Fiduciary Duty Claims pursuant to Bankruptcy Code section 502(d).  Am. Compl. (Adv. Pro. 21-01230 ECF 8) ¶ 37.

Also, the Trustee attached to the Amended Complaint a first draft of a proposed complaint against the Former Directors and Officers and certain former attorneys of the Debtors (the "Chapter 7 Trustee Proposed D&O Complaint").  Id. Exh. C.  The Trustee noted that the draft is based in part on the Corrected Amended Complaint filed by Discover against the Former Directors and Officers in the Discover Action.  Id. ¶ 14, Exh. C.  In the draft of the proposed complaint, the

Trustee asserts the Breach of Fiduciary Duty Claims and other claims against the Former Directors

and Officers.  Id. Exh. C ¶¶ 77-108.  To date, the proposed complaint has not yet been filed.

On May 18, 2021, the Trustee filed opposition to Discover's Motion to Dismiss.  Brief in

Opposition (Adv. Pro. No. 21-01230 ECF 11).

On June 18, 2021, this Court entered an Order, subsequently amended on July 2, 2021,

denying Discover's Motion but ordering the Trustee to file a complaint against the Former

Directors and Officers by a certain date, which has since been extended.  Order (Adv. Pro. 21-

01230 ECF 17); Order (Adv. Pro. 21-01230 ECF 21).

On June 30, 2021, Discover filed an Answer to the Amended Complaint.  Answer (Adv.

Pro. No. 21-01230 ECF 19).

On July 6, 2021, Discover filed an Amended Answer in which Discover denies the

Trustee's allegations and raises affirmative defenses, including failure to comply with applicable

statutes of limitations and failure to state a claim among other defenses.  Am. Answer (Adv. Pro.

21-01230 ECF 22).

**The Trustee Files Avoidance Complaints against the Former Directors and Officers.**

On April 1, 2021, the Trustee filed the following avoidance actions against the Former

Directors and Officers or affiliated entities: (i) Adv. Proc. No. 21-1228 for the avoidance and

recovery of transfers totaling $17,797.26 made to Fiorino; (ii) Adv. Proc. No. 21-1227 for the

avoidance and recovery of transfers totaling $49,216.76 made to Kazado; (iii) Adv. Proc. No. 21-

1229 for the avoidance and recovery of transfers totaling $56,666.67 made to Teper; (iv) Adv.

Proc. No. 21-1222 against Donna Rabin for the avoidance and recovery of transfers totaling not

less than $75,000 made to Rabin; (v) Adv. Proc. No. 21-1225 for the avoidance and recovery of

transfers totaling $36,827.66 made to Maza; and (vi) Adv. Proc. No. 21-01215 for the avoidance

and recovery of transfers totaling $59,510 made to Cytovia International Sarl.  The parties have
extended the deadlines to respond to the Complaints pending the mediation and settlement
negotiations.

On the same date, the Trustee and Crimson Biomedical Consulting, Inc. ("Crimson"), an
entity controlled by Paley and through which he was paid by Immune for medical consulting work
and director fees, entered into a stipulation extending the deadline for filing an avoidance action
against Crimson (collectively, with the other avoidance actions listed above, the "Avoidance
Actions").  Stipulation (ECF 623).  The deadline has since been extended to November 30, 2021.
Stipulation (ECF 686).

**The Parties Reach Settlement.**

On July 12, 2021, respective counsel for the Trustee, Discover, the Former Directors and
Officers, and the Insurer attended a mediation session and reached the framework for a settlement
of all claims between and among the parties, including the Proof of Claim filed by Discover, the
Proofs of Claim filed by the Former Directors and Officers and their affiliates, the Trustee's DGF
Adversary Proceeding and DGF Lien Adversary Proceeding against Discover, the Discover
Action, the Debtors' Breach of Fiduciary Duty Claims and other claims against the Former
Directors and Officers, the Avoidance Actions, and all pending appeals and motions.  Certif. of
Jeffrey A. Lester in Support of Motion for Approval of Settlement and Mutual Release Agreement
("Lester Certif.") ¶ 4.

On November 9, 2021, the parties, after extensive negotiations, agreed on the terms of the
Settlement Agreement.  Id. ¶ 5, Exh. A.  The relevant terms are as follows:

(i)      the Debtors' bankruptcy estates shall pay to Discover the sum of $3,120,000 in settlement of its Proof of Claim, id. Exh. A ¶ 2.A;

(ii)     the Insurer shall pay to the Trustee the sum of $880,000, and the Trustee shall in turn pay to Discover the sum of $880,000, in settlement of the Discover Action against the Former Directors and Officers, ibid.;

(iii)    the Insurer shall pay to the Trustee the sum of $2,100,000 in settlement of the Debtors' bankruptcy estates' claims against the Former Directors and Officers and the Rabin estate, ibid.;

(iv)    this Court's order approving the Settlement Agreement shall permanently enjoin, restrain, and bar any person or entity who has held, holds, or could hold or assert any claim, action, or cause of action of any kind, both known and unknown, against any of the Parties as defined in the Settlement Agreement, including but not limited to Discover, any directors or officers of the Debtors, the Trustee, or the Debtors or their bankruptcy estates, except governmental agencies, from filing, commencing, conducting, asserting, or continuing in any manner, directly, indirectly, or derivatively, any suit, action, claim, demand, or other proceeding (including, without limitation, any proceeding in any judicial, arbitral, administrative, or other forum) against any of the Parties, including but not limited to Discover, any directors or officers of the Debtors, the Trustee, or the Debtors or their bankruptcy estates, based upon, arising from, or attributable to the acts or omissions of the Former Director and Officer Defendants as defined in the Settlement Agreement in their capacity as directors or officers of the

17

Debtors or in any way related to the Debtors or the Litigation Matters as defined in the Settlement Agreement, or against the Insurer in connection with the directors or officers of the Debtors, the Debtors, the 2018 Transaction, or the Litigation Matters as defined in the Settlement Agreement; but it shall not, however, impact, impair, or otherwise affect any rights that an insured may have under the Policy or pursuant to any other arrangement among an insured and the Insurer, <u>id.</u> Exh. A ¶ 3.B;

(v)     this Court's order approving the Settlement Agreement must provide for findings of fact determining that it is probable that (a) the Debenture is not a "security" for purposes of 11 U.S.C. § 510(b) and that Discover's claim asserted in the bankruptcy cases is not a claim for "damages arising from the purchase or sale of such a security"; (b) Discover did not commit securities fraud with respect to the Debenture, the Securities Agreement, and related agreements and instruments; (c) Discover was not required to register as a dealer with the Securities Exchange Commission with respect to the 2018 Transaction; and (d) certain allegations made in the original Complaint filed by the Debtors and the Committee against Discover in the DGF Adversary Proceeding and subsequently deleted by the Trustee in the Amended Complaint against Discover were meritless and properly dismissed, <u>id.</u> Exh. A ¶ 3.C;

(vi)    Discover shall have an allowed secured claim in the amount of $4,000,000, to be satisfied by the payments cited in paragraphs (i) and (ii) above, and following these payments, Discover shall withdraw its Proof of Claim and

receive no other distribution from or assert any other claim against any party

to the Settlement Agreement, including the Debtors' bankruptcy estates, <u>id.</u>

Exh. A ¶ 3.D;

(vii)    the Former Directors and Officers shall withdraw their Proofs of Claim

against the Debtors' bankruptcy estates, <u>ibid.</u>;

(viii)    the Trustee shall release Discover, the Former Directors and Officers, and

the Insurer from all claims related to the Debtors' bankruptcy cases, except

for claims set forth in paragraph (xi) below, <u>id.</u> Exh. A ¶ 4.A;

(ix)    Discover shall release the Former Directors and Officers, the Trustee and

the bankruptcy estates, and the Insurer from all claims related to the

Debtors' bankruptcy cases, <u>id.</u> Exh. A ¶ 4.B;

(x)    the Former Directors and Officers shall release Discover and the Trustee

and the bankruptcy estates from all claims related to the Debtors'

bankruptcy cases, <u>id.</u> Exh. A ¶ 4.C;

(xi)    Discover, the Former Directors and Officers, and the Insurer shall release

any and all claims and liens, if any, against (a) the proceeds of any claims

made by the Trustee or the Debtors' bankruptcy estates against the Debtors'

former attorneys; and (b) any distributions from the Israeli insolvency estate

of Ltd. to the Debtors' bankruptcy estates; and in furtherance thereof, the

Debtors' bankruptcy estates shall hold harmless any directors and officers

of the Debtors, including the Former Directors and Officers, from any

liability arising from any claim asserted by the Debtors' bankruptcy estates

against a third party, but the Debtors' bankruptcy estates' obligations under

this "hold harmless" provision shall only apply to limit the Debtors'

bankruptcy estates' recovery from any third party to the allocated

percentage of fault attributable to such third party, and the Debtors'

bankruptcy estates shall not pay any monies on account of this "hold

harmless" provision, <u>id.</u> Exh. A ¶¶ 2.B, 4.D; and

(xii)    the parties to the Settlement Agreement shall dismiss all pending claims,

actions, appeals, and motions against each other, <u>id.</u> Exh. A ¶ 4.E.

This summary appears for illustrative purposes only; the complete terms of the settlement

appear in the Settlement Agreement.

**<u>Status of the Debtors' Chapter 7 Cases.</u>**

The proceeds of the sale of both the Ceplene and Bert assets, totaling $3,120,000, have

resided in trust pending resolution of the Debtors' estates' claims against Discover.  Lester Certif.

¶ 6.  If this Court were to disapprove the Settlement Agreement and ultimately determine that

Discover has a valid lien, however, the estates would have only *de minimis* unencumbered assets.

<u>Ibid.</u>

Moreover, in the absence of the settlement, extensive and costly litigation against Discover

and the Former Directors and Officers would remain.  To begin with, the Trustee has not yet filed

the Chapter 7 Trustee Proposed D&O Complaint against the Former Directors and Officers.  <u>Id.</u> ¶

7.  Also, in the Avoidance Actions against the Former Directors and Officers and related entities,

the defendants have not yet answered the complaints and the parties have not yet commenced

discovery.  <u>Ibid.</u>  Likewise, in the DGF Lien Adversary Proceeding against Discover, the parties

have not yet commenced discovery.  <u>Ibid.</u>  And even in the DGF Adversary Proceeding, the parties

have engaged only in documentary discovery to date; no depositions have yet been conducted. Ibid.

Otherwise, once the settlement is approved, the following matters will be left for disposition in these bankruptcy cases: (i) an avoidance action against a defendant unrelated to Discover or the Former Directors and Officers; (ii) the sale of any remaining intellectual property; (iii) the prosecution of the Debtors' estates' claims against the Debtors' former attorneys; and (iv) the resolution of the estates' claim against the Ltd. insolvency estate in Israel, from which, depending on an appeal and the subordination of another creditor's substantial claim, the estates expect to ultimately recover the amount of between $600,000 to $1 million. Id. ¶ 8. Once the Settlement Agreement is approved, it is possible that the Trustee can resolve these matters and fully administer the estate within a year. Ibid.

Finally, as for administrative claims filed against the Debtors' estates, the Trustee estimates that chapter 7 administrative claims against the estates currently amount to approximately $1,400,000; and that chapter 11 administrative claims against the estate amount to $2,890,644. Id. ¶ 9.

## LEGAL ARGUMENT

## THIS COURT SHOULD APPROVE THE SETTLEMENT.

Bankruptcy Rule 9019(a) authorizes a court, after notice and a hearing, to approve a compromise or settlement of controversy. Settlements are favored in bankruptcy because they minimize litigation and expedite administration of the bankruptcy estate. Myers v. Martin (In re Martin), 91 F.3d 389, 392 (3d Cir. 1996).

Before approving a settlement, a bankruptcy court must examine the fairness, reasonableness, and adequacy of the settlement in light of the Third Circuit's traditional "Martin" factors. Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002). The

four factors are: (i) the probability of success in litigation; (ii) the likely difficulties in collection; (iii) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (iv) the paramount interest of the creditors.  Ibid. (citing Martin, 91 F.3d at 393).

In applying the factors, "[t]he Bankruptcy Court need not probe the merits of all claims or conduct a 'mini-trial' before approving the settlement; rather, avoiding litigating the issues is one of the main advantages of settlement."  Stanziale v. U.S. Risk Ins. Group, Inc. (In re NovaPro Holdings, LLC), 815 F. App'x 655, 658 (3d Cir. 2020).

Instead, the court need only canvas the issues to determine whether the settlement falls above the "lowest point in the range of reasonableness"; and under normal circumstances, the court should defer to the trustee's judgment so long as there is a legitimate business justification. In re ID Liquidation One, LLC, 555 F. App'x 202, 207 (3d Cir. 2014) (quoting In re Capmark Fin. Grp. Inc., 438 B.R. 471, 515 (Bankr. D. Del. 2010)); Martin, 91 F.3d at 395.

Applying this analysis, this Court has approved settlements under Rule 9019 as a matter of routine.  In re SB Building Assocs., Ltd. P'ship, 621 B.R. 330, 379-81 (Bankr. D.N.J. 2020) (approving settlements in connection with confirmation of chapter 11 plan of reorganization because, among other reasons, "[y]ears of complex and costly multiparty litigations whose results were uncertain are being resolved"; "[f]urther discovery, motion practice and likely appeals are avoided"; and "[t]he settlements will not only end the substantial cost, uncertainty and delay inherent in litigation, but also result in substantial reductions of the secured claims against the Debtors (by more than $5 million)"); In re Petersburg Regency LLC, 540 B.R. 508, 512, 535-45 (Bankr. D.N.J. 2015) (granting creditors' motion to approve settlement providing for distribution of chapter 11 debtor-hotel's only significant asset — insurance proceeds generated by storm damage to hotel — and structured dismissal of case, on grounds that settlement provided only possibility for

distribution on unsecured claims; debtor was highly unlikely to succeed in proposed alternative distribution scheme based on adversary proceeding to avoid liens and reduce claims of secured creditors; and cost, delay, and uncertainty of adversary proceeding and debtor's proposed chapter 11 plan would likely only decrease creditors' ultimate recovery); Meisel v. Natale (In re JDN Props. at Florham Park, LLC), 2015 WL 5168600, at *33-35 (Bankr. D.N.J. Aug. 31, 2015) (approving settlement of adversary proceeding in which trustee sought to avoid transfers, on grounds that litigation had dragged for years and proceeding was estate's last remaining asset; defendants had asserted reasonable defenses; difficulty of collection was demonstrated by certain creditors' inability to collect on judgment for years; discovery would take a year or more to conclude, and trustee would have to fund litigation in case with little or no assets; and case was essentially two-party dispute).

Here, as set forth in detail above, the Trustee proposes to settle all litigation with Discover and with the Former Directors and Officers.  For the following reasons, the Martin factors weigh in favor of approval of the Settlement Agreement.

## A.    Analysis of the Probability of Success Favors the Settlement.

The Settlement Agreement provides for compromise of the Debtors' estates' claims against both Discover and the Former Directors and Officers.  Because the Avoidance Actions involve relatively *de minimis* amounts, the Trustee addresses only the primary claims below.

### 1.    The Trustee's Section 510(b) Claim Against Discover.

The Trustee's principal claim against Discover in the DGF Adversary Proceeding appears in the Eighth Count relating to section 510(b).  Am. Compl. (Adv. Pro. No. 19-02033 ECF 75) ¶¶ 137-48.  Under section 510(b), a claim for damages arising from the purchase of a security must be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security.  11 U.S.C. § 510(b).  Section 101(49) in turn expressly defines the term "security" to include a "debenture."  11 U.S.C. § 101(49)(A)(v).

23

Applying the plain meaning of sections 510(b) and 101(49)(A)(v), courts have determined, albeit in dicta, that a claim arising from the purchase of a debenture must be subordinated.  In re NAL Fin. Group, Inc., 237 B.R. 225, 230 (Bankr. S.D. Fla. 1999) (holding that unexercised, convertible debentures constituted a security within meaning of section 510(b)); Mid-Am., 228 B.R. at 827 n.8 (Bankr. D. Del. 1999) (noting that "[a]lthough § 510(b) obviously covers defrauded shareholders' claims, as noted above, its purpose is not so limited" and that "Congress clearly intended that debenture purchasers (*i.e.,* creditors, not shareholders) having securities law claims also are to be subordinated to general unsecured creditors").

Here, the parties executed a "Debenture," and thus, the Trustee has argued, such Debenture is a "security" based on the plain language of sections 510(b) and 101(49)(A)(v).  Also, the Trustee has argued, Discover sought not repayment of a fixed debt over time, but instead, the benefits of stock ownership with the possibility of receiving a higher return on its investment, and hence, its claim must be subordinated under section 510(b).  The Trustee has argued further that the documents executed by the parties and that Discover's actions further confirmed that the Debenture is a "security" under section 510(b).  Appellant's Brief in Support of Appeal (Civ. Action No. 20-09469 ECF 16).

In opposition, Discover has argued, first, that its claim does not arise from a security as that term under the Securities Exchange Act of 1934 has been interpreted by the Supreme Court in Reves v. Ernst & Young, 494 U.S. 56 (1990) and S.E.C. v. W.J. Howey Co., 328 U.S. 293 (1946) and by other courts in other cases, based on the motivations of the parties, the plan of distribution of the instrument, the reasonable expectation of the investing public, and the status of the transaction as a "one time business transaction between sophisticated parties."  Brief in

Opposition to Plaintiff's Second Motion for Partial Summary Judgment (Adv. Pro. No. 19-02033

ECF 22) at 18-25.

Second, Discover has argued that the 2018 Transaction was a secured credit transaction

and not an equity purchase transaction. Id. at 25-37.

Third, Discover has argued that the decisions in which a court subordinated a claim under

section 510(b) are distinguishable from the present case. Id. at 28-33.

Fourth, Discover has argued that Immune's own public filings indicate and Fiorino and

Rabin testified that Immune owes a secured debt to Discover. Id. at 8, 26-27. More specifically,

Discover has noted, Fiorino, an officer of Immune, has testified that it was his understanding that

the Debenture was a debt instrument until it is converted to stock; and that when he signed the

Securities Agreement, he understood that Immune was granting to Discover a security interest in

Immune's assets other than the Ceplene assets. Decl. of Dale E. Barney in Opposition to Plaintiffs'

Motion for Partial Summary Judgment (Adv. Pro. No. ECF 9-2) Exh. A at 24:22-25 to 25:1-5,

31:12-25 to 32:1-15. Similarly, Discover has noted, Rabin, also an officer of Immune, testified

that it was his understanding that the Debenture represented a debt instrument until it is converted;

and that it was his understanding that Immune was granting a security interest in intellectual

property to Discover. Id. Exh. B at 30:20-25 to 31:1-2, 40:3-25 to 41:1-11.

Finally, Discover has argued that courts distinguish between "debt" and "equity" portions

of a claim, and here, Discover's claim arises from a debt instrument and not a claim for conversion

or stock purchase rights. Brief in Opposition to Plaintiff's Second Motion for Partial Summary

Judgment (ECF 19-02033 ECF 22) at 18, 25-28 (citing Official Comm. of Unsecured Creditors v.

Am. Capital Fin. Servs. (In re Mobil Tool Int'l. Inc.), 306 B.R. 778, 782 (Bankr. D. Del. 2004)

(holding that once investors exchanged stock for a promissory note, "they removed the variable nature of their investments and placed themselves in the position of general creditors")).

Perhaps more importantly, this Court itself has noted that the language of section 510(b) is not clear and that courts are divided in their interpretation of the statute.  In fact, as noted above, this Court has expressed reservations about the Trustee's position.

In sum, the Trustee's chances of success on this claim are uncertain.

## 2.    The Trustee's Declaratory Judgment Action Against Discover.

In the DGF Lien Adversary Proceeding, the Trustee seeks judgment determining that Discover's lien failed to attach to and as a result that Discover failed to perfect such lien in any commercial tort claims against the Former Directors and Officers and certain former attorneys of the Debtors; and avoiding any such security interest for the benefit of the Debtors' estates.  Am. Compl. (Adv. Pro. No. 21-01230 ECF 8).  Although the Trustee estimates that the probability of success is greater in this action because a sufficient description of commercial tort claims as collateral, which is required under the plain language of U.C.C. section 9-108(e), was arguably absent in the Securities Agreement, Discover has strenuously contested the Trustee's allegations by way of two Motions to Dismiss and an Amended Answer in which Discover denies the Trustee's allegations and raises several affirmative defenses.  Am. Answer (Adv. Pro. 21-01230 ECF 22).

Thus, success in the DGF Lien Adversary Proceeding is not assured for the Trustee. Further, even if he were to succeed in the action, the Trustee would still have to prevail on the Debtors' estates' claims against the Former Directors and Officers and the Debtors' former attorneys for a successful lien determination to have any effect.

**3.**      **The Trustee's Claims Against the Former Directors and Officers**

In the Chapter 7 Trustee Proposed D&O Complaint, the Trustee alleges the following claims against the Former Directors and Officers: (i) breach of duty of good care; (ii) breach of duty of loyalty; (iii) breach of duty of good faith; and (iv) deepening insolvency.  Am. Compl. (Adv. Pro. No. 21-01230 ECF 8) Exh. C.  The Trustee briefly addresses each claim.

The fiduciary duties of a corporate director or officer extend to creditors when the debtor is in the "zone of insolvency."  Wasserman v. Halperin (In re Classica Group), 2006 Bankr. LEXIS 2599, at *20 n.7 (Bankr. D.N.J. Sept. 29, 2006).  In order to establish a cause of action for a breach of fiduciary duty under New Jersey law, a plaintiff must show that the defendant had a duty to the plaintiff, that the defendant breached the duty, that the plaintiff suffered injury as a result of the breach, and that the defendant caused that injury.  Sofia Design & Dev. at South Brunswick, LLC v. D'Amore (In re D'Amore), 472 B.R. 679, 686 (Bankr. D.N.J. 2012).

Corporate directors and officers owe several fiduciary duties.  First, under New Jersey law, directors of a corporation must discharge their duties "in good faith and with that degree of diligence, care, and skill which ordinarily prudent people would exercise under similar circumstances in like positions."  Frost v. Adiletta (In re Teleservs. Group, Inc.), 2009 Bankr. LEXIS 5533, at *26-27 (Bankr. D.N.J. Jan. 15) (quoting N.J.S.A. 14A:6-14), aff'd in part and remanded in part, 2009 U.S. Dist. LEXIS 110200, at *20 (D.N.J. Nov. 24, 2009).

In assessing whether a director has breached this duty of care, courts apply a grossly negligent standard.  Id. at *29 (citing cases).  Under New Jersey law, gross negligence is defined as "behavior falling into the 'upper reaches of negligent conduct,' including behavior that demonstrates an 'indifference to consequences.'"  Id. at *50 (quoting Parks v. Pep Boys, 282 N.J. Super. 1, 17 n.6, 659 A.2d 471 (App. Div. 1995)).

Thus, the "business judgment rule," which ordinarily would protect fully informed corporate decisions made in good faith, does not apply to grossly negligent acts; acts tainted with fraud, self-dealing, or unconscionable conduct; or decisions which lack a business purpose or result from an obvious and prolonged failure to exercise oversight or supervision. Classica, 2006 Bankr. LEXIS 2599, at *23-24 (citing PSE&G Shareholder Litig. v. Codey (In re PSE&G Shareholder Litig.), 173 N.J. 258, 276-77 (2002); Resolution Trust Corp. v. Hovnanian, 1994 U.S. Dist. LEXIS 19359, at *20 (D.N.J. Oct. 13, 1994)).

Here, the Trustee believes that the Debtors' estates hold certain claims against the Former Directors and Officers for breach of their duty of care, based on the following allegations among others: (i) causing Immune to enter into the May Debentures and the Debenture and other obligations, long after Immune had become insolvent and when Immune, lacking revenue, could not possibly satisfy the obligations; (ii) causing Immune to fail to register a sufficient number of available shares to enable the full conversion of the Debenture into shares, which would have reduced for the benefit of creditors the amount of any obligation purportedly owed under the Debenture; (iii) negotiating for the sale of the Ceplene assets with Vector, an entity allegedly controlled by Teper, an insider, rather than exposing the assets to the open market and generating a fair recovery; and (iv) either allowing the transfer of the Bert assets to Ltd., which is Immune's subsidiary and the subject of an insolvency proceeding in Israel, or agreeing to allocate to the Israeli trustee half of the proceeds of the sale of the Bert assets, when a basis for such allocation may have been lacking. Am. Compl. (Adv. Pro. No. 21-01230 ECF 8) Exh. C.

Second, the duty of loyalty requires corporate directors to promote the best interests of the corporation and not to benefit themselves. Teleservs., 2009 Bankr. LEXIS 5533, at *29 (citing VFB LLC v. Campbell Soup Co., 482 F.3d 624, 634-35 (3d Cir. 2007)). Directors and officers

can breach the duty of loyalty in either of two ways: (i) self-dealing; or (ii) failure of oversight. Forman v. Gittleman (In re OpenPeak, Inc.), 2020 Bankr. LEXIS 3463, at *35 (Bankr. D.N.J. Dec. 14, 2020) (citing In re Midway Games, Inc., 428 B.R. 303, 318 (D. Del. 2015)).

The duty of loyalty requires an undivided and unselfish loyalty to the corporation and demands "no conflict between duty and self-interest." Teleservs., 2009 Bankr. LEXIS 5533, at *30 (quoting Guth v. Loft, Inc., 23 Del. Ch. 255, 5 A.2d 503, 510 (Del. 1939)). Thus, the duty prohibits a corporate director from engaging in self-dealing or usurping corporate opportunities. Ibid. It follows that the "business judgment" rule does not apply if self-dealing is shown. Id. at *30-31. Classic examples of director self-interest in a business transaction involve "either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally." Id. at *30 (quoting Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 362 (Del. 1993)).

Alternatively, "[f]iduciaries breach their duty of loyalty by intentionally failing to act in the face of a known duty to act, demonstrating a conscious disregard for their duties." Teleservs., 2009 U.S. Dist. LEXIS 110200, at *20 (quoting Bridgeport Holdings Inc. Liquidating Trust v. Boyer, 388 B.R. 548, 564 (Bankr. D. Del. 2008)).

Here, the Trustee believes that the Debtors' estates hold certain claims for breach of the duty of loyalty, based on the allegation that the Former Directors and Officers, by allowing Immune to become hopelessly insolvent, intentionally failed to act in the face of a known duty to act, and thereby demonstrated a conscious disregard for their duties. Also, more particularly, the Trustee alleges, rather than expose the Ceplene assets to the open market, the Former Directors and Officers openly negotiated with Teper, a former director and officer of Immune and a former

officer of a subsidiary of Immune, for the sale of the assets.  Therefore, the Trustee alleges, the Former Directors and Officers breached their duty of loyalty to Immune.

Third, directors must exercise their corporate duties in good faith.  Teleservs., 2009 Bankr. LEXIS 5533, at *31 (citing N.J.S.A. 14A:6-14; Riddle v. Mary A. Riddle Co., 140 N.J. Eq. 315, 54 A.2d 607 (Ch. 1947)).  "The behavior that must be shown to prove a violation of the duty to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)."  Perkins v. Arif (In re Innovation Fuels, Inc.), 2013 Bankr. LEXIS 3041, at *27 (Bankr. D.N.J. July 22, 2013) (quoting In re Fedders N.A., Inc., 405 B.R. 527, 540 (D. Del. 2009)).  "[A] failure may be shown where the director intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."  Ibid.

Here, for the reasons set forth above, the Trustee alleges that the Former Directors and Officers consciously disregarded their duties to Immune, and in so doing, they breached their duty of good faith.

Finally, the Third Circuit has defined the concept of "deepening insolvency" as "an injury to [a debtor's] corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life."  Forman v. Salzano (In re Norvergence, Inc.), 405 B.R. 709, 753 (Bankr. D.N.J. 2009) (quoting In re CITX Corp., Inc., 448 F.3d 672, 677 (3d Cir. 2006)).  "The injury is premised upon the notion that 'the acquisition of debt by an insolvent corporation can harm the corporation as well as its creditors by making it more difficult for the corporation to run a profitable business without resorting to bankruptcy.'"  Id. at 753-54 (quoting Alberts v. Tuft (In re Greater Southeast Community Hosp. Corp.), 353 B.R. 324, 335 (Bankr. D.D.C. 2006)).  "An increased debt load also forces companies to expend their resources in the repayment of debt, thereby heightening the risk

of corporate dissolution through the bankruptcy process." <u>Id.</u> at 754.  In <u>Norvergence</u>, the Bankruptcy Court held that the Supreme Court of New Jersey would recognize deepening insolvency as an independent cause of action.  <u>Id.</u> at 758-59.

Here, as noted above, the Trustee alleges that the Former Directors and Officers caused Immune to continue to fraudulently incur obligations, including the May Debentures, the Debenture, and millions of dollars of other obligations, with which Immune could not possibly comply.  Thus, the Trustee asserts a claim for deepening insolvency against the Former Directors and Officers.

While the Trustee has not yet filed the Chapter 7 Trustee Proposed D&O Complaint, the Former Directors and Officers have indicated that they would vehemently dispute and deny all claims and would raise, among other legal and factual arguments, the following arguments in opposition to the Trustee's position: (i) the Certificate of Incorporation for Immune contains an exculpatory clause eliminating liability for breach of fiduciary duty claims to the corporation and its shareholders; (ii) in entering into the Debenture and related documents, they relied in good faith upon the advice of Immune's legal counsel, and thus, they cannot be held liable under New Jersey law; (iii) the claims have no merit based upon the facts; (iv) Immune was not insolvent at the relevant times; and (v) the business judgment rule protects them from liability.

Based upon the foregoing, any litigation against the Former Directors and Officers poses risks, and thus, the Trustee's prospects for success are not assured here either.

### 4.    <u>Securities Fraud Allegations Against Discover.</u>

Discover has advised the Trustee that before and for a period after the filing of its petition, Immune, by and through certain former directors and officers and its former attorneys, made certain accusations against Discover, including claims that Discover was engaged in unspecified acts of securities fraud and that Discover was required to register as a dealer under federal

securities laws.  These allegations, if true, could arguably constitute affirmative defenses to enforcement of the Debenture and to Discover's claims against Immune and the Former Directors and Officers.

The existence and nature of these accusations presented a significant impediment to Discover's acceptance of the settlement.  That is, Discover maintained that it could not, and would not, enter into a settlement that might create a potential perception that there is validity to the allegations made against it.  In Discover's view, a party waiving millions of dollars in potential recovery as part of a settlement in order to buy its "peace" cannot risk that the settlement would create either a misperception that the claims against it had any possible merit or the possibility that any third parties not in privity could again raise the same claims.  As such, Discover insisted, as a condition of settlement, that the order of this Court approving the settlement include consideration and a determination of the lack of probability of success on these claims.

This section addresses the allegations of securities fraud.  More specifically, Discover has advised the Trustee that Immune, by and through certain former directors and officers and its former attorneys, alleged that Discover made false statements of material fact or failed to disclose material facts concerning the financing agreements.  See 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 CFR § 240.10b-5.  According to Discover, these allegations lack merit for several reasons. First, Discover points out that the allegations failed to refer to any specific misrepresentation or omission, and therefore, any such claim against Discover would fail under Federal Rule 9(b). ScripsAm., Inc. v. Ironridge Global LLC, 119 F. Supp. 3d 1213, 1243–44 (C.D. Cal. 2015).

Second, Discover notes that its conduct in connection with the 2018 Transaction fails to qualify as deceptive or manipulative because all of the terms were set forth in the Debenture, the Securities Agreement, and the other documents between the parties and because Immune disclosed

the material terms of the deal in its Securities Exchange Commission ("SEC") filing.  Id. at 1234

("[T]he manner in which the adjustment mechanism was to operate was fully disclosed in the

parties' agreement and stipulation, which included a merger clause that cut off any right to rely on

prior oral representations; [defendant] thus did not conceal the adjustment mechanism from

[plaintiff].").

Third, Discover maintains that while Immune had a disclosure obligation regarding the

2018 Transaction and it made such disclosure in its public Form 8-K filing with the SEC,[1] S.E.C.

v. Chester Holdings, Ltd., 41 F. Supp. 2d 505, 526 (D.N.J. 1999), a third party, such as Discover,

which merely entered into a contract described in a public report, is not liable for any material

misrepresentations or omissions made by the filer in its disclosure in the report.  S.E.C. v.

Dauplaise, 2006 WL 449175, at *7, 2006 U.S. Dist. LEXIS 9589, at *26-27 (M.D. Fla. Feb. 22,

2006).  Thus, Discover maintains that as the purchaser and not the issuer of the Debenture, it had

no obligation to make any public disclosure regarding the 2018 Transaction, and thus, it could not

have engaged in securities fraud.

Fourth, insofar as Discover sold into the public markets shares of Immune that it received

after it converted a very small portion of the Debenture, Discover asserts that it took steps,

including directing trades to alternative trading systems to avoid disclosing its selling strategies to

the market, to minimize the negative impact.  Such selling of shares obtained at a discount does

not constitute market manipulation.  GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 207 (3d

Cir. 2001); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 106 (2d Cir. 2007) (holding

---

[1]A copy of the Form 8-K is available at:
https://www.sec.gov/Archives/edgar/data/1208261/000114420418053234/0001144204-18-053234-index.htm

that purchasing a convertible security, even when coupled with selling, is not inherently manipulative).

Finally, Discover points out that its sale of $530 of conversion shares through standard brokerage accounts is not unlawful, even if such activity causes the price of the stock to decline substantially and more shares to be issued and sold.  Sedona Corp. v. Ladenburg Thalmann & Co., 2009 WL 1492196, at *5, 2009 U.S. Dist. LEXIS 44748, at *26-30 (S.D.N.Y. May 27, 2009); see also ATSI Commc'ns, 493 F.3d at 101; ScripsAm., 119 F. Supp. 3d at 1239-40.  An investor cannot be liable for securities fraud absent a showing of specific facts that prove *scienter*, *i.e.*, that it wrongfully intended to fraudulently manipulate the market for its benefit.  Sedona, 2009 WL 1492196, at *5, 2009 U.S. Dist. LEXIS 44748, at *26-30.  That is not possible, however, when, as here, there was a contractual formula in place that permitted a party like Discover to convert a debenture and sell the conversion shares.  Id.

Therefore, Discover argues, any allegations of securities fraud would not succeed on the merits.

### 5.    Dealer Registration Allegations Against Discover.

Discover has advised the Trustee that Immune, by certain of its former directors and officers and its former attorneys, alleged further that Discover was required to register as a dealer under the Securities Exchange Act.  15 U.S.C. § 78o(a)(1).  Discover submits that these allegations likewise lack merit.  Under the plain language of the statute, a "dealer" does not include "a person who buys or sells securities for its own account . . . , but not as a part of a regular business."  15 U.S.C. § 78c(a)(5)(B).  The primary meaning of the term "regular" is "usual; normal; customary" or "confirming to or governed by an accepted standard of procedure or convention." Dictionary.com (2021), New Oxford American Dictionary 1470 (3rd ed. 2010).  Moreover, the term "regular business" as used in section (a)(5)(B) means "the regular business of providing

dealer services to others . . ., such as soliciting investor clients, handling investor clients' money and securities, [and] rendering investment advice to investors." Chapel Invs., Inc. v. Cherubim Interests, Inc., 177 F. Supp. 3d 981, 990 (N.D. Tex. 2016). These types of services "distinguish the activities of a dealer from those of a private investor or trader." In re Sodorff, 50 S.E.C. 1249, 1992 WL 224082, at *5 n.27, 1992 S.E.C. Lexis 2290, at *18 n.5 (Sept. 2, 1992).

Put differently, "[d]ealers are distinguished from investors and traders because they have customers and derive their income from marketing securities for sale to customers or from being compensated for services provided as an intermediary or market-maker." See Topic No. 429 Traders in Securities, https://www.irs.gov/taxtopics/tc429; Louis Loss & Joel Seligman, Fundamentals of Securities Regulation, Ch. 8A(b) The Dealer-Trader Distinction, pp. 814-15 (2004). "[Dealers] effect securities transactions for customers, for which they typically charge a commission or other transaction-based fee." XY Planning Network, LLC v. United States S.E.C., 963 F.3d 244, 248 (2d Cir. 2020). Indeed, the primary purpose of the registration requirement is to protect the broker or dealer's clients. Roth v. S.E.C., 22 F.3d 1108, 1109 (D.C. Cir. 1994). See also S.E.C. v. Big Apple Consulting USA, Inc., 783 F.3d 786, 809 (11th Cir. 2015) (holding that consulting and public relations service providers who depended on acquiring client stock and selling that client stock to fund operations and earn a profit were appropriately found to have acted as dealers).

Thus, whereas an investor or trader may buy securities from issuers at substantial discounts and resell them into the public market for immediate profit, a dealer buys and sells securities from its customers and to its customers. See C.H. Meyer, Law of Stock Brokers and Stock Exchanges § 43-a, at 33-34 (Supp. 1933). Put simply, because institutional investors do not have individual customers, they cannot be dealers. Id.

Finally, use of the plain language "part of" a regular business in the Act demonstrates that "a dealer must be engaged in the securities business, and be buying and selling for his own account." Sodorff, 1992 WL 224082, at *5.  Otherwise, if an entity which only buys and sells securities could be a dealer, the statute would refer to "all or part of" rather than "part of" a business. See, e.g., 11 U.S.C. § 1322(b)(8) (referring to "all or part of" a claim); 18 U.S.C. § 1955(a) (referring to "all or part of" a business).  See also National Council of Savings Institutions (S.E.C. No-Action Letter), 1986 WL 67129, at *2 (July 27, 1986) (describing the list of factors that make someone a trader rather than someone "engaged in the business" of buying and selling securities as a dealer).

Here, Discover submits that it is an investment fund, not a dealer.  Discover does not provide dealer services, does not solicit investor clients, does not handle investor clients' money or securities, and does not render investment advice to investors.  Thus, Discover has no clients or investors.  And in the 2018 Transaction in particular, Discover merely purchased a convertible Debenture for its own account and converted only $530 of the Debenture and sold the conversion shares through a brokerage account.  Discover had no customers in connection with the 2018 Transaction.  Thus, Discover maintains that it is not a dealer.

Therefore, Discover argues, any allegations regarding registration requirements would not succeed on the merits.

### 6.    Conclusion.

In sum, as to all of these actions or potential actions, while the Trustee believes that he has certain valid claims, the defending parties believe that they have meritorious defenses.  Thus, one can only speculate as to the Trustee's probability of success.  At the very least, one can conclude that the prosecution of each of the Trustee's claims is not without risk, and in some instances,

significant risk.  In fact, were he to proceed with litigation, the Trustee would face the possibility

that he would make no recovery whatsoever on any of the claims.

**B.**     **Possible Difficulties in Collection Is Not a Factor.**

Difficulty in collection is not a factor in this case to the extent that the Insurer has

comprehensively insured the potential liability of the Former Directors and Officers to the Debtors'

estates under the Policy, and to the extent that the Trustee can obtain only declaratory relief against

and not an affirmative recovery from Discover.

But to the extent that the Policy does not cover any and all potential liability of the Former

Directors and Officers, including liability for conduct not protected under the business judgment

rule, or for individual liability in the Avoidance Actions, the Trustee would face possible

difficulties in the enforcement and collection of any judgment from one or more of the Former

Directors and Officers.  The location of a defendant out of state poses an obstacle to collection.

See, e.g., In re McDermott, 2008 Bankr. LEXIS 968, at *17-18 (Bankr. D.N.J. Mar. 27, 2008)

(approving trustee's motion to approve settlement of state court action in part because "[t]he

Trustee further contend[ed] that the probability of success and the ability to collect on a judgment

in the State Court Action [we]re very problematic" where "the Defendants are Florida residents

and the ability to collect on any judgment there is unlikely," and thus, "any further litigation,

instead of implementing the proposed settlement, would extend the length of the Debtors'

bankruptcy case considerably with little assurance of an unsecured creditor recovery").

Here, certain Former Directors and Officers , including Kazado, a resident of Israel, reside

outside of New Jersey.  Am. Compl. (Adv. Pro. No. 21-01230 ECF 8) Exh. A ¶¶ 6-11.  The location

of some of the defendants out of state presents possible difficulties in enforcement and collection

for the Trustee.  Thus, insofar as it is relevant, this factor militates in favor of settlement.

**C.**     **The Complexity, Expense, Inconvenience, and**
       **Delay Associated with Litigation Favor Settlement.**

The complexity, expense, inconvenience, and delay associated with litigation militates in favor of approval of the settlement for the following reasons.

First, each of the claims at stake is complex.  For starters, as this Court is aware based on the long procedural history of the case, the Trustee's DGF Adversary Proceeding against Discover implicates not only the matter of securities and how they are defined, but also a Code section that has generated very little case law.  Similarly, the Trustee's DGF Lien Adversary Proceeding against Discover requires the application of Article 9 of the U.C.C., hardly a subject renowned for its simplicity.  Next, the Trustee's Breach of Fiduciary Duty claims against the Former Directors and Officers rely upon a complicated set of facts involving sophisticated financial transactions made in the biopharmaceutical industry.  Finally, even the Avoidance Actions may require advanced analysis, depending on the arguments raised.

Second, this case has been pending for over two and a half years, during which the Debtors' estates have engaged in costly, protracted litigation, in the DGF Adversary Proceeding against Discover in particular.  Thus, litigation has *already* proven expensive, especially for bankruptcy estates that currently have only *de minimis* unencumbered assets.  Further, the Trustee's prosecution of his claims has essentially only started.  In the first place, the Trustee has not yet even filed a complaint against the Former Directors and Officers.  Also, in the Avoidance Actions and in the DGF Lien Adversary Proceeding, the parties have yet to commence discovery.  And even in the DGF Adversary Proceeding, the parties have engaged only in paper discovery thus far; no depositions have yet been conducted. Lester Certif. ¶ 7.  Therefore, in the absence of settlement, the estates would only continue to incur significant expense.

Finally, given the state of discovery, it may well be years before all of the pending actions, including anticipated appeals, are concluded.  Thus, continued litigation would only cause further delay and inconvenience.  In contrast, if the settlement is approved, not only will the actions be concluded with finality, but the underlying bankruptcy cases can be fully administered and closed more quickly.  Excluding the actions which are the subject of the settlement, only the following matters will be left in the bankruptcy cases: (i) the prosecution of a single avoidance action not involving the Former Directors and Officers; (ii) the sale of any remaining intellectual property; (iii) the prosecution of the estates' claims against the Debtors' former attorneys; and (iv) the resolution of the estates' claim against the Ltd. insolvency estate in Israel.  Lester Certif. ¶ 8.  Hence, following approval of the Settlement Agreement, it is possible that the Trustee can fully administer the estate within a year.  Ibid.  Also, the proceeds generated from the settlement could help fund these extant tasks.

Accordingly, all of these factors favor settlement.

**D.**     **The Paramount Interest of Creditors Favors Settlement.**

Under the Settlement Agreement, Discover's claim, which has been asserted in the amount of $15,874,977.38, will be reduced to $4 million and satisfied in full and its lien on the Debtors' remaining assets will be released.  Following the payment of Discover's $4 million claim, these assets will include: (i) the Trustee's recovery of $2.1 million from the Insurer on account of the Debtors' estates' alleged claims against Immune's directors and officers; (ii) the estates' recovery, in the projected amount of between $600,000 and $1 million, on account of its claim against the Ltd. insolvency estate in Israel; and (iii) the estates' claims against the Debtors' former attorneys.  Lester Certif. ¶¶ 5(iii), 8.  And in the process, all parties to the Settlement Agreement will release their claims against each other, and as a result, all of the litigation involving such claims will cease.  Id. ¶ 5(viii-x).

In the alternative, if the settlement is not approved, the Debtors' estates would face the prospect of prosecuting the estates' actions not only through trial, but also appeals, when the Debtors' estates do not even have resources to pay for litigation, and with no certainty of any success in the actions, and given the out of state residency of some defendants, no certainty of any recovery even if the Trustee does succeed.

Thus, the settlement provides a certainty of proceeds to be available for distribution to the creditors of the Debtors' estates, without undertaking the risk, cost, expense, inconvenience, delay, and uncertainty of potential future litigation.

Therefore, based on the four <u>Martin</u> factors, consisting of the risk and lack of certainty of success in litigation; the possible difficulties in collection; the complexity, expense, inconvenience, and delay associated with litigation; and the paramount interests of creditors, the Trustee respectfully submits that, in his good faith business judgment, the proposed settlement represents the best possible outcome for the Debtors' estates and easily falls within the lowest range of reasonableness required for such a settlement.   Accordingly, the Trustee respectfully requests that this Court approve the Settlement Agreement in all respects.

<u>**CONCLUSION**</u>

The Trustee respectfully requests that this Court grant his Motion for Approval of the Settlement and Mutual Release Agreement and grant in favor of the Trustee such other relief as is just.

Date: November 9, 2021                    **RABINOWITZ, LUBETKIN & TULLY, LLC**
                                          Attorneys for Jeffrey A. Lester, Chapter 7 Trustee


                                          By: /s/ Jonathan I. Rabinowitz
                                              JONATHAN I. RABINOWITZ